UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

        Plaintiff,

    vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

        Defendant

Civ. A. No. 17-12472-DLC

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION TO COMPEL**

PRELIMINARY STATEMENT

Dr. Luigi Warren ("Warren") seeks a copy of the licensing agreement between IDI, the predecessor in interest of The Children's Hospital Corporation ("BCH," or "the Hospital") and Moderna Therapeutics, Inc. ("Moderna"). In this memorandum, we explain why the document is irrelevant to any party's claim or defense and therefore need not be disclosed. We do not respond to every statement Warren makes in his motion, particularly erroneous statements about supposed motives, bad faith, and so forth. We do, however, provide a high-level overview of the dispute, and although we need offer no rationale for refusing to produce irrelevant documents in discovery, we explain the reasons why the Hospital regards the licensing agreement as confidential and proprietary, particularly given Warren's current business venture.

FACTS

A.      Overview of the Dispute.

Warren was employed by the Immune Disease Institute ("IDI") as a post-doctoral researcher in a lab run by Dr. Derrick Rossi. Rossi and Warren were the co-inventors of a new technology that used modified RNA to change the phenotype of human cells.

Like most nonprofit research institutions, IDI had policies providing for sharing licensing revenue with its scientists if IDI licensed intellectual property created by its scientists to third parties. These policies are in the institutions' interest, because they help to attract and retain top talent who might otherwise go to work in the private sector, and because they provide some financial incentive for creative and inventive work. The policies are also in the scientists' interests, for the same reasons. The policies also typically provide for sharing royalties with the relevant laboratories or others. IDI's policy was of this kind, and it expressly provided that management could amend the policy from time to time.

In 2008, IDI and the Hospital began to work towards a merger. They (or more precisely, IDI and the Hospital's sole member, The Children's Medical Center Corporation) entered into an affiliation agreement in contemplation of the eventual merger. The affiliation agreement provided that at the Effective Time, which was February 20, 2009, IP rights that had not yet been licensed would be subject to the Hospital's policies for intellectual property rather than IDI's policies.

IDI licensed the intellectual property that resulted from Warren's and Rossi's work in late 2010. IDI and the Hospital consummated their merger in 2012, by which time Warren had left— he never became a BCH employee. Since 2009, the Hospital has been applying its own policies on revenue sharing not just to the Moderna license transaction, but to other transactions, and not just to Warren, but to Rossi, who did become a BCH employee after the merger. In fact, at

Rossi's request, the Hospital agreed to apply a policy to the Moderna transaction that is *more* favorable to Rossi—and to Warren—than the generally applicable Hospital policy.

The main dispute in this case is about whether the Hospital had an obligation to apply the IDI policy to determine the royalties to be shared with Warren. This dispute raises several issues: is the IDI policy, or the Hospital's policy, contractual, or is it instead a policy that the institutions choose to apply and can cease to apply or modify? If these policies are contracts, does the IDI policy still apply to Warren?

Warren has raised a second claim, relating to equity the Hospital obtained from Moderna as part of the consideration for the license. Warren claims that he should have received shares of Moderna stock at the time the Hospital received the stock, rather than at the time the Hospital sells the stock, as the Hospital asserts is customary. This claim raises the same issues that arise in connection with the main claim, but some additional issues as well: *could* the Hospital permissibly transfer shares to Warren if it wished? How is the language of the IDI policy to be construed (assuming the policy applies at all), both on its face and in light of industry custom and practice?

As we explain below in more detail, in this action Warren seeks two things: (1) a declaration "that the defendant is bound by the express promises in the Net Proceeds section of the IDI inventions policy" and (2) an injunction "requiring the defendant to distribute licensing proceeds in accord with these obligations in a timely and well-documented fashion."

