LUIGI WARREN,

       Plaintiff,

  vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

       Defendant

Civ. A. No. 17-12472-DLC

## MEMORANDUM IN SUPPORT OF DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Dr. Luigi Warren, a biologist who worked in the Rossi Lab at the Immune Disease Institute, is the co-inventor (with Dr. Derrick Rossi) of a breakthrough technique for using messenger RNA to cause human cells to become pluripotent stem cells—cells that can develop into any kind of cell in the body and that hold great therapeutic promise. IDI licensed the invention to Moderna Therapeutics, then a start-up Cambridge-based biotechnology company, and it later merged with Boston Children's Hospital, which stepped into the position of licensor. Dr. Warren has received some royalties already under the Hospital's policy for sharing licensing revenues with inventors, and he stands to receive a significant sum of money now that Moderna has made its initial public offering and now that the Hospital will sell the Moderna shares it (or rather IDI) received under the terms of the license.

But Dr. Warren asserts that the Hospital has wronged him, for two basic reasons. First, he claims that the Hospital should have calculated the percentage of the revenue it paid to Dr. Warren based on IDI's policy rather that the Hospital's own policy. Second, he claims that the

Hospital should have given him shares of Moderna stock at some unspecified point in the past, rather than simply agreeing to give him his share of the proceeds of the sale of the stock.

In fact, the Hospital has treated Dr. Warren with complete fairness, and just as it has treated other inventors. More to the point, Dr. Warren's claim necessarily fails on the undisputed facts. In this memorandum, we show that IDI's policy was not a contract at all, but simply an IDI policy that IDI could modify unilaterally and at will. That is enough to resolve the case. But we also show that IDI's modification of the policy and its adoption of the Hospital's policy at the time of the affiliation of the two institutions is dispositive; and that Dr. Warren cannot make out a case for promissory or equitable estoppel, even though the Hospital did, regrettably, mistakenly, and long after the fact, tell Dr. Warren that the IDI policy applied.

We give additional reasons why Dr. Warren's claim for an injunction requiring a transfer of the stock must fail in any case. Now that Moderna has made its IPO and its stock is trading publicly, the claim for an injunction is moot because there no longer any irreparable injury and a damages remedy, which Dr. Warren has expressly disclaimed, would be adequate. The theory Dr. Warren has advanced to explain why he would have been better off had he received the stock at some time in the past is wrong on the substance of the tax law. And the IDI policy itself, even treated as a contract, would not require transfer of the shares.

In summary, Dr. Warren did outstanding scientific work while employed by IDI. The invention he and Dr. Rossi created has been licensed to a company that everyone hopes will be able to commercialize the invention for the benefit of the public. The Hospital has recognized Dr. Warren's important contribution by treating him just like it treats all inventors in its employ and by sharing revenues with him in accordance with its policies. On the undisputed facts, the Hospital is entitled to judgment as a matter of law. The Court should grant this motion and enter a summary judgment in the Hospital's favor on all claims.

A.    <u>Drs. Warren and Rossi Make A Key Discovery At IDI's Rossi Lab.</u>

Luigi Warren, Ph.D., is a biologist who worked as a post-doctoral research in the Rossi Lab, headed by Dr. Derrick Rossi, from 2007 to 2010. (Statement of Undisputed Material Facts, ("SUMF") ¶ 3). The Rossi Lab is now a part of BCH, but in 2007, as described below in more detail, it was a part of the Immune Disease Institute ("IDI"). In Dr. Warren's time at the Rossi Lab, he and Dr. Rossi invented a new and important technique for "reprogramming" cells in order to induce them to become pluripotent stem cells. These induced pluripotent stem cells have many potential uses in research and therapies. At the time, there were known techniques for creating induced pluripotent stem cells. For example, Dr. Yamanaka had invented a technique that injected cells with a virus that would carry "genes associated with the embryonic state" into a cell and integrate those genes with the cell's genome, so that after a few weeks in which the cell expressed the proteins coded by those genes, the cell would "regress to [the] embryonic state." (*Id.* ¶¶ 21-22). But these known techniques had problems. Techniques that modified the genome carried with them a risk of cancer. (*Id.* ¶ 23). Drs. Warren and Rossi made an important advance by using messenger RNA ("mRNA") to cause cells to express the proteins that would cause them to regress to the embryonic state. (*Id.*). The main advantage of this technique is that mRNA is short-lived, and after the cell had been reprogrammed, the scientists simply stopped injecting it into the cells. Thus there was no risk of cancer, as there was when the genome of the cell was altered to include the genes for producing the necessary proteins. (*Id.* ¶ 25). It is this groundbreaking technique—or rather, the consequences of the commercialization of the technique—that is at issue in this case. Dr. Warren's work for most if not all of the time he was in the Rossi Lab was relevant to the invention.  He and Dr. Rossi submitted their invention disclosure to IDI on or about May 20, 2010 (*Id.* ¶ 26), though Dr. Rossi may have informed

