# SUMF EXHIBIT 1
## EXCERPT OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION TRANSCRIPT

Confidential - Subject to Protective Order

1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

3                      - - -
4

   LUIGI WARREN,              :   Civ. A. No.
5            Plaintiff,       :   17-12472-DLC
                              :
6         vs.                 :
                              :
7   THE CHILDREN'S HOSPITAL   :
   CORPORATION,               :
8            Defendant.       :
9

                         - - -
10

        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
11

               Friday, November 16, 2018
12

                      - - -
13

14        Videotaped deposition of LUIGI WARREN, Ph.D.,
15   held at VEDDER PRICE, P.C., 1925 Century Park East,
16   Suite 1900, Los Angeles, California, commencing at
17   approximately 9:14 a.m., before Rosemary Locklear, a
18   Registered Professional Reporter, Certified Realtime
19   Reporter and California CSR (#13969).
20

21                      - - -
22

23

24          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | 971.591.5672 Fax
25               deps@golkow.com

Confidential - Subject to Protective Order

1   Q.      Were you in any other labs at Caltech?

2   A.      No.

3   Q.      Was Dr. Quake the principal in those labs, or

4   was it Dr. Sternberg, Dr. Fraser, and Dr. Rothenberg?

5   A.      Those were rotation assignments during my first

6   year or maybe year and a half.  So the -- the principal

7   investigators in those labs were the names you've just

8   mentioned.

9   Q.      And then at some point you switched to the Quake

10  lab at Stanford; right?

11  A.      Yes.  I joined the lab just as he, Steve Quake,

12  moved to Stanford.

13  Q.      And that was in 2004?

14  A.      I believe so, yes.

15  Q.      And you were there until approximately 2007,

16  when you received your degree?

17  A.      I was there until 2007.  I finished up I guess

18  October, I guess, and the degrees are only awarded once

19  per year, so the degree wasn't actually awarded until

20  2008.

21  Q.      Following your time at the Quake lab, you joined

22  Derrick Rossi's lab; correct?

23  A.      That's right.

24  Q.      And at that time that lab was at the Immune

25  Disease Institute.

Confidential - Subject to Protective Order

1   A.      Yes.

2   Q.      In Boston.

3   A.      Yes.

4   Q.      And we're going to, obviously, talk at greater

5   length about your time with Dr. Rossi.  I'm just trying

6   to establish my chronology here.

7   A.      Uh-huh.

8   Q.      You were there from approximately 2007 to 2010;

9   correct?

10  A.      Yes.

11  Q.      Following your departure from Dr. Rossi's lab,

12  you joined the Yanik lab at MIT?

13  A.      That's correct.

14  Q.      You were then working as a post-doctoral

15  researcher?

16  A.      Yes.

17  Q.      And that was true at the Rossi lab as well?

18  A.      Yes.

19  Q.      From 2010 to 2012, you were a self-employed

20  consultant?

21  A.      Yes.

22  Q.      What sort of consulting were you doing at that

23  period?

24  A.      Biology, work related to reprogramming and other

25  closely related topics.

Confidential — Subject to Protective Order

1   of cell, and regressing it artificially to express or to

2   have the phenotype or the properties of an embryonic

3   cell, a cell such as you would find in an extremely

4   early embryo where it's just a ball of cells that

5   haven't decided what they're going to become.

6           So those cells have the potential to be directed

7   to become any other kind of cell.  So the reprogramming

8   process is a method of artificially redirecting a

9   specialized cell to become an unspecialized cell, and

10  once it becomes an unspecialized cell, then potentially

11  you can make any other kind of cell.

12          And this is a process that was originally

13  presented around 2006, 2007 in the literature by Shinya

14  Yamanaka, a Japanese scientist, who subsequently got the

15  Nobel Prize for this work.

16          And he, Yamanaka, originally, effected that

17  process by using integrating viruses to carry genes

18  associated with the embryonic state to -- into cells so

19  that they integrated into the DNA of the cells and

20  expressed these embryonic genes, and after a period of a

21  few weeks of expression, this forced the whole gene

22  expression network to -- to remodel to this embryonic

23  state or regress to this embryonic state.

24          So, obviously, as reflected by the award of the

25  Nobel Prize, this is a -- people saw this as a huge --

Confidential - Subject to Protective Order

1    hugely useful breakthrough.

2         A major potential problem with the

3    breakthrough -- well, with applying it clinically to

4    produce cells for, for example, for transplant, is that

5    it involves modifying the genome and putting genes that

6    are -- potentially could cause cancer into the -- into

7    the genome.  And those genes could spontaneously be

8    reactivated or even if -- even just the fact that you

9    have disrupted the DNA, the native sequence of the DNA,

10   could cause dysregulation of genes and could cause

11   cancer.

12        So although the technology that Yamanaka

13   originally presented had tremendous promise and it had

14   immediate application in producing cells for -- of

15   different types for research -- for example, you could

16   produce human neurons, which are normally quite

17   difficult to get, you could take skin cells, convert

18   them to these so-called pluripotent stem cells and then

19   convert those to neurons and study the neurons in a

20   dish.

21        So for that purpose, this problem of the

22   integration of the -- the genes was perhaps not that big

23   of an issue, but if you wanted to produce cells for

24   medical application, then it would be a huge issue,

25   because anything you put back into the patient, say, you

Confidential - Subject to Protective Order

1  made a skin graft to treat a burn patient, for example,

2  those cells, the genes might be reactivated and cause

3  cancer.

