# SUMF EXHIBIT 3

## EXHIBIT 4 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

 **Immune Disease Institute**

# RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

Approved by the ID I Board of Trustees
October 28, 2004



EXHIBIT 4
DATE: 11/16/18
ROSEMARY LOCKLEAR CSR #13969

# Table of Contents

|  | page |
|---|---|
| Preamble | 3 |
| A. Purpose | 4 |
| B. Research and Technology Development Committee | 5 |
| 1. Committee Membership | 5 |
| 2. Responsibilities | 5 |
| C. Scope | 5 |
| D. Technology Reporting and Disclosure | 6 |
| 1. Reporting to OTD | 6 |
| 2. Disclosure Outside IDI | 6 |
| E. Technology Ownership: | 6 |
| 1. Principles | 6 |
| 2. Process | 7 |
| F. Protecting Intellectual Property Rights | 7 |
| G. Marketing and Commercialization | 8 |
| H. Distribution of Net Proceeds: | 8 |
| 1. Net Proceeds | 8 |
| 2. Equity | 8 |
| 3. IDI General Fund | 9 |
| 4. Distribution Schedule | 9 |
| 5. Multiple Inventors | 9 |
| 6. No Active Research Program | 10 |
| 7. Death or Departure from IDI | 10 |
| 8. Postponement of Distribution | 10 |
| I. General Equity Provisions: | 10 |
| 1. Decision to Accept Equity | 10 |
| 2. Receipt of Equity | 10 |
| 3. Distribution of Equity | 11 |
| 4. Monitoring | 11 |
| 5. Clinical or Other Sponsored Research | 11 |
| 6. Governing or Scientific Board Membership | 11 |
| J. Conflicts of Interest Policies | 12 |
| K. Consulting Agreements | 13 |
| L. Other Arrangements | 13 |
| M. Former Policies | 13 |
| **APPENDIX** |  |
| Exhibit A - Participation Agreement | 15 |
| Exhibit B – Standard Consulting Agreement Provisions | 18 |

## IMMUNE DISEASE INSTITUTE
## RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

### - Preamble -

The collaboration between Immune Disease Institute and its physicians and researchers is critical to IDI's successful fulfillment of its mission of providing a high level of excellence in research. Over the last several years, a variety of relationships with industry have brought new resources to the support of science that facilitates translation of knowledge from the laboratory to the bedside. These relationships have great potential to benefit the public as well as research institutions, their faculty and staff, and their industrial partners. The Trustees of Immune Disease Institute are strongly committed to the continued growth in these innovative and mutually beneficial relationships, while realizing their paramount responsibility to safeguard the principles of academic freedom and timely dissemination of information about important new scientific developments.

This policy is intended to serve as a guide for members of the IDI community in structuring their relationships with industry and other outside ventures in view of their academic responsibilities for teaching, research and patient care. In addition, the policy encourages creativity and innovation of researchers, with incentives for productivity and opportunities to gain recognition for individual accomplishments.

In addition, this policy is also meant to encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property rights of IDI, while providing for fair and equitable allocation of responsibilities and rewards among inventive researchers, IDI and other collaborators who may have contributed in whole or in part to inventions, discoveries or Technology.

Finally, the policy supports the goal of bringing to the public important new discoveries, which, through commercialization, address unmet medical needs and alleviate human suffering.

## IMMUNE DISEASE INSTITUTE
## RESEARCH AND TECHNOLOGY DEVELOPMENT POLICY

### A. PURPOSE

The mission of Immune Disease Institute (IDI) is to provide the highest level of excellence in medical research. To further this mission, the Trustees of IDI (the "Trustees"), who are responsible for the overall allocation of resources to accomplish this objective, have adopted this Research and Technology Development Policy (the "Policy") to:

> benefit the public by facilitating commercial development and utilization of inventions, discoveries and other Technology;

> encourage the creativity and innovation of current staff, and encourage the recruitment and retention of talented and innovative staff;

> provide incentive to researchers to be productive and recognize individual accomplishment;

> foster scholarly pursuits and principles of academic freedom;

> encourage researchers to disclose discoveries in a timely manner in order to protect the intellectual property interests of IDI;

> provide guidelines for negotiating, preparing and implementing contracts with outside sponsors, collaborators and licensees;

> provide for equitable allocation of responsibilities and financial rewards among inventors, researchers, IDI and any other entity, which may have developed, sponsored or financed in whole or in part, such invention, discoveries or Technology; and

> provide support for IDI's mission of excellence in clinical care, teaching and research.