B.     The Document Is Highly Sensitive.

The Hospital's concerns about disclosing the License Agreement to Warren are heightened because Warren, according to publicly available information, is the principal of Cellular Reprogramming, Inc., a California corporation. (MacIver Decl. Ex. 1). According to its website, Cellular Reprogramming is in the business of "reprogramming" cells using mRNA to

create what it calls "induced pluripotent stem cells." (MacIver Decl. Ex. 2). We do not have

detailed insight into Warren's business, but it is apparently related in its general subject matter to

the work Warren did at IDI that led to the invention licensed to Moderna. In other words, Warren

appears to be working in the field, and sharing the detailed commercial terms of the Moderna

deal with him would be akin to sharing the terms with a competitor. Moreover, the Moderna

License Agreement requires Moderna's prior written consent before disclosure to any third party.

In an ordinary case—and if the License Agreement were relevant and subject to discovery—the

Hospital could deal with the problem by producing the document on an "attorneys-eyes-only"

basis,[1] but that is not possible here, as Warren is acting *pro se.*

ARGUMENT

The Hospital has objected to production of the License Agreement on grounds of

relevance. A document can be obtained in discovery only if it is "relevant to any party's claim or

defense." Fed. R. Civ. P. 26(b)(1). The Court must, therefore, look to the "actual claims and

defenses involved in the action." Fed. R. Civ. P. 26(b)(1) advisory committee note (2000). It is

Warren's burden to show relevance. *See United States v. IBM Corp.,* 66 F.R.D. 215, 218

(S.D.N.Y. 1974).

A.      The Claim Is For A Declaration That The Hospital Must Follow The IDI Policy and for
        an Injunction Directing It To Do So, Not For Damages or Any Other Remedy.

Warren's complaint seeks only forward-looking relief. In particular, he seeks (1) a

declaration "that the defendant is bound by the express promises in the Net Proceeds section of

---

[1] *See, e.g., Adm'rs of the Tulane Educ. Fund v. Cytogel Pharma, LLC,* 2018 U.S. Dist. LEXIS 71937, at *4 (E.D. La. Apr. 30, 2018) (where defendant was a potential competitor in the marketplace, court ordered license agreement to be produced in its entirety on an attorney's eyes only basis and in a redacted version to the defendant); *Blue Gentian, LLC v. Tristar Prods.,* 2017 U.S. Dist. LEXIS 193748, at *6 (D.N.J. Mar. 21, 2017) (same).

the IDI inventions policy" and (2) an injunction "requiring the defendant to distribute licensing proceeds in accord with these obligations in a timely and well-documented fashion." (ECF 1 at 5). He is not seeking damages or any other legal or equitable remedy.

Thus the concerns Warren raises are not really at issue in this case. He suggests, for example, that if the Court were to find that "equity should have been distributed to [him] on receipt, e.g., at the time of the 2010 licensing agreement, specific performance in the form of a transfer now might not recoup the economic injury because the low tax basis of the startup equity has been lost." (ECF 30 at 3). He suggests that the Court could award him damages "to compensate for the high tax burden." (Id.). But he is not seeking damages, so this reasoning and suggestion is neither here nor there.

Warren also suggests that the Court might declare that the failure to transfer the equity to him earlier "was the result of error." (Id. at 4). He suggests that if the Court's judgment contained such a declaration, the IRS might find that he had constructively received the shares earlier, and he would obtain tax advantages (assuming that he uses cash basis accounting). Again, Warren's complaint does not seek such a declaratory remedy, and Warren does nothing more than speculate about how the IRS might treat such a declaratory judgment. But in any event, there is no way the Court could find that the Hospital had erroneously or mistakenly failed to give Warren the shares such that he constructively received them. Contrary to Warren's suggestion of error or oversight, the Hospital *intentionally* did not transfer the shares to Warren when received, because its policy is to distribute the proceeds of the sale of stock, not the shares of stock themselves, to inventors. If an employer wrongfully withholds wages, and the employee sues to recover them, the employee is taxed on the income when the wages are paid, not when they should have been paid.

Warren cites *United States v. Fort,* 638 F.3d 1334 (11th Cir. 2011), a case where an employee had received restricted shares from his employer, which were put in an escrow account and subject to forfeiture on certain conditions. The question was whether, under IRS regulations, the employee had constructively received the shares when they were put in escrow. The regulation in question provides:

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Thus, if a corporation credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.