IDI's technology transfer office about their work to date orally August 2008. (*Id*.). The timing is ultimately unimportant to this motion, because the date that the Hospital uses to determine what percentage of licensing revenues it will share with inventors is the date of the license agreement, which postdated not just the written invention disclosure but Dr. Warren's departure from IDI. (SUMF ¶ 3).

B.    Background to Technology Transfer.

Hospitals and universities that do basic research typically lack the capacity to turn their scientists' research into drugs or other products that can be sold in the market. They therefore typically license their intellectual property to commercial firms that are in a better position to bring the products that result from the research to market. *See generally* 3 *Eckstrom's Licensing in Foreign & Domestic Operations* §§ 11:2-11:8. To carry out this licensing program, research institutions establish technology transfer offices. *See id.* § 11:28.

Under the Bayh-Dole Act, 35 U.S.C. §§ 200 *et seq.,* even intellectual property resulting from federally-funded research (much basic science research receives federal funding) can be licensed to private companies for purposes of commercialization in this way. The Act requires institutions that receive federal funding regarding an invention to "share royalties with the inventor," 35 U.S.C. § 202(c)(7), though the statute does not specify the amount or percentage that must be shared. The work Drs. Rossi and Warren did was not federally funded (SUMF ¶ 12), and thus the statute does not apply. After the enactment of the Bayh-Dole Act, however, many institutions, including IDI and BCH, adopted policies that provided for the sharing of royalties with inventors regardless of the source of the funding for the research in question. (*Id.* ¶ 13). IDI's policy, embodied in its Research and Technology Policy dated October 28, 2004 ("the IDI Policy"), was that it would share one-third of the licensing revenue with inventors. (*Id.* ¶ 16).

The IDI Policy also provided that IDI's trustees "retain the discretion to amend this policy from time to time." (SUMF ¶ 17).

We show in this motion that IDI's and BCH's policies for sharing revenue with inventors are not contractual. In a case like this, where there is no statutory requirement to share revenue, and where there is no contractual obligation, why do sophisticated institutions share revenues anyway? The question almost answers itself. Institutions like BCH and IDI have a mission of doing basic research with the aim of making scientific discoveries that others can commercialize for the benefit of the public. The scientists who make discoveries are the crown jewels of the institutions. And the institutions recognize that fair and equitable treatment for their scientists is not just the right thing to do—it leads to better relationships between the institutions and the scientists and ultimately to better retention. From an economic perspective, sharing revenues with inventors also gives them a better economic incentive to carry out the institutions' missions. (*Id.* ¶ 14).

C.    IDI and BCH Sign an Affiliation Agreement and Later Merge.

When Dr. Warren joined the Rossi Lab, the lab was part of IDI, at that time an independent, Harvard-affiliated research institution. (SUMF ¶ 27). However, on December 24, 2008, it entered into an Affiliation Agreement with BCH's corporate parent, The Children's Medical Center Corp., in contemplation of an eventual merger. (*Id.* ¶ 28).

The Affiliation Agreement provided:

All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement.[1]

---

[1] The "GSK Agreement" was an unrelated intellectual property agreement that has no relationship with this case. (Dietz Decl. ¶ 5 n.1).

(SUMF ¶ 29).[2] IDI did adopt BCH's relevant policies, including its policy on sharing revenues with inventors, at the Effective Time of the Affiliation Agreement. (*Id.* ¶ 30). The "Effective Time" was defined to be the day on which "the Amended and Restated Articles of Organization" that IDI was to file with the Secretary of the Commonwealth were "approved and filed by the Secretary," unless the parties agreed on another date. (*Id.* ¶ 31). The Amended and Restated Articles were filed and approved on February 20, 2009, which is therefore the Effective Time. (*Id.*).