4       So it was in the early days of -- after

5  Yamanaka's publication, the entire field recognized that

6  we needed to find ways of getting rid of those viruses

7  and reprogramming the cells in some way that didn't

8  modify the genome and didn't entail this risk of -- for

9  this particular risk of oncogenesis, of being

10  potentially cancer-forming.

11       And the approach that I took while I was in the

12  Rossi lab, which was somewhat, I think, for -- out of

13  left field for most people in the -- in the -- in this

14  area, was to express the gene, the reprogramming genes,

15  from synthetic messenger RNA transcripts.

16       So genes -- most of the -- most of the genes

17  that the cell expresses are ultimately converted to --

18  to protein or express protein.  There are some that have

19  their effect as RNA, but, mostly, most genes are

20  associated with protein.

21       And DNA, which is -- is kind of the long-term

22  storage of the genetic information of the cell, is

23  transiently converted into short-lived messenger RNA

24  transcripts, which, in turn, are translated to become

25  protein.

Confidential - Subject to Protective Order

1    us at that point, and Derrick went to Philadelphia for

2    the ICCR conference.  So this was still fairly soon

3    after Yamanaka's big breakthrough, which everybody was

4    talking about at that conference.

5          It was the, you know, talk of the town, as it

6    were, and there were big, you know, speeches about it,

7    including these prominent individuals, like Yamanaka

8    himself and other -- other top stem cell researchers,

9    talking about reprogramming.  And in some of these

10   speeches the -- the theme was brought out, you know,

11   number-one -- number-one thing we need to do is get rid

12   of the viruses that are currently required for

13   reprogramming.

14         And, you know, that suddenly -- I don't know if

15   I had connected this mRNA idea to the Yamanaka stuff

16   before that.  Probably not.  I don't think I was

17   particularly aware of it, neither was -- you know, we

18   were a hematopoesis lab, not a pluripotent stem cell

19   lab.  So we were stem cell, but not pluripotent stem

20   cell.

21         But, you know, suddenly that kind of really

22   connected with this idea that had been in my head and

23   I -- I remember listening to a talk, big talk, like a

24   keynote, maybe it's Yamanaka himself, maybe it was

25   George Daley, but they were running down these ideas for

Confidential - Subject to Protective Order

1  how we would get rid of the viruses.  And it was the

2  usual suspects, you know, cell -- cell-penetrating

3  proteins and small molecules.  And I remember having the

4  reaction, I can think of a much better way of doing it.

5       Also, one of my -- one of the other post-docs in

6  the lab, Isabel Beerman, had a friend who was also

7  attending the conference.  His name is Han Lee.  He was

8  out of -- I think he'd been a grad student, maybe, with

9  Isabel at Yale, I think.  And he actually had done

10 something with synthetic mRNA, which I hadn't.  I worked

11 with synthetic RNA, but that's not the same thing as

12 synthetic mRNA.

13      So I picked his brains and bounced the idea off

14 him and, you know, he was kind of like, it's not a bad

15 idea.  So -- so I came back from that conference, which

16 was sometime I think in middle or late June, and I wrote

17 up my notes from the conference in my notebook, and I

18 think a few days later also wrote my idea for using

19 synthetic mRNA to -- to make iPS.

20      And I actually -- I didn't initially seek

21 Derrick's approval for this idea, but I ordered some

22 cheap reagents, some primers, to make -- to start making

23 some constructs related to this project.

24      And -- and then I think it wasn't until -- I

25 think it was a few weeks later that I started to feel

Confidential — Subject to Protective Order

 1   filed the first --

 2   Q.      Provisional application.

 3   A.      -- provisional application.  And about a year

 4   before that Derrick had -- so that would be 2009 --

 5   Q.      Okay.

 6   A.      -- not 2008.  2009, had said we're close, we're

 7   starting to talk to people, we need to start thinking

 8   about protecting this.

 9           MR. FOLKMAN:  And let me ask the reporter to

10   mark this as Exhibit 3.

11           (Exhibit Warren-3 was marked for

12   identification.)

13           THE WITNESS:  And, of course, even -- so Derrick

14   had already spoken to Ryan in August of 2008, resulting

15   in the -- he had notified him of the invention or

16   whatever.  I forget what the exact term they used is.

17           MR. FOLKMAN:  Sure.

18           THE WITNESS:  Sorry.

19   BY MR. FOLKMAN:

20   Q.      So, Dr. Warren, do you now have Exhibit 3 in

21   front of you?

22   A.      Yes.

23   Q.      And do you see -- well, is this the Report of

24   Invention that you were referring to?

25   A.      I don't think so, but let me look more closely.

1   Q.      Okay.

2   A.      (Witness reviews document.)  I think this is

3   much later.  This is some other document much later.

4   Q.      Yes.  I see that this one is dated in May of

5   2010, if you look on Page 2.

6   A.      Yes.  So this may be an Report of Invention, but

7   I know from emails from Ryan and from some notes that

8   have been turned over to me from Ryan that he logged a

9   conversation with Derrick that was in August 2008.  So

10  the month after I disclosed to Derrick that -- the idea

11  for the project and got his permission.