The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes.

## B. RESEARCH AND TECHNOLOGY DEVELOPMENT COMMITTEE

1. Committee Membership. The Trustees, in consultation with the President of IDI, the Executive Vice President and the Director of the Office of Technology Development ("Director") will appoint members of the Research and Technology Development Committee (the **"Committee")**. Membership may consist of the President of IDI or designee, the Executive Vice President, the Director for Development, the Director of the Office of Technology Development (OTD); two Senior Investigators, active in research at IDI; and at least five members of the Board of Trustees. All members of the Committee shall have the right to vote on matters that come before the Committee. All members of the Committee shall serve at the pleasure of the Board of Trustees. Members of the Committee shall serve at the discretion of the Chairman of the Committee. A quorum shall consist of at least two thirds (2/3) of the membership with at least three (3) Trustees, one (1) Faculty member and either the Director or the Chairman included in that number.

The Chairman of the Committee shall be designated annually by the Chairman of the Trustees. The Director, or designee, shall be responsible for scheduling all meetings of the Committee and keeping the minutes for such meetings. The President and Chief Financial Officer of IDI shall have the right to attend all meetings, and the Director shall be responsible for notifying them of all meetings.

2. Responsibilities. The Committee shall oversee and advise the Director on the interpretation and application of this policy, and may grant exceptions to the Policy in special cases. The Chairman shall act on or recommend to the Board, as appropriate, any motions on matters that are brought to a vote in the Committee and agreed to by a majority of those present. From time to time; the Committee may recommend to the Trustees amendments and/or additions to this Policy.

## C. SCOPE

This Policy applies to any invention, discovery, data, writing, and other intellectual property, including trade or service marks, works-for-hire, know-how, computer software and biological materials, whether or not patentable, copyrightable or otherwise entitled to legal protection (collectively "Invention") made, conceived, reduced to practice or generated by a full or part-time professional staff, faculty, employee of, student, trainee, or person or entity otherwise engaged at IDI, such as consultants or agents retained by IDI (collectively **"Covered Person")**. Any Invention that (1) either has potential commercial value or is patentable, copyrightable, or otherwise entitled to legal protection, and (2) is made, conceived, reduced to practice or generated by a Covered Person while engaged in activities: (a) for which the Covered Person received financial support from or through IDI; (b) during which the Covered Person made significant use of facilities, materials, equipment, staff, information, ideas, data, computers or other resources of IDI; or (c) which are related to the employment, research or other activities conducted at IDI by the Covered Person is referred to as **"Technology"**. Ordinary use of desktop computers, library facilitities or personal office space shall not be considered "significant" use for purposes of Section (b) above. Steps taken toward commercialization, such as filing a patent application or seeking other protection of intellectual property, will be interpreted as demonstrating potential commercial value.

In keeping with principles of academic tradition, IDI claims no ownership interest in scholarly publications, such as textbooks, that do not embody or disclose any Technology and were not prepared with significant use of IDI resources.



Each Covered Person shall sign a Participation Agreement in which the Covered Person agrees to comply with this Policy. A copy of a Participation Agreement is attached as **Exhibit A.**

## D. TECHNOLOGY REPORTING AND DISCLOSURE

1. Disclosure of Technology to IDI. Each Covered Person who makes, conceives, reduces to practices or generates Technology (the **"Inventor"**) should promptly submit a completed Report of Invention to IDI's Office of Technology Development ("OTD") when Technology is identified. Report of Inventions are available from the OTD. If the Covered Person is a consultant engaged by an employee or staff member of IDI, then the employee or the staff member is responsible for ensuring that the Report of Invention is completed and submitted. The description of the Technology in the disclosure form should provide enough detail to determine the most appropriate steps, if any, to protect and commercialize the Technology.