26 C.F.R. § 1.451-2(a).

Unlike in *Fort,* here the Hospital has not segregated shares for Warren, Rossi, or anyone else who will eventually receive the proceeds of their sale. The shares are held by the Hospital and in its name, as shown in the stock certificate produced in discovery. (BCH616-617). Unlike in *Fort,* Warren has none of the indicia of control over the shares such as dividends and voting rights. Warren had no right to "draw upon" the equity. Indeed, this case is about the Hospital's refusal to give him Moderna stock on his demand.

In any case, the documents produced in discovery, including the stock certificate evidencing the shares (BCH616-617), the Stock Purchase Agreement (BCH1179-1186), and the Certificate of Incorporation as amended (BCH678-787), have been produced in discovery and provide Warren with information relevant to questions about the permissibility or feasibility of transferring shares rather than the proceeds of the sale of shares to Warren—for example, restrictions contained in the legend on the stock certificate; rights of first refusal in the other

documents—though of course whatever legal conclusions Warren chooses to draw from the facts are entirely up to him.

B.      A License Agreement Will Contain No Relevant Representations.

Warren speculates that the License Agreement may contain representations by the Hospital that might somehow be relevant to his case. He does not appear to offer any possible examples. A licensing agreement typically may include representations that the licensor owns the intellectual property being licensed or even that the invention was a work for hire. *See, e.g.,* 3 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Licensing* §§ 23.03-23.04 (rev. ed.). But such representations would do nothing to help or hurt Warren's case. The licensee wants to know that the licensor has the power to convey the license. The licensee has no interest in what the licensor does with the licensing revenue, and thus typically there are no representations on that topic.

In fact, the Moderna License Agreement (which the Hospital is prepared to provide to the Court *in camera* if the Court wishes) contains no relevant representations. It has standard representations about corporate existence, authority to contract, etc., and standard representations that IDI owns the licensed IP, that the IP is free of liens, and that IDI has no knowledge of claims of invalidity or of infringing activities. None of this is relevant to Warren's case.

C.      The Fact That There May Be Periodic Royalty Payments In The Future Gives No Basis For Discovery of the License Agreement.

Warren observes, correctly, that under the License Agreement—as under most license agreements—there may well be royalty payments from Moderna to the Hospital well into the future. He says that without the License Agreement, he has "no way of proving to the Court that this potential exists in the absence of the license agreement." (ECF 30 at 5). His argument seems to be that the Hospital might argue that injunctive relief is inappropriate unless he can show a

"likelihood the underlying dispute could entrain multiple time-consuming court actions owing to a recurrent obligation." (ECF 30 at 4).

But the Hospital does not make that argument. Subject to all appeals, if the Court should determine that Warren is entitled to the percentage of the licensing revenue set out in the IDI Policy, then the Hospital will pay him that percentage. This dispute is not about the Hospital's refusal to pay Warren his share of licensing revenue under a policy that all agree applies. It is about who is right about which policy the Hospital should apply to determine the revenue to be shared with Warren. The entire dispute will be resolved in one decision. This is not a case, for example, where a debtor owes a stream of payments due over time and requires the creditor to sue for each payment in turn when it becomes due.

<u>CONCLUSION</u>

Because the License Agreement is not relevant to any claims or defenses in this case, the motion to compel must be denied.

<u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to L.R. 7.1(d), the Hospital requests oral argument on this motion.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:


*/s/ Andrea L. MacIver*
Theodore J. Folkman (BBO No. 647642)
Andrea L. MacIver (BBO No. 569280)
MURPHY & KING, PC
One Beacon Street
Boston, Massachusetts  02108
(617) 423-0400
tfolkman@murpyking.com
amaciver@murphyking.com


Dated: September 14, 2018

<u>CERTIFICATE OF SERVICE</u>

I certify that this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the NEF and that paper copies will be sent to this indicated as non-registered participants on September 14, 2018.

*/s/ Andrea L. MacIver*
Andrea L. MacIver