The BCH policy that IDI adopted at the Effective Time, embodied in the "Children's Hospital Policy on Inventions and Intellectual Property" dated April 21, 1992 and amended in 1993 ("the BCH Policy"), was somewhat more complex than the IDI Policy. (SUMF ¶ 32) It provided that the percentage of net revenues that an inventor would receive would decrease as the total amount of net revenues the Hospital received grew. (*Id.* ¶ 34). And it provided for a significantly lower percentage of net revenues to be shared with *former* Hospital employees than with *current* Hospital employees. (*Id.*). The details of the BCH Policy are described in more detail below.

Dr. Warren continued to work for IDI after the Effective Time of the Affiliation, but he decided to leave IDI in 2010 after some professional differences arose between him and Dr. Rossi, relating primarily to the Rossi Lab's strategy for selecting journals in which to publish its results. (*Id.* ¶ 5). He never became an employee of BCH. (*Id.* ¶ 10).

IDI merged with BCH effective September 28, 2012. BCH was the surviving entity. (*Id.* ¶ 38).

---

[2] Because the Affiliation Agreement is voluminous, we provide only excerpts.

D.     IDI Licenses The Invention To Moderna.

IDI exclusively licensed the Invention to Moderna Therapeutics, Inc. on December 21, 2010. On March 16, 2012, IDI and Moderna entered into an Amended and Restated Exclusive License Agreement. (SUMF ¶ 40). The license agreement provided IDI (and thus the Hospital, its successor in interest) with several forms of consideration in return for the intellectual property the Hospital was licensing. ███████████████████████████████████

███████████████████.[3] (*Id.* ¶ 41). ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████. The license agreement used the Hospital's form, because in the Affiliation Agreement, the parties had agreed that the Hospital's policies would apply to all intellectual property matters. (*Id.* ¶ 41).

E.     Dr. Warren Refuses to Assign His Rights a Second Time.

Before IDI filed its first application for a patent claiming the Invention, in or around April 2010, Dr. Warren assigned his rights in the Invention to IDI. (SUMF ¶ 45). But when IDI requested that he execute a second assignment in 2011, required for the filing of second provisional necessitated by the availability of new data, Dr. Warren demurred.  In an e-mail exchange with Ryan Dietz, a manager at IDI's technology transfer office, Dr. Warren asked to see the language of the policy obligating him to assign his inventions, and Mr. Deitz sent him an excerpt from the IDI policy indicating that the obligation to assign was a condition of employment at IDI. (*Id.* ¶¶ 46-48). As part of the e-mail exchange, Dr. Warren asked a "follow up" question seeking the language of the IDI revenue sharing policy he had remembered being told about. (*Id.* ¶ 49).  In response, Mr. Dietz provided him with the relevant provision from the

---

[3] The figures are irrelevant to the claims, and therefore the Hospital is omitting them in its memorandum.

IDI revenue sharing policy. Although Dr. Warren asked for the IDI policy on revenue sharing, and Mr. Dietz responded by providing the details of that policy, the reference to the IDI policy was a mistake: in fact, the BCH policy was in effect and had been in effect since the Effective Time of the affiliation. (SUMF ¶¶ 50-51). Dr. Warren continued to refuse to execute an assignment, even though the undisputed evidence is that IDI required its employees to assign inventions they made in the course of their employment as a condition of their employment (*Id.* ¶ 44), and even though Dr. Warren understood that fact very well:

> Q.      Do you understand, having worked in other research institutions, that the standard practice is to require as a condition of employment that scientists who are doing inventive work agree to assign their inventions to the institution?

> A.      I'm sure that is a standard practice, yes.

> Q.      Was that the practice at Caltech [where Dr. Warren had previously worked]?

> A.      I mean, I would assume it is. I would assume that any institution like that would—would make that a requirement.

> Q.      And do you believe it was a requirement of your employment at Caltech?

> A.      I have no specific knowledge of that, but I—I would be very surprised if that wasn't the case.

> Q.      How about MIT [where Dr. Warren also worked]; do you believe that?

> A.      Well, any of these institutions.

> Q.      Well, how about IDI?

> A.      Yes.

> Q.      So you had a—you had an understanding that as a condition of being employed by IDI, you were required to assign your inventions; right?

> A.      I wouldn't say that I had an understanding, but I'm not surprised that the—they have a policy which says that, and have asserted that that—that policy creates an obligation on me and that I—that's the extent of it, yes.