12          So that's -- so these are different things.

13  Q.      Are you aware of an invention disclosure form

14  other than this one?

15  A.      No.

16  Q.      When did you leave IDI?

17  A.      June of 2010.

18  Q.      By that time, the research on the project had

19  been completed?

20  A.      My part of it had been.  I mean, we'd written

21  the paper, we'd submitted the paper, and we'd filed the

22  IP.

23  Q.      Do you remember approximately when you submitted

24  the paper for publication?

25  A.      Again, I was reviewing that.  And let me -- I

1  this proves that in vivo these cells were pluripotent,

2  they could give rise to these appropriately diverse

3  lineages.

4       So those things were just kind of -- I mean, we

5  just had to wait for those and, hopefully, have them in

6  our back pocket if the reviewers came back, as they

7  quite possibly might, and say, oh, we want to see better

8  validation that you've really got what you say you got.

9  Q.    Why did you leave IDI?

10 A.    The proximate grievance that I had was with the

11 submission to Cell as opposed to just Cell Stem Cell.

12 So I had a bitter disagreement with Rossi about doing

13 that.  And, you know, I knew it was his authority to do

14 that, but I felt that I had standing.

15      And the more collegial thing would have been to,

16 you know, work -- pay heed to my -- my desires on that

17 front.  But these kind of conflicts often happen between

18 somebody who owns a project and then his boss has, in a

19 sense, hedged because he's got multiple projects.  So

20 there's a conflict of interest, but -- or difference in

21 how we weigh things.

22      So I had accepted, or didn't resign when he did

23 that, but I was, shall we say, disgruntled.  And I

24 thought that it was a potentially suicidal strategy and

25 either that I would bear the brunt of that since my

Confidential - Subject to Protective Order

1    whole career, basically, at this point was this was the

2    big thing that I had done and I would have not hedged.

3         But, you know, I went about my business and

4    supported these other projects while we waited to see.

5    And, you know, Derrick was -- in fact, I remember

6    Derrick's words were, I feel lucky about the Cell

7    submission.  And I didn't feel lucky about the Cell

8    submission.

9         And as it turned out, we came -- it came back

10   with three reviews, one of which was quite nasty and

11   demanded us to do all kinds of things that would take a

12   long time and didn't really seem that justified, and the

13   other two were -- Derrick said they were quite good

14   reviews.  I wouldn't -- I was looking at them in the

15   last few days.  I wouldn't say they were that -- that

16   good.

17        So we resubmitted, so I think -- I think we --

18   we got the initial rejection back fairly quickly,

19   actually, within about four weeks, but with these pretty

20   nasty reviews, or at least one of them was very nasty,

21   and -- and we resubmitted.

22        In fact, we were then out at Cell.  So, in a

23   way, that was good.  Because to get published in Cell,

24   typically, can take a year, or a year and a half, even,

25   and they can make you jump through all kinds of hoops.

Confidential — Subject to Protective Order

```
 1   And, you know, I'm not saying that they shouldn't, but

 2   that's -- that's how it is.

 3          And then we resubmitted to Cell Stem Cell and so

 4   there was a burst of optimism.  And then a few weeks

 5   after that, we got the rejection back from Cell Stem

 6   Cell and it was evident from the rejection that we still

 7   had that same reviewer that we got lumbered with from

 8   the Cell submission.

 9          And he was asking us to do, you know -- I think

10   he was -- I think one of the things he asked was, you

11   know, to get this working in -- in mouse, because in

12   mouse you could do more rigorous proofs of pluripotency,

13   where I've never actually worked significantly with

14   murine-induced pluripotent stem cells, but there are

15   things you can do in the mouse system, which are just

16   not possible.  And like you can kind of take it,

17   demonstrate that the cells contribute over generations,

18   and things like that.

19          So that would have taken a long time.  In fact,

20   we now know that this technique didn't really adapt very

21   well to murine reprogramming.  I'm not even completely

22   convinced that -- I know that there has been publication

23   claiming it, relatively obscure, but that would have

24   been a Vietnam-type scenario if we'd gone down that

25   route.
```

Confidential - Subject to Protective Order

1        So Derrick was like -- Derrick was appropriately

2    outraged, but said, oh, we got George Daley on our side

3    and he's very influential, and we're really -- you know,

4    push the editor to kind of override this reviewer.

5        But, in any case, when I saw that, I felt like

6    outraged, and that's when I quit.

7    Q.      And so that I, as an outsider, can understand,

8    what you're telling me, as I understand it, is that you

9    felt that for your career, given that this was your main

10   project, it would have been more advantageous for you to

11   submit the article for publication in Cell Stem Cell

12   first, rather than submitting it to Cell first.

13   A.      Yes.  So Cell Stem Cell had a reputation at that

14   time, and I don't know if this is still true, they were

15   a fairly new journal, offshoot of Cell, on the block,

16   and I believe -- I think the -- I think it was -- I

17   forget whether it was 2007, 2008, they had published the

18   protein -- protein-based reprogramming, cell-penetrating

19   protein, which one -- I think two labs came up with it

20   about the same time, Sheng Ding was one of them.

21       And that work even -- I think they -- they

22   turned it around in a couple of weeks, which is pretty

23   extraordinary for a -- I'm not sure if that was to

24   publication, but my recollection is that they -- that

25   they had accepted within a couple weeks.  So they were,

1   person, et cetera.