2. Disclosure Outside IDI. If Technology is disclosed outside IDI, such as in a publication or oral presentation, by use, or by public sale, before appropriate steps are taken to protect the intellectual property rights in the Technology, such as filing a patent application, then those rights may be lost. Therefore, prior to any proposed publication of Technology or other disclosure of the Technology outside IDI, the Inventor should contact the OTD to coordinate the disclosure with steps IDI may take to protect rights in the Technology. If Technology is to be disclosed to a third party for commercial evaluation or other IDI purposes, in most cases an appropriate, signed Confidential Disclosure Agreement should be obtained from the recipient of the information. For Reports of Invention, Confidential Disclosure Agreements, and information about the appropriate use of each, contact the OTD or log on to the IDI website.

## E. TECHNOLOGY OWNERSHIP

1. Principles:

   a. All Technology is owned by IDI. When an entity other than IDI has also sponsored, financed, or otherwise participated in the invention, the Director will negotiate with the other entity to determine the percentage of the Technology owned by IDI. The Director may consult with the Committee and the Inventor.

   b. The ownership of Technology made in whole or in part in connection with activities conducted under a grant from or other agreement with the U.S. Government is subject to the retained rights of the U.S. Government.

   c. The ownership of Technology made in whole or in part in connection with activities conducted pursuant to any industrially sponsored or otherwise sponsored research agreement between IDI and the sponsor will be in accordance with this Policy.

Immune Disease Institute
Plaintiff's Rule 26(a)(1) Initial Disclosures

2. Process:

    a. The Director: will make the initial determination of ownership. Decisions of the Director about whether an Invention is within the definition of Technology and other issues of ownership may be appealed to the President by an Inventor in writing within one (1) month of notification to the inventor of the Director's decision The President will convene a subcommittee of IDI consisting of the Director and the Executive Committee whose decision will be final.

    b. Subject to obligations to third parties (such as a sponsor or the Government), IDI may waive ownership and release, in whole or in part, any Technology and its related patent, copyright or other legal protection, to the Inventor. The terms of the release may include appropriate compensation to IDI for its out-of-pocket expenses associated with the Technology. IDI may also elect to retain the non-exclusive right to use any released Technology for IDI's non-commercial research.

    If IDI has not taken steps to obtain legal protection of Technology within three (3) months after the filing of a completed Report of Invention or the Effective Date of this Policy, whichever is later to occur, then the Inventor may submit a written request to the Director for the release of the Technology to the Inventor(s). Within three (3) months of receiving the request, the Director will present the request to the Committee for approval and inform the Inventor of whether or not the request is approved, and the reasons for the decision. If the request is approved, then IDI will provide appropriate documentation releasing the Technology to the Inventor(s).

## F. PROTECTING INTELLECTUAL PROPERTY RIGHTS

The Director or designee, working with the Inventor, will decide whether to seek legal protection of technology. If IDI seeks patent, copyright or other legal protection of Technology, in whole or in part, then the Inventor and IDI will work together to protect the Technology. IDI will provide professional services at its expense. The Inventor will provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI. The OTD will retain Participation Agreements, invention disclosures, inventorship declarations, and assignments. IDI is not obligated to pay for professional services that are not authorized in advance by the Director.

## G. MARKETING AND COMMERCIALIZATION

The Director and the Inventor, working together, will decide what measures are to be taken to commercialize the Technology, taking into account the principles of academic freedom while optimizing the utility of the Technology to the public and its commercial value to IDI. This may include, but are not limited to, agreements with third parties for the development, patenting, promotion, marketing, licensing and manufacturing of Technology. Transfers of any interest in Technology to third parties are to be by license, rather than assignment, unless otherwise decided by the Director in consultation with the Committee. The license should provide IDI the right to reduce or terminate the license if the third party does not make a diligent effort to make a product developed from the Technology available to the public. If necessary, the Director will expend reasonable efforts to locate Inventors who are no longer at IDI although primary responsibility for keeping address information current will reside with the Inventor. If an Inventor is no longer employed or otherwise engaged at IDI, then the Director may independently decide what measures are to be taken to commercialize the Technology.