> * * *

> Q.      Are you aware of any research university that does not require its scientists who are doing inventive work to assign their inventions to the institution?

A.     No.

(Warren Dep. 83:12-85:1)[4].

As a result of Dr. Warren's refusal to do what he knew he was obligated to do, BCH's general counsel sent a letter to Dr. Warren, again explaining that he was obligated to execute the assignment. (SUMF ¶ 52). The email enclosed IDI's Policy. (*Id.*). It was a mistake to cite the IDI Policy. (*Id.* ¶ 53). But the BCH Policy, which IDI applied after the Effective Time of the affiliation, included a similar obligation to assign (*Id.* ¶ 33), and in any case Dr. Warren knew already of his obligation. (*Id.* ¶ 44). Dr. Warren did execute the second assignment of his rights after receipt of the letter from BCH's general counsel. (*Id.* ¶ 54).

F.     <u>The Hospital Treats Dr. Warren Just As It Treats Dr. Rossi.</u>

Although Dr. Warren testified that he felt that the invention was "morally [his]" on account of his key role in the idea and the laboratory work, he agreed that it was fair that he and Dr. Rossi should share the inventors' share of the royalties equally: "I've never tried to . . . suggest that we should have other than a 50/50 split." (SUMF ¶ 55). And that is precisely what the Hospital has provided. (*Id.* ¶ 56). Indeed, in November 2017, Dr. Rossi negotiated with the Hospital for a better deal for inventors on the Rossi/Warren invention. Under the Hospital's usual policy, inventors who remain employed by the Hospital, such as Dr. Rossi, receive 70% of the first $100,000 in net revenues, 45% of the next $400,000, and 25% of remaining net revenues. (*Id.* ¶ 58). But inventors who are not Hospital employees, such as Dr. Warren, receive 35% of the first $500,000 in net revenues and only 25% of the remainder. (*Id.* ¶ 59). Dr. Rossi and the Hospital agreed that on this transaction, inventors should receive 27.5% of *all* net revenues. (*Id.* ¶ 60). Simple arithmetic shows that the specially negotiated policy would provide higher payments to Dr. Rossi than the Hospital's standard policy if the Hospital receives at least

---

[4] An excerpt of Dr. Luigi Warren deposition transcript, taken on November 16, 2019 is attached as SUMF Exhibit 1.

$5 million in net revenues, but that it would provide higher payments to Dr. Warren than the Hospital's standard policy if the Hospital receives only $2 million in net revenues. The Hospital's "reasonable assumption" is that its Moderna stock alone, leaving aside expected royalties, is worth "tens of millions of dollars." (SUMF ¶ 66).

Dr. Warren was the one stakeholder who refused to approve the *ad hoc* policy Dr. Rossi worked out with the Hospital. (*Id.* ¶ 61). The Hospital is nevertheless giving Dr. Warren the benefit of the *ad hoc* policy, because it is fair that he should be treated just as his co-inventor is being treated. (*Id.* ¶ 62).

G.    Moderna Makes Its IPO.

While this case has been pending, there have been some relevant developments concerning Moderna, and BCH asks the Court to take judicial notice of them, because they involve facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2). First, on November 9, 2018, Moderna filed a Form S-1 with the Securities and Exchange Commission, indicating an intention to make an initial public offering of its common stock (*Id.* ¶ 64). Second, Moderna made its IPO on December 6, 2018, raising more than $600 million in the market. (*Id.* ¶ 65).

ARGUMENT

A.    Standard of Decision

The Court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must first assert "the absence of a genuine issue of material fact" and must support its assertions by "affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). If the movant meets this burden, the other party must "show that a factual dispute does exist," but it must do so without relying on "improbable inferences, conclusory allegations, or rank

speculation." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (citation omitted). The party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (citation omitted). The Court "must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Id.* (citation omitted).

B.  The IDI Policy Did Not Create Contractual Rights To Share In Licensing Revenues.

Dr. Warren does not spell out the legal theory on which he claims to be entitled to have the IDI Policy apply to him in the context of the Moderna license. The obvious theory is contractual: perhaps he means to say that the policy is a contract between him and IDI and that he is entitled to what it provides.