2   A.      Yeah.

3   Q.      So let's leave that to the side for a minute.

4   A.      Okay.

5   Q.      Is there anybody else that you're working with

6   in connection with this lawsuit, aside from that lawyer?

7   A.      On a long-term basis, no.

8   Q.      On any basis.

9   A.      I mean, there are people that I've consulted

10  with, like accountants and tax law specialists, you

11  know, these various services that you can just speak to

12  a lawyer on a specific point, that kind of thing.

13  Q.      Okay.  And your discussions with accountants,

14  that relates to the issues about equity that the case

15  raises?

16  A.      Yes.

17  Q.      And can you tell me what accountants you've

18  spoken with?

19  A.      I don't believe I -- I'm not going to answer

20  that.

21  Q.      Okay.  So let me just -- I obviously can't make

22  you answer anything you don't want to answer.

23  A.      Sure.

24  Q.      Is it fair to say that you believe that the name

25  of the accountants that you've spoken with is

Confidential - Subject to Protective Order

```
 1   privileged?

 2   A.      I believe that this would be, since I'm

 3   representing myself, attorney work product.

 4   Q.      Okay.  Will you agree with me that any issues

 5   that come up in the deposition like this where you've

 6   sort of raised a point of privilege, that rather than

 7   sort of stopping the deposition and filing motions and

 8   so forth, we can wait until the end, I can finish the

 9   deposition and then if there are any issues, I can raise

10   them later?

11           Does that seem fair to you?

12           In other words, what I don't want to do is to

13   say, well, we've got to stop, we've got to go see the

14   judge.  I'd like --

15   A.      You mean you want to go back to these questions

16   at the end and we'll see where we stand.

17   Q.      Sure.  Sure.

18   A.      If that's what you're saying, yes, that's okay.

19   Q.      Okay.  So other than accountants and the tax law

20   specialist that you say you spoke with, was there

21   anybody else that you've spoken with in any kind of

22   consulting or advisory professional capacity about the

23   lawsuit?

24   A.      Again, I think I'm not going to answer.  We went

25   through this in the written discovery phase and --
```

Confidential - Subject to Protective Order

1    Q.      Now, how do you know that it was approved by the

2    IDI board of trustees?

3            In other words, is that something that you have

4    any knowledge about?

5    A.      You mean apart from the fact that it says that

6    it was?

7    Q.      Correct.

8    A.      No.

9    Q.      Okay.  How did you become aware of the existence

10   of this policy?

11   A.      Yes.  In spring of 2011, I was contacted by Ryan

12   Dietz, who asked me to provide follow-up assignments or

13   additional assignments for, I think it was at least -- I

14   think it was two new patent filings that were based on

15   the original patent filing of, I think, April 2010, but

16   included -- I believe the difference was that they

17   included some of the additional data that we'd gotten

18   from our collaborators.

19           And I said I would like to -- in responding, I

20   said I would like to know, you know, exactly what your

21   obligations to me are before I continue with this

22   process, because I had been told by Derrick Rossi that

23   the inventors were to share one-thirds of the licensing

24   proceeds, but I didn't seem to have any piece of paper

25   in my possession that, you know, put this down in

Confidential - Subject to Protective Order

1   writing.

2          And I told, in a series of emails, told Ryan

3   that I wanted to get this clarified, what I was being

4   promised, before I continued, having left the employ of

5   the IDI, to, you know, continue to work with them on the

6   prosecution of the patent, and also expressed a desire

7   to know -- I had read -- the first I had heard of the

8   Moderna deal was that it was mentioned in a footnote in

9   the Cell Stem Cell publication.  So I had not heard that

10   that deal had been done prior to that.

11          So I was aware of that.  And I had been in on

12   some of the early conversations with Ryan Dietz and

13   Derrick about commercializing the IP.  In fact, I think

14   I may have been the one who suggested the idea of

15   setting up this corporation, and then I'd been kind of

16   left out progressively of the later discussions that

17   they had.

18          So -- but I do remember, you know, the issue

19   of -- in fact, again, I think I might have been the one

20   who suggested that you could do an equity deal for the

21   license.  And so I was curious because Derrick had said,

22   as inventors we'll share one-third of the licensing

23   revenue, what does that mean if it's an equity deal?  Or

24   what does it mean if it's not licensing, but they just

25   sell it outright?  So I wanted to know the details of

Confidential – Subject to Protective Order

1   or what?

2        And I -- I think it was after this interaction

3   that I got an email from I think it's Mr. Resnick, who

4   was the external counsel for IDI, an email again said

5   I'm bound by these policies, the IDI policies, and

6   demanded my cooperation, and included a draft lawsuit

7   for breach of contract and seeking injunctive and

8   declaratory relief from -- I think it was from the -- it

9   was written from the Superior -- I think you would call

10  it Superior Court, State Court, not the Federal Court.

11       So I -- and so that kind of spelled out a case

12  and made a number of assertions about the IDI policies,

13  including that they were posted on the company intranet

14  and that all IDI employees at their induction or their

15  orientation receive a copy of these policies and are

16  required to sign a Participation Agreement, which is

17  included as an annex to the -- to this document.