Only approved agreements signed by an authorized representative of IDI shall be valid and binding upon IDI. The Director or designee is authorized to negotiate agreements for the development or transfer of Technology with commercial and non-commercial third parties. The President of IDI is authorized to approve and sign Exclusive License Agreements. The Director, and, in the case of agreements for clinical research, the Director or designee, is authorized to approve and sign all other Technology development and transfer agreements.

## H. DISTRIBUTION OF NET PROCEEDS

1. Net Proceeds. The term "Net Proceeds" as used in this Policy shall mean the amount actually received by IDI from the sale, license or other commercialization of Technology owned in whole or in part, by IDI, including, but not limited to, royalties, fees, milestone payments, and Equity (as defined below), less all costs and expenses reasonably attributable to obtaining intellectual property protection and commercialization of the Technology. These costs and expenses may include, without limitation, attorney fees, and out-of-pocket administrative and other costs and expenses of contract negotiations and administration, and any out-of-pocket cost or expense of patent or copyright prosecution, litigation, marketing, licensing and/or negotiation. Research funding and contributions of equipment received by IDI from the sale, licensing or other commercialization of any Technology, shall be the property solely of IDI and shall not be included within Net proceeds.

2. Equity. The term **"Equity"** as used in this Policy shall include stocks, options, warrants and/or other financial instruments convertible to equity in an entity that has rights to Technology.

3. IDI General Fund. IDI General Fund supports initiatives generally of IDI. This fund is hereinafter referred to as the **"General Fund"**.

8

4. Distribution Schedule. IDI may receive Net Proceeds for the license, sale or other transfer of Technology. If the Inventor arranges to receive Equity from the company to which the Technology is transferred, the guidelines for Conflict of Interest and Commitment of the Faculty Policies on Integrity in Science of Harvard University Faculty of Medicine shall apply. The Net Proceeds actually received by IDI for its interest in Technology, excluding works for hire and trade or service marks, shall be periodically distributed by IDI as provided in the following schedule:

### Distribution Schedule

| Inventor | Inventor's Laboratory | IDI General Fund |
|----------|----------------------|------------------|
| 33 1/3% | 33 1/3% | 33 1/3% |

All distributions to Inventors shall be considered miscelaneous income and will be reported on Internal Revenue Service form 1099.

5. Multiple Inventors. In the event there are joint Inventors, distributions made to the Inventors under the Distribution Schedule shall be divided equally among the Inventors, except as may be otherwise directed by the Inventors and approved by the Director. If the Inventors' work is in different Laboratories, the distributions allocated to each of their respective Research Programs and Departments shall be in direct proportion to the amounts allocated to each Inventor.

6. No Active Research Program. If the Inventor does not have an active research program at the time of commercialization, the Inventor's Laboratory share shall be distributed to the General Fund.

7. Death or Departure from IDI. If the Inventor dies or ceases to be employed by or otherwise engaged at IDI, then IDI will distribute the Inventor's individual share (as distinguished from that of the Inventor's Laboratory) to the Inventor or the Inventor's estate. It shall be the responsibility of the Inventor or the executor or legal representative of the Inventor's estate to notify IDI's OTD in writing, as to where future payments should be sent. Under these circumstances, the Inventor's Laboratory share shall be distributed to the General Fund.

8. Postponement of Distribution. Notwithstanding all of the foregoing, the Committee may postpone distribution of Net Proceeds when extraordinary future expenses, such as an infringement suit, relating to the applicable Technology are reasonably anticipated by the Committee. In such event, the amounts received shall be segregated by IDI, and Net Proceeds will be distributed in accordance with this Policy after actual expenses have been reimbursed to IDI.

I.     GENERAL EQUITY PROVISIONS

1. Decision to Accept Equity. In certain cases of Technology transfer, IDI may have the opportunity to acquire Equity in the licensee's or buyer's company in exchange for IDI's interests in Technology. Decisions regarding ownership of Equity by IDI or an individual Inventor shall be guided by the policies of IDI, and the Harvard Faculty of Medicine policies concerning conflicts of interest and conflicts of commitment together with the purposes and objectives of this Policy.