The immediate and fatal problem with this theory is that the policy itself says expressly that IDI had the power to modify the policy unilaterally. The case is like cases in which an employee claims that the employer's employee handbook or similar document constitutes a contract. When the handbook expressly provides that the employer has the power to amend it at will, any offer (in the contractual sense) that it might contain is illusory. *See Jackson v. Action for Bos. Cmty. Dev., Inc.*, 403 Mass. 8, 14-15 (1988);[5] *contrast LeMaitre v. Mass. Turnpike Auth.,* 70 Mass. App. Ct. 634, 639-40 (2007) (manual was a contract when it did not *state* the employer could change it, even though the employer did change it from time to time), *aff'd*, 452 Mass. 753 (2008).

---

[5] In *Pearson v. John Hancock Mutual Life Insurance Co.*, 979 F.2d 254, 256 (1st Cir. 1992), the Court read *Jackson* to create a six-factor test: (1) the employer's right of unilateral modification; (2) whether there was a "firm commitment concerning the employer's course of conduct;" (3) whether the language was negotiated by the parties; (4) whether the employer called "special attention" to the manual; (5) whether there was evidence that the employee had manifested his intent to the manual's terms; and (6) whether there was a specified term of employment. Even reading the law this way, it is clear that the claim of a contract must fail. Dr. Warren had never seen the policy, and knew only that Dr. Rossi had told him that the inventors' share was one-third. (Warren Dep. 75:19-77:3). So in addition to IDI's unilateral right of modification, there was no negotiation between Dr. Warren and IDI concerning the language of the policy; IDI did not call the policy especially to Dr. Warren's attention; Dr. Warren had never manifested his agreement; and there was no specified term of employment.

Perhaps Dr. Warren might respond that he "reasonably believed that [IDI] was offering to continue [his] employment on the terms stated in the [policy]," which could lead a court to find that IDI's offer was not illusory even though it contained language allowing IDI to amend it unilaterally and at will. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 692-93 (1996) (distinguishing *Jackson* in such circumstances; continued employment after receipt of a manual "would be in the nature of an acceptance of an offer of a unilateral contract"); *contrast Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 780-81 (2001) (no contract where employee could not show reliance). Here, though, the evidence is undisputed: Warren says he never saw the policy until long after his employment with IDI had ended. (SUMF ¶ 20).

The Court need decide no more. The remaining arguments show that Dr. Warren cannot prevail even if the IDI policy were not an illusory contract.

C.     If The IDI Policy Were A Contract, IDI Modified It.

We have shown that the IDI Policy was not a contract at all, in part because IDI retained to power to modify it unilaterally and at will. But even if it were a contract, the undisputed evidence is that IDI *did* modify the policy and adopt BCH's policy at the Effective Time of the Affiliation Agreement. (*Id.* ¶ 30). Dr. Warren can give no evidence to the contrary.

D.     There Is No Estoppel, Because There Was No Reasonable Reliance.

The undisputed evidence is that IDI adopted the BCH Policy at the Effective Time of the Affiliation Agreement. (*Id.* ¶ 30). There is no evidence to the contrary. IDI had the power to do so under the terms of the IDI policy itself.

Dr. Warren has not put his argument in this form in any papers filed to date, but he might seek to make a case that the Hospital is estopped to apply its own policy in light of Mr. Dietz's

email (Warren Ex. 5)[6] and the letter from the general counsel's office (Warren Ex. 6)[7], both of which wrongly referenced the IDI Policy. Promissory estoppel is, of course, a non-starter, because it requires a promise, and at most the email and the letter contained statements (or rather misstatements) of fact about which policy applied. (Warren Ex. 5, 6). But both promissory estoppel and equitable estoppel would require proof that Dr. Warren's reasonable reliance on BCH's statements induced him to do something different from what he otherwise would have done, to his detriment. *See Boston & Albany R.R. v. Reardon,* 226 Mass. 286, 291 (1917) ("In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. But the doctrine of estoppel is not applied except when to refuse it would be inequitable."); *Koufman v. New Eng. Merchants Nat'l Bank of Bos.*, 9 Mass. App. Ct. 40, 44-45 (1980) (equitable estoppel); *Loranger Constr. Co. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154-55 (1978) (promissory estoppel; promise must induce "action or forbearance of a definite and substantial character on the part of the promise"). A party asserting the estoppel theory has a "heavy burden" to prove all three elements: (1) A representation intended to induce a course of conduct (2) An act or omission resulting from the representation (3) Detriment. *Clickner v. City of Lowell*, 422 Mass. 539, 544 (1996). This is a burden Dr. Warren cannot meet on the undisputed facts.