18       I don't know if you've got it here, the

19  Participation Agreement.  Yeah, Participation Agreement.

20  And that I would -- I would be in breach of contract if

21  I didn't sign these assignments.

22       And so, finally, I had in my hands a paper copy

23  of the -- of this exact document.  I had an email saying

24  that I'd get half of one-third of licensing proceeds,

25  and that that is promised to me in -- in return for --

Confidential - Subject to Protective Order

1    for fulfilling my duties under this Agreement, which

2    include helping with the prosecution of the patent.

3           And I discussed it with my attorney I had in

4    Boston and went over the legal points and, I mean, A,

5    the end -- the take-away from that was, yeah, they

6    probably have a pretty good case here.  And, also, I had

7    got what I -- I had finally gotten what I had sought,

8    which was to have in writing what I was going to be paid

9    from this -- from the Moderna agreement, and -- and full

10   context of that, not just this number hanging in the

11   air, this 33 and a third to inventors.

12          So I wrote back and said, I'm satisfied the law

13   is in your favor and I'm sending you the -- I agree to

14   execute the -- these two follow-on Assignments.

15   Q.     Had you executed an Assignment before that?

16   A.     Yes.  In, I think, maybe July of 2010, I guess

17   it must have been, because it couldn't have been 2009

18   because the -- it didn't exist at that time.

19   Q.     And in July --

20   A.     I'm a little -- yeah, I believe it was July

21   of -- of -- I know I've turned those documents over to

22   you, so you can see the date on it.

23   Q.     Sure.

24          That was -- just so that I'm clear, that was

25   shortly after your departure from --

Confidential – Subject to Protective Order

1    Q.      Uh-huh.

2            And just so that I'm clear on the chronology,

3    you don't -- you don't recall today the circumstances of

4    how it is that you came to sign that first assignment,

5    but it was sometime shortly after your departure from

6    IDI.

7    A.      Was it after or before?  I'm not sure.  I seem

8    to remember it being July, the date on it being --

9    Q.      July?

10   A.      Maybe -- maybe what happened was that it was on

11   my desk and I took it with me at the time that I quit

12   and then --

13   Q.      Sent it in.

14   A.      -- then sent it in.  Maybe that's what happened.

15   Q.      Okay.  Now, is it true that the spring of 2011

16   was the first time that you had ever seen any portion of

17   the IDI policy?

18   A.      I don't know if that's true.

19   Q.      When do you think the first time is that you saw

20   any portion of the IDI policy, Exhibit --

21   A.      This is --

22   Q.      Excuse me.

23   A.      I don't know if I ever saw this.  According to

24   the draft lawsuit, this was on the IDI intranet.  So

25   maybe I looked at it there in the two or three years

Confidential - Subject to Protective Order

1    that I was at IDI.  But I have no recollection of that.

2    Q.     Okay.

3    A.     So the first time that I recall seeing this was

4    when -- when Dianne McCarthy sent me a copy.

5    Q.     And you don't recall seeing it during your IDI

6    onboarding process.

7    A.     As I said, I don't really recall the onboarding

8    process, so no.

9    Q.     Right.

10          So -- and it's the kind of thing that you can't

11   say one way or the other?

12   A.     Yeah.  I certainly can't say whether I ever saw

13   it while I was at IDI.

14   Q.     Okay.  Did anybody have to make any legal

15   threats or demands in order to get you to sign that

16   first Assignment?

17   A.     No.

18   Q.     When was it that Dr. Rossi told you that the

19   inventors' share was one-third?

20   A.     That I don't know.  I've tried to recollect it

21   with more specificity, but I can't.

22   Q.     Can you recall whether it was before or after

23   you left IDI?

24   A.     Oh, I think it was quite early on.

25   Q.     Do you recall anything about the -- that

Confidential - Subject to Protective Order

1   conversation?  In other words, did he say anything more

2   detailed than the inventors get a third?

3   A.      Not that I recall.

4          I do know that the thing about the inventors

5   getting a third was something that I took as read from

6   quite early on, but I took it on the basis of Derrick

7   told me this, and this is Harvard, they must mean what

8   they say.

9   Q.      Do you know, by the way -- well, when you say

10  "this is Harvard," just so that everybody is clear, you

11  mean that IDI was a Harvard-affiliated institution.

12  A.      Yeah.  And it was on the Harvard Medical School

13  campus and I had a Harvard email, so...

14  Q.      Do you recall whether Derrick told you that the

15  inventors got a third before or after the Affiliation

16  Agreement between IDI and Children's Hospital?

17  A.      I cannot be sure of that either way.

18  Q.      Okay.

19  A.      I don't -- it wasn't late, but it wasn't -- but

20  I -- I -- I can't pinpoint it --

21  Q.      Okay.

22  A.      -- beyond that.

23          MR. FOLKMAN:  I'm going to ask the reporter to

24  mark two more documents.

25          Why don't we mark the emails first as Number 5

Confidential - Subject to Protective Order

1  know that for a fact.

2  Q.      Leaving aside any side deals, so to speak, that

3  Dr. Rossi may have had with Moderna, founders' shares or

4  whatever, do you believe fundamentally that a 50/50

5  split between you and Dr. Rossi in terms of the

6  inventors' share is fair?

7  A.      I think it's -- yes.  I don't -- I don't really

8  know.  I -- my impression is that agreeing to either

9  split is -- I don't know how common that is.

10         So, in a certain sense, yes, morally, I feel

11  that the invention is primarily mine, although I

12  certainly don't deny that he had a role in it.  But I've

13  never tried to push that point or suggest that we should

14  have other than a 50/50 split.