   The Director will make an initial determination as to whether IDI should accept Equity for the transfer. If the Director determines that an equity transaction meets the objectives of this Policy, then the Executive Vice President will make a written recommendation to a subcommittee of the Committee, designated by the chair of the Committee, to confirm the acceptance of equity and address issues relating to equity ownership (the "Equity Subcommittee").

2. Receipt of Equity. Unless otherwise approved by the Equity Subcommittee, Equity is to be received at the time the Technology is transferred to the company, and not structured as a series of future payments linked to financing milestones or unit sales. However, IDI may accept additional shares in order to maintain IDI's relative Equity percentage interest without additional approval of the Equity Sub-Committee.

   Managers of the Equity account will not have access to any insider knowledge of publicly traded securities. The Investment Committee shall hold Equity in accounts separate from other investment accounts of IDI so that they can be monitored in accordance with this Policy.

   IDI shall disclose its Equity interest in IDI's sponsored publications or presentations regarding associated research and in other situations where the public or where IDI patients would reasonably expect a disclosure. IDI shall also report these interests in its annual report or, if the annual report would not be timely, through appropriate news releases.

3. Distribution of Equity: Equity received by IDI in lieu of a Licensing Fee shall be deemed to be a royalty. The Inventor's share of equity taken as a royalty shall be distributed to Inventors at the earliest opportunity following receipt. The Laboratory and IDI General Fund shares shall be transferred to and disposed of by the Investment Committee. The Principal Investigator of the Laboratory shall be consulted by the Investment Committee about the timing of liquidation of the Laboratory share of an equity transaction.

4. Monitoring. In all circumstances in which IDI receives Equity from a licensee or assignee of Technology, IDI shall closely monitor such relationships to materialize any real or perceived potential conflicts of interest that may arise from that relationship. The Executive Vice President is responsible for overseeing the research implications of Equity arrangements, and will periodically interview appropriate researchers regarding their work and its relationship to the company in which IDI and/or researchers hold Equity.

5. <u>Clinical or Other Sponsored Research</u>. If IDI plans to participate in Clinical Research (as defined by the Harvard University Faculty of Medicine's Policy on Conflicts of Interest and Commitment) sponsored or otherwise financed by a company in which either (a) IDI holds Equity and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company, then IDI shall give due consideration to conflict of interest and commitment concerns that may exist as a result of IDI's holdings in the company. IDI shall take appropriate action, including selling its Equity share in that company, in order to manage, reduce or eliminate conflicts of interests.

Inventors may only hold Equity during the course of Sponsored Research as defined in and to the extent provided for in Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment and the Conflict of Interest and Related Policies for IDI and its Affiliates. If the Inventor desires to avoid Equity in order to obtain research funding from a company, the Inventor may request that IDI also avoid taking Equity through a license agreement so as to allow the sponsored research. IDI normally shall not accept Equity under such circumstances; provided, however, that IDI will require in its license or other Technology transfer agreement that the Inventor will not obtain Equity at a later date without the consent of IDI.

6. <u>Governing or Scientific Board Membership</u>. Without the prior consent of the Equity Subcommittee, neither IDI nor any non-faculty employee shall accept a board seat of a company or a seat on a company's Scientific Advisory Board if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company. No Faculty member may accept a voting seat on a Governing Board of a company if either (a) IDI holds Equity in the company and the company has a market capitalization of less than $10 billion; or (b) IDI holds an Equity interest of at least 5% in the company, regardless of the market capitalization of that company

## J. CONFLICT OF INTEREST POLICIES

1. All financial or compensation arrangements between Covered Persons and third-parties are subject to the *Conflict of Interest and Related Policies for IDI and its Affiliates* and also the *Harvard University Faculty of Medicine Policy on Conflicts of Interest and Commitment* to the extent provided for in those policies and as may be amended by the appropriate authorized governing committee or board.