First, of course Dr. Warren cannot say that he did the work that resulted in the invention because of the Hospital's misstatements—the work had been done years earlier.

---

[6] A true copy of Exhibit 5 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 4.

[7] A true copy of Exhibit 6 from Dr. Luigi Warren deposition, taken on November 16, 2019 is attached as SUMF Exhibit 5.

Second, Dr. Warren cannot say that he assigned his rights a second time because of the Hospital's misstatements. To be sure, one of the purposes of Mr. Dietz's email and the letter from general counsel was to encourage Dr. Warren to sign the second assignment of rights—he had already assigned his rights once, even though at that time no one had incorrectly pointed him to the IDI Policy as the source of his obligation. But the evidence is clear and undisputed: Dr. Warren already knew that he had an obligation to assign his rights to the Hospital. He knew that such an obligation was a "standard practice" in research institutions. (SUMF ¶ 44). He understood it was the practice at Caltech, where he had studied and been employed before joining the Rossi Lab. (*Id*.). He knew it was an obligation at IDI. (*Id*.). He knew that it was a policy of BCH to require such assignments from employees. (*Id*.). Since he already knew he was obligated, he cannot say that he was persuaded to assign his rights by the misstatements. Courts have "repeatedly resisted plaintiffs' reliance on estoppel to escape obligations to which they would otherwise be subject by law." *Nagle v. Acton-Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 7 (1st Cir. 2009). *See Gamache v. Mayor of N. Adams*, 17 Mass. App. Ct. 291, 294 (1983) ("Fatal in this case to any claim of estoppel is the absence in the record of any showing that the plaintiff did anything different from what he otherwise would have done."); *Clancey v. G.F. Wright Steel & Wire Co.,* No. 950239, 1998 WL 1182096, at *3 (Mass. Super. Ct. Apr. 1, 1998) (granting summary judgment, where party asserting estoppel against employer who promised certain extra pay, testified that he had no plans to leave the company and that he understood the gift to be in recognition of his past services.); *Hamilton v. Hanover Ins. Co.,* 75 Mass. App. Ct. 1113 (2009) (affirming summary judgment declining to apply estoppel against tortfeasor's insurance provider in an action seeking coverage, where there no evidence from which it reasonably may be inferred that tortfeasor changed his position as a result of insurance company's original indication that he was covered).

E.    Dr. Warren Is Not Entitled To Transfer of the Shares.

Dr. Warren seeks a declaration and injunction requiring the Hospital to transfer shares of Moderna stock to him. (SUMF ¶ 67). The reason—the only reason—he says receipt of stock rather than the proceeds of the sale of the stock could matter to him is the difference in tax treatment he says he would have received in the two cases. (*Id.* ¶ 70). All of the reasons given above apply to the claim about the stock with equal force: Dr. Warren's claim requires him to show that the IDI policy governed and gave him contractual rights, and he cannot.

1.    Dr. Warren Cannot Show Irreparable Injury or the Inadequacy of Legal Remedies.

Dr. Warren has been very clear throughout the lawsuit. He does not seek damages. His complaint seeks only an injunction and declaratory relief. His initial disclosures state clearly that he seeks no damages. And in his testimony he corrected a question that had incorrectly framed his case as a damages case. (Warren Dep. 105:24-106:19). So there is no ambiguity whatsoever: this is not a damages case.

But the injury Dr. Warren claims he suffered because the Hospital is a claim that can be measured by damages: if his claim had merit, he would be entitled to the difference in value between the money he will receive when the Hospital sells the its shares (the undisputed evidence is that the Hospital will sell it shares) and the money he would have received if he had received the shares and then sold them later, taking into account what he claims are the differing tax treatments applicable to the two situations. Because it is undisputed that he could not have sold the shares until December 2018, when Moderna went public, at the earliest (Warren Dep. 109:17-110:5), there is no difficulty in finding the price of the stock on the first day Dr. Warren could have sold it and comparing that price to the price at whatever date the Hospital ultimately sells the shares, and adjusting the calculation to reflect any applicable differential tax treatment, if there were any tax difference.