15  Q.      In your experience working in labs where there's

16  a principal investigator and then post-docs, is it

17  fairly typical for principal investigators, who may not

18  be doing the lion's share of the actual work, to receive

19  equal shares with the other inventors?

20  A.      I would expect that's the case.  I don't have

21  real no -- really no concrete insight, but just common

22  sense would suggest that rank has its privileges.

23  Q.      Remind me, is this -- is this invention -- I

24  think you said it was one of two in biology that you had

25  been involved with that had gotten to the stage of

1          So part of this purpose of this is to -- it's a

2     promise that you'll get something in return for not

3     doing that.  So that seems broadly to fulfill, you know,

4     the basic character of a contract.

5          And also IDI and -- and Dianne McCarthy and

6     IDI's lawyer and Ryan Dietz all represented to me that I

7     had obligations.  This was not as a result of the -- or

8     arising from this document.  And seems that there's --

9     seems reasonable that if -- if I have obligations

10    arising from what's in this document, then the other

11    side does.

12    Q.     Do you understand, having worked in other

13    research institutions, that the standard practice is to

14    require as a condition of employment that scientists who

15    are doing inventive work agree to assign their

16    inventions to the institution?

17    A.     I'm sure that is a standard practice, yes.

18    Q.     Was that the practice at Caltech?

19    A.     I mean, I would assume it is.  I would assume

20    that any institution like that would -- would make that

21    a requirement.

22    Q.     And do you believe it was a requirement of your

23    employment at Caltech?

24    A.     I have no specific knowledge of that, but I -- I

25    would be very surprised if that wasn't the case.

Confidential - Subject to Protective Order

1    Q.      How about MIT; do you believe that?

2    A.      Well, any of these institutions.

3    Q.      Well, how about IDI?

4    A.      Yes.

5    Q.      So you had a -- you had an understanding that as

6    a condition of being employed by IDI, you were required

7    to assign your inventions; right?

8    A.      I wouldn't say that I had an understanding, but

9    I'm not surprised that the -- they have a policy which

10   says that, and have asserted that that -- that policy

11   creates an obligation on me and that I -- that's the

12   extent of it, yes.

13   Q.      And Children's Hospital -- you never became a

14   Children's Hospital employee; right?

15   A.      No.

16   Q.      But you understand that -- or do you understand

17   that Children's Hospital also has a policy of requiring

18   its scientists to assign their intellectual -- their

19   inventions to the hospital?

20   A.      Yes.  Because I've read those policies, yes,

21   both the 1992 policy and the new one, which I think was

22   promulgated in 2015, I think.

23   Q.      Are you aware of any research university that

24   does not require its scientists who are doing inventive

25   work to assign their inventions to the institution?

Confidential -- Subject to Protective Order

1    A.      No.

2    Q.      Are you -- are you aware or do you -- do you

3    recall whether you signed a -- something -- let me start

4    again.

5            Are you aware whether you signed a Participation

6    Agreement when you worked at Caltech?

7    A.      I don't have any recollection of that.  But -- I

8    should say, I don't know.  Because that's a long time

9    ago.

10   Q.      Do you have any recollection of signing such an

11   agreement at MIT?

12   A.      I don't -- I don't recall what I signed at MIT.

13   Q.      Do you know whether others in the Rossi lab

14   signed Participation Agreements?

15   A.      The only thing I know is that in -- that I had a

16   Request for Production of both my signed Participation

17   Agreement and Rossi's signed Participation Agreement,

18   and that in your responses you've told me that the --

19   you're unable to find these documents.  Whether that

20   means they don't exist or never existed, I have no way

21   of knowing.

22   Q.      Well, do you believe that you signed a

23   Participation Agreement?

24   A.      I have no belief about it.  I just don't know.

25   Q.      Do you --

Confidential -- Subject to Protective Order

1    but it -- I would tend to assume that, yeah.  Because

2    it's not based on any concrete knowledge, just I would

3    assume that they would want to make sure that any

4    inventions -- that they had at least some ability to --

5    to profit from those inventions.

6         Whether that -- whether that necessarily implies

7    this assignment, I -- I don't know, but that's an

8    obvious -- that's the most natural way to do it.

9    Q.     Do you know whether assignments are required

10   from inventors in cases where all or any part of the

11   funding for the research is provided by the Federal

12   Government?

13   A.     I don't.

14   Q.     Was the Rossi lab doing work that was funded by

15   the Federal Government?

16   A.     Not that I was aware of.

17   Q.     Do you know whether any of the projects, other

18   than this cellular reprogramming project that you've

19   been describing that you did work on in the early parts

20   of your tenure at the Rossi lab, were federally funded?

21   A.     Not that I know of.

22   Q.     What was the role of the techs in the Rossi lab?

23   A.     Well, I think -- I think in the case of

24   Ms. Zguro, I seem to remember she was mainly an animal

25   tech or at least she had experience with that.  And,

1    Q.      Okay.

2    A.      All annual license fees --

3    Q.      You can -- yes, unless you want to read the rest

4    out loud.

5    A.      No, that's okay.

6    Q.      Okay.  You see the use of the term "license

7    fees" in that paragraph; right?