2. Conflicts of Interest arising from Technology transfer to a company in which a Trustee of IDI or a member of their immediate family holds significant or controlling interest, shall be resolved according to the following guidelines:

   • assign oversight of the transaction to a committee of disinterested Trustees, and require approval by the committee or the full board before a Trustee transaction may occur;

- follow carefully the Intermediate Sanctions rebuttable presumption requirement that the Trustee fully recuse himself or herself from the deliberations and decision making;

- include within the committee's responsibilities the question of whether to sell the Technology at this time or whether to wait;

- conduct sufficient market outreach to establish whether there is a market, other than a Trustee transaction, for the Technology (for example, conduct at least the same market outreach that IDI would conduct before selling Technology in a non-Trustee transaction);

- if a Trustee transaction is under consideration, make sure that the committee or board has sufficient information to determine that the transaction will provide fair value to IDI;

- in deciding whether to enter into a Trustee transaction, factor into the decision any potential adverse publicity that might result for IDI from the fact of entering into a Trustee transaction;

- in determining the minimum amount of consideration to be received in a Trustee transaction, ensure that the consideration will be sufficient to counter criticism of the fact that the transaction is a Trustee transaction;

- if equity or debt of the acquiring entity are proposed as a part of the consideration to be received by IDI, do not accept a higher percentage of such non-cash consideration than IDI would accept in a non-Trustee transaction (non-cash consideration should be viewed from the perspective of IDI's total investment portfolio, avoiding an imprudent percentage of investment in a single non-seasoned company, and avoiding an imprudent overall percentage of high risk investments for the total portfolio) -- here again, ensuring that the mix of non-cash and cash consideration will be adequate to counter criticism of the fact that the transaction is a Trustee transaction;

- before entering into a Trustee transaction, make sure that due diligence is conducted with at least the same level of intensity and sophistication as would be conducted for a non-Trustee transaction;

- as required for the IRS rebuttable presumption, carefully document the basis for the determination concurrently with making the determination.

## K. CONSULTING AGREEMENTS

All consulting arrangements between any Covered Person and any third-party are subject to IDI review pursuant to IDI's applicable Policy on *Consulting Relationships, and Other Financial Arrangements between IDI Staff and Outside Organizations*. Consulting

arrangements between a Covered Person and a third party are subject IDI's Standard Provision's for Consulting, appended to this document as Exhibit B.

## L. OTHER ARRANGEMENTS

Should there be any conflict between this Policy and (a) the terms or conditions of a proposed or existing agreement between IDI and a sponsor, or (b) the policies of another organization to which an Inventor is obligated by agreement, joint appointment, or other affiliation, the conflict shall be resolved by the Director in consultation with the Committee.

## M. FORMER POLICIES

This Policy shall replace all existing policies regarding Technology transfer, effective upon the approval of this Policy by the Trustees. This Policy shall govern the actions, rights and responsibilities of IDI and Covered Persons regarding all Invention, and Technology, from and after the Effective Date, regardless of the date of conception or disclosure of said Invention or Technology.


APPROVED BY THE BOARD OF TRUSTEES
October 28, 2004


# Immune Disease Institute

## Exhibit A

### IMMUNE DISEASE INSTITUTE
### PARTICIPATION AGREEMENT

Name: _____

Department or Laboratory: _____

In consideration of my employment by or association with Immune Disease Institute (IDI), and/or being afforded an opportunity to work on projects being carried out by IDI, or substantive use of IDI resources, I hereby represent and agree as follows:

1. Compliance with IDI Policies. I have read and I understand the terms of IDI's "Research and Technology Development Policy" and IDI's Policy on Consulting Relationships between IDI Staff and Outside Organizations, and agree to comply with these policies, as amended by the appropriate authorized governing committee or board.

2. Compliance Pursuant to Contracts and Grants. I shall comply with every obligation of IDI that applies to me pursuant to any contract, grant or commitment relating to research or other work covered by the Research and Technology Development Policy.