The Court cannot enter a permanent injunction unless it finds that the plaintiffs has shown an irreparable injury and that the remedies at law, such as damages, are inadequate. *Greene v. Ablon*, 794 F.3d 133, 156-57 (1st Cir. 2015).[8] The supposed injury here cannot be irreparable: it is one that is readily measured by money. *See Rondeau v. Mosinee Paper Corp*., 422 U.S. 49, 60 (1975) (adequate damages remedy for seller of stock at an unfairly depressed price; equitable relief held unavailable).

2.      Dr. Warren's Tax Theory Is Wrong.

Dr. Warren acknowledged that if the Hospital had delivered the Moderna shares to him at some time in the past, he would not have been able to sell them, because of the applicable restrictions on transfer. (SUMF ¶ 68). Moderna has never paid a dividend (*Id.* ¶ 69), and so Dr. Warren cannot claim that he was prejudiced by loss of a dividend. The only harm he claims to have suffered is a speculative tax harm. He says that if he had received the shares earlier, then he would have been able to sell them (at some future date) and pay tax on his capital gain at the favorable rate for long-term capital gains. But if he receives the proceeds of the sale of the shares at some future date, the income will be taxed as ordinary income. (*Id.* ¶ 70).[9]

Dr. Warren acknowledged that if the Hospital had delivered the Moderna shares to him at some time in the past, he would not have been able to sell them, because of the applicable restrictions on transfer. (SUMF ¶ 68). Moderna has never paid a dividend (*Id.* ¶ 69), and so Dr. Warren cannot claim that he was prejudiced by loss of a dividend. The only harm he claims to have suffered is a speculative tax harm. He says that if he had received the shares earlier, then he would have been able to sell them (at some future date) and pay tax on his capital gain at the

---

[8] Dr. Warren has not described his claim as one for specific performance, but specific performance also requires a showing that legal remedies are inadequate. *See Atlantech, Inc. v. Am. Panel Corp.*, 540 F. Supp. 2d 274, 285 (D. Mass. 2008); *Greenfield Country Estates Tenants Ass'n v. Deep,* 423 Mass. 81, 87-88 (1996).

favorable rate for long-term capital gains. But if he receives the proceeds of the sale of the shares at some future date, the income will be taxed as ordinary income. (*Id.* ¶ 70).[10]

This argument is based on a faulty premise. Under the Internal Revenue Code:

A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 1 year, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

26 U.S.C. § 1235(a). And under the Treasury Regulations:

Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all the facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other requirements under section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent.

26 C.F.R. § 1.1235-1(c)(2) (emphasis supplied).

The cases interpreting the statute and the regulation show that *even the receipt of cash* by Dr. Warren from the Hospital should be treated as a long-term capital gain rather than ordinary income. In *Chilton v. Comm'r of Internal Revenue*, 40 T.C. 552 (1963), Chilton was employed as an engineer by Wright Aeronautical Corp.[11] as a consulting engineer, specifically to do inventive work. His contract read in part: "Chilton shall during business hours devote his whole time and

---

[10] This theory ignores the income tax consequences to Dr. Warren if he had received the shares of stock at or near the time IDI received its shares. But we do not consider that issue further here.

[11] This summary omits some immaterial facts concerning Chilton's employers after he left Wright, etc.

apply his experience and his inventive ability to the problems, improvements, and developments relating to the Company's products and products similar to the Company's products, referred to him by the Company." *Id.* at 554. His employment contract required him to assign all inventions to Wright, and it required Wright to pay a fixed percentage royalty on sales resulting from his invention. Wright reported his royalty payments as capital gains in several tax returns, and the IRS argued that he should have reported the payments as ordinary income. It argued that because Chilton was contractually required to assign his inventions to Wright, Wright was the equitable owner of the invention, and thus that the payments to Chilton were in consideration of his employment, not in consideration of the inventions he was already obligated to assign. But the court rejected the argument: the "agreement . . . to assign . . . the rights to his inventions, standing alone, would not cause section 1235 to be inapplicable to the payments received by him" as royalties. *Id.* at 561. The court also noted that the Chilton was not "hired to invent," which the court took to be the "real question" in the case. *Id.* at 562. The court ruled in Chilton's favor. *Id.* at 563. *Chilton* applies to Dr. Warren's situation *a fortiori,* since there is even less of a basis to conclude that Dr. Warren was "hired to invent." *See also McClain v. Comm'r of Internal Revenue*, 40 T.C. 841, 850 (1963) (in similar case, court held that *Chilton* applied *a fortiori* where the contractual language in *Chilton* suggesting the employee was "hired to invent" was absent); *Baier v. Comm'r of Internal Revenue*, 63 T.C. 513 (1975).