8    A.      Yes.

9    Q.      So you see that Paragraph 8 -- well, will you

10   agree with me that Paragraph 8, although the numbers are

11   redacted, that those are -- those are amounts of money

12   and not equity?

13           You see that?

14   A.      Yes.

15   Q.      License --

16   A.      Yes.

17   Q.      So why is it that you think that Paragraph 3, on

18   Page 10 of Exhibit 4, applies to the equity that the

19   hospital received as part of the Moderna transaction?

20           Or, put another way, why do you believe that the

21   equity that the hospital received is equity received in

22   lieu of a licensing fee?

23   A.      I'm not sure I understand the question.

24   Q.      Well, you see that Paragraph 3, on Page 10, says

25   that equity received by IDI in lieu of a Licensing Fee

Confidential - Subject to Protective Order

1   looked at.

2   A.      Yeah.

3   Q.      So, with that in mind, I mean, is there any

4   reason that you have to think that that equity is a

5   license fee, other than what you've already said?

6   A.      Well, let's see if they define the term

7   "licensing fee" in this document.

8           (Witness reviews document.)  I don't see, so far

9   anyway, a specific definition of that, but I think that

10  would be kind of a commonsense interpretation of that

11  language.

12  Q.      Okay.

13  A.      In the context of this document.

14  Q.      All right.  Is there any provision, other than

15  the provision on Page 10 of the IDI policy regarding

16  distribution of equity, that you rely on when you say

17  that the hospital was required to distribute the equity

18  to you soon after the time that it received it from

19  Moderna?

20  A.      I couldn't really answer that question without,

21  you know, going over the text with a fine-toothed comb.

22  Q.      Okay.  Well, I mean, one thing we could do is,

23  we could go off the record and you could take as much

24  time as you need and then answer that question.

25          Is that fair?

Confidential - Subject to Protective Order

1  A.      Sure.

2  Q.      Okay.

3          MR. FOLKMAN:  So why don't we go off the record.

4          VIDEO OPERATOR:  We are now going off the video

5  record, and the time is approximately 11:35 a.m.

6          (Recess, 11:35-11:52 a.m.)

7          VIDEO OPERATOR:  We are now going back on the

8  video record, and the time is approximately 11:52 a.m.

9  BY MR. FOLKMAN:

10 Q.      So, Dr. Warren, when we left off, the question

11 on the table was whether there was any provision in the

12 IDI policy, other than -- which is Exhibit 4, other than

13 the provision that we had been talking about on Page 10,

14 that you would rely on to support the argument that the

15 hospital was required to deliver shares of stock to you

16 sometime shortly after it received them from Moderna.

17         And we took a pause so that you could just take

18 a look through.  So that's the question.

19 A.      Yeah.  So let me see if I can kind of restate or

20 rephrase what you said.  It seems to me that what you're

21 really asking is, is there anything that wouldn't allow

22 us to put an interpretation on this Distribution of

23 Equity paragraph where we could say that the language of

24 agreement could be equivocating between equity and

25 liquidated equity.

Confidential - Subject to Protective Order

1        And I don't see anything in the rest of the

2   Agreement that argues against that, except in a negative

3   sense that the rest of the Agreement does repeatedly

4   refer to equity in the kind of restrictive sense.

5   Q.      Okay.  Okay.  Do you see on Page 4 of Exhibit 4

6   the very last sentence?

7   A.      Yes.

8   Q.      Could you read that one out loud, please.

9   A.      The Trustees retain the discretion to amend this

10  Policy from time to time to fulfill these purposes.

11  Q.      Now, you said before that you didn't know, other

12  than the fact that the document itself said so, that

13  Exhibit 4 itself had been adopted by the IDI Board of

14  Trustees; correct?

15  A.      Sorry.  Say that again.

16  Q.      You told us earlier that, aside from the fact

17  that Exhibit 4 itself says approved by the IDI Board of

18  Trustees, you didn't have any knowledge about whether

19  the IDI Board of Trustees actually did anything to

20  approve Exhibit 4; right?

21       In other words, you don't know of any meetings

22  where that happened or any discussions among the board

23  approving this policy.

24  A.      No.  I know about it because this was what was

25  represented to me as the controlling policy by Ryan

Confidential — Subject to Protective Order

```
 1            (The court reporter read the requested portion

 2   of the record.)

 3            THE WITNESS:  Yes.  The only thing I would add

 4   to that is it's never been -- the question of whether

 5   the policies have ever been changed has obviously come

 6   up in the context of this suit, and the only thing

 7   that's ever been asserted regarding that has been this

 8   claim that the policies were changed through the

 9   language in the Affiliation Agreement.

10            So I guess, by implication, that suggests that a

11   2004 document was -- was -- was it.  Plus, that was the

12   document they sent me.  So, in that sense, I do have

13   reason to believe that it wasn't changed.

14            MR. FOLKMAN:  Okay.  So I move to strike the

15   answer, but I'll go on.

16   BY MR. FOLKMAN:

17   Q.       Who were the trustees at the time that you were

18   at IDI?

19   A.       I have no idea.

20   Q.       Do we agree that neither IDI nor Children's

21   Hospital ever made distributions to you or to Derrick

22   Rossi under the IDI policy, Exhibit 4?

23   A.       Yes.

24   Q.       I'd like to talk about the damages and remedies

25   that you're claiming in this lawsuit.
```