3. Disclosure of Inventions. Each Invention (meaning all discoveries, concepts, ideas, processes, methods, formulas, and techniques, whether or not patentable) and further including trademarks and copyright rights conceived or reduced to practice by me solely, jointly, or with others in the course of my employment by IDI shall be promptly disclosed to IDI by me utilizing a written Report of Invention. Report of Invention forms are available from the Office of Technology Development. Such report shall be sufficiently complete in technical detail and appropriately illustrated by sketch or diagram to convey understanding of the nature, purpose, operation, and to the extent known, the physical, chemical and biological characteristics of the Invention.

4. Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any Invention or any litigation or other claim or proceeding involving any Invention, but all expenses thereof shall be paid by IDI. All records which I shall use or prepare or come into contact with in the course of working for IDI, shall

remain IDI's sole and exclusive property and shall be subject to the agreement; except that I may retain for my own personal use one copy of all my scientific work papers customarily retained by researchers at non-profit institutions unless prevented by contractual obligations to third parties pertaining to confidential papers or trade secrets, which obligations prevent such retention of any such papers.

5. Filing Copies of Agreements with OTD. I will file with the OTD a final copy of every consulting agreement to which I am a party or become a party (a) that is connected to work which I have done, am doing, or expect to do within the scope of my employment by, appointment with, or education at IDI or (b) for which I have made, am making, or expect to make use of facilities, materials, equipment, staff, information, ideas, data or other resources furnished by or through IDI.

6. Ownership of Notebooks and Data. I agree that all notebooks and other data generated in research and other activities associated with or funded through IDI (whether in paper, electronic or other media) shall belong to IDI. The originals of such data are to remain with IDI. In accordance with the policies of IDI and Harvard Medical School, I may obtain a copy of such data. At the request of IDI, I shall deliver promptly to IDI copies of all written, electronic, or other records describing or referencing Technology as defined in IDI's "Research and Technology Development Policy", whether or not I am still employed by or otherwise engaged at IDI.

7. No Employment Contract. I understand that this Agreement does not constitute an employment contract and that, if I am otherwise an employee of IDI, this Agreement does not constitute any representation that my employment will continue for any definite period of time nor does this Agreement affect my employment status in any other way.

8. Prior Inventions Excepted. Descriptions of all Inventions, whether or not patented, which I conceived or reduced to practice prior to my employment by IDI, are attached hereto as Schedule A, and those Inventions shall be excluded from this agreement. I represent that the absence of any Invention from Schedule A shall indicate that I own no such Invention at the time of signing the Agreement.

9. Publication or Disclosure of Confidential Matter. I agree that I will not at any time, whether or not I am employed by IDI, except as properly required in the conduct of the business of IDI, or except as authorized in writing by IDI, publish, disclose, or authorize anyone else to publish or disclose, any Invention or any other secret or confidential matter relating to any aspect of the operations or business of IDI or its related companies, business clients or associates with which my employment may in any way acquaint me. However, in all cases where not prevented by contractual agreement with third parties, I shall have an absolute right to make scientific publication of my work.

10. Limitation on Authority. I understand and agree that I am not authorized by IDI to sign, and I will not sign, any agreement or document on behalf of IDI that may commit, restrict, or otherwise affect Inventions that I create, including confidentiality agreements, license agreements, material transfer agreements, and research agreements. I shall not sign individually any document or agreement (other than one solely involving an Academic

Work) unless specifically approved or requested to do so by an authorized representative of IDI and I understand and agree that all such documents must be submitted to the OTD.

11. <u>Distribution Policy</u>. I have read and understand the Distribution of Net Proceeds mentioned in the IDI's "Research and Technology Development Policy".


Signature: _____

Date: _____


## Exhibit B

The following example document, Standard Provisions for Consulting, is provided for informational purposes. Any IDI personnel who are asked to consult for an outside company, should present a copy of this document to the company and ask that it be appended to the Consulting Agreement. The provisions contained in this agreement protect the rights of the consultant and IDI and are generally accepted without any changes by the companies. Executable versions of this form may be downloaded from the IDI website or obtained from the Office of Technology Development.