In *Lehman v. Comm'r of Internal Revenue*, 835 F.2d 431 (2d Cir. 1987), the Court ruled in favor of the government and against the taxpayer in a § 1235 case, and it is important, therefore, to see why *Lehman* does not apply here. Lehman was a chemist working for IBM. He was not hired as an inventor but did agree to assign his rights in future inventions to the company. IBM had an "incentive plan," to "recognize employee achievements of significant or outstanding value, especially those that are beyond the levels of expected performance in the

assigned jobs." Lehman assigned his rights in an invention in 1965, and he received an award of $30,000 from IBM in 1981. The court distinguished cases like *Chilton* and *McClain* on the grounds that in those cases, the employee would "share in revenue or royalties at a specified rate," whereas under the IBM plan, whether the employee received an award was a matter of "subjective judgments by [the] employer about [the employee's] continuing performance." *Id.* at 435. In Dr. Warren's case, of course, the royalties to be shared under the BCH Policy are a fixed percentage of sales. The court also distinguished *McClain* on the grounds that there (as in Dr. Warren's case), the employee would continue to share in the revenues even after his employment terminated. *Id.* at 435-36; *see also id.* at 436 (distinguishing *Chilton* on similar grounds). And it distinguished *McClain* on the grounds that there (as here (SUMF ¶ 63)), if the employee dies, his estate would continue to receive his share. *Id.* at 436. Thus *Lehman* is distinguishable on the key grounds.

There is no evidence about why Dr. Warren is unwilling to take the position the cases so clearly support. The Hospital was unable to get to the bottom of that question, because Dr. Warren refused to identify his accountant, claiming even the name of the accountant was privileged. (SUMF ¶ 71). Perhaps Dr. Warren's advisers were unaware of the cases. Perhaps they told him they were unwilling to take arguable positions with the IRS. In any case, in light of the precedents cited, Dr. Warren's view is outright wrong at worst, merely speculative at best. Especially without any expert testimony, there is no way Dr. Warren could possibly establish, in light of the cases we have cited, that he would not receive capital gains treatment on royalties received under the BCH Policy.

3. The IDI Policy Would Not Require Transfer of the Shares Even If Treated As A Contract.

The IDI policy provided that "Equity received by IDI **in lieu of a Licensing Fee** shall be deemed a royalty." (SUMF ¶ 18) (emphasis supplied). And it provided that "equity taken as a

royalty" should be distributed to inventors "at the earliest opportunity following receipt." (Id.). It is clear, however, that the equity component of the consideration for the Moderna license was **not** paid in lieu of a licensing fee. Thus even if Dr. Warren were right to say that the IDI policy was a contract, he still would have no entitlement to distribution of the shares.

The license agreement between Moderna and IDI provided for ███████████████ ██████████. (*Id.* ¶ 41). The license agreement provided separately ██ IDI ████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████. (*Id.*). It is clear on the face of the Moderna license agreement that the shares of stock are **not** in lieu of a licensing fee. The agreement specifically provided for █████████████████████ ███████.

There is no evidence that the License Agreement means something other than what it says. Nor has Dr. Warren articulated any real reason to think the License Agreement means something different than what it says. (Warren Dep. at 94:3-11 ("I think that would be a kind of a commonsense interpretation of that language"); *Id.* at 95:10-96:4). And thus even if everything else Dr. Warren argues were accurate, he would still lose on this claim, because the stock was not given in lieu of the licensing fee provided for in the License Agreement.

## CONCLUSION

For these reasons, the Court should enter summary judgment in favor of BCH on all claims.

Respectfully submitted,

THE CHILDREN'S HOSPITAL
CORPORATION

By its attorneys:

       /s/ Theodore J. Folkman

Theodore J. Folkman (BBO No. 647642)
PIERCE BAINBRIDGE BECK PRICE &
HECHT, LLP
361 Newbury Street, 5th Floor
Boston, MA 02115
(212) 484-9866
tfolkman@piercebainbridge.com

Dated: February 15, 2019

## CERTIFICATE OF SERVICE

I, Theodore J. Folkman, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on February 15, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

 /s/ Theodore J. Folkman      
Theodore J. Folkman