Confidential - Subject to Protective Order

```
 1   A.       Uh-huh.

 2   Q.       One element of what you're claiming, as I

 3   understand it, is that the percentage of the licensing

 4   revenue, the net licensing revenue, that you were

 5   entitled to under the IDI policy is higher than the

 6   percentage that you were entitled to under the policies

 7   that the hospital has actually applied and you're

 8   entitled to the difference between those two

 9   percentages.

10            Are you with me?

11   A.       That's a somewhat strange way of putting it,

12   since it's not a damages case, but I'm asking the judge

13   to rule that the IDI percentage is controlling.

14   Q.       That's a very fair point.

15            I mean, you're not claiming damages, you're

16   claiming -- you're seeking a declaratory judgment.  But

17   that's the essence of your point about the percentages;

18   right?

19   A.       Yes.

20   Q.       Okay.  And thank you for correcting me about the

21   technicality there.  You're absolutely right.

22            The other main claim that you're making is

23   that -- as I understand it, is that the hospital and IDI

24   should have distributed -- well, that you should have

25   received stock at or shortly after the time that IDI
```

Confidential -- Subject to Protective Order

```
 1    additional advice.

 2    Q.       If you had received stock -- I want to try to

 3    understand why you think you would have been better off

 4    receiving the stock --

 5    A.       Uh-huh.

 6    Q.       -- than receiving the proceeds.

 7             Do you have an understanding about whether you

 8    will have a right to elect to treat cash that you

 9    receive upon the sale of the stock as capital gains for

10    tax purposes?

11    A.       I have -- I have asked about that, you know,

12    asked financial experts, accountants, tax lawyers, and I

13    did raise that possibility.  And I don't have a definite

14    answer, but, generally, it seemed probably not.

15    Q.       You've received advice that says probably not?

16    A.       Yes.

17    Q.       Okay.  If you had received the stock at the time

18    that IDI received the stock, what would you have done

19    with it?

20    A.       Nothing.

21    Q.       You would have held it?

22    A.       That's not liquid -- it's not a liquid asset.

23    It's a private corporation.  In any case, there would,

24    I'm sure, been restrictions, which I would have

25    inherited on any sale of the stock.  So it would just
```

1    have been a long-term capital asset.

2    Q.      And do you agree with me, then, that the

3    stock -- if you had received a stock certificate, it

4    probably wouldn't have been saleable?

5    A.      I think that's likely, yes.

6    Q.      And so, as I understand it, the basis of your

7    claim that you would have been better off receiving the

8    stock earlier rather than receiving the cash later is

9    that you believe that you would not be entitled to

10   capital gains treatment on cash that you received later,

11   but you would have been entitled to capital gains

12   treatment if you had received the stock earlier.

13          Is that a fair statement of your view?

14   A.      In terms of that direct economic injury

15   resulting from not receiving the stock early, that's

16   correct, yes.

17   Q.      And is there any other reason that you think you

18   would have been better off receiving the stock earlier

19   rather than receiving the cash later?

20   A.      I do think that receiving the stock earlier

21   would have made it harder for the -- for the hospital

22   to, as it were, change the rules on me.

23          In fact, they certainly -- if I had received the

24   stock back in 2011, I certainly would have received it

25   based on the 33-and-a-third rule, because even -- even

Confidential - Subject to Protective Order

```
 1    which has a different set of terms and percentages, I
 2    guess because they were perhaps in the negotiations with
 3    Rossi, that did have a significant lab percentage.  So
 4    they were partly modeling it in the negotiations with
 5    this 2015, although nobody claimed that the 2015 policy
 6    applied.
 7           So I had several exchanges with him where I
 8    tried to get the facts of the three different policies
 9    we're talking about.  What's the basis for which policy
10    applies?  Well, there are four, if you include the
11    custom policy.
12           And -- and once I got those all lined up, all
13    those facts lined up, I said, I'm not willing to sign
14    this custom agreement because it means that I'm
15    basically signing away my rights to the 33 and a third
16    that I was promised, and I'm not sure that that's okay,
17    and so I'm not just going to stick my signature on it.
18           And Dietz said -- well, in an email, I think we
19    had -- we had a second -- we scheduled a second phone
20    conversation and Dietz was non-committal, but he said,
21    I'll have somebody, you know, our legal department get
22    in touch with you and explain why this is okay, that
23    we're -- and, in fact, we're now offering you -- excuse
24    me -- this is actually better than okay, because we're
25    actually in this custom agreement offering you more than
```

Confidential - Subject to Protective Order

```
1   STATE OF CALIFORNIA          )

2   COUNTY OF LOS ANGELES        )

3            I, ROSEMARY LOCKLEAR, a Certified Shorthand

4   Reporter of the State of California, duly authorized to

5   administer oaths pursuant to Section 2025 of the

6   California Code of Civil Procedure, do hereby certify

7   that

8            LUIGI WARREN, Ph.D., the witness in the

9   foregoing deposition, was by me duly sworn to testify

10  the truth, the whole truth and nothing but the truth in

11  the within-entitled cause; that said testimony of said

12  witness was reported by me, a disinterested person, and

13  was thereafter transcribed under my direction into

14  typewriting and is a true and correct transcription of

15  said proceedings.

16           I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any

19  way interested in the outcome of the cause named in

20  said deposition dated the_____ day of

21  _____, 2018.

22

23

24

25  ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969
```