 **Immune Disease Institute**

## Exhibit B

**IMMUNE DISEASE INSTITUTE**
**STANDARD CONSULTING AGREEMENT PROVISIONS**

Attachment to Consulting Agreement between _____ and _____

1   It is the policy of The Immune Disease Institute (IDI) that these Standard Consulting Agreement Provisions ("Standard Provisions") must be attached to any written agreement ("Agreement") to provide consulting services between an employee, student, or member of the professional staff ("Consultant") of IDI and any organization ("Company") and must be signed by both parties to the Agreement.  By signing these Standard Provisions, the parties to the Agreement agree to abide by these Standard Provisions, and further agree that if anything in the Agreement is inconsistent with these Standard Provisions, these Standard Provisions shall govern.

2   Nothing in the Agreement shall limit or be construed to limit the right of Consultant to use or publish information which (a) is or becomes available to the public through no breach of the Agreement by Consultant, (b) was known to Consultant before the consulting services were performed, (c) is acquired by Consultant from a third party has the legal right to disclose the information to the Consultant, or (d) Consultant is required to disclose by law, government regulation, or court order.  In addition, information generated by Consultant pursuant to the Agreement shall be proprietary to the Company only if (a) such information is generated as a direct result of the performance of consulting services under the Agreement and (b) is not generated in the course of the Consultant's activities as a IDI employee.

3   Consulting services shall not involve any use of the funds, personnel, facilities, materials, or other resources of IDI, provided that Consultant may use the library and the Consultant's office.

4   Neither the name of the Consultant nor that of IDI, nor any variation thereon, nor adaptation thereof may be used in any advertising, promotional or sales literature, or other publicity without the prior written approval of the party whose name is to be used.

5   Consultant's rights, title and interest in inventions, discoveries and developments conceived or reduced to practice in the performance of Company funded consulting services made solely or jointly with Company employees or agents ("Consulting Inventions") may be assigned to the Company, so long as the provisions in Paragraph 6 below are not applicable.  Consultant shall disclose to IDI's Office of Technology Development, in confidence, all Consulting Inventions which are related to Consultant's research, clinical, or educational activities at IDI in order to provide IDI an opportunity to assess, together with Company, whether the invention is subject to the provisions of Paragraph 6 below.

6   Not withstanding Paragraph 5 above, Company agrees and understands that Consultant has

a pre-existing obligation to assign to his or her employer, IDI, all of Consultant's rights in intellectual property which arise or are derived from Consultant's employment at IDI or which utilize the funds, including funding from any outside source awarded to or administered by IDI, personnel, facilities, materials, or other resources of IDI including resources provided in-kind by outside sources. Company has no rights by reason of this Agreement in any publication, invention, discovery, improvement or other intellectual property, whether or not publishable, patentable or copyrightable that is subject to Consultant's obligations to IDI. Company also acknowledges and agrees that it will enjoy no priority or advantage as a result of the consultancy created hereunder in gaining access, whether by license or otherwise, to any proprietary information or intellectual property of IDI.

7   Consultant shall not disclose to Company any unpublished results of research performed at IDI by Consultant or any other IDI employee, student, or member of the professional staff. Other than the inventions assigned to Company pursuant to Paragraph 5 above, Company shall have no rights or interests in any other inventions, discoveries or developments owned by or assignable to IDI.

8   Nothing in the Agreement shall be construed to restrict or limit the duties Consultant is performing or may perform in the course of, or incidental to, Consultant's employment at IDI, including but not limited to research sponsored by a third party commercial entity nor shall anything in the Agreement be construed to restrict or limit Consultant's right to serve as an advisor to any hospital, or to any governmental or not-for-profit organization.

9   Each party to the Agreement acknowledges (i) that the Consultant is entering into the Agreement, and providing services to the Company, in the Consultants individual capacity and not as an employee or agent of IDI, (ii) IDI is not a party to this Agreement and has no liability or obligation hereunder, and (iii) IDI is intended as a third party beneficiary of this Agreement and certain provisions to this Agreement are for the benefit of IDI and are enforceable by IDI in its own name.

10  The Standard Provisions shall be and hereby are in force and effect for the entire term of any Agreement between Consultant and Company.


ACCEPTED:

_____     _____
Authorized Officer of Company         Date

_____     _____
Consultant                            Date