# SUMF EXHIBIT 7
## EXHIBIT 15 OF DR. LUIGI WARREN'S NOVEMBER 16, 2018 DEPOSITION

### THE CHILDREN'S MEDICAL CENTER CORPORATION
### AFFILIATION WITH
### IMMUNE DISEASE INSTITUTE, INC.

*February 20, 2009*

**TAB**

I.  **AGREEMENTS**

    1.1.  Affiliation Agreement by and between The Children's Medical Center      1
Corporation ("CMCC") and Immune Disease Institute, Inc. ("IDI"), dated
December 24, 2008.

        1.1.1.  Exhibits.      A

            1.1.1.1.  Exhibit 1.3(a) – Amended and Restated Articles of Organization.

            1.1.1.2.  Exhibit 1.3(b) – Amended and Restated Bylaws.

            1.1.1.3.  Exhibit 4.1 – Attorney General Notice.

            1.1.1.4.  Exhibit 4.5 – Employees and Independent Contractors.

            1.1.1.5.  Exhibit 5.1.5 – Opinion from Edwards Angell Palmer & Dodge, LLP.

            1.1.1.6.  Exhibit 5.1.8 – Consents.

            1.1.1.7.  Exhibit 5.2.5 – Opinion from Ropes & Gray, LLP.

            1.1.1.8.  Exhibit 6.3.4 – Faculty Members.

            1.1.1.9.  Exhibit 6.3.7 – Administrative Personnel.

            1.1.1.10.  Exhibit 6.4.1 – Endowment Investment Agreement.

        1.1.2.  IDI Disclosure Schedule.      B

            1.1.2.1.  Schedule 2.1 – Subsidiaries, Affiliates and Other Interests in Entities.

            1.1.2.2.  Schedule 2.3(a) – IDI Board of Trustees and IDI Board of Overseers.

            1.1.2.3.  Schedule 2.3(b) – IDI Officers.

            1.1.2.4.  Schedules 2.3(c) and (d) – IDI Bank and Investment Accounts.

            1.1.2.5.  Schedule 2.4(a) – Governmental Approvals and Notices.

            1.1.2.6.  Schedule 2.4(b) – Agreement and Instrument Waivers, Consents and Notifications.

            1.1.2.7.  Schedule 2.6 – Employee Loans as of October 31, 2008.

            1.1.2.8.  Schedule 2.8 – Pending Litigation.

            1.1.2.9.  Schedule 2.9.1 – IDI Intellectual Property Rights.



| | | | | TAB |
|---|---|---|---|---|
| | 1.1.2.10. | Schedule 2.9.11 – Outbound Licenses. | | |
| | 1.1.2.11. | Schedule 2.9.12 – Domain Names. | | |
| | 1.1.2.12. | Schedule 2.11.1 – Employee Benefit Plans. | | |
| | 1.1.2.13. | Schedule 2.11.3 – Change in Control Agreements. | | |
| | 1.1.2.14. | Schedule 2.11.5 – Audit of Plans. | | |
| | 1.1.2.15. | Schedule 2.12 – Material Agreements. | | |
| | 1.1.2.16. | Schedule 2.17 – Insurance Policies. | | |
| | 1.1.2.17. | Schedule 2.19.1 – Owned Real Property and Real Property Leases. | | |
| | 1.1.2.18. | Schedule 2.19.2 – Encumbrances on Real Property. | | |
| 1.1.3. | | CMCC Disclosure Schedule. | | C |
| | 1.1.3.1. | Schedule 3.4 – Required Consents. | | |

1.2. Amended and Restated Articles of Organization of IDI, as filed with the Secretary of State of The Commonwealth of Massachusetts on February 20, 2009.     2

1.3. Amended and Restated Bylaws of IDI.     3

**II.   PRE-CLOSING DELIVERABLES**

2.1. Certificate of IDI Chief Executive Officer.     4

2.2. Certificate of CMCC Chief Executive Officer.     5

2.3. Opinion of Edwards Angell Palmer & Dodge, LLP, counsel to IDI.     6

2.4. Opinion of Ropes & Gray, LLP, counsel to CMCC.     7

**III.   THIRD PARTY NOTICES AND CONSENTS**

3.1. Consent of GlaxoSmithKline Research & Development Limited.     8

3.2. Consent of President and Fellows of Harvard College.     9

3.3. Consent of Blood Research Institute, Inc.     10

3.4. Written confirmation of oral discussion with National Institutes of Health.     11

3.5. Notice to the Attorney General of The Commonwealth of Massachusetts.     12

**IV.   ANCILLARY DOCUMENTS**

4.1. Endowment Investment Agreement by and between CMCC and IDI.     13

4.2. Instrument of Appointment for CMCC-appointed trustees.     14

4.3. IDI Certificate of Good Standing.     15

4.4. CMCC Certificate of Good Standing.     16

1

*EXECUTION COPY*

# AFFILIATION AGREEMENT
## by and between
## THE CHILDREN'S MEDICAL CENTER CORPORATION
### and
## IMMUNE DISEASE INSTITUTE, INC.

This Affiliation Agreement (the "Agreement") is entered into as of this 24th day of December, 2008 by and between The Children's Medical Center Corporation ("CMCC") and the Immune Disease Institute, Inc. ("IDI"), each a Massachusetts nonprofit corporation. CMCC and IDI are each sometimes referred to herein as a "Party" and, collectively, as the "Parties."

## RECITALS

WHEREAS, the Parties have discussed the possibility of effectuating a corporate affiliation between them (the "Affiliation") to further their respective charitable missions by furthering scientific knowledge and public health through research in immunology, inflammation and other areas of biomedical science, and to advance medical education in these areas;

WHEREAS, pursuant to these discussions, CMCC and IDI have entered into a non-binding Letter of Intent, dated August 14, 2008 (the "Letter of Intent"), whereby each Party agreed, subject to certain contingencies, to effect a commonality of control between them which would permit an affiliation of their respective organizations;

WHEREAS, the Parties believe that the Affiliation will facilitate the growth and attraction of research funding through synergies and interdisciplinary grant proposals; provide greater coordination of research programs, thereby increasing efficiencies in those programs; enhance IDI's access to funding and revenue sources; increase private philanthropy to IDI; and preserve and create opportunities for research and medical education in Massachusetts;

WHEREAS, the members of the Board of Trustees of IDI (the "IDI Board of Trustees") and the members of the Board of Trustees of CMCC (the "CMCC Board of Trustees") have each approved the Affiliation, and each of IDI and CMCC considers it to be in its respective best interests and in the interests of the public it serves to enter into the Affiliation on the terms, conditions and contingencies set forth herein.

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements and covenants hereinafter set forth and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    THE AFFILIATION.

1.1.    The Affiliation shall be effectuated subject to satisfaction of the conditions contained in Sections 5 and 6 hereof, including, without limitation, (a) naming CMCC as the sole corporate member of IDI, (b) the adoption by IDI of the Amended and Restated Articles of Organization (as defined herein) and the Amended and Restated Bylaws (as defined herein), as more fully described in Section 5.1.6 hereof, and (c) the modification of the composition of the IDI Board of Trustees, as more fully described in Section 5.1.6 hereof.

1.2.    The closing of the Affiliation (the "Closing") will take place at the offices of Ropes & Gray, LLP, One International Place, Boston, Massachusetts, 02110, no later than three (3) business days immediately following the satisfaction of all closing conditions and the receipt of all necessary Consents or Permits (as hereinafter defined) of any Governmental Authority (as hereinafter defined) whose consent is required or sought for the consummation of the Affiliation, or on such other date and place as CMCC and IDI shall mutually agree. The date on which the Closing occurs is referred to herein as the "Closing Date." The Affiliation shall become effective at 11:59 pm on the date the Amended and Restated Articles of Organization are approved and filed by the Secretary of State of the Commonwealth of Massachusetts or such later date and time as is agreed upon by the Parties and specified in the Amended and Restated Articles of Organization. The time at which the Affiliation shall become effective is referred to as the "Effective Time."

1.3.    At the Effective Time (a) the articles of organization of IDI ("Articles of Organization") shall, by virtue of the Affiliation and without further action by the trustees of IDI, be amended and restated in the form attached hereto as Exhibit 1.3(a) (the "Amended and Restated Articles of Organization") until thereafter changed or amended as provided therein or by applicable law; and (b) the bylaws of IDI ("Bylaws") shall, by virtue of the Affiliation and without further action by the trustees of IDI, be amended and restated in the form attached hereto Exhibit 1.3(b) (the "Amended and Restated Bylaws") until thereafter changed or amended as provided therein or by applicable law.

2.    REPRESENTATIONS AND WARRANTIES OF IDI.

Except as set forth in the corresponding section and subsection of IDI's disclosure schedule attached hereto as Schedule 2 (with such disclosures to qualify any other section and subsection for which the appropriateness of the disclosure is reasonably apparent on its face), IDI represents and warrants to CMCC as follows:

2.1.    Organization. IDI is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. Other than receipt of all necessary Consents or Permits, IDI has all requisite power and authority and has taken all necessary action required for the due authorization, execution, delivery and performance by IDI of this Agreement, and the entry into and consummation of the Affiliation. IDI has no subsidiaries, affiliates, membership interest or equity interest (other than equity interests in publicly traded companies) in any entity, except as set forth on Schedule 2.1 attached hereto. Without giving effect to the Affiliation, no individual, partnership, joint venture, corporation

2

(including not-for-profit corporation), limited liability company, limited liability partnership, trust, unincorporated organization, or Governmental Authority or any department or agency thereof (collectively, a "Person") has any interest or expectation of interest as a member or otherwise of IDI.

2.2.     Authorization; Validity; Company Action.  The execution and delivery of this Agreement, the entry into and consummation of the Affiliation and the consummation of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action, including without limitation the approval of the IDI Board of Trustees, and no other corporate proceedings on the part of IDI are necessary to authorize this Agreement or the Affiliation or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by IDI, and assuming due authorization, execution and delivery by CMCC, constitutes a valid and binding agreement of IDI, enforceable against IDI in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).  The rights, designation, powers, qualifications, limitations and restrictions of CMCC as the sole member of IDI are as stated in the Amended and Restated Articles of Organization and Amended and Restated Bylaws, which shall become effective at the Effective Time.

2.3.     Governing Boards, Officers, Investments and Signatories.  The IDI Board of Trustees and the IDI Board of Overseers are as set forth on Schedule 2.3(a) attached hereto, and the officers of IDI are as set forth on Schedule 2.3(b) attached hereto.  A statement listing all investment and bank accounts, including but not limited to checking accounts, savings accounts, certificate of deposits, money market accounts, and brokerage accounts of IDI (collectively, the "Investments") and the approximate amount of money or value of such Investments is attached hereto as Schedule 2.3(c).  The names of all authorized signatories of IDI are attached hereto as Schedule 2.3(d).

2.4.     Consent and Approval; No Conflicts.  The execution of this Agreement, the entry into and consummation of the Affiliation, the contemplated merger under Section 6.1.2, and the compliance of IDI with the provisions of this Agreement do not (i) conflict with or result in any breach of any provision of the Articles of Organization or Bylaws; (ii) other than as set forth on Schedule 2.4(a) attached hereto, require any consent, approval, waiver, filing with or notification to, any foreign, federal, state, local or municipal court or other judicial authority, legislative or executive body, administrative agency (including, without limitation, the National Institutes of Health), commission or other governmental or regulatory body or authority (each, a "Governmental Authority"); (iii) result in a violation or breach of or default (or gives rise to any right of termination, cancellation or acceleration) under, or require any consent, approval, waiver, filing with or notification under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, grant, agreement, Lease (as defined herein) or other instrument or obligation to which IDI is a party, except as set forth on Schedule 2.4(b); or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to IDI.

2.5.     Financial Statements.  Prior to the date hereof, IDI has furnished to CMCC or its representatives (i) the audited consolidated statement of financial position of IDI as of June 30,

3

2008, (ii) the related audited consolidated statements of activities and cash flows for the year then ended (collectively the "Audited Financial Statements") and (iii) comparable unaudited statements as of September 30, 2008 and for the three months then ended (collectively, the "Unaudited Financial Statements"). The Audited Financial Statements and the Unaudited Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the relevant periods (except as may otherwise be noted therein), and present fairly, in all material respects, the financial position, results of operations and the cash flows (as appropriate) of IDI as of the dates, and for the periods, indicated thereon, except for the absence of footnotes and as otherwise noted therein, and subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments which are not material individually or in the aggregate. There are no material liabilities or obligations (absolute, accrued, contingent or otherwise) of a type that generally accepted accounting principles would require to be on the Audited Financial Statements or the Unaudited Financial Statements which are not fully reflected or reserved against in such statements, except for liabilities and obligations that may have arisen in the ordinary course of business and consistent with past practice since September 30, 2008. IDI has maintained its books and records in accordance with generally accepted accounting principles and practices applied on a consistent basis, and such books and records are, and during the periods covered by the Audited Financial Statements and Unaudited Financial Statements were, true, correct and complete in all material respects.

2.6. Conduct of Business. Since June 30, 2008, (a) IDI has conducted business in the ordinary course consistent with past practice, and (b) IDI has not (1) borrowed any money or mortgaged, pledged or subjected to any lien any of its assets, tangible or intangible (absolute, accrued or contingent); (2) sold, leased, assigned or transferred any of its tangible assets except in the ordinary course of business consistent with past practice; (3) suffered any change, event or development or series of changes, events or developments which is material except for investment losses and as disclosed in the Unaudited Financial Statements; (4) suffered any damage, destruction or casualty loss to its physical properties (whether or not covered by insurance) which has been or would reasonably be expected to be material; (5) been the subject of any investigation by a Governmental Authority or had litigation threatened; (6) except for fair consideration canceled or compromised any debts that are material, individually or in the aggregate, or waived or permitted to lapse any claims or rights relating to debt that is material, individually or in the aggregate, or sold, transferred or otherwise disposed of any of its properties or assets that are material individually or in the aggregate; (7) made any change in any method of accounting or accounting practice; (8) increased any salaries, wages or any employee benefits, adopted or amended any employee benefit plans, paid any bonuses or otherwise increased the compensation of any of its officers, employees or consultants, other than in the ordinary course of business and consistent with past practice; (9) granted any change of control, severance, or termination pay, or instituted any new, or modified any existing, change of control, severance, or termination pay plan or practice; (10) made any loan to or engaged in any other transaction with any officer, employee, consultant, or affiliate of IDI, other than payment of salaries and benefits to such persons in the ordinary course of business or in connection with travel or other business-related expenses and other than tuition loans pursuant to IDI's tuition loan program and housing loans pursuant to commitments in effect on September 30, 2008 and previously disclosed to CMCC and set forth on Schedule 2.6 attached hereto; (11) made or committed to make any

4

capital expenditures individually in excess of $100,000; or (12) agreed to take any action referred to in this paragraph; except, with respect to subsections (1), (3), (10) and (11) of this section, in accordance with its fiscal year 2009 budget previously furnished to CMCC or pursuant to an existing HEFA lease facility.

2.7.    Absence of Undisclosed Liabilities. IDI has no liabilities or obligations (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due) other than (a) liabilities or obligations reserved against or otherwise disclosed in the Audited or the Unaudited Financial Statements, (b) liabilities for Actions set forth on Schedule 2.8 hereto and (c) liabilities or obligations arising since September 30, 2008 which were incurred in the ordinary course of business consistent (in amount and kind) with past practice (none of which is a liability resulting from a breach of contract, breach of warranty, tort, infringement claim, or lawsuit).

2.8.    Litigation. Except as set forth on Schedule 2.8 attached hereto, there are no actions, suits or proceedings pending or, to the knowledge of IDI, threatened against IDI at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign ("Actions"). Additionally, IDI is not in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign.

2.9.    Intellectual Property.

2.9.1.    Schedule 2.9.1 sets forth, as of the date hereof, a complete and accurate list of all of the following IDI Intellectual Property Rights: all Patents; all registrations of Copyrights and applications therefor; and all registrations of Trademarks and service marks and applications therefore. Except as set forth in Schedule 2.9.1.IV., IDI Intellectual Property Rights are free and clear of all mortgages, liens, security interests, leases, pledges, encumbrances, equities, claims, charges, options, written restrictions, rights of first refusal, title retention agreements or other exceptions to title which affect IDI Intellectual Property Rights or restrict the use by IDI of IDI Intellectual Property Rights in any way with the exception of Patents jointly owned with other Persons (such jointly owned Patents indicated as such in Schedule 2.9.1) and Outbound Licenses listed in Schedule 2.9.11 ("IP Liens"). "IDI Intellectual Property Rights" means all Intellectual Property Rights (as hereinafter defined) owned by, co-owned by, subject to an obligation of assignment to, or licensed to IDI, or in which IDI has any right, title or interest as of the date of this agreement. "Intellectual Property Rights" shall mean any or all of the following and all worldwide common law and statutory rights in, arising out of, or associated therewith: (i) patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof ("Patents"); (ii) software, copyrights, copyrights registrations and applications therefor, and all other rights corresponding thereto throughout the world including moral and economic rights of authors and inventors, however denominated ("Copyrights"); (iii) industrial designs and any registrations and applications therefor; (iv) trade names, logos, common law trademarks and service marks, trademark and service mark registrations and applications therefor and all goodwill associated therewith ("Trademarks"); (v) trade secrets (including those trade secrets defined in the Uniform

5

Trade Secrets Act and under corresponding foreign statutory and common law), inventions and discoveries, whether or not patentable, invention disclosures, business, technical and know-how information, non-public information and confidential information and rights to limit the use or disclosure thereof by any Person, including databases and data collections and all rights therein ("Trade Secrets"); and (vi) any other proprietary rights or rights similar or equivalent to any of the foregoing (as applicable).

2.9.2.  All current employees, consultants and contractors of IDI have executed a Participation Agreement substantially in IDI's standard form that, among other things, binds such employees, consultants and contractors to the terms of IDI's Research and Technology Development Policy, including an obligation to assign to IDI all Inventions, as that term is used in the Participation Agreement. All former employees, consultants and contractors of IDI who contributed to IDI Intellectual Property Rights either have (i) executed a Participation Agreement substantially in IDI's standard form that, among other things, binds such employees, consultants and contractors to the terms of IDI's Research and Technology Development Policy, including an obligation to assign to IDI all Inventions, as that term is used in the Participation Agreement or (ii) otherwise agreed to assign all such rights to IDI. Except as permitted under a Participation Agreement substantially in IDI's standard form, to the knowledge of IDI, there has been no disclosure by IDI or its former or current employees, consultants or contractors of any confidential or proprietary information of IDI. A true and accurate copy of the Research and Technology Development Policy, including a true and accurate copy of IDI's form of Participation Agreement, has been furnished to CMCC. Each inventor named on the Patents listed in Schedule 2.9.1 has executed an agreement assigning his, her or its entire right, title and interest in and to such Patents, and the inventions embodied and claimed therein, to IDI, except that in the case of Patents jointly owned with other Persons, to the knowledge of IDI, to the appropriate owners. To the knowledge of IDI, no such inventor has any contractual or other obligation that would preclude any such assignment or otherwise conflict with the obligations of the inventor to IDI, or in the case of Patents, to the appropriate owners.

2.9.3.  There have not been in the past five years and there are no actions pending or, to IDI's knowledge, threatened with regard to the ownership of any IDI Intellectual Property Rights, and, to the knowledge of IDI, there is no valid basis for any such action.

2.9.4.  To IDI's knowledge, IDI Intellectual Property Rights collectively constitute all of the Intellectual Property Rights necessary to enable IDI to research, develop, use, offer to sell, import, commercialize or otherwise exploit products or services as currently under development by IDI.

2.9.5.  There have not been in the past five years and there are no pending claims or to IDI's knowledge claims threatened that (i) IDI, (ii) the IDI Intellectual Property Rights or (iii) the manufacture, development, use, sale, offering for sale, importing, commercialization or other exploitation of the IDI Intellectual Property Rights has infringed or is infringing any Intellectual Property Rights of any third party. To IDI's knowledge, (i) the IDI Intellectual Property Rights and (ii) the manufacture, development, use, sale, offering for sale, importing, commercialization or other exploitation of the IDI Intellectual Property Rights, do not and will

6

not infringe, constitute contributory infringement, inducement to infringe, misappropriation or unlawful use of Intellectual Property Rights of any third party.

2.9.6.   The IDI Intellectual Property Rights listed in Schedule 2.9.1 have been duly registered and / or filed with or issued by the appropriate Governmental Entity (as hereinafter defined) in the jurisdictions indicated in Schedule 2.9.1. All such IDI Intellectual Property Rights are pending and have not been abandoned or expired and have been timely prosecuted, the representations in this sentence being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. All issued Patents, registered Trademarks and registered Copyrights within the IDI Intellectual Property Rights are in full force and effect and, to IDI's knowledge, valid and subsisting, the representations in this sentence being to IDI's knowledge in the case of issued Patents jointly owned with other Persons for which such Persons have responsibility. Patent applications included in Patents are pending with the applicable Governmental Entity, the representations in this sentence being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. All steps necessary to maintain such IDI Intellectual Property Rights including the payment when due of all maintenance fees and annuities and the filing of all necessary renewals, statements and certifications have been taken, and all necessary affidavits of continuing use have been timely filed, such representations being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility. A "Governmental Entity" means any court, arbitral tribunal, administrative agency or commission or other governmental or other regulatory authority or agency, or foreign, federal, state, local or supranational entity.

2.9.7.   To IDI's knowledge, there are no published patents, patent applications, articles or other prior art references that would reasonably be expected to adversely affect the validity or enforceability of any issued Patents. None of the IDI Intellectual Property Rights have been declared invalid or unenforceable, in whole or in part, by any Governmental Entity, and there are no ongoing interferences, oppositions, reissues, reexaminations or other proceedings involving any of the Patents including ex parte and post-grant proceedings, before any Governmental Entity, the representations in this section being to IDI's knowledge in the case of Patents jointly owned with other Persons for which such Persons have responsibility.

2.9.8.   IDI has met its duty of candor as required under 37 C.F.R. 1.56 and complied with analogous laws outside the United States requiring disclosure of references. With respect to IDI Intellectual Property Rights, there have been no material misrepresentations or concealment of any material information to the United States Patent and Trademark Office or other applicable Governmental Entity by IDI, or in connection with the prosecution of any Patents listed in Schedule 2.9.1, in violation of 37 C.F.R. Section 1.56 or similar disclosure requirements.

2.9.9.   To IDI's knowledge, IDI Intellectual Property Rights have not been infringed or misappropriated, and are not being infringed or misappropriated, by any third party. There is no claim asserted, threatened or planned to be asserted by IDI that any third party has infringed, misappropriated or otherwise violated any Intellectual Property Rights of IDI.

7

2.9.10. There are no options, rights, licenses or interests of any kind relating to IDI Intellectual Property Rights licensed or granted to IDI (other than software licenses for generally available software, employee assignment agreements, nondisclosure agreements and material transfer agreements ("MTAs")) ("Inbound Licenses"). With respect to each Inbound License, to IDI's knowledge: (i) no claim is pending or threatened with respect to any Inbound License or that challenges the legality or validity of any underlying item of Intellectual Property Rights subject to the Inbound License; and (ii) no sublicense or similar right has been granted by IDI with respect to any Inbound License.

2.9.11. Schedule 2.9.11 sets forth a true, complete and accurate list of all material agreements or instruments with respect to any options, rights, licenses or interests of any kind relating to Intellectual Property Rights licensed or granted by IDI to any third party (other than software licenses for generally available software, employee assignment agreements, and nondisclosure agreements) ("Outbound Licenses").

2.9.12. Schedule 2.9.12 lists all domain names owned by IDI. IDI owns all the domain names necessary for the conduct of business by IDI as currently conducted.

2.9.13. IDI does not own copies of any third-party software that is used in or is necessary for its business as currently conducted, other than software generally available to the public.

2.9.14. All personally identifiable information and data, including but not limited to health records and personal health information, used by or in the possession of IDI has been collected, stored, maintained, used and disclosed in accordance with all applicable legal requirements. IDI maintains policies and procedures regarding data security, privacy and the protection of personally identifiable information, including but not limited to health records and personal health information, that are commercially reasonable and, in any event, in compliance with all applicable legal requirements. There have been no security breaches relating to, violations of any security policy regarding or any unauthorized access of any data or information used in the business of IDI. To the knowledge of IDI, IDI has given all notices, made all disclosures, and obtained all necessary consents related to collection, storage, maintenance, use and disclosure of all such data or information. The transactions contemplated to be consummated her eunder will not violate any IDI policies or laws relating to collection, storage, maintenance, use or disclosure of any such data or information.

2.9.15. IDI has taken all reasonable precautions to protect the secrecy, confidentiality and value of all Trade Secrets.

2.10.   Labor Relations and Employment. There are no union or collective bargaining agreements relating to employees of IDI and with respect to such employees: (a) IDI is in compliance with all applicable laws respecting employment and employment practices, including without limitation, terms and conditions of employment, classification of employees as exempt for overtime purposes, classification of service providers as independent contractors or consultants, and wages and hours; (b) there are no labor troubles (including any arbitrations, grievances, strikes, lockouts, slowdowns, or stoppages) pending or threatened against or

8

affecting IDI, and there have been no such troubles in the past five years; and (c) during the last five years, IDI has not received any written notice that any representation petition respecting the employees of IDI has been filed and no petition or proceedings have been threatened by or on behalf of any employee or group of employees with the National Labor Relations Board or any other labor relations board seeking recognition of a bargaining representative. Additionally, there are no actions pending or threatened by any employee of IDI, no employee of IDI has provided a written claim to IDI, in each case relating to IDI's employment of such employee. During the past five years, there have not been any layoffs, plant closings, reductions in workforce, or other actions that have resulted or triggered or could result or trigger notice requirements or liability under the Worker Adjustment and Retraining Notification ("WARN") Act or under any similar or local plant closing notice law. There is not presently pending, and for the past five years there has not been, any compliance review conducted by the U.S. Department of Labor, Office of Federal Contract Compliance Programs ("OFCCP") that resulted in, or that has the potential to result in (A) any adverse finding with respect to IDI, (B) any corrective or adverse action taken with respect to IDI, (C) any conciliation agreement between the OFCCP and IDI, or (D) the loss of federal contractor status of IDI.

### 2.11. Employee Benefits.

2.11.1. Attached hereto as Schedule 2.11.1 is a true and complete list of each deferred compensation, bonus or other incentive compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, independent contractor, severance, change of control, or similar agreement; and each other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by IDI or to which IDI is a party, whether written or oral, for the benefit of any employee, officer or consultant of IDI (the "Plans"). Additionally, IDI has provided to CMCC or its representatives a written statement of IDI's cost related to each employee welfare benefit plan (as that term is defined in Section 3(1) of ERISA) which is a Plan, including information about the portion of such cost which is borne by the employees of IDI through payroll deductions or otherwise. As of the Closing Date the portion of the Plans relating to severance, vacation, and other assorted benefits which have accrued shall not exceed $500,000. All Plans are in material compliance with all applicable provisions of ERISA, as well as with all other applicable federal, state and local statutes, ordinances and regulations. All reports or other documents required by law or contract to be filed with any governmental agency, or distributed to Plan participants or beneficiaries, with respect to the Plans have been timely filed or distributed. Each of the Plans intended to be "qualified" within the meaning of Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and IDI knows of no event that would cause the Plan to lose its qualified status.

2.11.2. No Plan provides welfare or insurance benefits (whether or not insured) to any participating employee of IDI or their dependents or beneficiaries beyond such participant's termination of employment or termination of service of non-employees, other than coverage mandated by applicable state law or Part 6 of Title I of ERISA, Section 4980B of the Code and

9

the regulations and guidance promulgated and issued thereunder, respectively ("COBRA") and benefits, the full cost of which are borne by such participant (or his or her dependent or beneficiary). IDI has not maintained, or been obligated to contribute to, or incurred any liability with respect to, a Plan that is subject to the provisions of Title IV of ERISA, and IDI has not incurred any liability under Section 4201 of ERISA with respect to any "multi-employer plan" (as such term is defined in Section 4001(a)(3) of ERISA) or any other plan subject to Title IV of ERISA, and the Affiliation and the contemplated merger under Section 6.1.2 will not constitute a complete or partial withdrawal from or with respect to any such "multi-employer plan" or other plan subject to Title IV of ERISA or any collective bargaining agreement to which IDI is a party or by which IDI is bound or otherwise give rise to any liability of IDI in connection therewith. IDI does not have nor has ever had any funding arrangement intended to qualify as a VEBA under Section 501(c)(9) of the Code.

2.11.3. Except as set forth in Schedule 2.11.3 attached hereto, the consummation of the Affiliation and the contemplated merger under Section 6.1.2 will not, either alone or in combination with another event, (i) entitle any current or former employee or officer of IDI to severance pay, unemployment compensation or any other payment or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee or officer.

2.11.4. IDI has complied with all of its obligations under COBRA, and does not expect to incur any liability in connection with the benefit continuation rights under COBRA with respect to employees of IDI. No Plan is a multiple employer welfare arrangement.

2.11.5. There are no pending, or to the knowledge of IDI, threatened or anticipated claims by or on behalf of any Plan, by any employee of IDI or beneficiary thereof covered under any such Plan, or otherwise involving any such Plan (other than routine claims for benefits). Except as set forth on Schedule 2.11.5 attached hereto, no Plan is or, within the last six years, has been the subject of an examination or audit by any domestic or foreign governmental or regulatory authority, agency, commission, body, court or other legislative, executive, judicial or governmental entity. No Plan is the subject of an application or filing under, or is a participant in, a government-sponsored amnesty, voluntary compliance, self-correction or similar program.

2.12. Material Agreements. IDI has provided to CMCC or its representatives (a) true and correct copies of each written contract, agreement, license agreement, document, instrument, understanding, and any and all amendments thereto of IDI and (b) all oral agreements and understandings of IDI have been adequately disclosed to the satisfaction of CMCC and its representatives that are material to the operation of IDI or any of its subsidiaries, except for contracts, agreements, documents, instruments, understandings or arrangements with total payments less than $100,000 in the aggregate (each a "Material Agreement"). A list of the Material Agreements is set forth in Schedule 2.12 attached hereto.

2.13. No Defaults. IDI is not and, to the knowledge of IDI, no other party is in breach or violation of, or default under, in any material respect, any Material Agreement, except such events of default and other events as to which requisite waivers or consents have been obtained.

10

IDI has not received notice of any claim of default under any Material Agreement, and, to the knowledge of IDI, no event has occurred that would result in a breach or violation of, or a default under, in any material respect, any Material Agreement.

2.14. <u>No Material Claims or Judgments</u>. As of the date hereof, (a) there are no claims, actions, investigations, or proceedings pending or, to the knowledge of IDI after having made reasonable efforts to investigate or inquire, threatened against IDI by any Governmental Authority; (b) IDI is not subject to any outstanding judgment, rule, order, writ, injunction or decree of any Governmental Authority; and (c) IDI is not subject to any agreement, stipulation or settlement with any person that compromises or settles any action, investigation or proceeding.

2.15. <u>Consents and Permits</u>. As of the date hereof, IDI is not and has not conducted business in violation in any material respect of any applicable law or any order, writ, injunction or decree of any court or Governmental Authority. IDI has all permits, certifications, licenses, approvals, orders, consents and other authorizations of any Governmental Authority necessary to conduct its business as currently conducted (collectively, the "Consents and Permits"). IDI is not in material violation of the terms of any Consent or Permit, nor is the cancellation or suspension of any Consent or Permit threatened in writing.

2.16. <u>Taxes</u>. IDI is tax-exempt under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and is exempt from paying Massachusetts state sales tax and Massachusetts local property tax, and there are no federal, state or local investigations or audits pending with respect to the status thereof. IDI has timely filed or caused to be filed all federal, state and local tax and information returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on said returns or on any assessment received by it, to the extent that such taxes have become due. IDI is not obligated to make any "gross-up" or similar payment to any individual on account of any tax under Section 409A of the Code. IDI does not have nor could reasonably expected to incur prior to or in connection with the Closing, any liability or obligation with respect to tax reporting of or withholding on amounts includable in gross income as a result of Section 409A of the Code.

2.17. <u>Insurance</u>. Attached hereto as <u>Schedule 2.17</u> is a list of current insurance policies maintained by IDI. There is currently no claim pending by IDI under any insurance policies currently in effect and covering the property, business or employees of IDI and all premiums due and payable with respect to the policies maintained by IDI have been paid to date. The insurance coverage maintained by IDI provides coverage for all assets of IDI that are of insurable character against risk of liability, casualty and fire and other losses and liabilities customarily obtained to cover comparable entities and assets in amounts, scope and coverage which are consistent with prudent industry practices. IDI has not made any claims with its insurers other than worker's compensation claims during the 12 months prior to the date hereof.

2.18. <u>Accounts Receivable</u>. Except to the extent of the amount of the reserve for doubtful accounts reflected in the Audited Financial Statements or the Unaudited Financial Statements all Accounts Receivable reflected therein and all Accounts Receivable that have arisen since the Audited Financial Statements (except Accounts Receivable that have been collected since such date) are valid and enforceable claims, and constitute bona fide Accounts

11

Receivable resulting from the sale of goods and services in the ordinary course of the business. The Accounts Receivable are subject to no valid defense, offsets, returns, allowances or credits of any kind, and IDI has no reason to believe that the Accounts Receivable are not reasonably collectible except as to the extent of the amount of the reserve for doubtful accounts reflected in the Unaudited Financial Statements. Except for the Accounts Receivable (i) IDI has not made any loan or advance to any person and (ii) IDI has not loaned or advanced any of the Accounts Receivable to any person. For purposes of this Agreement, "Accounts Receivable" is defined as (i) all trade accounts receivable and other rights to payment from researchers of IDI and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services provided or rendered to researchers of IDI; (ii) all other accounts or notes receivable of IDI and the full benefit of all security for such accounts or notes; and (iii) any claim, remedy or other right related to any of the foregoing.

2.19.   Real Property.

2.19.1. Schedule 2.19.1 attached hereto sets forth all real property owned by IDI ("Owned Property") and each of the leases, subleases, and licenses (the "Leases") of real property, including all amendments and modifications thereto, to which IDI is a party, and each of the Leases is in full force and effect and is legal, valid, binding and enforceable in accordance with its terms. Prior to the date hereof, IDI has delivered to CMCC correct and complete copies of the Leases and any notices of lease and subordination, non-disturbance, and attornment agreements related thereto. There are no defaults by IDI or, to the knowledge of IDI, by any other party thereto, which might with due notice or lapse of time or both curtail the present use by IDI of any of its real property. Subject to obtaining the consent of President and Fellows of Harvard College and Blood Research Institute, Inc. with respect to lease of 200 Longwood Avenue, Boston, the Affiliation and the contemplated merger under Section 6.1.2 will not result in a breach of or default under, the termination of, or any increase of any amounts payable under, any Lease.

2.19.2. Except as set forth on Schedule 2.19.2 attached hereto, IDI has good and marketable title to, and, with respect to the Leases, a valid leasehold interest in, all of its real property free and clear of any mortgages, judgments, claims, liens, security interests, pledges, escrows, charges or encumbrances of any kind or character including encumbrances on the underlying fee to the real property leased pursuant to the Leases (collectively the "Encumbrances"). None of the Encumbrances set forth on Schedule 2.19.2 has, individually or in the aggregate, a material adverse effect on the use or value of the Owned Property or IDI's leased real property as currently operated or as contemplated under the Affiliation and the contemplated merger under Section 6.1.2. Prior to the date hereof, IDI has provided to CMCC a list setting forth the addresses and uses of all real property that IDI owns, leases or subleases, and any liens or Encumbrances on any such owned real property or leasehold interest, specifying in the case of each such lease or sublease, the name of the lessor or sublessor, as the case may be. There are commercially reasonable non-disturbance or recognition agreements for the benefit of IDI from IDI's landlords' lenders or ground lessors with respect to IDI's Leases. There are no pending or, to IDI's knowledge, threatened condemnation proceedings or administrative actions that may adversely affect the business or operations of IDI, the premises leased under the Leases

12

11315168_28.DOC

or the buildings in which such premises are located.

2.19.3. To IDI's knowledge, the improvements at the Owned Property and the premises leased pursuant to the Leases are structurally sound, in good condition, free of any material damage or waste and served by all utilities necessary and desirable for the conduct of IDI's business as currently conducted. The equipment and personal property located at the Owned Property and the premises leased pursuant to the Leases and used in connection with the conduct of IDI's business are in good condition and repair (subject to normal wear and tear), and are suitable, adequate and sufficient for the current operation of IDI's business.

2.19.4. The Owned Property has a valid and enforceable right to vehicular access to a public road. No building located at the Owned Property or any appurtenance thereto or equipment thereon, or any improvements planned therefor, or the use or operation thereof, violates in any material respect any restrictive covenant of record (or other private agreement, whether or not recorded) applicable to the Owned Property, and no such building, equipment, or planned improvements encroach upon the easement or real property of another Person, which encroachment is necessary for the business of IDI or could reasonably be expected to have a material adverse effect on such business or the value of such building, equipment, or planned improvements. No Person has any possessory interest in or right to occupy (whether by written or oral agreement or otherwise) any of the Owned Property or IDI's leased real property except IDI.

2.20. Compliance with Laws Relating to Real Property. There is no material violation of any law, regulation or ordinance (including, without limitation, laws, regulations or ordinances relating to zoning, environmental, city planning or similar matters) relating to any real property owned, leased or subleased by IDI.

2.21. Environmental Laws and Regulations. (i) Hazardous Materials (as hereinafter defined) have not been generated, used, treated or stored on, transported to or from or disposed of on, at, under or from any Property (as hereinafter defined) in a manner that could give rise to liability for IDI under Environmental Laws (as hereinafter defined); (ii) there has been no release of Hazardous Materials in any amount or concentration that would require remediation or reporting under Environmental Laws on, at or from any Property for which release IDI may be liable under Environmental Laws; (iii) IDI has been in compliance with all applicable Environmental Laws and the requirements of any permits issued under such Environmental Laws, except where failure to obtain such permits would not be expected to have, individually or in the aggregate, a material adverse effect; (iv) there are no underground storage tanks currently used by IDI, or to IDI's knowledge, other underground storage tanks, polychlorinated biphenyl-containing equipment or asbestos containing materials at any of the Owned Property or IDI's leased real property which could give rise to liability under Environmental Laws; (v) there are no past, pending or, to the knowledge of IDI, threatened environmental claims against IDI; (vi) except as provided in the Leases, IDI has not, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any liability or obligation, arising under or relating to Environmental Laws, including, but not limited to, any obligation for investigation, corrective or remedial action; (vii) there are no facts or circumstances, conditions or occurrences regarding the current or former business, assets or

13

operations of IDI, or their predecessors, that reasonably could be anticipated to form the basis of an environmental claim against IDI; and (viii) IDI has made available to CMCC complete and accurate copies of all environmental assessments, investigations, reports, studies, audits, tests, reviews and other analyses in the possession of IDI relating to all Property currently owned, leased or operated in connection with the business of IDI. For purposes of this Section 2.2.1, (i) "Environmental Law" means any federal, state, foreign or local statute, law, rule, regulation, ordinance, code or rule of common law and any judicial or administrative interpretation thereof binding on IDI or its operations or property as of the date of this Agreement and Closing Date, including any judicial or administrative order, consent decree or judgment, relating to the environment, Hazardous Materials, or the protection of human health; (ii) "Hazardous Materials" means any petroleum or petroleum products, radioactive materials, asbestos in any form, polychlorinated biphenyls and radon gas, and any chemicals, materials or substances regulated under any applicable Environmental Law; and (iii) "Property" means any real property, plant, equipment, building or facility and improvements (including leasehold improvements), now or heretofore, owned, leased or operated by IDI.

## 3. REPRESENTATIONS AND WARRANTIES OF CMCC.

Except as set forth in the corresponding section and subsection of CMCC's disclosure schedule attached hereto as Schedule 3 (with such disclosures to qualify any other section and subsection for which the appropriateness of the disclosure is reasonably apparent on its face), CMCC represents and warrants to IDI as follows:

3.1.    Organization.  CMCC is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts.  CMCC has all requisite power and authority and has taken all necessary action required for the due authorization, execution, delivery and performance by CMCC of this Agreement, and the entry into and consummation of the Affiliation.

3.2.    Authorization; Validity; Company Action.  The execution and delivery of this Agreement, the entry into and consummation of the Affiliation and the consummation of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate action, including without limitation the approval of the CMCC Board of Trustees, and no other corporate proceedings on the part of CMCC are necessary to authorize this Agreement or the Affiliation or to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by CMCC, and, assuming due authorization, execution and delivery by IDI, constitutes a valid and binding agreement of CMCC enforceable against CMCC in accordance with its terms, except as may be limited by (i) bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or (ii) general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

3.3.    Taxes.  CMCC is tax-exempt under Section 501(c)(3) of the Code, and there are no federal, state or local investigations or audits pending with respect to the status of CMCC. CMCC has timely filed or caused to be filed all federal, state and local tax and information returns which are required to be filed, and has paid or has caused to be paid all taxes as shown on

14

said returns or on any assessment received by it, to the extent that such taxes have become due, except any such taxes that are immaterial in amount and reserved against or any such taxes, levies, assessments, deficiencies or claims which are being contested in good faith by appropriate proceedings.

3.4. Consent and Approval; No Conflicts. Except as set forth on Schedule 3.4 attached hereto, the execution of this Agreement, the entry into and consummation of the Affiliation, the contemplated merger under Section 6.1.2 and the compliance of CMCC with the provisions of this Agreement do not (i) violate or result in any breach of any provision of the articles of organization of CMCC (the "CMCC Articles of Organization") or the bylaws of CMCC (the "CMCC Bylaws"); (ii) require any consent, approval, waiver, filing with or notification to any Governmental Authority; (iii) result in a violation or breach of or default (or give rise to any right of termination, cancellation or acceleration) under, or require any consent, approval, waiver, filing with or notification under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, license, grant, agreement, lease or other instrument or obligation to which CMCC is a party; or (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to CMCC.

3.5 Financial Statements. Prior to the date hereof, CMCC has furnished to IDI or its representatives (i) the audited consolidated balance sheet of CMCC as of September 30, 2007 and (ii) the related audited consolidated statements of operations and changes in net assets and cash flows for the year then ended (collectively the "Audited Financial Statements") and (iii) comparable unaudited statements as of August 31, 2008 and for the eleven months then ended (collectively the "Unaudited Financial Statements"). The Audited Financial Statements and the Unaudited Financial Statements have been prepared in accordance with generally accepted accounting principles applied on a consistent basis during the relevant periods (except as may otherwise be noted therein), and present fairly, in all material respects, the financial position, results of operations and the cash flows (as appropriate) of CMCC as of the dates, and for the periods, indicated thereon, except for the absence of footnotes and as otherwise noted therein, and subject, in the case of the Unaudited Financial Statements, to normal recurring year-end adjustments which are not material individually or in the aggregate. There are no material liabilities or obligations (absolute, accrued, contingent or otherwise) of a type that generally accepted accounting principles would require to be on the Audited Financial Statements or the Unaudited Financial Statements which are not fully reflected or reserved against in such statements, except for liabilities and obligations that may have arisen in the ordinary course of business and consistent with past practice since August 31, 2008. CMCC has maintained its books and records in accordance with generally accepted accounting principles and practices applied on a consistent basis, and such books and records are, and during the periods covered by the Audited Financial Statements and Unaudited Financial Statements were, true, correct and complete in all material respects.

3.6. Litigation. There are no Actions pending or, to the knowledge of CMCC, threatened against CMCC which involve any of the transactions contemplated herein or which, if adversely determined against CMCC, would result in any materially adverse change in the business, operations, prospects, properties or assets or in the condition (financial or otherwise) of CMCC or its subsidiaries. Additionally, CMCC is not in default with respect to any judgment,

15

writ, injunction, decree, rule or regulation of any court or federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would have a materially adverse effect on the condition (financial or otherwise) of CMCC.

4. PRE-CLOSING COVENANTS.

    4.1.    Between the date hereof and the Closing, IDI shall:

    (a)    conduct its business in the ordinary course consistent with past practice, maintain its corporate existence, preserve intact its organizational structure and use commercially reasonable efforts to (i) keep available the services of its officers and employees, and (ii) maintain its existing relationships and goodwill with researchers, donors, governmental and quasi-governmental agencies with which it is affiliated or does business, or any lenders;

    (b)    amend the Bylaws and Articles of Organization in a manner consistent with this Agreement as of the Effective Time;

    (c)    notify CMCC of any material change in its financial position reflected on its Unaudited Financial Statements;

    (d)    notify CMCC of receipt of any notice from any regulatory authority, including without limitation any state or federal medical oversight body, of any pending or threatened disciplinary action, change of status or any other such notice that would have a material adverse effect on the operations or finances of IDI;

    (e)    notify CMCC immediately of any notice, whether written or oral, from the IRS regarding a change or potential change in its tax status;

    (f)    use its commercially reasonable efforts to (i) obtain all Consents and Permits from any Governmental Authority; (ii) obtain all consents from and/or provide notifications to all third parties required hereunder, including those set forth on Exhibit 5.1.8 hereto, necessary to consummate the Affiliation; and (iii) provide written notice of the Affiliation to the Massachusetts Attorney General in the form attached hereto as Exhibit 4.1 (the "Attorney General Notice");

    (g)    not enter or agree to enter into any membership arrangement with any Person; (ii) terminate any employee or officer of IDI or any of its subsidiaries except in the ordinary course of business consistent with past practice; (iii) sell, transfer or otherwise dispose of any assets with a value in excess of $100,000, individually or in the aggregate; (iv) purchase or otherwise acquire real estate or businesses; or (v) make or commit to make any capital expenditures individually or in the aggregate in excess of $100,000, other than in accordance with its fiscal year 2009 budget or pursuant to an existing HEFA lease facility;

    (h)    except as required by applicable law, not take any action that would prevent the

16

Affiliation or that would prevent a Governmental Authority from granting all necessary Consents and Permits;

(i)    except as required by applicable law or pursuant to contractual obligation in effect as of the date hereof, not (i) execute, establish, adopt or amend, or accelerate rights or benefits under any agreement relating to severance or change in control, any employment or consulting agreement with current or former employees, independent contractors, other service providers, officers or members of either the IDI Board of Trustees or the IDI Board of Overseers; (ii) increase the compensation payable or to become payable to any of its officers, employees, independent contractors or other service providers; (iii) grant or increase any severance or termination pay to any officer, employee, independent contractor or other service provider of IDI; or (iv) amend any existing Plan or adopt any new Plan.

(j)    not change its accountants, fiscal year or accounting policies, practices or methods except as required by generally accepted accounting principles;

(k)    not enter into any agreement with any other Person outside of the ordinary course of business consistent with past practices;

(l)    not waive any of its rights under, or release any other Person from such other Person's obligation under, or amend or terminate any Material Agreement; and

(m)    not enter into any commitments or agreements to do any of the actions contemplated by sections (f)-(l) of this paragraph.

4.2.    Between the date hereof and the Closing, CMCC shall:

(a)    notify IDI of any material change in its financial position reflected on its Unaudited Financial Statements;

(b)    notify IDI of receipt of any notice from any regulatory authority, including without limitation any state or federal medical oversight body, of any pending or threatened disciplinary action, change of status or any other such notice that would have a material adverse effect on the operations or finances of CMCC;

(c)    notify IDI immediately of any notice, whether written or oral, from the IRS regarding a change or potential change in its tax status; and

(d)    direct its representatives and advisors to take all actions necessary to consummate the Affiliation.

4.3.    Prior to and from and after the Closing, IDI shall afford to CMCC and its employees, counsel, accountants and other authorized representatives full access, during normal business hours, upon reasonable advance notice, with due regard to IDI's ongoing operations, to all of the books, records, personnel files, accounts and properties of or relating to (including,

17

without limitation, all work papers of IDI's accountants) IDI and to all officers, employees, independent contractors, and other service providers of IDI, for any reasonable purpose whatsoever.

4.4.    Prior to the Closing, CMCC shall afford to IDI and its employees, counsel, accountants and other authorized representatives full access, during normal business hours, upon reasonable advance notice, with due regard to CMCC's ongoing operations, to all of the books, records, accounts and properties of or relating to (including, without limitation, all work papers of CMCC's accountants) CMCC, for any reasonable purpose related to its due diligence review of CMCC in connection with the Affiliation.

4.5.    Exhibit 4.5 attached hereto sets forth a list of all employees, consultants and independent contractors of IDI who work on a full-time or part-time basis, as well as all other service providers of IDI who work for IDI on a full-time basis, and their respective job titles, benefits and severance arrangements in effect as of the Closing. IDI shall provide to CMCC a list setting forth the compensation amounts of all individuals listed on Exhibit 4.5.

4.6.    Between the date hereof and the Closing Date, IDI shall maintain in full force and effect its corporate existence, rights, governmental approvals, Consents and Permits, insurance policies, and all licenses and other rights and shall not enter into any employment, consulting, severance or other benefits arrangement or agreement (except such arrangements or agreements as IDI would enter into in the ordinary course of business), and shall operate the business in a manner consistent with past practice.

4.7.    Subject to terms and conditions set forth in this Agreement, IDI and CMCC shall cooperate with each other and use their respective commercially reasonable efforts to take or cause to be taken all actions reasonably necessary or advisable to consummate the Affiliation as soon as practicable, including obtaining all necessary consents, approvals and nonobjections from third parties and Governmental Authorities.

4.8.    From the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, IDI shall not, and IDI shall cause each officer, trustee, employee, independent contractor, other service provider, agent or representative ("Representatives") of IDI not to, directly or indirectly, (i) solicit, initiate or knowingly encourage or facilitate (including by way of furnishing non-public information) any inquiries relating to, or the making or submission of, or any inquiry, offer, proposal or indication of interest that constitutes, or would reasonably be expected to lead to, an affiliation, merger or other similar strategic relationship with IDI (an "Affiliation Proposal"), (ii) participate or engage in any discussions or negotiations with, or disclose or provide any non-public information or data relating to IDI or afford access to the properties, assets, books or records or employees of IDI to any Person other than CMCC (any such Person and its Representatives a third party) relating to an Affiliation Proposal, (iii) accept, approve, endorse or recommend an Affiliation Proposal, or (iv) enter into any agreement, arrangement, contract or commitment (including any agreement in principle or letter of intent or understanding) with respect to or contemplating an Affiliation Proposal or enter into any agreement, arrangement, contract or commitment requiring IDI to abandon, terminate or fail to consummate the proposed

18

Affiliation. From the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, IDI shall promptly (and in any event within 48 hours) notify CMCC of (i) any Affiliation Proposal that IDI receives or of any request for information or inquiry that IDI receives which relates to or reasonably could lead to an Affiliation Proposal, which notification shall include, (ii) the material terms and conditions of such Affiliation Proposal, request or inquiry and (iii) the identity of the Person making such Affiliation Proposal, request or inquiry.

5.   OBLIGATIONS TO CONSUMMATE THE AFFILIATION.

5.1.   The obligation of CMCC to consummate the Affiliation shall be subject to the fulfillment on or prior to the Closing Date of the following conditions, any or all of which may be waived by CMCC, in whole or in part, to the extent permitted by Applicable Law:

5.1.1.   IDI shall have performed in all material respects each of the covenants, obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing;

5.1.2.   The representations and warranties made by IDI in this Agreement shall be true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date;

5.1.3.   Between the date hereof and the Closing Date, neither IDI nor the business, properties, assets, or condition (financial or otherwise) of IDI has been materially adversely affected whether by fire, casualty, act of God or otherwise, and there shall have been no other changes in the business, properties, assets, condition (financial or otherwise), management or prospects of IDI that would have individually or in the aggregate a material adverse effect on the business, condition or results of operations of IDI, provided that neither of the following shall be taken into account in determining the occurrence of such material adverse effect: (i) a reduction in IDI's National Institutes of Health grant funding consistent with general trends in such funding and (ii) a decline in the market value of IDI's investment portfolio. Notwithstanding the foregoing, IDI agrees that it shall not materially change its portfolio investments between the date hereof and the Closing Date without the prior written consent of CMCC;

5.1.4.   CMCC shall have received a certificate of IDI, dated the Closing Date, signed by the Chief Executive Officer of IDI that the conditions specified in the aforementioned paragraphs shall have been fulfilled;

5.1.5.   CMCC shall have received from Edwards Angell Palmer & Dodge, LLP, counsel to IDI, an opinion, as set forth in Exhibit 5.1.5.

5.1.6.   IDI shall amend its Articles of Organization and Bylaws to read as set forth in Exhibits 1.3(a) and 1.3(b) attached hereto, to among other things (a) name CMCC as its sole member; (b) provide that the Historical Trustees (defined below) shall have the authority to elect three (3) trustees to the IDI Board of Trustees in accordance with Section 5.1.7 herein,

19

provided that CMCC shall have the authority to object to any such trustee in CMCC's reasonable discretion; (c) provide that CMCC will have the sole authority to appoint all of the trustees on the IDI Board of Trustees (other than the Historical Trustees and the GSK Trustee), and the sole authority to remove any trustees (other than the Historical Trustees and the GSK Trustee) with or without assignment of cause; (d) provide that any Historical Trustee or the GSK Trustee may be removed (i) for cause by agreement of two-thirds of the total number of trustees and (ii) without assignment of cause by agreement of two-thirds of the total number of trustees (provided that in the case of (ii), with respect to the removal of a Historical Trustee, such number shall include a majority of the Historical Trustees eligible to vote); and (e) provide that CMCC shall have the sole authority to amend the Amended and Restated Bylaws or Amended and Restated Articles of Organization, subject to the consent rights of the Historical Trustees as set forth Section 9 of Exhibit 1.3(b). For purposes of this Agreement, the GSK Trustee means the trustee that the parties anticipate will be appointed by GlaxoSmithKline Research & Development Limited ("GSK") to the IDI Board of Trustees pursuant to Section 11 of the Research Collaboration Agreement by and between IDI and GSK, dated May 14, 2008 (the "GSK Agreement").

5.1.7. CMCC and IDI shall have agreed in writing upon the number of trustees to be appointed to the IDI Board of Trustees effective as of the Effective Time, including the number of trustees to be selected by IDI (the "Historical Trustees"), in accordance with Section 5.1.6 herein. Notwithstanding anything in this Agreement to the contrary, no individual shall serve as a Historical Trustee unless and until CMCC shall have determined, in its sole discretion, that each such individual is independent of CMCC for control purposes.

5.1.8. Each of the consents set forth on Exhibit 5.1.8 of this Agreement, in form and substance reasonably satisfactory to CMCC, shall have been obtained;

5.1.9. Neither IDI nor CMCC shall have received any notification from the Attorney General objecting to the Affiliation on any grounds in response to the Attorney General Notice;

5.1.10. No Legal Proceeding or order of any Governmental Authority shall be pending or threatened (i) challenging this Agreement or the transactions contemplated hereby or (ii) seeking to delay, restrain or prohibit the Affiliation or any other action contemplated by this Agreement; and

5.1.11. IDI shall have provided written confirmation of oral notice of the Affiliation to the National Institutes of Health ("NIH") and no notice of objection to said Affiliation shall have been received by IDI or CMCC, provided that an indication that IDI's indirect cost recovery rate may be adjusted as a result of the Affiliation shall not constitute such objection, provided that IDI's indirect cost recovery rate remains at or above eighty-nine percent (89%).

5.2. The obligation of IDI to consummate the Affiliation shall be subject to the fulfillment on or prior to the Closing Date of the following conditions, any or all of which may be waived by IDI, in whole or in part to the extent permitted by applicable law:

11315168_28.DOC

5.2.1.  CMCC shall have performed in all material respects each of the covenants, obligations and agreements contained in this Agreement required to be performed by it prior to or at the Closing;

5.2.2.  The representations and warranties made by CMCC in this Agreement shall be true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date;

5.2.3.  Between the date hereof and the Closing Date, neither CMCC nor any of its the business, properties, assets, or condition (financial or otherwise) of either have been materially adversely affected whether by fire, casualty, act of God or otherwise, and there shall have been no other changes in the business, properties, assets condition (financial or otherwise) or management of CMCC or that would have individually or in the aggregate a material adverse effect on the business, condition or results of operations of CMCC;

5.2.4.  IDI shall have received a certificate of CMCC, dated the Closing Date, signed by the Chief Executive Officer or Chief Financial Officer of CMCC that the conditions specified in the aforementioned paragraphs shall have been fulfilled;

5.2.5.  IDI shall have received from Ropes & Gray, LLP, counsel to CMCC, an opinion, as set forth in Exhibit 5.2.5.

5.2.6.  Each of the consents set forth on Exhibit 5.1.8 of this Agreement, in form and substance reasonably satisfactory to IDI, shall have been obtained;

5.2.7.  Neither IDI nor CMCC shall have received any notification from the Attorney General objecting to the Affiliation on any grounds in response to the Attorney General Notice;

5.2.8.  No Legal Proceeding or order of any Governmental Authority shall be pending or threatened (i) challenging this Agreement or the transactions contemplated hereby or (ii) seeking to delay, restrain or prohibit the Affiliation or any other action contemplated by this Agreement; and

5.2.9.  IDI shall have provided written confirmation of oral notice of the Affiliation to the National Institutes of Health ("NIH") and no notice of objection to said Affiliation shall have been received by IDI or CMCC, provided that an indication that IDI's indirect cost recovery rate may be adjusted as a result of the Affiliation shall not constitute such objection, provided that IDI's indirect cost recovery rate remains at or above eighty-nine percent (89%).

## 6. POST-CLOSING COVENANTS.

### 6.1.  Corporate Governance Matters.

6.1.1.  Until the merger of IDI into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2 below, the Historical Trustees and the GSK Trustee will continue to

21

serve on the IDI Board of Trustees for terms set forth in the Amended and Restated Bylaws. Any vacancy on the IDI Board of Trustees resulting from the resignation or removal of (i) a Historical Trustee shall be filled by a majority of the Historical Trustees then in office and (ii) the GSK Trustee shall be filled by the GSK Trustee then in office; provided, however, that CMCC shall have the authority to object to any trustee appointed by the Historical Trustees in CMCC's reasonable discretion.

6.1.2.   Anytime on or after October 1, 2012 (or earlier with the mutual agreement of a majority of the Historical Trustees), CMCC shall have the right to merge IDI into CMCC or a controlled affiliate of CMCC and the faculty members of IDI will become employees of the successor to IDI or such CMCC affiliate as customarily employs faculty of the same specialty. Upon any such merger, such faculty members will be entitled to participate in such salary, benefit and compensation programs as are customarily available to CMCC-employed faculty, subject to the requirements of applicable law.

6.1.3.   In the event of a merger pursuant to Section 6.1.2 herein, until the fifth (5th) anniversary of the Effective Time, the Historical Trustees, acting unanimously, shall continue to have the authority to enforce the terms of the Affiliation for the benefit of the IDI Program (defined below). Without limiting the foregoing, the Historical Trustees, acting unanimously, shall have the authority to retain separate legal counsel, at IDI's sole cost and expense, if such trustees reasonably determine that the hiring of such counsel is necessary to enforce the provisions of this Section 6 to the extent such terms are for the express benefit of the IDI Program (defined below).

6.2.   Program Matters.

6.2.1.   As soon as reasonably practical after the Effective Time, CMCC will cause IDI to be recognized as a CMCC multidisciplinary research program (the "IDI Program") with status equivalent to CMCC's existing multidisciplinary research programs in Vascular Biology, Genomics, Bio-Informatics, Stem Cell Biology, and Neuroscience (the "CMCC Existing Programs"). The IDI Program will be named the "Program in Cellular and Molecular Medicine" or such other name as the IDI Board of Trustees may determine from time to time with the approval of a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

6.2.2.   Until the fifth (5th) anniversary of the Effective Time, the IDI Program shall be entitled to all of the rights, and be subject to all of the obligations, that CMCC provides and / or requires of the CMCC Existing Programs, including, without limitation, CMCC's guarantee of CMCC program status for the IDI Program. For the avoidance of doubt, CMCC commitments with respect to CMCC's support of the IDI Program for the five (5) year period beginning at the Effective Time shall continue for such 5-year period in the event IDI is merged into a CMCC affiliate as set forth in Section 6.1.2.

22

### 6.3.    Personnel / Recruitment Matters.

6.3.1.  Dr. Fred Alt will be the Executive Director of the IDI Program (the "IDI Director") until the fifth (5th) anniversary of the Effective Time. If for any reason Dr. Alt should cease to be the IDI Director during the five (5) year period following the Effective Time, a majority of trustees on IDI's Board of Trustees shall appoint a successor to Dr. Alt; provided, that such successor has been approved by a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

6.3.2   Until the fifth (5th) anniversary of the Effective Time, the IDI Director shall report directly to the Chief Executive Officer and the Chief Operating Officer of CMCC. The salary of the IDI Director shall be set and approved jointly by the Chief of the applicable CMCC Department and the Chief Executive Officer of CMCC.

6.3.3.  Until the fifth (5th) anniversary of the Effective Time, the IDI Director shall serve as a member of CMCC's Research Strategy Group ("RSG") and Research, Recruitment, and Resource Committee ("RRRC"), or any such successor committees.

6.3.4.  As soon as reasonably practical after the Effective Time, each faculty member of IDI, a list of whom is set forth on Exhibit 6.3.4, shall become a faculty member of an appropriate department at Children's Hospital Boston. Salaries for such faculty members shall comply with Harvard Medical School Compensation Guidelines and shall be subject to the approval of the Chief of the applicable department at Children's Hospital Boston, in consultation with the IDI Director.

6.3.5.  Until the fifth (5th) anniversary of the Effective Time, the IDI Program shall be entitled to recruit faculty, post doctorates and other personnel in the same fashion as the CMCC Existing Programs. To the extent that any recruitment by the IDI Program requires resources of CMCC, or to the extent that the IDI Program desires to receive resources from CMCC to achieve a recruitment, such recruitment shall be subject to the processes and approvals required of any Program seeking CMCC support (currently, the approval of RRRC and the CMCC Chief Executive Officer ("CEO")).  It is the intent of the Parties initially to recruit three (3) additional faculty after the Effective Time and subject to approval by RRRC and the CEO. CMCC will reimburse IDI for fifty percent (50%) of the salary, benefits and customary start up expenses associated with said additional personnel for up to three (3) years for each such individual.

6.3.6.  Until the first (1st) anniversary of the Effective Time, Theodore M. Cronin will be retained as IDI's Chief Executive Officer and Chief Financial Officer, unless he resigns from employment or is otherwise terminated earlier for cause.  Until the earlier of (i) the fifth (5th) anniversary of the Effective Time and (ii) merger of IDI into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2 above, any successor to Mr. Cronin must be approved by a majority of the Historical Trustees, such approval not to be unreasonably withheld or delayed.

23

6.3.7. Until the second (2nd) anniversary of the Closing Date, CMCC will use reasonable efforts to offer comparable employment with a CMCC affiliate to any full-time administrative employee of IDI as of the Closing Date, a list of whom as of December 1, 2008 is set forth on Exhibit 6.3.7, whose employment is terminated after the Closing Date without assignment of cause. Notwithstanding anything in this Agreement to the contrary, under no circumstances shall any party, including IDI and / or a current or former employee of IDI, have any right or other cause of action to enforce the foregoing obligation against CMCC.

### 6.4. Financial Matters.

6.4.1. In order to provide IDI with the benefit of CMCC's investment management expertise and to effectuate any additional provisions related to the obligations contemplated by Section 6.4.2 herein, the Parties shall as soon as practicable after the Effective Time execute an agreement to transfer management of IDI's endowment (the "IDI Endowment") to CMCC (the "Endowment Investment Agreement") substantially in the form of Exhibit 6.4.1 hereto. As provided in the Endowment Investment Agreement, CMCC shall allocate $20 million of its existing endowment, which shall remain under the designation and control of CMCC, to be invested along side the IDI Endowment (together the "Combined Funds").

6.4.2. In the event that, prior to the merger of the IDI Program into a CMCC affiliate as contemplated by Section 6.1.2 herein, CMCC suffers any individual or series of losses, liabilities, obligations, damages, diminution in value, notices, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties or expenses (including reasonable attorneys' and other professionals' fees and disbursements) having an adverse financial impact equal to or greater than One Million Dollars ($1,000,000) in the aggregate (individually a "Loss" and, collectively, "Losses") based upon or arising from any breach of any representation, warranty or other obligation made by IDI in this Agreement, CMCC shall provide written notice of such Loss(es) to the Historical Trustees (provided that failure to so notify shall not deprive CMCC of its rights under this Section; and provided further that the $1,000,000 aggregate loss amount shall not apply in the case of Loss(es) arising on the account of IDI's fraud). Notwithstanding anything in this Agreement to the contrary, in the event of any such Loss(es), CMCC shall have the right to access and utilize funds from the IDI Endowment to reimburse CMCC in the amount of such Loss(es), and to the extent the funds available in the IDI Endowment are not available to cover such Loss(s), CMCC may also decrease the amount of financial support that CMCC is obligated to provide to the IDI Program under this Agreement, including, without limitation, the Support Payments (as hereinafter defined) in accordance with Section 6.4.3 herein. In addition, without limiting the foregoing, and without in any way limiting CMCC's rights under this Agreement generally, CMCC expressly reserves the right to make operational and/or programmatic changes to the IDI Program to the extent the event giving rise to the Loss(es) is recurring or causes ongoing losses to the IDI Program.

6.4.3. Each of IDI and CMCC agrees that the IDI Program will be subject to the spending rules and oversight of funds established by CMCC, as the same may be amended from time to time. IDI covenants and agrees that IDI shall use commercially reasonable efforts to manage its financial resources such that IDI's Operating Loss shall not exceed more than

24

$1,000,000 in any fiscal year. For purposes of this Section 6.4.3, "Operating Loss" is defined as (i) IDI's operating revenue, (ii) less IDI's operating expenses, (iii) plus five percent (5%) of the Combined Funds. Until the fifth (5th) anniversary of the Effective Time, CMCC agrees to support any such operating loss up to $1,000,000 in any fiscal year (the "Support Payments"). CMCC agrees that it will not fund any Support Payments from the Combined Funds.

6.4.4. Until the fifth (5th) anniversary of the Effective Time, CMCC will actively engage in fundraising on behalf of and in cooperation with the IDI Program in substantially the same fashion as CMCC does for the CMCC Existing Programs, and CMCC will commit substantially similar resources to the IDI Program in support of this effort. Such fundraising will be conducted so as not to infringe upon existing relationships established by CMCC departments, divisions or programs or use their names without consent of their chair, chief or program director.

6.4.5. Until the fifth (5th) anniversary of the Effective Time, the IDI Program will occupy the space at the Alpert Building and in the Center for Life Science Boston Building. CMCC also agrees that during this period, CMCC will use reasonable efforts to ensure that any adjustments to the IDI Program space will not result in the IDI Program having space in more than two locations.

6.4.6. As soon as reasonably practical after the Effective Time, CMCC and the IDI Program will jointly explore opportunities that will allow the IDI Program to achieve administrative efficiencies and / or benefits; provided that no such efficiencies will be undertaken until the first (1st) anniversary of the Effective Time unless otherwise agreed to by the Chief Executive Officer of IDI or a majority of the Historical Trustees.

6.5.    Intellectual Property Matters. All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement.

6.6.    Trustee and Officer Indemnification and Insurance.

6.6.1. IDI shall indemnify and advance expenses to individuals who were trustees and officers of IDI prior to the Effective Time at least to the extent provided in the Articles of Organization and the Bylaws on the date hereof, regardless of any amendment, repeal or other modification of the Articles of Organization and the Bylaws.

6.6.2. Prior to the Effective Time or as soon as practicable thereafter, IDI shall obtain and fully pay for "tail" insurance policies with a claims period of at least six years from and after the Effective Time from IDI's current director and officer liability insurance ("D&O Insurance") carrier or another carrier with the same or better credit rating, for the persons who, as of the date hereof, are covered by IDI's existing D&O Insurance with terms at least as favorable as IDI's existing D&O Insurance with respect to matters existing or occurring at or prior to the

25

Effective Time (including in connection with this Agreement and the Affiliation), and IDI shall maintain such D&O Insurance in full force and effect for the full term.

6.6.3.  From the Effective Time and until such time as IDI may merge into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2, IDI will provide to the trustees and officers of IDI the same indemnification and advance of expenditures rights and CMCC will arrange for IDI to have D&O Insurance coverage consistent with the coverage CMCC provides for its own trustees and officers.  CMCC will arrange for IDI to have D&O Insurance coverage consistent with the coverage extended to CMCC and its affiliates provided that IDI recognizes and agrees that such coverage will not be in effect as of the Closing Date if the Closing occurs prior to April 1, 2009; provided further that CMCC reasonably anticipates that the coverage will be made retroactive to the Effective Date.

7.  PUBLIC DISCLOSURE.  Each of CMCC and IDI agrees that it shall not make any public announcement or issue any press release in connection with the transactions contemplated hereby, except (i) as provided in this paragraph, (ii) in accordance with the terms of the Confidentiality Agreement (as defined below), and (iii) pursuant to a mutual agreement of the parties hereto; provided, however, that nothing contained herein shall prevent any Party, at any time, from furnishing any information required by any Governmental Authority or from issuing any announcement, press release, public statement or other information to the press or any third party with respect to this Agreement if required by applicable law; provided, further, that to the extent reasonably practical, the Parties agree to consult with each other as to the content of any such disclosure so required and consider in good faith the comments of the other thereon.  The Parties will jointly agree upon and approve any press release to be issued by CMCC on or after the date hereof in connection with this Agreement.

8.  TERMINATION.

8.1.  This Agreement may be terminated on or prior to the Closing (a) by the mutual written consent of IDI and CMCC or (b) by either IDI or CMCC if the Closing shall not have occurred on or before six (6) months from the date hereof, unless the terminating party has failed to perform or observe any agreement or condition set forth herein that is required to be observed by such party on or before the Closing.

8.2.  In the event that IDI willfully breaches this Agreement, IDI shall reimburse CMCC for all expenses incurred in connection with the Affiliation, including without limitation attorneys fees, accountants fees, filing fees and any other reasonable fees that CMCC determines directly relate to the Agreement or the Affiliation

8.3.  In the event that CMCC willfully breach this Agreement, CMCC shall reimburse IDI for all expenses incurred in connection with the Affiliation, including without limitation attorneys fees, accountants fees, filing fees and any other reasonable fees that IDI determines directly relate to the Agreement or the Affiliation.

26

9.    MISCELLANEOUS.

9.1.    All notices, requests, consents, reports and demands shall be in writing and shall be hand delivered, sent by facsimile or other electronic medium, or mailed, postage prepaid, to IDI or to CMCC at the address set forth below or to such other address as may be furnished in writing to the other parties hereto:

To IDI:

Theodore M. Cronin
Acting President and Chief Financial Officer
Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

With a copy to:

David R. Pokross, Jr.
Edwards Angell Palmer & Dodge, LLP
111 Huntington Ave.
Boston, MA 02199

To CMCC:

James Mandell, M.D.
Chief Executive Officer
The Children's Medical Center Corporation
300 Longwood Ave.
Boston, MA 02115

With copies to:

Stuart J. Novick
Senior Vice President & General Counsel
Children's Hospital Boston
300 Longwood Avenue
Boston, MA 02115

Michele Garvin
Ropes & Gray, LLP
One International Place
Boston, MA 02110

9.2.    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by either

27

Party, including by operation of law without the prior written consent of the other Party. Except for the rights of (i) IDI trustees and officers to indemnification and insurance protection under Section 6.6 and (ii) the Historical Trustees to enforce this Agreement under Section 6.1.3, this Agreement is not intended to confer upon any Person other than the Parties any rights or remedies hereunder.

9.3.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts (regardless of the laws that might otherwise govern under applicable Massachusetts principles of conflicts of law) as to all matters, including but not limited to matters of validity, construction, effect, performance and remedies, and IDI and CMCC hereby agree to irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court sitting in Suffolk County, Massachusetts over any suit, action or proceeding arising out of or relating to this Agreement.

9.4.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.5.    This Agreement may be executed in counterparts, including by facsimile, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree that they have been represented by counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any applicable law, regulation, holding or rule of construction providing that ambiguities in an agreement, document or provision will be construed against the party drafting such agreement, document or provision.

9.6.    Definitions in this Agreement shall apply equally to both the singular and plural forms of the terms defined. All Exhibits attached hereto shall be deemed incorporated herein as if set forth in full herein and, unless otherwise defined therein, all terms used in any Exhibit shall have the meanings ascribed to such terms in this Agreement. The words "hereof," "hereinafter," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. Unless otherwise expressly provided herein, any statute referred to herein means such statute as may from time to time be amended, modified or supplemented.

9.7.    If for any reason any term or provision of this Agreement is held to be invalid or unenforceable, all other valid terms and provisions hereof shall remain in full force and effect, and all of the terms and provisions of this Agreement shall be deemed to be severable in nature.

9.8.    This Agreement including the Exhibits referred to herein and the Confidentiality Agreement between IDI and CMCC dated February 6, 2008 (the "Confidentiality Agreement") embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or

28

referred to herein or therein.  This Agreement supersedes all prior agreements and understandings between the Parties with respect to such transactions other than the Confidentiality Agreement.

*[Signature page follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective, duly authorized officers as of the date first above written.

THE CHILDREN'S MEDICAL CENTER
CORPORATION

By: _____

James Mandell, M.D.
Chief Executive Officer

IMMUNE DISEASE INSTITUTE, INC.

By: _____

Theodore M. Cronin
Acting President and Chief Financial Officer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective, duly authorized officers as of the date first above written.

THE CHILDREN'S MEDICAL CENTER
CORPORATION

By:  _____

James Mandell, M.D.
Chief Executive Officer

IMMUNE DISEASE INSTITUTE, INC.

By:  _____

Theodore M. Cronin
Acting President and Chief Financial Officer

# A

EXHIBIT 1.3(a)

AMENDED AND RESTATED ARTICLES OF ORGANIZATION

See Attached.

## EXHIBIT 1.3(b)

AMENDED AND RESTATED BYLAWS

See Attached.

## EXHIBIT 4.1

## ATTORNEY GENERAL NOTICE

See Attached.

## EXHIBIT 4.5

## EMPLOYEES AND INDEPENDENT CONTRACTORS

**Immune Disease Institute - Administrative & Facilities Personnel**

| Last | First | Title |
|------|-------|-------|
| **Administration** | | |
| Cronin | Theodore | Acting President & CFO |
| Simmons | Steven | Director of Finance &Operations |
| Majewski | Amanda | Office Manager/Administrator |
| Bradley | Margaret | Chief Scientific Administrative Officer |
| DiPasquale | Zachary | Administrative Assistant |
| Norris | John | Envir. Health & Safety Mgr |
| Boothby | Catherine | Administrative Assistant |
| Rosenbaum | Rachelle | Executive Officer for Institutional Relations |
| Nicholson | Shirley | IACUC Coordinator |
| Viehman | Louise | Administrative Assistant |
| **Animal Facility** | | |
| Chenaif | Miriam | Animal Caretaker |
| Sumpf | Sierra | Animal Caretaker |
| Ramirez | Francia | Animal Caretaker |
| **Facilities** | | |
| Bono | George | Director of Construction Projects |
| Garcia | Oscar | Facilities Assistant |
| Landry | Peter | Facilities Manager |
| Schmidt | Howard | Sr. Security/Helpdesk SC |
| **Accounting, Finance & Grants Administration** | | |
| Carriuolo | Stephen | Controller |
| Hourihan | Helen | Grants Manager |
| Morris | Barbara | Financial Analyst |
| Craig | Nicole | Accountant/Financial Analyst |
| Frank | David | Accountant/Payroll Mgr. |
| Goto-Hardy | Megumi | A/P Clerk |
| Chen | Eva | Accts Payable Coordinator |
| Cheung | Elisa | Accounts Payable Supv. |

**Core Facility**

| Ketman | Kenneth | Cell Sorter Operator |
| Barteneva | Natalie | Director Flow Cytometry |
| Leung | Harry | Dir. Microscope Core Fac |

**Human Resources**

| Morgan Williams | Christine | Hum. Resources Generalist |
| Wilson | Nicole | H.R. Intern |
| Rosenbaum | Joshua | Human Resources Rep. |
| Santos | Gabriel | Immigration Specialist |
| Donovan | Doreen | HR Director |

**IT Services**

| LaSalle Jr. | Jurvis | IT Manager & Systems Architect |
| Lamb | Braden | Jr. Desktop Specialist |
| May | Timothy | Desktop Support Specialist |
| O'Connor | Justin | Systems Administrator |
| Perry | James | Jr Systems Administrator |

**Glass Wash Facility**

| Williams | Ronald | Laboratory Aide |
| Garcia | Hector | Laboratory Aide |
| Halhoul | Latifa | Laboratory Aide |
| Hines | Jesse | Supervisor Glasswash |

**Technology Development**

| Hsu | Amy | Admin. Asst. |
| Dietz | Ryan | Director of Tech Development |

**Procurement**

| Buchanan, Jr. | Jack | Procurement Manager |

**Scientfic Personnel**

**Alper Lab**

| Borotto | Nicholas | Co-op Student |
| Garbarino | Kathleen | Co-op Student |
| Jalloh | Yanoh | Co-op Student |
| Kunnenkeri | Sushruta | Co-op Student |
| Tarnacki | Jennifer | Co-op Student |
| Alford | Dennis | Research Scientist |
| Larsen | Charles | Jr. Investigator |
| Trautwein | Michael | Research Technic. |
| Alper | Chester | Sr. Investigator |

**Alt Lab**

|  |  | Administrative |
| --- | --- | --- |
| Needham | Judith | Assistant |
| Basu | Uttiya | Research Fellow |
| Choi | Vivian | Research Fellow |
| Datta | Abhishek | Research Fellow |
| Franklin | Andrew | Research Fellow |
| Gostissa | Monica | Research Fellow |
| Phan | Ryan | Research Fellow |
| Schwer | Bjoern | Research Fellow |
| Wang | Jing | Research Fellow |
| Zhang | Yu | Research Fellow |
| Zhu | Li | Research Fellow |
| Acquaviva | Lisa | Research Technic. |
| Bianco | Julia | Research Technic. |
| Gallagher | Michael | Research Technic. |
| Hansen | Erica | Research Technic. |
| Patel | Harin | Research Technic. |

**Carroll Lab**

| Carroll | Elisabeth | Sr. Research Associate |
| --- | --- | --- |
| Conway | Ryan | Animal Technologist |
| Constantin | Myrna | Research Fellow |
| Tsiftsoglou | Stefanos | Research Fellow |
| Fernandez Gonzalez | Santiago | Research Fellow |
| Kim | Young-A | Research Fellow |
| Kuligowski | Michael | Research Fellow |
| Pitcher | Lisa | Research Fellow |
| Ma | Minghe | Research Assoc. |
| Carroll | Michael | Sr. Investigator |

**Davis Lab**

| Fernandes | Stacey | Research Technic. |
| --- | --- | --- |
| Mejia De La Roca | Juan | Research Fellow |
| Lu | Fengxin | Research Fellow |
| Davis | Alvin | Sr. Investigator |

**Goldfeld Lab**

| Blodgett | Christopher | Admin. Asst. |
| --- | --- | --- |
| Biglione | Sebastian | Research Fellow |
| Jasenosky | Luke | Research Fellow |
| Haridas | Viraga | Research Fellow |
| Falvo | James | Instructor |
| Ranjbar | Shahin | Jr. Investigator |

| Tsytsykova | Alla | Jr. Investigator |
| Goldfeld | Anne | Sr. Investigator |

**Hur**
| Peisley | Alys | Research Fellow |
| Hur | Sun | Jr. Investigator |

**Kirchhausen**
| Boecking | Till | Research Fellow |
| Rapoport | Iris | Research Assoc. |
| Cocucci | Emanuele | Research Fellow |
| Guan | Rong | Research Fellow |
| McDonald | Catherine | Admin. Asst. |
| Kural | Comert | Research Fellow |
| Lu | Lei | Research Fellow |
| Saffarian | Saviz | Research Assoc. |
| Yu | Anan | Research Fellow |
| Boll | Werner | Research Assoc. |
| Marino | Eric | Imaging Specialist |
| Kirchhausen | Tomas | Sr. Investigator |

**Rossi**
| Zguro | Dhoksiana | Research Technic. |
| Beerman | Isabel | Research Fellow |
| Warren | Luigi | Research Fellow |
| Gazit | Roi | Research Fellow |
| Rossi | Derrick | Jr. Investigator |

**Winau Lab**
| Winau | Florian | Jr. Investigator |

**Fraser Lab**
| Ding | Wei-Zi | Research Technic. |
| Fraser | Patricia | Jr. Investigator |

**Silberstein Lab**
| Pivarnik | Gregory | Research Technic. |
| Graves | Katherine | Research Technic. |
| Stegner | Joseph | Research Assoc. |
| Waters | Collin | Research Technic. |
| Silberstein | Leslie | Sr. Investigator CHCT Prog. |
| Thostenson | Kari | Administrator |
| Armant | Myriam | Assistant Director |

**Rajewsky Lab**

| | | |
|---|---|---|
| Grundy | Jaclyn | Lab Technician |
| Jensen | Kari | Research Technic. |
| Xia | Junrong | Research Technic. |
| Pellerin | Alex | Research Technic. |
| Zhang | Baochun | Research Fellow |
| Koralov | Sergei | Research Fellow |
| Wang | Jing | Research Technic. |
| Derudder | Emmanuel | Research Fellow |
| Srinivason | Lakshmi | Research Fellow |
| Wang | Donghai | Research Fellow |
| Chakraborty | Tirtha | Research Fellow |
| Thai | To-Ha | Research Fellow |
| Seagal | Jane | Research Fellow |
| Otipoby | Kevin | Research Fellow |
| Ottaviano | Michelle | Admin. Asst. |
| Bamberg | Michael | Lab Manager Mgr. |
| Ghitza | Dvora | Con.Mut.MouseFac |
| Rajewsky | Klaus | Sr. Investigator |

**Remold Lab**

| | | |
|---|---|---|
| Stolley | James | Research Technic. |
| Gong | Dapeng | Research Fellow |
| Cooley | Jessica | Lab Manager |
| Benarafa | Charaf | Instructor |
| Remold-O'Donnell | Eileen | Sr. Investigator |

**Shimaoka Lab**

| | | |
|---|---|---|
| Silkworth | Whitney | Research Technic. |
| Morishita | Yoshiyuki | Research Fellow |
| Srinivasan | Charudharshini | Research Fellow |
| Park | Eun Jeong | Research Fellow |
| Peer | Dan | Research Fellow |
| Shimaoka | Motomu | Investigator |

**Springer Lab**

| | | |
|---|---|---|
| Drabek | Andrew | Research Technic. |
| Eng | Edward | Research Fellow |
| Mondal | Subhanjan | Research Fellow |
| Shi | Minlong | Research Fellow |
| Zhang | Qing | Research Fellow |
| Zhou | Yanfeng | Research Fellow |

| | | |
|---|---|---|
| Chen | Xing | Research Fellow |
| Zhang | ChengZhong | Research Fellow |
| Kim | Jongseong | Research Fellow |
| Sen | Mehmet | Research Fellow |
| Smagghe | Benoit | Research Fellow |
| Yu | Yamei | Research Fellow |
| Zhu | Jianghai | Research Fellow |
| Schuerpf | Thomas | Research Fellow |
| Grey | Michael | Research Fellow |
| Mi | Li Zhi | Research Fellow |
| Zhu | Jieqing | Research Fellow |
| Pierce | April | Admin. Asst. |
| Xie | Can | Research Fellow |
| Mulligan | Eadaoin | Lab Manager |
| Lu | Chafen | Investigator |
| Springer | Timothy | Sr. Investigator |

**Von Andrian Lab**

| | | |
|---|---|---|
| Alton | Jennifer | Admin. Asst. |
| Perdomo Ortiz | Lilia | Short term Research Schol |
| Cheng | Guiying | Research Assoc. |
| Mazo | Irina | Jr. Investigator |

**Wagner Lab**

| | | |
|---|---|---|
| Carbo Cots | Carla | Research Fellow |
| Schatzberg | Daphne | Research Technic. |
| Yang | Janie | Research Technic. |
| Canault | Matthias | Research Fellow |
| Duerschmied | Daniel | Research Fellow |
| Cifuni | Stephen | Research Technic. |
| Brill | Alexander | Research Fellow |
| Chauhan | Anil | Instructor |
| Zhao | Bingqiao | Research Fellow |
| Cowan | Lesley | Admin. III |
| Wagner | Denisa | Sr. Investigator |

**Rao Lab**

| | | |
|---|---|---|
| Keil | Brittany | Research Technic. |
| Kenney | Grace | Research Technic. |
| Kwon | Hyoung | Research Technic. |
| Pishyareh | Mojgan | Research Technic. |
| Stevanovic | Irena | Research Fellow |
| Gelinas | Curtis | Research Technic. |
| Banfield-Weir | Jake | Admin. Asst. |

| Bandukwala | Hozefa | Research Fellow |
|------------|--------|-----------------|
| Ghosh | Srimoyee | Research Fellow |
| Zhou | Yubin | Research Fellow |
| Meraner | Paul | Research Fellow |
| Sundrud | Mark | Research Fellow |
| Koh | Kian Peng | Research Fellow |
| Mueller | Martin | Research Fellow |
| Oberdoerffer | Shalini | Research Fellow |
| Li | Huiming | Research Fellow |
| Ohora | Masatsugu | Instructor |
| Sharma | Sonia | Research Fellow |
| Hogan | Patrick | Investigator |
| Lee | Jung | Lab Manager |
| Lamperti | Edward | Research Assoc. |
| Rao | Anjana | Sr. Investigator |

**Lieberman**

| McKernan | Shannon | Research Technic. |
|----------|---------|-------------------|
| Tsai | Perry | Research Technic. |
| Ferrini, II | Roger | Research Fellow |
| Thiery | Jerome | Research Fellow |
| Yan | Nan | Research Fellow |
| Petrocca | Fabio | Research Fellow |
| Wu | Yichao | Research Fellow |
| Ahmed | Fariyal | Research Fellow |
| Navarro Lopez | Francisco | Research Fellow |
| Leonard | Julie | Admin. Asst. |
| Lal | Ashish | Instructor |
| Martinvalet | Denis | Research Fellow |
| Xu | Zhan | Research Assoc. |
| Lieberman | Judy | Sr. Investigator |

**NRSA**

| Pipkin | Matthew | Research Fellow |
|--------|---------|-----------------|

**Independent Contractors**
Kathleen Dimino
Robert Forrester
Dr. May S. Jacobson
Sherwin Kevy
Ian Levesque
Patricia McCaffrey, PhD

Piotr Sliz    Agreement dated December 21, 2007

EXHIBIT 5.1.5

OPINION FROM EDWARDS ANGELL PALMER & DODGE LLP

See Attached.

EXHIBIT 5.1.8

CONSENTS

1.    Lease by President and Fellows of Harvard College to Blood Research Institute, Inc.,
      dated September 3, 1992

2.    Sublease by Blood Research Institute, Inc. to Center for Blood Research, Inc., dated
      September 3, 1992

3.    Research Collaboration Agreement by and between Immune Disease Institute, Inc. and
      GlaxoSmithKline Research & Development Limited, dated May 14, 2008

EXHIBIT 5.2.5

OPINION FROM ROPES & GRAY, LLP

See Attached.

## EXHIBIT 6.3.4

## FACULTY MEMBERS

| Name | Harvard Medical School Appointment |
| --- | --- |
| 1. Frederick W. Alt, Ph.D. | Charles A. Janeway Professor of Pediatrics & Professor of Genetics |
| 2. Chester A. Alper, M.D. | Professor of Pediatrics |
| 3. Michael Carroll, Ph.D. | Professor of Pediatrics (Pathology) |
| 4. Alvin E. Davis, III, M.D. | Professor of Pediatrics |
| 5. Anne E. Goldfeld, M.D. | Associate Professor of Medicine |
| 6. Sun Hur, Ph.D. | Lecturer (pending Assistant Professor) of Biological Chemistry and Molecular Pharmacology |
| 7. Tomas Kirchhausen, Ph.D. | Professor of Cell Biology |
| 8. Judy Lieberman, M.D., Ph.D. | Professor of Pediatrics |
| 9. Eileen Remold-O'Donnell, Ph.D. | Professor of Pediatrics |
| 10. Anjana Rao, Ph.D. | Professor of Pathology |
| 11. Klaus Rajewsky, M.D. | Fred S. Rosen Professor of Pediatrics & Professor of Pathology |
| 12. Derrick J. Rossi, Ph.D. | Assistant Professor of Pathology |
| 13. Motomu Shimaoka, M.D., Ph.D. | Associate Professor of Anesthesiology |
| 14. Leslie Silberstein, M.D. | Professor of Pathology (Pediatrics) |
| 15. Timothy Springer, Ph.D. | Latham Family Professor of Pathology |
| 16. Erdyni Tsitsikov, Ph.D. | Assistant Professor of Pediatrics |
| 17. Ulrich von Andrian, M.D., Ph.D. | Edward Mallinckrodt Jr. Professor of Immunopathology (Pathology) |
| 18. Denisa D. Wagner, Ph.D. | Professor of Pathology |
| 19. Florian Winau, M.D. | Lecturer (pending Assistant Professor) of Pathology |

EXHIBIT 6.3.7

ADMINISTRATIVE PERSONNEL

| Last | First | Title |
|------|-------|-------|
| **Administration** | | |
| Cronin | Theodore | Acting President & CFO |
| Simmons | Steven | Director of Finance &Operations |
| Majewski | Amanda | Office Manager/Administrator |
| Bradley | Margaret | Chief Scientific Administrative Officer |
| DiPasquale | Zachary | Administrative Assistant |
| Norris | John | Envir. Health & Safety Mgr |
| Boothby | Catherine | Administrative Assistant |
| Rosenbaum | Rachelle | Executive Officer for Institutional Relations |
| Nicholson | Shirley | IACUC Coordinator |
| Viehman | Louise | Administrative Assistant |
| **Animal Facility** | | |
| Chenaif | Miriam | Animal Caretaker |
| Sumpf | Sierra | Animal Caretaker |
| Ramirez | Francia | Animal Caretaker |
| **Facilities** | | |
| Bono | George | Director of Construction Projects |
| Garcia | Oscar | Facilities Assistant |
| Landry | Peter | Facilities Manager |
| Schmidt | Howard | Sr. Security/Helpdesk SC |
| **Accounting, Finance & Grants Administration** | | |
| Carriuolo | Stephen | Controller |
| Hourihan | Helen | Grants Manager |
| Morris | Barbara | Financial Analyst |
| Craig | Nicole | Accountant/Financial Analyst |
| Frank | David | Accountant/Payroll Mgr. |
| Goto-Hardy | Megumi | A/P Clerk |
| Chen | Eva | Accts Payable Coordinator |
| Cheung | Elisa | Accounts Payable Supv. |
| **Core Facility** | | |
| Ketman | Kenneth | Cell Sorter Operator |
| Barteneva | Natalie | Director Flow Cytometry |
| Leung | Harry | Dir. Microscope Core Fac |

**Human Resources**

| Morgan Williams | Christine | Hum. Resources Generalist |
| Wilson | Nicole | H.R. Intern |
| Rosenbaum | Joshua | Human Resources Rep. |
| Santos | Gabriel | Immigration Specialist |
| Donovan | Doreen | HR Director |

**IT Services**

| LaSalle Jr. | Jurvis | IT Manager & Systems Architect |
| Lamb | Braden | Jr. Desktop Specialist |
| May | Timothy | Desktop Support Specialist |
| O'Connor | Justin | Systems Administrator |
| Perry | James | Jr Systems Administrator |

**Glass Wash Facility**

| Williams | Ronald | Laboratory Aide |
| Garcia | Hector | Laboratory Aide |
| Halhoul | Latifa | Laboratory Aide |
| Hines | Jesse | Supervisor Glasswash |

**Technology Development**

| Hsu | Amy | Admin. Asst. |
| Dietz | Ryan | Director of Tech Development |

**Procurement**

| Buchanan, Jr. | Jack | Procurement Manager |

**Administrative Assistants to Investigators**

| Needham | Judith | Administrative Assistant |
| Blodgett | Christopher | Administrative Assistant |
| McDonald | Catherine | Administrative Assistant |
| Thostenson | Kari | CHCT Prog. Administrator |
| Ottaviano | Michelle | Administrative Assistant |
| Pierce | April | Administrative Assistant |
| Alton | Jennifer | Administrative Assistant |
| Cowan | Lesley | Administrative Assistant |
| Banfield-Weir | Jake | Administrative Assistant |
| Leonard | Julie | Administrative Assistant |

## EXHIBIT 6.4.1

ENDOWMENT INVESTMENT AGREEMENT

See Attached.

# B

# SCHEDULE 2

## IDI DISCLOSURE SCHEDULE

## SCHEDULE 2.1

### SUBSIDIARIES, AFFILIATES AND OTHER INTERESTS IN ENTITIES

Subsidiaries

None.

Affiliates

Blood Research Institute, Inc., a Massachusetts not-for-profit corporation.  The president of IDI
serves as a trustee.

Stock Ownership – Not Publicly Traded

Natural Antibodies, 20,000 shares

Cardicum Pharmaceuticals, Inc., 484 shares

LigoCyte Pharmaceuticals, Inc., 5,000 shares

Mosaic Technologies, Inc., 8,000 shares

## SCHEDULE 2.3(a)

### IDI BOARD OF TRUSTEES AND IDI BOARD OF OVERSEERS

**IDI BOARD OF TRUSTEES**

Frederick W. Alt, PhD
Steven M. Berzin
Robert Carpenter
Anish B. Dhanda
M. Douglas Dunn
Winifred Perkin Gray
Arthur R. Greene, Jr.
Zsolt Harsanyi
Yumiko Honda

Michael Lytton, M.Sc., J.D.
Vicki Modell
Martin Peretz, PhD
Joan Pinck
Walter M. Pressey
Sarah J. Schiermeyer
Enid M. Starr
William H. Tehan
Gary D. Tureski

**IDI HONORARY TRUSTEES**

Casimir de Rham, Jr.
David A. Mittell

Maurice M. Pechet, M.D., PhD
Douglas M. Surgenor

**IDI BOARD OF OVERSEERS**

A. Edward Allinson
Laurence Aucella
Robert Forrester
Howard J. Goldman
John T. Hemenway
Eric R. Hubbard
E. Barlow Keener
Jessica Brilliant Keener
John Landis
Frederick H. Lovejoy, Jr., M.D.

William J. McCune, Jr.
Matthew McPherron
Frederick H. Modell
Joseph Perini
David R. Pokross, Jr.
Nancy Potter
Harriet L. Robinson, PhD
Timothy A. Springer, PhD
Timothy R. Surgenor
Christopher M. Walter

## SCHEDULE 2.3(b)

### IDI OFFICERS

| | |
|---|---|
| Walter M. Pressey | Chairman of the Board |
| Michael Lytton | Vice Chairman of the Board |
| Theodore M. Cronin | Acting President, CEO and CFO |
| Steven M. Berzin | Treasurer |
| Frederick W. Alt, PhD | Scientific Director |
| Chester A. Alper, PhD | Vice President |
| David R. Pokross, Jr. | Clerk |
| Rachelle A. Rosenbaum | Assistant Clerk |

SCHEDULE  2.3(c) and (d)

IDI BANK & INVESTMENT ACCOUNTS

Approximate Balance 10/31/08

Citizens Bank

Signatories:

Theodore Cronin
Steven Simmons

Accounts:

|   |   |   |
|---|---|---|
| 1. | Commercial checking | $1,356,753 |
| 2. | Operating money market | 1,289 |
| 3. | Endowment money market | 157,499 |
| 4. | Payroll | 0 |
| 5. | Benefit account | 0 |

State Street Global Advisors

Signatory: Theodore Cronin

Accounts

BWA1 Commingled Funds

|   |   |   |
|---|---|---|
| 1. | Russell 3000 Index CTF | $4,987,481 |
| 2. | MSCI All Country World Equity Index Fund | 2,452,378 |
| 3. | Real Asset CTF | 1,173,306 |
| 4. | Passive Intermediate Government Credit Bond Fund | 1,804,597 |
| 5. | Treasury Money Market Fund | 1,946,937 |
| 6. | National City Corp (individual stock) | 14,999 |

BWA3 Cash Account: Treasury Money Market Fund        3,303,109

SCHEDULE 2.4(a)

GOVERNMENTAL APPROVALS AND NOTICES

1.    Notice to the National Institutes of Health would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

2.    Filing of a certificate of merger with the Secretary of State of Massachusetts

SCHEDULE 2.4(b)

AGREEMENT AND INSTRUMENT WAIVERS, CONSENTS, NOTIFICATIONS

CONSENTS

1.  Lease by President and Fellows of Harvard College to Blood Research Institute, Inc., dated September 3, 1992

2.  Sublease by Blood Research Institute, Inc. to Center for Blood Research, Inc., dated September 3, 1992

3.  Research Collaboration Agreement by and between Immune Disease Institute, Inc. and GlaxoSmithKline Research & Development Limited, dated May 14, 2008

4.  Consent of Citizens Bank under agreements Nos. 99, 100, 101 and 102 listed on Schedule 2.12 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

5.  Consent of President & Fellows of Harvard College (Landlord) under the lease agreement with the CBR Institute for Biomedical Research, Inc., dated June 21, 2006 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

6.  Consent of the Massachusetts Health and Educational Facilities Authority under the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-1A, dated October 17, 2003 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

7.  Consent of the Massachusetts Health and Educational Facilities Authority under the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-3A (2004) Pool 3, dated November 2, 2004 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

8.  Consent of the Massachusetts Health and Educational Facilities Authority and Banc of America Public Capital Corp under the Master Lease and Sublease Agreement dated January 11, 2007 and Schedule No. 1 dated February 6, 2007 and Schedule No. 2 dated April 29, 2008 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

9.  Consent of the Massachusetts Health and Educational Facilities Authority and Hewlett-Packard Financial Services under the Master Lease and Sublease Agreement dated 12/13/2005 and Schedule No. 1 dated 1/18/2006 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

10. Consent of the Massachusetts Health and Educational Facilities Authority and Banc of America Public Capital Corp under the Master Lease and Sublease Agreement dated as of April 29, 2008 would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

NOTIFICATIONS

1.    Notification to 800 Huntington LLC under the Sublease dated May 10, 2006 between 800 Huntington LLC and CBRI would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

2.    Notification to 800 Huntington LLC under the Subordination, Non-Disturbance and Attornment Agreement dated June 29, 2006 among Citizens, 800 Huntington LLC and CBRI would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

3.    Notification to CLSB I LLC under the Lease dated May 23, 2006 between CLSB I LLC and CBRI as amended through a 3rd Amendment would be required for a merger of IDI into a CMCC affiliate pursuant to Section 6.1.2 of the Agreement..[1]

---

[1] Consent of CLSB I L-LC is not required, so long as the "Transfer Net Worth Test" is satisfied. The Transfer Net Worth Test shall be satisfied if, immediately following a merger of IDI into a CMCC affiliate, the CMCC affiliate has a net worth at least equal to IDI's net worth on the date three months prior to the merger. (Art. 13, §13.01)

## SCHEDULE 2.6

### EMPLOYEE LOANS AS OF OCTOBER 31, 2008

| | | |
|---|---|---|
| Dr. Denisa Wagner | Education Loan | $288,206 |
| Dr. Denisa Wagner | Housing Loan | $46,288 |
| Dr. Ulrich Von Andrian | Housing Loan | $80,000 |
| Dr. Fredrick Alt | Housing Loan | $120,000 |
| Dr. Derrick Rossi | Housing Loan | $150,000 |

## SCHEDULE 2.8

### PENDING LITIGATION

Murphy & McManus, LLC, Plaintiff
Norfolk Superior Court No. 2006-2022

## SCHEDULE 2.9.1

## IDI INTELLECTUAL PROPERTY RIGHTS

### I. Patents & Applications

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-003 | Japan | 05/04/2001 | 2001-580432 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | United States | 11/06/2007 | 11/935,817 | Colloidal Compositions for Solid Phase Biomolecular Analytical, Preparative and Identification Systems | Filed | |
| 00-003 | Canada | 02/14/2003 | 2,408,094 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | European | 04/25/2001 | 01932980.4 | Colloid Compositions for Solid Phase Biomolecular Analytical Systems | Filed | |
| 00-003 | PCT | 05/04/2001 | PCT/US01/14373 | Novel Colloid Compositions Useful in the Preparation of Solid Phase Biomolecular Analytical, Preparative and Indentification Systems | Filed | |
| 00-003 | United States | 03/03/2005 | 11/071,674 | NOVEL COLLOIDAL MICROARRAYS | Filed | |
| 00-003 | United States | 05/04/2001 | 09/848,777 | Colloid Compositions Useful in the Preparation of Solid Phase Biomolecular Analytical, Preparative and Identification Systems | Issued | |
| 00-004 | PCT | 08/31/2001 | PCT/US01/27227 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | United States | 03/15/2005 | 11/080,043 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | Canada | 08/31/2001 | 2,417,432 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-004 | European | 08/31/2001 | 01966492.9 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | Japan | 08/31/2001 | 2002-522490 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Filed | |
| 00-004 | United States | 08/31/2001 | 09/945,265 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Issued | |
| 00-004 | United States | 03/15/2005 | 11/080,026 | Modified Polypeptides Stabilized in a Desired Conformation and Methods for Producing Same | Notice of Allowance | |
| 00-006 | European | 05/11/2001 | 01989905.3 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-006 | United States | 11/05/2001 | 10/007,856 | Compositions and Methods for Prolonging Survivial of Chilled Platelets | Filed | Yes |
| 00-006 | United States | 11/05/2001 | 10/007,856 | Compositions and Methods for Prolonging Survivial of Chilled Platelets | Filed | Yes |
| 00-006 | PCT | 11/05/2001 | PCT/US01/46408 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-006 | Canada | 11/05/2001 | 2,431,332 | Compositions and Methods for Prolonging Survival of Chilled Platelets | Filed | Yes |
| 00-007 | United States | 06/08/2001 | 10/297,371 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Filed | Yes |
| 00-007 | United States | 06/08/2001 | PCT/US01/18510 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Filed | Yes |
| 00-007 | PCT | 06/08/2001 | PCT/US01/18510 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | National Phase | Yes |
| 00-007 | Japan | 06/08/2001 | 2002-501463 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Pending | Yes |
| 00-007 | Australia | 03/01/2005 | 2005219839 | Natural IGM Antibodies and Inhibitors Thereof | Pending | Yes |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-007 | Canada | 06/08/2001 | 2410458 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Pending | Yes |
| 00-007 | United States | 03/01/2005 | 11/069,834 | Natural IgM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | European | 06/08/2001 | 01942082.7 | Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury | Published | Yes |
| 00-007 | United States | 03/01/2005 | PCT/US05/006276 | Natural IgM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | European | 03/01/2005 | 05723931.1 | Natural Igm Antibodies and Inhibitors Thereof | Published | Yes |
| 00-007 | Japan | 03/01/2005 | 2007-501869 | Natural IGM Antibodies and Inhibitors Thereof | Published | Yes |
| 00-008 | United States | 07/09/2001 | 09/902,481 | Novel Proteins With Integrin-Like Activity | Issued | |
| 00-009 | Canada | 05/17/2001 | 2,408,883 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | Japan | 11/19/2002 | 2001-585806 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | United States | 12/01/2004 | 10/999,477 | (Diagnostic Claims) Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | United States | 02/13/2008 | 12/030,576 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | European | 05/17/2001 | 06075760.6 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Filed | |
| 00-009 | Italy | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | France | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 00-009 | Australia | 05/17/2001 | 2001261735 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | United Kingdom | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | European | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | Germany | 05/17/2001 | 01935660.9 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Issued | |
| 00-009 | United States | 02/19/2004 | 10/782,456 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity (Hemophilia and Bleeding Disorder claims) | Published | |
| 00-009 | United States | 05/17/2001 | 09/860,618 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Published | |
| 00-009 | PCT | 05/17/2001 | PCT/US01/16021 | Methods for Diagnosing and Treating Hemostatic Disorders by Modulating P-Selectin Activity | Published | |
| 01-001 | PCT | 01/29/2002 | PCT/US02/02412 | Anergy Regulated Molecules | Published | |
| 01-002 | United States | 02/17/2003 | 2004-0048803 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | United States | 02/28/2003 | 2004-0072750 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | PCT | 05/03/2002 | PCT/US02/13900 | Compounds and Methods for the Modulation of CD154 | Filed | |
| 01-002 | United States | 11/30/2001 | 10/002,585 | Compounds and Methods for the Modulation of CD154 | Issued | |
| 01-002 | United States | 10/29/2003 | 10/476,237 | Compounds and Methods for the Modulation of CD154 | Notice of Allowance | |
| 01-003 | United States | 03/11/2002 | 10/094,757 | A Multi-Plate Electrophoresis System Having Non-Mechanical Buffer Circulation | Issued | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 02-001 | European | 10/29/2003 | 03781487.8 | Inhibition of Gene Expression Using RNA Interfering Agents | Filed | |
| 02-001 | Japan | 10/29/2003 | 2004-548585 | Inhibition of Gene Expression Using RNA Interfering Agents | Filed | |
| 02-001 | United States | 02/15/2006 | 10/533,621 | Inhibition of Gene Expression Using RNA Interfering Agents | Pending | |
| 02-001 | PCT | 10/29/2003 | PCT/US2003/034424 | Inhibition of Gene Expression Using RNA Interfering Agents | Published | |
| 02-004 | PCT | 06/25/2003 | PCT/US03/20270 | Vacuolins | Filed | |
| 02-004 | United States | 12/23/2004 | 11/021,840 | Vacuolins | Filed | |
| 02-005 | European | 10/30/2003 | 03816740.9 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNA Interfering Agents | Filed | |
| 02-005 | Japan | 10/30/2003 | 2005-507650 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNAi | Filed | |
| 02-005 | United States | 10/30/2003 | 10/533,622 | Methods for Treating and Preventing Apoptosis Related Disease Using RNA | Pending | |
| 02-005 | PCT | 10/30/2003 | WO2005/013886 | Methods for Treating and Preventing Apoptosis Related Diseases Using RNA Interfering Agents | Published | |
| 02-007 | PCT | 10/08/2003 | PCT/US03/31918 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | Australia | 04/06/2005 | 2003288925 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | European | 10/08/2003 | 03781314.4 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-007 | Canada | 10/08/2003 | 2,502,685 | Compounds for Modulation of Cholesterol Transport | Filed | Yes |
| 02-008 | PCT | 03/20/2003 | PCT/US03/08653 | HIV Therapeutic | Filed | Yes |
| 02-008 | United States | 03/20/2003 | 10/393,411 | HIV Therapeutic | Filed | Yes |
| 02-008 | Canada | 03/20/2003 | 2,479,530 | HIV Therapeutic | Filed | Yes |
| 02-008 | Japan | 03/20/2003 | 2003-577602 | HIV Therapeutic | Filed | Yes |
| 03-001 | United States | 10/05/2006 | 12/089,015 | RNAi-Based Treatment Approach for West Nile and Japanese Encephalitis Viruses | National Phase | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 03-002 | PCT | 05/21/2004 | US2004016210 | Compounds and Methods for Improving Platelet Recovery and Function | Filed | |
| 03-002 | United States | 05/21/2004 | 10/851,255 | Compounds and Methods for Improving Platelet Recovery and Function | Filed | |
| 03-003 | United States | 05/22/2003 | 09/863,141 | Novel Alkaloids | Issued | Yes |
| 03-005 | United States | 04/13/2006 | 10/575,932 | MODULATION OF ANERGY AND METHODS FOR ISOLATING ANERGY-MODULATING COMPOUNDS | Filed | |
| 03-007 | United States | 02/15/2007 | 10/560,563 | SKN-1 Gene and Protein | Filed | |
| 03-008 | United States | 02/08/2005 | 11/053,285 | CD70 INHIBITION FOR THE TREATMENT AND PREVENTION OF INFLAMMATORY BOWEL DISEASE | Filed | |
| 03-009 | United States | 04/28/2006 | 10/577,814 | Methods for Treating and Preventing Ischemia-Reperfusion Injury Using RNA Interfering Agents | Filed | |
| 03-009 | PCT | 11/01/2004 | US2004/036200 | Methods for Treating and Preventing Ischemia-Reperfusion Injury Using RNA Interfering Agents | Filed | |
| 04-001 | PCT | 01/21/2005 | US/2005/003104 | SYSTEMS AND METHODS FOR INDUCING SHORT RNA EXPRESSION | Filed | |
| 04-001 | United States | 06/25/2007 | 10/585,886 | SYSTEMS AND METHODS FOR INDUCING SHORT RNA EXPRESSION | Pending | |
| 04-002 | United States | 02/05/2007 | 11/659,386 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | European | 08/15/2005 | 5807329.7 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Australia | 08/15/2005 | 2005277547 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Canada | 08/15/2005 | 2,576,925 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | Japan | 08/15/2005 | 2007-527944 | Methods for Delivering RNA interference and Uses Thereof | Filed | |
| 04-002 | PCT | 08/16/2005 | PCT/US2005/029111 | Methods for Delivering RNA interference and Uses Thereof | Published | |
| 04-003 | United States | 12/29/2006 | PCT/US2005/022926 | Gelling Electohporeses Loading Buffer | Published | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 04-005 | United States | 04/24/2006 | 11/409,927 | Methods for the Treatment of Multiple Myeloma | Filed | |
| 04-006 | United States | 03/28/2008 | 12/057,523 | Allele-Specific Silencing of Sickle Cell Anemia and Beta E Thalassemia by Sirnas and Shrnas | Pending | |
| 04-007 | PCT | 04/28/2006 | PCT/US2006/016384 | TREATING GASTROINTESTINAL DISORDERS WITH MODULATORS OF RETINOIC ACID | Filed | |
| 04-007 | United States | 04/28/2006 | 11/413,874 | TREATING GASTROINTESTINAL DISORDERS WITH MODULATORS OF RETINOIC ACID | Filed | |
| 05-001 | PCT | 06/16/2006 | PCT/EP2006/005800 | ADAMTS13-Containing Compositions Having Thrombolytic Activity | Filed | Yes |
| 05-001 | United States | 06/16/2006 | 11/454,615 | ADAMTS13-Containing Compositions Having Thrombolytic Activity | Filed | Yes |
| 05-003 | European | 06/05/2006 | 06772167.0 | RNAI as a Microbicide | Filed | |
| 05-003 | PCT | 06/05/2006 | PCT/US06/21758 | siRNA Microbicides for Preventing and Treating Diseases | Filed | |
| 05-003 | United States | 06/05/2006 | 11/916,334 | RNAI as a Microbicide | Filed | |
| 05-004 | PCT | 12/12/2006 | PCT/US2006/047281 | Novel Integrin Al I Domain Mutants with Unprecedented Affinity and Their Therapeutic Use | Published | |
| 05-007 | PCT | 04/24/2007 | PCT/US2007/10075 | LAYER BY LAYER COATING OF IMMUNOLIPOSOMES | Filed | |
| 05-009 | PCT | 01/05/2007 | PCT/US2007/000280 | Novel Regulators of NFAT | Filed | |
| 06-001 | PCT | 05/22/2007 | PCT/US07/12152 | Delivery Across Blood Brain Barrier | Filed | |
| 06-002 | PCT | 04/25/2007 | PCT/US2007/009980 | TARGETED DELIVERY TO LEUKOCYTES USING NON-PROTEIN CARRIERS | Filed | |
| 06-002 | PCT | 04/25/2007 | PCT/US2007/009975 | TARGETED DELIVERY TO LEUKOCYTES USING PROTEIN CARRIERS | Published | |
| 06-004 | Japan | 02/22/2005 | 2006-554260 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | PCT | 02/22/2005 | PCT/US2005/005361 | CONFORMATION SPECIFIC ANTIBODIES | Filed | Yes |
| 06-004 | Australia | 02/22/2005 | 2005215024 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | United States | 02/19/2004 | 60/546,354 | LFA-1 Conformation Specific Antibodies | Filed | Yes |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 06-004 | United States | 02/22/2005 | 10/589,956 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | Canada | 02/22/2005 | 2,554,965 | Conformation Specific Antibodies (LFA1) | Filed | Yes |
| 06-004 | European | 02/22/2005 | 05723364.5 | Conformation Specific Antibodies (LFA1) | Issued | Yes |
| 07-001 | PCT | 01/29/2008 | PCT/US08/52086 | Compositions and Methods for Treating Hematapoietic Maligancies | Filed | Yes |
| 07-002 | PCT | 01/31/2008 | PCT/US08/52654 | Let-7 Micro-RNA and Mimetics Therof as Therapeutics for Cancer | Filed | |
| 07-003 | United States | 08/21/2007 | 60/957,023 | Delivery of Hydrophilic and Lipophilic Drugs via Stabilized Nanoparticles Targeting Integrins and Their Ligands | Filed | |
| 07-004 | PCT | 01/25/2008 | PCT/US08/52054 | Targeted Delivery of siRNA | Filed | Yes |
| 07-005 | PCT | 04/30/2007 | PCT/US08/62029 | Diagnosis and Treatment of Type 1 Diabetes | Filed | |
| 07-006 | United States | 10/12/2007 | 60/979,596 | Vaccine Nanotechnology | Filed | Yes |
| 07-008 | United States | 08/15/2007 | 60/964,936 | Methods for Modulating Development and Expansion of IL-17 Expressing Cells | Filed | Yes |
| 07-010 | United States | 12/14/2007 | 61/007,766 | Treatment and Prevention of HIV Infection | Filed | Yes |
| 07-010 | United States | 01/15/2008 | 61/011,157 | Treatment and Prevention of HIV Infection | Filed | Yes |
| 07-011 | United States | 01/04/2008 | 61/018,919 | Treatment or Prevention of Inflammation by Targeting Cyclin D1 | Filed | |
| 08-002 | United States | 05/12/2008 | 61/127,426 | VWF Inhibitors for Treatment of Infarction | Filed | Yes |
| 08-004 | United States | 05/16/2008 | 61/053,769 | Compositions and Methods for Inhibition of Retroviruses | Filed | |
| 08-005 | United States | 07/14/2008 | 61/080,367 | Regulation of CD45 Alternative Splicing and Uses Thereof | Filed | |
| 08-006 | United States | 10/08/2008 | 61/103,628 | Regulators of NFAT and/or Store-Operated Calcium Entry | Filed | |
| 08-007 | United States | 09/26/2008 | 61/100,503 | Selective Oxidation of 5-Methylcytosine by Tet-Family Proteins | Filed | |
| 08-007 | United States | 09/29/2008 | 61/100,995 | Selective Oxidation of 5-Methylcytosine by Tet-Family Proteins | Filed | |
| 08-008 | United States | 09/19/2008 | 61/098,696 | miRNA Targets | Filed | |
| 08-009 | United States | 09/19/2008 | 61/098,707 | Therapeutic and Diagnostic Strategies | Filed | |
| 80-001 | United States | 01/09/1980 | 06/110,592 | Amidinophenylmethylsulfonylfluoride | Issued | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 81-001 | United States | 07/27/1981 | 06/287,139 | Means and methods for purifying Clq, Clr and Cls | Issued | |
| 86-001 | United States | 04/11/1986 | 06/850,759 | Platelet Concentrates | Issued | |
| 86-002 | United States | 09/15/1986 | 06/907,405 | Non-Mechanical Buffer Circulation Apparatus for Electrophoresis | Issued | |
| 89-001 | European | 02/22/1990 | 90904139.4 | Human Elastase Inhibitor | Filed | |
| 89-001 | United States | 05/13/1996 | 29/054344 | Flexible Multiple Compartment Medical Container | Issued | |
| 89-001 | Italy | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | Germany | 02/04/1998 | 690302025.6 | Human Elastase Inhibitor | Issued | |
| 89-001 | France | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | Japan | 08/23/1991 | 504382/90 | Human Elastase Inhibitor | Issued | |
| 89-001 | United Kingdom | 02/04/1998 | 90904139.4 | Human Elastase Inhibitor | Issued | |
| 89-001 | United States | 09/06/1991 | 07/755,461 | Cloned gene encoding human monocyte elastase inhibitor | Issued | |
| 89-001 | United States | 09/30/1994 | 08/315,831 | Human Monocyte Elastase Inhibitor | Issued | |
| 89-001 | United States | 06/13/1996 | 08/662,318 | Human Monocyte Elastase Inhibitor Antibodies | Issued | |
| 89-001 | PCT | 02/02/1990 | PCT/US90/00920 | Human Elastase Inhibitor | Published | |
| 90-001 | United States | 11/28/1990 | 07/618,286 | Functional derivatives of ICAM-1 which are substantially capable of binding to LFA-1 but are substantially incapable of binding to MAC-1 | Issued | |
| 91-001 | United States | 05/20/1992 | 07/887,444 | Device and Method for Analysis of Blood Components and Identifying Inhibitors and Promoters of the Inflammatory Response | Issued | |
| 91-001 | PCT | 05/29/1992 | PCT/US92/04524 | Device and Method for Analysis of Blood Components and Identifying Inhibitors and Promoters of the Inflammatory Response | Published | |
| 91-002 | Mexico | 06/11/1992 | 92 2804 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Norway | 06/11/1992 | 934491 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Bulgaria | 06/11/1992 | 98287 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 91-002 | Czech Republic | 06/11/1992 | PV 2702-93 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Hungary | 06/11/1992 | P9303529 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Romania | 06/11/1992 | 93-01672 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Russian Federation | 06/11/1992 | 93058655 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 06/11/1997 | 08/873,288 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Brazil | 06/11/1992 | 9206142-7 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Slovakia | 06/11/1992 | PV 1395-93 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | Republlic of Korea | 06/11/1992 | 93-703828 | Intercellular Adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 12/23/1992 | 08/038,990 | Method of identifying agents which modulate ICAM-3 binding to LFA-1 | Filed | |
| 91-002 | United States | 06/11/1991 | 07/712,879 | Intercellular adhesion Molecule-3 and its Binding Ligands | Filed | |
| 91-002 | United States | 06/07/1995 | 08/474,087 | Methods of Using Intercellular Adhesion Molecule-3 (ICAM-3), Antibodies Thereto, and Soluble Fragments Thereof | Issued | |
| 91-002 | United States | 06/07/1995 | 08/473,981 | Method of identifying agents which modulate ICAM-3 binding to LFA-1 | Issued | |
| 91-002 | PCT | 06/11/1992 | PCT/US92/04896 | Intercellular Adhesion Molecule-3 and its Binding Ligands | National Phase | |
| 91-003 | United States | 06/12/1992 | 07/899,063 | Plasmodium Infected Erythrocytes Binding to ICAM-1 & CD36 | Filed | |
| 92-001 | PCT | 05/21/1993 | PCT/US93/04956 | A Novel Receptor for Alpha4 Integrins & Methods Based Thereon | Published | |
| 92-002 | United States | 08/22/1995 | 08/517,589 | Antibodies which Bind a Subpopulation of Mac-1 (CD11b/CD18) Molecules which Mediate Neutrophil Adhesion to ICAM-1 and Fibrinogen | Issued | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 93-001 | PCT | 03/11/1994 | PCT/US94/02632 | Asseys/Therapeutic Methods Lymphocyte Chemoattractants | Published | |
| 93-002 | European | 03/23/1994 | 4014206.9 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Examination Requested | |
| 93-002 | Japan | 03/24/1994 | 521367/94 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Filed | |
| 93-002 | Canada | 03/23/1994 | 2,159,005 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Filed | |
| 93-002 | United Kingdom | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | France | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Belgium | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | European | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Germany | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | United States | 12/18/1995 | 08/525,719 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Australia | 03/23/1994 | 64150/94 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | Switzerland | 03/23/1994 | 94911692.5 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Issued | |
| 93-002 | PCT | 03/24/1994 | PCT/US94/03189 | Method and Apparatus for Encapsulation of Biologically Active Substances in Cells | Published | |
| 94-001 | Canada | 06/01/1995 | 2,191,577 | Method for Treating and Preventing Atherosclerosis | Filed | |
| 94-001 | Germany | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Granted | |
| 94-001 | France | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 94-001 | United Kingdom | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 94-001 | Italy | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 94-001 | Germany | 06/01/1995 | 95921563.3 | Method for Treating and Preventing Atherosclerosis | Issued | |
| 95-001 | United States | 02/10/1995 | 08/386,728 | LIL-Stat DNA Binding Sites and Methods for Identifying Inhibitory Binding Agents | Issued | |
| 95-002 | United States | 12/05/1997 | 08/985,499 | Methods for Enhancing Thrombolysis in a Mammal | Issued | |
| 95-004 | United States | 06/07/1995 | 08/474,387 | Use of Functional Derivatives of the Intercellular Adhesion Molecule ICAM-1 in Diagnosis of Viral Infection | Issued | |
| 95-004 | United States | 04/11/1995 | 08/420,720 | Functional Derivatives of the Intercellular Adhesion Molecule ICAM-1 in Anti-viral Therapy | Issued | |
| 95-004 | United States | 06/07/1995 | 08/479,557 | Pharmaceutical Composition of the Intercellular Adhesion Molecule ICAM-1 for Use in Anti-viral Prophylactic Therapy | Issued | |
| 96-001 | United States | 01/29/2003 | 10/353,494 | Purification and Uses of Dendritic Cells and Monocytes | Issued | |
| 96-001 | United States | 07/29/1997 | 08/902,246 | Enrichment of Dendritic Cells from Blood | Issued | |
| 96-001 | United States | 01/31/2001 | 09/774,948 | Enrichment of Dendritic Cells from Blood | Issued | |
| 96-001 | PCT | 07/29/1997 | PCT/US97/13448 | Enrichment of Dendritic Cells from Blood | Published | |
| 97-003 | Japan | 07/23/1999 | 10-532102 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Filed | |
| 97-003 | United States | 01/22/1998 | 09/012,145 | Methods for Diagnosing and Treating Body Weight Related Disorders | Filed | |
| 97-003 | Canada | 01/22/1998 | 2,276,691 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Filed | |
| 97-003 | PCT | 01/22/1998 | PCT/US98/01110 | Methods for Diagnosing and Treating Body Weight Related Disorders in Animals | Published | |
| 97-004 | European | 08/17/1998 | 98942081.5 | Methods for Using Granzymes and Binding Molecules Thereof for Treating Disease Characterized by Abnormal Apoptosis | Filed | |

| Tech ID | Country | File Date | Serial No. | Patent Title | Status | Joint Ownership |
|---------|---------|-----------|------------|--------------|--------|-----------------|
| 97-004 | PCT | 08/17/1998 | PCT/US98/17022 | Methods for Using Granzymes and Binding Molecules Thereof for Treating Diseases Characterized by Abnormal Apoptosis | Published | |
| 97-005 | PCT | 08/20/1998 | PCT/US98/17280 | Methods for Diagnosing and Treating Diseases Associated with Abnormal Levels of Myeloid Cells Utilizing Eotaxin and Antagonists and Agonists Thereof | Published | |
| 98-001 | United States | 10/25/2005 | 11/258,620 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Filed | |
| 98-001 | United States | 06/23/2006 | 11/474,218 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Filed | |
| 98-001 | United States | 01/31/2002 | 10/066,151 | Specific Inhibitors of NFAT Activation by Calcineurin and their use in Treating Immune-Related Diseases | Issued | |
| 98-001 | United States | 02/04/2003 | 10/358,052 | Specific Inhibitors of NFAT Activation by Calcineurin and the Use in Treating Immune-Relate Diseases | Published | Yes |
| 98-002 | United States | 02/29/2008 | 12/040,253 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | Canada | 06/29/1999 | 2,331,925 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | United States | 06/04/2004 | 10/861,123 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | Mexico | 06/29/1998 | 985265-21296 | Monocyte Locomotion Inhibitory Factor | Filed | |
| 98-002 | United States | 06/29/1999 | 09/342,956 | Monocyte Locomotion Inhibitory Factor | Issued | |
| 98-002 | United States | 10/03/2002 | 10/263,947 | Anti-Amoebic Vaccine | Issued | |
| 98-002 | PCT | 06/29/1999 | PCT/US99/14877 | Monocyte Locomotion Inhibitory Factor | Published | |
| 99-001 | PCT | 03/31/2000 | PCT/US00/08654 | Modified Dendritic Cells and Uses Therefor | Filed | |
| 99-001 | United States | 03/31/2000 | 09/540,963 | Modified Dendritic Cells and Uses Therefor | Issued | |

IDI INTELLECTUAL PROPERTY RIGHTS

II.  Copyrights and Applications Therefor

None.

BOS111 12334986.1

IDI INTELLECTUAL PROPERTY RIGHTS

III.  Trademarks and Service Marks and Applications Therefor

| Country | File Date | Serial No. | Mark | Status | Joint Ownership |
|---------|-----------|------------|------|--------|-----------------|
|         |           |            |      |        |                 |
| U.S.A.  | 4/26/2007 | 77/166,482 | CORVUS | Filed | No |

## IDI INTELLECTUAL PROPERTY RIGHTS

### IV. Options and Liens

| Party Name | Type | Effective Date | Reference ID | Scope | Term Date | Tech | Summary |
|---|---|---|---|---|---|---|---|
| CalciMedica | Right of First Negotiation | 10/01/2007 | CAL-OPT-061307 | New disclosures from Rao lab in the areas of initiation and regulation of store operated calcium entry and the function of STIM and ORAI proteins. | 10/01/2009 | 05-009 08-006 07-007 | ROFN covers new disclosures in the Field from the lab of Dr. Anjana Rao. First disclosure was made by email to CalciMedica CEO on 10/24/08. Three techs came from the lab and only one fit under the Field. (08-006 ORAI/STIM RNAi Screen). Also disclosed on the same day 07-007 which was known at the time of drafting this application and is explicitly covered. |
| CalciMedica | Exclusive License, Nonexclusive License and Option Agreement | 04/01/2007 | CAL-EX-012607 | Human Therapeutics - EX License to 05-009 and 03-005; NE License and EX Option to 98-001. | Patent Expiration | 05-009 03-005 98-001 | IDI grants to CalciMedica a non-exclusive license, without the right to grant sublicenses, under the Patent Rights of Patent Portfolio A to develop, make, have made, use, import, offer for sale, sell and have sold Licensed Products and render Licensed Services in the Field and in the Territory during the Term; and an exclusive license, together with the right to grant sublicenses through multiple tiers of sublicensees, under the Patent Rights of Patent Portfolios B and C to develop, make, have made, use, import, offer for sale, sell and have sold Licensed Products and render Licensed Services in the Field and in the Territory during the Term. |
| DecImmune Therapeutics, Inc. | Exclusive License and Option Agreement | 10/01/2003 | NAI-EX-070103 | Human and Animal Therapeutics; Option for Diagnostics | Patent Expiration | 00-007 | Exclusive license for development of therapeutics and option for diagnostic rights should they arise (have not to date). Technology is co-owned based upon joint inventorship by Brigham and Women's Hospital and Harvard. |
| GlaxoSmithKline | Right of First Negation under Alliance Agreement | 05/14/2008 | GSK Alliance | Alliance for funding reseaerch and fellowships of interest to GSK. Agreement also includes a Right of First Negotiation to obtain an exclusive license to all new disclosures not falling under multiple exceptions listed in the agreement. | 05/14/2013 | N/A | Funding under the agreement is allocated into 3 categories: ROFN fee; Resarch Grant funding; and Fellowship funding. Alliance is governed by Joint Sterring Committee made up of equal number of both parties. |

## SCHEDULE 2.9.11

### OUTBOUND LICENSES

| Agrmnt ID | Type | Effective Date | Party Name | Reference ID | Term Date | Info |
|---|---|---|---|---|---|---|
| ADVANCE | Non-Exclusive License | 10/15/1999 | Advanced Targeting Systems | (N/A) | 10/14/2009 | Materials Transferred: M1/70 (Hybridoma); Product is AB-N06 Mac-1 antibody. |
| ALNYLAM NE DELIVERY | Non-Exclusive License | 04/27/2006 | Alnylam Pharmaceuticals | ALN-NE-122905 | Life of Patent | Tech 04-002 Methods of Delivering RNA Interference and Uses Thereof (Fusion Protein). |
| APOTECH 01 | Non-Exclusive License | 02/20/2004 | Apotech Corporation | APO-NE-060903 | 02/20/2014 | Materials Transferred: Pab to SET; Mab to pp32 (RJ1). |
| ASURAGEN MTA 2 | Non-Exclusive License | 01/04/2008 | Asuragen | ASU110107 | 01/04/2009 | Materials Transferred: K562 cell line expressing LFA-1. |
| AVENTIS | Non-Exclusive License | 07/22/2002 | Aventis Behring GmbH | vWf mice | 07/22/2012 | Materials Transferred: vWf knockout mice. |
| BAXTER SRA 1 | Sponsored Research | 10/01/2005 | Baxter AG | BAX-SRA-071505 | 12/31/2008 | Tech 05-001 ADAMTS13 as an Anti-thrombotic Therapeutic. Tech 08-002 ADAMTS13 as Treatment for Stroke. |
| BAXTER SRA 2 | Sponsored Research | 05/04/2007 | Baxter AG | BAX-SRA-120706 | 05/04/2010 | Tech 05-003 siRNA Microbicides for Preventing and Treating Diseases. |
| BAXTER vWf MICE | Non-Exclusive License | 01/05/2006 | Baxter AG | BAX112905 | 01/05/2016 | Materials Transferred: vWf knockout mice. |
| BAYER HEALTHCARE MTA | Non-Exclusive License | 09/20/2006 | Bayer HealthCare | BAY090706 | 09/20/2011 | Materials Transferred: vWf knockout mice. |
| BENDER NE LICENSE | Non-Exclusive License | 09/17/2008 | Bender MedSystems | BEN-NE-082208 | 09/17/2023 | Materials Transferred: M3/38. |
| BIOLEGEND NON-EX. 1 | Non-Exclusive License | 12/05/2002 | BioLegend, Inc. | 15 Springer Reagents | 12/05/2012 | Various Springer reagent sales. |
| BIOLEGEND NON-EX. 2 | Non-Exclusive License | 03/10/2003 | BioLegend, Inc. | BIL-NE-031003 | 03/10/2013 | Materials Transferred: CB9 cells Human Granzyme A. |
| BIOLEGEND NON-EX. 3 | Non-Exclusive License | 03/01/2008 | BioLegend, Inc. | BIL-NE-092106 | 03/01/2018 | Various Springer reagent sales. |

| Agrmnt ID | Type | Effective Date | Party Name | Reference ID | Term Date | Info |
|---|---|---|---|---|---|---|
| BIOMED LICENSE | Non-Exclusive License | 07/21/2008 | BioMed Central Ltd | BioMed Non-Ex Lic | 07/21/2013 | To reproduce images from Dr. Thorsten Mempel, produced in the lab of Prof. Ulrich von Andrian. |
| BOEHRINGER | Exclusive License | 07/01/1988 | Boehringer Ingelheim Pharmaceuticals, Inc. | BI/SPRINGER | 01/01/2015 | Tech 91-002 Method of Identifying Agents which Modulate ICAM-3 Binding to LFA-1. |
| CALCIMEDICA EX & OPT | Field of Use Exclusive | 04/01/2007 | CalciMedica, Inc. | CAL-EX-012607 | Life of Patent | Human Therapeutics - EX License to 05-009 and 03-005; NE License and EX Option to 98-001. |
| CALTAG 02 | Non-Exclusive License | 03/30/2004 | Invitrogen | CAL-NE-160304 (2278) | 03/30/2014 | Materials Transferred: M1/70. |
| CEDARLANE | Non-Exclusive License | 01/22/1999 | Cedarlane Laboratories Limited | CEDAR NE Lic. 1999 | 01/22/2009 | Materials Transferred: M3/38 M3/84 Rat cell lines. |
| CYTODYN EX AGREEMENT | Field of Use Exclusive | 01/01/2007 | CytoDyn, Inc. | CYT-EX-112806 | 01/01/2027 | License to use Materials MAT0026 and MAT0027 in the limited field of HIV Disease applications explicitly excluding targeted delivery of other drugs. |
| DECIMMUNE- EXCLUSIVE | Field of Use Exclusive | 10/01/2003 | DecImmune Therapeutics, Inc. | NAI-EX-070103 | Life of Patent | Tech 00-007 Methods and Compositions for Inhibiting Immunoglobulin-Mediated Reperfusion Injury. |
| EBIOSCIENCE01 | Non-Exclusive License | 10/15/1999 | eBioscience | 0044.1 | 10/14/2009 | Materials transferred: M17/4, M1/70, M5/114.15.2, M18/2, M3/84. |
| EBIOSCIENCE02 | Non-Exclusive License | 12/16/1999 | eBioscience | 0044.3 | 12/15/2009 | Materials transferred:  cell lines 429 and 9F10. |
| EBIOSCIENCE03 | Non-Exclusive License | 01/25/2002 | eBioscience | 0044.4 | 12/31/2012 | Materials transferred:  CBR M1/5 and M1/69 Cell lines. |
| EBIOSCIENCE04 | Non-Exclusive License | 07/26/2006 | eBioscience | EBI-NE-060903 (44.5) | 07/26/2021 | Materials transferred: M3/38. |
| EBIOSCIENCE05 | Non-Exclusive License | 10/01/2007 | eBioscience | EBI-NE-100107 (44.6) | 10/01/2022 | 3C4 (mIC2/4) hybridoma producing monoclonal antibodies against mouse CD102; CBRIC2/2 hybridoma producing monoclonal antibodies against human |

| Agrmnt ID | Type | Effective Date | Party Name | Reference ID | Term Date | Info |
|---|---|---|---|---|---|---|
| | | | | | | CD102. |
| EBIOSCIENCE06 | Non-Exclusive License | 11/12/2007 | eBioscience | EBI-NE-110707 | 11/12/2022 | Materials: TS2/16 hybridoma producing monoclonal antibodies against human CD29. |
| INVITRO/ZYMED 01 | Non-Exclusive License | 01/22/2005 | Invitrogen Corporation | ZYM-NE-II1904 (1759) | 01/22/2015 | Materials: M3/38 cell line producing Galectin-3. |
| INVITROGEN CD43 | Non-Exclusive License | 05/15/1999 | Invitrogen | CD43, L-10 (#2279) | 05/31/2019 | Materials: CD43 (Hybridoma), L-10 clone. |
| INVITROGEN MTA 1 | Non-Exclusive License | 02/07/2006 | Invitrogen Corporation | INV011206 | 02/07/2009 | Tech 04-002 Methods of Delivering RNA Interference and Uses Thereof (Fusion Protein). |
| JOSLIN EX LICENSE | Exclusive License | 06/13/2005 | Joslin Diabetes Center | JDC-EX-052005 | Life of Patent | Tech 03-007 SKN-1 Gene and Protein. |
| LFB BMTA | Non-Exclusive License | 06/19/2007 | LFB | LFB020205 | 06/19/2009 | Materials: C3 Mice from the Jackson Lab. |
| LIGOCYTE EXCLUSIVE | Exclusive License | 06/01/2003 | Ligocyte Pharmaceuticals | LIG-EX-031703 | Life of Patent | Tech 91-001 Device and Method for Analysis of Blood Components and Identifying Inhibitors and Promoters of the Inflammatory Response. Tech 91-002 Method of Identifying Agents which Modulate ICAM-3 Binding to LFA-1. |
| MAXCYTE/ENTREMED | Exclusive License | 11/05/1992 | MaxCyte, Inc. | Entremed EX-License | 03/18/2014 | Tech 93-002 Method and Apparatus for Encapsulation of Biologically Active Substances in Cells. |
| MILLENNIUM GFP-MICE | Non-Exclusive License | 07/09/2002 | Millennium Pharmaceuticals Inc. | (N/A) | 07/09/2012 | Materials: C57B1/6 GFP-Pan T Mice: Research & Development. |
| MILLENNIUM MTA 3 | Non-Exclusive License | 11/15/2006 | Millennium Pharmaceuticals Inc. | MIL092206 | 11/15/2009 | Expression system for recombinant a4b7 integrin proteins. |

| Agrmnt ID | Type | Effective Date | Party Name | Reference ID | Term Date | Info |
|---|---|---|---|---|---|---|
| NOVARTIS MTA 2 | Non-Exclusive License | 11/30/2006 | Novartis Pharma AG | NOV083106 | 11/30/2008 | Materials:  C3 Mice from the Jackson Lab. |
| NOVO NON-EX LICENSE | Non-Exclusive License | 10/11/2007 | Novo Nordisk A/S | NOV092007 | 10/11/2009 | vWf mice on C57BL6 background. |
| PHARMINGEN | Non-Exclusive License | 03/06/1998 | BD Biosciences PharMingen | 1230000063 | 03/06/2018 | Materials transferred: M5/114.15.2. |
| PHARMINGEN01 | Non-Exclusive License | 09/27/1991 | BD Biosciences PharMingen | 1230000061/730 | 12/31/2016 | Materials transferred: M1/69.16.11.HL. |
| PHARMINGEN02 | Non-Exclusive License | 08/13/1992 | BD Biosciences PharMingen | 1230000060 | 12/31/2016 | Various Materials licensed: 16 separate hybridomas. |
| PHARMINGEN03 | Non-Exclusive License | 03/06/1998 | BD Biosciences PharMingen | 1230000062 | 03/31/2018 | Materials transferred: CB9 cells Human Granzyme A. |
| PHARMINGEN04 | Non-Exclusive License | 09/18/2001 | BD Biosciences PharMingen | (N/A) | 09/01/2051 | Materials transferred: Granzyme B Baculovirus Plasmid. |
| PHARMINGEN05 | Non-Exclusive License | 08/12/2003 | BD Biosciences PharMingen | 1230000704 | 08/12/2013 | Materials transferred:  CBR-IC2/2. |
| PURDUE PHARMA BMTA | Non-Exclusive License | 02/20/2004 | Purdue Pharma L.P. | PUR102903 | 02/20/2009 | Materials:  C3 knockout mice. |
| SANTACRUZ 01 | Non-Exclusive License | 12/10/2001 | Santa Cruz Biotech | (N/A) | 12/10/2011 | Various Springer reagent sales. |
| SANTACRUZ 02 | Non-Exclusive License | 05/01/2004 | Santa Cruz Biotech | SCZ-NE-050104 | 05/01/2014 | Various Springer reagent sales. |
| SANTACRUZ 03 | Non-Exclusive License | 02/01/2007 | Santa Cruz Biotech | SCZ-NE-012307 | 02/01/2017 | Reagent sales.  Granzyme A and Mab directed against Tenascin, CD34 (CBR-E8). |
| SANTACRUZ 04 | Non-Exclusive License | 01/01/2008 | Santa Cruz Biotech | SCZ-NE-121707 | 01/01/2023 | Materials:  Clones of monoclonal antibody LM2/1 with specificity to Integrin alpha M. |
| SBH REAGENT NE 01 | Non-Exclusive License | 10/19/2005 | SBH Sciences | SBH-NE-111205 | 10/19/2015 | Materials transferred: Granzyme B Baculovirus Plasmid. |
| SBH REAGENT NE 02 | Non-Exclusive License | 02/20/2006 | SBH Sciences | SBH-NE-020906 | 02/20/2016 | Materials transferred:  Plasmid to make mouse Perforin. |
| SEROTEC/MORPHOSYS 01 | Non-Exclusive License | 02/10/2004 | MorphoSys AG | SER-NE-060903 | 02/10/2014 | Various Springer reagent sales. |
| SOUTHBIO | Non-Exclusive License | 06/17/1996 | Southern Biotechnology Associates, Inc. | SOUTHBIO-NE-061796 | 06/17/2016 | Materials:  mouse cell surface antigen CD34. |

| Agrmnt ID | Type | Effective Date | Party Name | Reference ID | Term Date | Info |
|---|---|---|---|---|---|---|
| SOUTHBIO 1 | Non-Exclusive License | 07/08/1998 | Southern Biotechnology Associates, Inc. | (N/A) | 07/28/2018 | 3 Mouse Cell lines: M1/70, 5H10-27, 3C4. |
| SOUTHBIO 2 | Non-Exclusive License | 03/01/2000 | Southern Biotechnology Associates, Inc. | (N/A) | 03/01/2010 | Materials: Clone TS2/4 anti human CD11-alpha ("Hybridoma"). |
| STEM CELL 01 | Non-Exclusive License | 01/01/2005 | Stem Cell Technologies | STM-NE-110904 | 01/01/2015 | Reagent sales:  M1/70 cell line. |
| THROMBOTARGETS MTA | Non-Exclusive License | 04/01/2007 | ThromboTargets Corporation | THR031507 | 04/01/2009 | Materials Transferred:  vWf knockout mice. |

## SCHEDULE 2.9.12

### DOMAIN NAMES OWNED BY IDI

| Domain Names | Date |
|---|---|
| cbrinstitute.org | 2/6/2014 |
| immunediseaseinstitute.org | 5/30/2017 |
| chct.org | 8/30/2009 |
| centerforhumancelltherapy.org | 8/30/2009 |

In addition:

Harvard University has granted IDI permission to use the idi.harvard.edu subdomain.
Harvard Medical School has granted IDI permission to use the cbr.med.harvard.edu domain name.

SCHEDULE 2.11.1

EMPLOYEE BENEFIT PLANS

1.    Group Health Insurance Plan

    a.    Blue Choice

    b.    HMO Blue

    c.    Retiree coverage from HMO Blue up to age 65.  An employee who retires from employment with IDI after reaching age 59-1/2 and before age 65 can remain on the health plan, paying the full COBRA rate, until reaching age 65.

2.    Group Dental Insurance Plan

    a.    Dental Blue

    b.    Retiree coverage up to age 65.  An employee who retires from employment with IDI after reaching age 59-1/2 and before age 65 can remain on the health plan, paying the full COBRA rate, until reaching age 65.

3.    Group Life Insurance and Accidental Death and Dismemberment Plan

    a.    The Principal Life Insurance Company

4.    Group Long-Term Disability Plan

    a.    The Principal Life Insurance Company

5.    Short-Term Disability Plan

    a.    Self-insured by IDI.

6.    Center for Blood Research, Inc. and CBR Laboratories, Inc. Flexible Benefits Plan

7.    Center for Blood Research, Inc. and CBR Laboratories, Inc. Dependent Care Reimbursement Plan

8.    Center for Blood Research, Inc. and CBR Laboratories, Inc. Medical Reimbursement Plan

9.    Tuition Reimbursement Plan (up to $5,250 reimbursement for college courses; $3,250 reimbursement for employees with less than 2 years of service)

10.   Center for Blood Research, Inc. Retirement Plan for Investigators

11.   Center for Blood Research, Inc. Tax Deferred Annuity Plan

12.   The CBR and CBRL Retirement Plan

13.   Employee Assistance Program

14.   Change in Control Severance Program for Key Employees (dated March 6, 2008)

15.   The Company has generally provided standard severance to employees terminated by the Company without cause, equal to 1 week of salary per year of service.

SCHEDULE 2.11.3

CHANGE IN CONTROL AGREEMENTS

Under the Change in Control Severance Program for Key Employees (dated March 6, 2008), an eligible employee is entitled to severance pay, in accordance with the Plan, if he is terminated by the employer (or its successor) or terminates his employment for "good reason" (as defined in the Plan) within 12 months after a "change in control", as defined by the Plan. The following employees are considered "eligible employees" for this Plan:

1.    Margaret Bradley

2.    Stephen Carriuolo

3.    Theodore Cronin

4.    Ryan Dietz

5.    Doreen Donovan

6.    David Frank

7.    Helen Hourihan

8.    Jurvis LaSalle

9.    Rachelle Rosenbaum

10.   Steven Simmons

SCHEDULE 2.11.5

AUDIT OF PLANS

1.  In a letter dated May 14, 2008, the US Department of Labor, after auditing The CBR and CBRL Retirement Plan, outlined its findings.  As a result of the audit, IDI made a contribution to the Plan of $48.76, representing lost earnings for not transferring participant loan repayments to the Plan as soon as such amounts could reasonably be segregated from IDI's general assets.  In addition, IDI changed the Plan's loan policy and ceased charging participants for loan maintenance charges.  In a letter dated October 23, 2008, the US Department of Labor determined to take no further action with respect to its findings set forth in the May 14, 2008 letter.

    IDI filed a Form 5330, Return of Excise Taxes related to Employee Benefit Plans, to report the excise tax relating to the prohibited transaction of not transferring participant loan payments on a timely basis.

2.  In a letter dated May 27, 2005 the Internal Revenue Service, after auditing the CBR and CBRL Retirement Plan for the plan year ending December 31, 2001, outlined its findings.  All returns audited were accepted as filed.  As a result of the audit, IDI now hires a private locator service to locate terminated participants who do not leave a valid forwarding address.  This procedure insures that required distributions are now made within 60 days after the end of the plan year where separation of service occurred.

SCHEDULE 2.12

MATERIAL AGREEMENTS

Contracts with Vendors
1.  Operational Consulting Proposal from Awen and related insurance documents
2.  Construction Proposal from Admiral
3.  Several services agreements with Verizon
4.  Project Management Proposals from Diversified Project Management, Inc. regarding relocation to space at 350 Longwood Ave. (2006-2008)
5.  Pricing Arrangements with Staples, Waste Management and Steady Vision
6.  Letter of Intent and draft Agreement with Tsoi/Kobus and Associates
7.  Drafts of Diversified Project Management Owner-Architect Agreement/TSA
8.  Cleaning Services pricing agreement with Janitronics, dated 6/4/2008
9.  IKON Financial Services addendum, dated 6/13/2008 updating agreement for equipment
10. IKON Office Solutions cost sheet
11. Placement agency Agreement with Kennison & Associates
12. Monster, Inc. job posting resource proposal
13. NEC Unified Solutions, Inc. CallManager Implementation Statement of Work, dated 4/1/2008, and Master Purchase Agreement (not fully executed or dated)
14. Merck & Co., Inc. Purchase Order email
15. Infowires Purchase Order-related emails
16. Service Agreement with Professional Staffing Group (refers candidates for possible employment or consulting work), dated 2/19/2008 (not executed by PSG)
17. Sigma-Aldrich pricing list, dated 1/14/2008
18. Invitrogen Pricing Quote for 2008

Equipment Leases
19. Loan from the Massachusetts Health and Educational Facilities Authority to The CBR Institute for Biomedical Research, Inc. to be funded from proceeds of the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-1A, Closing Date of 10/17/2003
20. Loan from the Massachusetts Health and Educational Facilities Authority to The CBR Institute for Biomedical Research, Inc. to be funded from proceeds of the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-3A (2004) Pool 3, Closing Date of 11/2/2004
21. Master Lease and Sublease Agreement among Banc of America Public Capital Corp as Lessor and Servicer, HEFA as Lessee and Escrow Agent, and The CBR Institute for Biomedical Research, Inc. as Sub-Lessee, dated as of 1/11/2007 and Schedule No. 1 dated 2/6/2007 and Schedule No. 2 dated 4/29/2008
22. Master Lease and Sublease Agreement among Hewlett-Packard Financial Services Company, HEFA and The CBR Institute for Biomedical Research, Inc. dated 12/13/2005 and Schedule No. 1 dated 1/18/2006
23. Master Lease and Sublease Agreement among Banc of America Public Capital Corp as Lessor and Servicer, and HEFA as Lessee and Escrow Agent, and the Immune Disease Institute, Inc. as Sub-Lessee, dated as of April 29, 2008

Real Estate Leases
The leases listed on Schedule 2.19.1 are incorporated herein

Proprietary Rights Agreements
24.     Assignment of Licensing Agreement by and between CBR Laboratories, Inc. and The
        CBR Institute for Biomedical Research, Inc., dated 12/202006
24.1.   Assignment of Licensing Agreement: Exclusive, worldwide license to certain patent
        rights w/ Entremed (assigned by Entremed to MacCyte, Inc.)
24.2.   Assignment of Patent 5,612,207 by CBR Laboratories, Inc. to CBR Institute for
        BioMedical Research, dated 12/20/2006
25.     Non-Exclusive License Agreement with BioMed Central Limited, effective 7/21/2008
26.     Sponsored Research Agreement with Merck & Company, effective 5/29/2008
27.     Joint Invention Administration Agreement with President and Fellows of Harvard
        College, effective 5/15/2008
28.     Research Collaboration Agreement with GlaxoSmithKline Research & Development
        Limited, effective 5/14/2008
29.     Material Transfer Agreement with Integrated DNA Technologies, effective 11/7/2007
30.     Material Transfer and Sponsored Research Agreement with Archemix Corp., effective
        10/22/2007
31.     Non-Exclusive License Agreement with Novo Nordisk A/S, effective 10/11/2007
32.     Exclusive Right of First Negotiation Agreement with CalciMedica, Inc., effective
        10/1/2007
33.     Non-Exclusive License Agreement with eBioscience, effective 10/1/2007
34.     Joint Study Agreement with International Business Machines Corporation, effective
        9/18/2007
35.     Sponsored Research Agreement with Isis Pharmaceuticals, Inc., effective 9/12/2007
36.     Research Collaboration Agreement with Garvan Institute of Medical Research, effective
        9/1/2007
37.     Material Transfer Agreement with Genentech, Inc., effective 8/21/2007
38.     Material Transfer and Research Project Agreement with Alnylam Pharmaceuticals, Inc.,
        effective 8/1/2007
39.     Material Transfer and Sponsored Research Agreement with Archemix Corp., effective
        7/31/2007
40.     Research Agreement with Novartis Pharma AG, effective 7/1/2007
41.     Amendment to Biological Material Transfer Agreement with LFB, effective 6/19/2007
        (and Biological Material Transfer Agreement with LFB, effective 3/15/2002)
42.     Sponsored Research Agreement with Proteologics, Inc., effective 2/1/2007
43.     Exclusive License Agreement with Advanced Genetic Technologies, Inc., effective
        1/1/2007
44.     Biological Material Transfer Agreement with Alnylam Pharmaceuticals, Inc., effective
        12/14/2006
45.     Research Agreement with MedImmune, Inc., effective 10/19/2006
The agreements listed on Schedule 2.9.1, Section IV and on Schedule 2.9.11 are incorporated
herein

NIH Research Grants and Agreements

46.  Correspondence from NIH indicating grant awards for research of various investigators (2003, 2006-2008)
47.  IDI NIH Subcontracts/Memoranda of Understanding with Dana-Farber Cancer Institute, Beth Israel Deaconess Medical Center, Brigham and Women's Hospital, Inc.; Subaward Agreement with Boston University; Memorandum of Agreement Modification with Children's Hospital Boston; Subaward Amendments with Harvard Medical School and Massachusetts Institute of Technology

Non-NIH Research Grants and Agreements

48.  Letter of Agreement for Research Studies with Dyax
49.  Grant or Fellowship Award Notices from the Cancer Research Institute, The Parker B. Francis Fellowship Program, The Leukemia & Lymphoma Society, Harvard Stem Cell Institute, American Cancer Society, Northeast Affiliate Research Committee of the American Heart Association, Lady Tata Memorial Trust (International Awards for Research in Leukemia), Machiah Foundation, Flight Attendant Medical Research Institute
50.  Collaboration/Joint Services Agreement with CompuCyte Corporation, effective 8/15/2008
51.  Sponsored Research Agreements: the Harvard Stem Cell Institute (Amendment to Project Agreement), Affiliated Institution Sponsored Program Agreement with the President and Fellows of Harvard College on behalf of Harvard Medical School (and Amendments to Agreements)
52.  Grant Agreements with the Leukemia & Lymphoma Society, European Hematology Association
53.  Memoranda of Agreement – Training Grants with Children's Hospital Boston
54.  Cost-Reimbursement Project Agreement with the President and Fellows of Harvard College on behalf of Harvard Stem Cell Institute
55.  Research Agreement with MedImmune, dated 10/19/2006
56.  Agreements with the French National Agency for Research on AIDS and Viral Hepatitis
57.  Ellison Medical Foundation/AFAR Senior Postdoctoral Research Grant Application by Bjoern Schwer
58.  Partners Healthcare Grant Agreement
59.  Harvard School of Public Health Trainee Appointment Authorization
60.  Sponsored Research Agreement with Isis Pharmaceuticals, Inc., effective 9/12/2007
61.  Material Transfer Agreement / Sponsored Research Agreement with Archemix Corp., effective 10/22/2007
62.  Material Transfer Agreement / Sponsored Research Agreement with Archemix Corp., effective 7/31/2007
63.  Agreement between President and Fellows of Harvard College and the CBR Institute for Biomedical Research, dated 6/15/2006
64.  Letter of Agreement between CBR Institute for Biomedical Research and Pharming Technologies B.V., effective 7/26/2004 (expired?)
65.  Contract Research Agreement with Lev Pharmaceuticals, Inc., dated 7/11/2004 (expired 12/31/2004?)

Mosaic Technologies
66. Research Cooperation and Royalty Agreement between Mosaic Technologies, Inc. and CBR Laboratories, Inc., effective 3/25/1997
67. Mosaic Technologies, Inc. Deferred Payment Note, dated 3/25/1997
68. Mosaic Technologies, Inc. Convertible Note, dated 3/25/1997 (matured by 1/31/2002 at the latest)

DHHS Agreements
69. Nonprofit Rate Agreement with the (federal) Dept. of Health and Human Services
70. DHHS Newco Agreement, dated 4/30/1990 (approval of costs associated with HEFA lease and Newco when it is recognized by the IRS as a 501(c)(3) organization)

Letters of Intent, Memoranda of Understanding
71. Sub-agreements NIH/IDI Prime
72. Amendments to subcontracts between Judy Lieberman and several institutions
73. Memoranda of Agreement related to NIH grant money, between IDI and Beth Israel Deaconess Medical Center, St. George's University of London, Tulane University Health Sciences Center, Alnylam Pharmaceuticals, Inc., Max-Delbruck Center for Molecular Medicine, Massachusetts General Hospital, the Children's Hospital, the Dana Farber Cancer Institute, and Brigham and Women's Hospital

Loans / Financial Commitments to Employees
74. Recruitment Packages for Winau (11/19/2007), Rossi (9/20/2007), and Hur (3/25/2008 and additions 4/2/2008)
75. 5/24/2001 Letter for Professor Klaus Rajewsky from Fred Rosen, pledging funds to cover all mouse costs incurred by Rajewsky for three years and to cover 60% of mouse costs going forward from the 3-year mark
76. Promissory Note between Derrick J. Rossi and IDI, dated 4/1/2008
77. Housing Allowance to Frederick Alt: letter to Fred Alt dated January 8, 2007; promissory note $240,000 dated January 12, 2007; letter from Children's Hospital Boston (Stuart Novick) to The CBR Institute for Biomedical Research, Inc. (Theodore Cronin) dated January 4, 2007; mortgage executed on January 12, 2007 on real property located at 18 Shipway Place, Charlestown, Massachusetts
78. Letter from CBRI to Von Andrian committing to pay a housing allowance of $100,000 and an annual bonus of $15,000, dated 11/2/2006; Mortgage securing payment, dated 12/5/2006; Promissory Note dated 12/5/2006 for $100,000; Memorandum of Understanding with Von Andrian, dated 10/16/2006
79. Loan documents with Denisa Wagner (purchase of promissory note agreement between CBR and New England Medical Center, mortgages, promissory notes, financial statements, etc.
80. Letter agreement with Ryan Dietz dated November 18, 2008 relating to compensation
81. Change of Control Severance Program for Key Employees dated 3/6/2008

Harvard Affiliation Agreements
82. Harvard University Janeway Professorship Agreement
83. Harvard Medical School Structural Biology Professorship Agreement

84. Harvard Medical School Rosen Professorship in Pediatrics Agreement
85. Harvard Medical School Latham Family Professorship Terms
86. General Policies and Principles Governing Relationships between Harvard Medical School and Center for Blood Research, Inc. dated May 15, 1986

Salary Guaranties for Tenured Harvard Medical School Professors
87. Chester Alper
88. Michael Carroll
89. Thomas Kirchhauser
90. Judy Lieberman
91. Klaus Rajewsky (Fred S. Rosen Professor of Pediatrics)
92. Anjana Rao
93. Timothy Springer (Latham Family Professor of Pathology)
94. Denisa Wagner

Health and Retirement Benefit Agreements
95. Northeast Retirement Services Plan Services Agreement, effective 11/25/2001
96. Welcome Package from Northeast Retirement Services, including Custodial Account Adoption Agreement
97. MB Trust Company, LLC Custodial Account Agreement for CBR & CBRL Retirement Plan, dated 3/20/2008
98. Business Associate Contract Addendums between CBR and Medical Claims Service, Inc. (effective 4/14/2004) and Mount Auburn Hospital Employee Assistance Program (effective 4/14/2004)

Financing Agreements with Citizens Bank
99. Reimbursement Agreement dated October 1, 2003, as amended relating to letter of credit for MHEFA Series M-1A Pool Loan
100. Reimbursement Agreement dated November 1, 2004, as amended relating to letter of credit for MHEAF Series M-3A Pool Loan
101. Application and Agreement for Standby Letter of Credit dated June 1, 2006 relating to letter of credit for the benefit of BMR-Blackfan Circle LLC required under CLSB lease
102. Revolving Credit Agreement dated October 31, 2001 as amended relating to $2,000,000 revolving credit facility

Other Agreements
103. Exclusive Representation Agreement by and between CBR and Murphy & McManus, LLC, dated 8/1/2004
104. Settlement Agreement with SSga, dated 7/9/2008
105. Independent Contractor Agreement for Consultant between IDI and Piotr Sliz, dated 12/21/2007
106. Documentation related to restricted funds
107. Randstad Service Terms for Center for Blood Research Institute, dated 12/7/2007 (one employee under contract for 6 months or more).

## SCHEDULE 2.17

### INSURANCE POLICIES

See Attached.

SCHEDULE 2.17



**William Gallagher Associates**
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **I.  DOMESTIC PACKAGE POLICY** | | | National Fire Insurance of Hartford (CNA) | 1056927008 | 7/1/08-09 | $74,775 |
| *A.  PROPERTY SECTION:* | | | | | | |
| Scheduled Locations: | | | | | | |
| 1)  800 Huntington Avenue, Boston, MA 02115 | | | | | | |
| 2)  200 & 350 Longwood Ave, Boston, MA 02115 | | | | | | |
| 3)  One Blackfan Circle, Boston, MA | | | | | | |
| 4)  10 Mission Street, Boston, MA 02115 | | | | | | |
| 5)  210 Longwood Ave, Boston, MA 02115 | | | | | | |
| 6)  One Blackfan Circle, Boston MA 02115 | | | | | | |
| 7)  Three Blackfan Circle, Boston, MA 02115 | | | | | | |
| Limits: | | | | | | |
| Blanket Business Personal Property | $ | 52,015,000 | | | | |
| Blanket Business Income | $ | 10,809,382 | | | | |
| Blanket Flood – Annual Aggregate | $ | 15,000,000 | | | | |
| Blanket Earthquake – Annual Aggregate | $ | 15,000,000 | | | | |
| Property in Transit | $ | 50,000 | | | | |
| Property at Any Other Location | $ | 50,000 | | | | |
| Valuable Papers | $ | 500,000 | | | | |
| Research & Development Restoration Expense | $ | 1,500,000 | | | | |
| Refrigerant Contamination | $ | 1,000,000 | | | | |
| Bio-Contamination | $ | 100,000 | | | | |
| Ordinance/Law/Demolition and ICC | $ | 1,000,000 | | | | |
| Off-Premises Service Interruption | $ | 300,000 | | | | |
| Pollutant Cleanup & Removal Location #1 | $ | 1,000,000 | | | | |
| Pollutant Cleanup & Removal –all other locations | $ | 100,000 | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance.  Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements.  Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

1

WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **I.** **DOMESTIC PACKAGE POLICY (CONTINUED)** | | | National Fire Insurance of Hartford (CNA) | 1056927008 | 7/1/08-09 | $74,775 |
| *A.* *PROPERTY SECTION (Continued)* | | | | | | |
| Deductibles: | | | | | | |
| "All Risk" Perils - Property | $ | 10,000 | | | | |
| Deductibles: | | | | | | |
| Flood Peril | $ | 50,000 | | | | |
| Earthquake Peril | $ | 100,000 | | | | |
| Pollutant Cleanup | $ | 25,000 | | | | |
| Business Income and Extra Expense | | 24 Hours | | | | |
| *B.* *LIABILITY SECTION:* | | | | | | |
| General Liability: | | | | | | |
| General Aggregate | $ | 2,000,000 | | | | |
| Each Occurrence | $ | 1,000,000 | | | | |
| Personal & Advertising Injury | $ | 1,000,000 | | | | |
| Fire Damage Legal | $ | 300,000 | | | | |
| Medical Expense | $ | 5,000 | | | | |
| *Excludes Products/Completed Operations* | | | | | | |
| *Excludes Professional Liability* | | | | | | |
| Employee Benefits E&O Liability: | | | | | | |
| Each Employee | $ | 1,000,000 | | | | |
| Aggregate | $ | 1,000,000 | | | | |
| Deductible | $ | 1,000 | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

2

**WGA**

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **I.   DOMESTIC PACKAGE POLICY (CONTINUED)** | | | National Fire Insurance of Hartford (CNA) | 1056927008 | 7/1/08-09 | *Included* |
| C.   *CRIME SECTION:* | | | | | | |
| | | | | | | |
| Employee Theft | $ | 500,000 | | | | |
| Forgery or Alteration | $ | 500,000 | | | | |
| Computer Fraud | $ | 500,000 | | | | |
| Money & Securities Inside/Outside | $ | 25,000 | | | | |
| | | | | | | |
| Deductibles: | | | | | | |
| Money and Securities | $ | 1,000 | | | | |
| All Other | $ | 10,000 | | | | |
| | | | | | | |
| D.   *BOILER & MACHINERY POLICY* | | | | | | |
| | | | | | | |
| Scheduled Locations: | | | | | | |
| 1)   800 Huntington Avenue, Boston, MA 02115 | | | | | | |
| 2)   200 Longwood Avenue, Boston, MA 02115 | | | | | | |
| 3)   350 Longwood Avenue, Boston, MA 02115 | | | | | | |
| 4)   210 Longwood Avenue, Boston, MA 02115 | | | | | | |
| 5)   10 Mission Street, Boston, MA 02115 | | | | | | |
| 6)   One Blackfan Circle, Boston, MA 02115 | | | | | | |
| 7)   Three Blackfan Circle, Boston, MA 02115 | | | | | | |
| | | | | | | |
| Limits: | | | | | | |
| Blanket Limit - Direct Damage | $ | 44,282,588 | | | | |
| Blanket Limit - Business Income | $ | 10,809,382 | | | | |
| Spoilage Damage | $ | 100,000 | | | | |
| Utility Interruption | $ | 500,000 | | | | |
| Expediting Expense | $ | 100,000 | | | | |
| Hazardous Substance | $ | 100,000 | | | | |
| Ammonia Contamination | $ | 100,000 | | | | |
| Water Damage | $ | 100,000 | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

3

WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **I. DOMESTIC PACKAGE POLICY (CONTINUED)** | | | National Fire Insurance of Hartford (CNA) | 1056927008 | 7/1/08-09 | *Included* |
| Deductibles: | | | | | | |
| Direct Damage | $ | 10,000 | | | | |
| Business Income | | 24 Hours | | | | |
| **II. AUTOMOBILE POLICY** | | | National Fire Ins. Co. (CNA) | 2083328381 | 7/1/08-09 | $666 |
| Hired Car Physical Damage: Actual Cash Value or $35,000, whichever is less, subject to: $500 Comprehensive Deductible $500 Collision Deductible | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

4



William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| III.   **WORKERS' COMPENSATION POLICY** | | | Continental Casualty Insurance Company (CNA) | WC251583761 | 7/1/08-09 | $46,145 Deposit Premium |
| Workers' Compensation Coverage: Statutory Benefits – State of Hire Covered State: Massachusetts | | | | | | |
| Employer's Liability Coverage: | | | | | | |
| Bodily Injury by Accident (each accident) | $ | 1,000,000 | | | | |
| Bodily Injury by Disease (each employee) | $ | 1,000,000 | | | | |
| Bodily Injury by Disease (policy limit) | $ | 1,000,000 | | | | |
| Payrolls | | | | | | |
| MA Class Code 8810 | $ | 2,860,386 | | | | |
| MA Class Code 4512 | $ | 11,031,408 | | | | |
| Experience Mod of 1.32 | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

5



William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **IV. FOREIGN PACKAGE POLICY** | | | Continental Insurance Co. (CNA) | PST283529617 | 7/1/08-09 | $3,650 |
| *A. GENERAL LIABILITY SECTION:* | | | | | | |
| Bodily Injury & Property Damage | $ | 1,000,000 | | | | |
| Personal & Advertising Injury | $ | 1,000,000 | | | | |
| Premises Legal Liability | $ | 1,000,000 | | | | |
| Medical Expense (Each person) | $ | 10,000 | | | | |
| Medical Expense (Each accident) | $ | 50,000 | | | | |
| Employee Benefits (Each employee) | $ | 1,000,000 | | | | |
| Employee Benefits (Aggregate) | $ | 1,000,000 | | | | |
| Deductible (Each employee) | $ | 1,000 | | | | |
| *Excluding Products Liability* | | | | | | |
| *Excluding Professional Liability* | | | | | | |
| *B. DIC/EXCESS AUTOMOBILE LIABILITY:* | | | | | | |
| Bodily Injury & Property Damage Non-Owned & Hired Autos Only | $ | 1,000,000 | | | | |
| Auto Medical Expense Coverage - Ea. Person | $ | 10,000 | | | | |
| Auto Medical Expense Coverage - Ea. Accident | $ | 50,000 | | | | |
| Hired Auto – Any One Accident | $ | 2,500 | | | | |
| DIC/Excess Physical Damage – Any One Policy Period | $ | 25,000 | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

6

Case 1:17-cv-12472-DLC   Document 55-7   Filed 02/15/19   Page 104 of 183



**William Gallagher Associates**
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|
| **IV. FOREIGN PACKAGE POLICY (CONTINUED)** | Continental Insurance Co. (CNA) | PST283529617 | 7/1/08-09 | $6,250 |

C.  *WORKERS' COMPENSATION SECTION:*

Statutory Benefits – State of Hire Benefits
(excludes 3rd country nationals & local national  employees)

Employer's Liability:
Bodily Injury by Accident (Each Accident)         $    1,000,000
Bodily Injury by Disease (Policy Limit)            $    1,000,000
Excess Repatriation Expense (Any One Employee)$    100,000
Excess Repatriation Expense (Annual Aggregate)  $    250,000

D.  *KIDNAP & RANSOM:*

Each occurrence                    $    25,000
Aggregate Limit                    $    25,000

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance.  Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements.  Please contact your WGA Account Executive or Account Manager with any questions that you may have.*                7

**WGA**

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| **V.   UMBRELLA LIABILITY POLICY** | | | Continental Casualty Ins. Co. (CNA) | A1064097008 | 7/1/08-09 | $16,160 |
| Limits of Liability: | | | | | | |
| Each Incident | $ | 10,000,000 | | | | |
| Aggregate | $ | 10,000,000 | | | | |
| Deductible/Retention: | $ | 0 | | | | |
| Coverage is Excess Over:<br>General Liability<br>Employee Benefits<br>Non-Owned & Hired Automobile Liability<br>Employers Liability<br>Foreign Liability | | | | | | |
| Excludes:<br>_Products/Completed Operations<br>Professional Liability<br>Sexual Misconduct<br>Human Clinical Trials | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

8

WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| VI. **PROFESSIONAL LIABILITY POLICY** | | | Columbia Casualty Company (CNA) | ADT1028638447-12 | 7/1/08-09 | $32,320 Plus 4% MA Surplus Line Tax |
| Limits of Liability: | | | | | | |
| Each Occurrence | $ | 5,000,000 | | | | |
| Annual Aggregate | $ | 5,000,000 | | | | |
| Deductible: | | | | | | |
| Each Claim | $ - | 10,000 | | | | |
| Claims-Made Coverage Form | | | | | | |
| Retroactive Date is 5/4/1987 | | | | | | |
| Worldwide Coverage Territory | | | | | | |
| Defense Included within the Limits of Liability | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

9

WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| VII. ASSOCIATION LIABILITY POLICY | | | National Union Fire Insurance (AIG) | 6462994 | 7/1/08-09 | $17,307 |
| Coverage Afforded: Directors & Officers Liability Employment Practices Liability | | | | | | |
| Limits of Liability: | | | | | | |
| D&O and EPLI Combined – Policy Aggregate | $ | 5,000,000 | | | | |
| Crisis Management Funds for D&O | $ | 25,000 | | | | |
| D&O | | | | | | |
| Crisis Management Events | $ | 2,500 | | | | |
| All other Claims | $ | 25,000 | | | | |
| Employment Practices | | | | | | |
| All Claims | $ | 25,000 | | | | |
| Deductible/Retention: | | | | | | |
| Non-Indemnifiable Loss | $ | 0 | | | | |
| Indemnifiable Loss | $ | 25,000 | | | | |
| Claims-Made Coverage Form Continuity Dates: 12/01/02 Defense Costs are included within the Limits of Liability | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*    10

  
WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|
| **VIII. BUSINESS TRAVEL ACCIDENT POLICY** | Federal Insurance Co. (Chubb) | 64777014 | 7/1/08-09 | $1,750 |

Covered Individuals:
(Class 1) All employees of Immune Disease Institute, Inc.
(Class 2) Spouse of a Primary Insured Person
(Class 3) Dependent Children of a Primary Insured Person.

Covered Benefits:
Accidental Loss of Life, Limb, Sight, Speech, Hearing and Thumb or
Index Finger.

Covered Hazards:
Worldwide Business Travel; must be on assignment by or at the
direction of Immune Disease Institute, Inc. Includes personal
excursions when in conjunction with business travel. Does not include
daily travel to and from work.

Benefit Amounts:
(Class 1) 24 Hour Business Travel / Extraordinary Commutation Bomb:
5 x Annual Salary to a Maximum of $500,000
and a Minimum of $250,000

(Class 2) Business Travel Family          $    25,000
(Class 3) Business Travel Family          $    10,000

Aggregate amount of insurance (per accident)   $   500,000
Medical Evaluation and Repatriation            $    50,000

Additional Benefits:
Family Coverage - $25,000 for Spouse and $10,000 for each Dependent
Child and Medex Travel Assistance worldwide services

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for*    11
*information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.*

WGA

William Gallagher Associates
470 Atlantic Avenue
Boston, MA 02210
Telephone: (617 261-6700
Fax: (617) 261-6720

Outline of Insurance

Name: Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Date: November 2008

| COVERAGE AND LIMITS | | | INSURANCE COMPANY | POLICY NUMBER | TERM | PREMIUM |
|---|---|---|---|---|---|---|
| IX. FIDUCIARY LIABILITY POLICY | | | Travelers Property Casualty Ins. Co. | 104968798 | 7/1/07-10 | $2,669 (08-09 Installment) |
| Limit of Liability: Aggregate | $ | 2,000,000 | | | | |
| Prior & Pending Date: 04/11/2001 | | | | | | |
| *Claims-Made Coverage Form* | | | | | | |

*This outline is intended for informational purposes only and is not intended as nor should be construed as a grant of coverage for any policy of insurance. Please refer to the actual policies for information relating to limits, terms, conditions, exclusions and endorsements. Please contact your WGA Account Executive or Account Manager with any questions that you may have.* 12

## SCHEDULE 2.19.1

## OWNED REAL PROPERTY AND REAL PROPERTY LEASES

### OWNED REAL PROPERTY

1.   800 Huntington Avenue, Boston, MA

2.   10 Mission Street, Boston, MA

### REAL PROPERTY LEASES

3.   Lease dated May 10, 2006, between CBRI, as landlord, and 800 Huntington Avenue LLC, as tenant ("800 LLC")

4.   Sublease dated May 10, 2006, between 800 LLC, as sublandlord, and CBRI, as subtenant

5.   Subordination, Non-Disturbance and Attornment Agreement dated June 29, 2006, among Citizens, 800 LLC and CBRI

6.   Lease dated May 23, 2006, between CLSB I LLC, as landlord, and CBRI, as tenant, as amended through a 3rd Amendment.

7.   Sublease dated as of September 3, 1992, between Blood Research Institute, Inc., as sublandlord, and CBRI, as subtenant

8.   Children's Hospital Corporation (Lessor) to The CBR Institute for Biomedical Research, Inc (Lessee) dated April 29, 2005. Space: 1,583 rsf on the 9th floor of the Karp Family Laboratory Building. Term: February 1, 2005 through December 31, 2009.

9.   President & Fellows of Harvard College (Landlord) to The CBR Institute for Biomedical Research, Inc. (Tenant); Space: 2,902 nasf on the 2nd floor of the Armenise Building. Dated June 21, 2006. Term: June 21, 2006 through December 31, 2010.

10.   Longwood Galleria Lease: Newton Place Associates I, LLC (c/o Druker Company, LTD) as landlord; the Center for Blood Research, Inc. (tenant). Space: 5,315 rsf on the ground level of the Longwood Galleria Building at 350 Longwood Avenue Boston. Effective February 1, 2001 for a 72 month term. Amended on July 20, 2006, extending the termination date to January 31, 2010.

SCHEDULE 2.19.2

ENCUMBRANCES ON REAL PROPERTY

1.  Mortgage dated May 8, 2006, from CBR Institute for Biomedical Research, Inc. to 800 Huntington Avenue LLC

2.  Mortgage dated on or about June 29, 2006, from 800 Huntington Avenue LLC, as tenant, to Citizens Bank of Massachusetts, encumbering 800's leasehold estate

3.  The landlord's interests in IDI's leased premises at 350 Longwood Avenue and 3 Blackfin Circle are encumbered by mortgages



## SCHEDULE 3

CMCC DISCLOSURE SCHEDULE

SCHEDULE 3.4

REQUIRED CONSENTS

1.      Notice to the National Institutes of Health would be required for a merger of IDI into a
        CMCC affiliate pursuant to Section 6.1.2 of the Agreement.

2.      Filing of a certificate of merger with the Secretary of State of Massachusetts

2

FEDERAL IDENTIFICATION
NO. 04-2158520

Examiner

# The Commonwealth of Massachusetts
**William Francis Galvin**
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

Name
Approved

## RESTATED ARTICLES OF ORGANIZATION
(General Laws, Chapter 180, Section 7)

We, _Theodore M. Cronin_ , *President / ~~Vice President~~,

and _David R. Pokross, Jr._ , *Clerk / ~~Assistant Clerk~~

of _Immune Disease Institute, Inc._ ,
(Exact name of corporation)

located at _800 Huntington Avenue, Boston, MA 02115_ ,
(Street address of corporation in Massachusetts)

do hereby certify that the following Restatement of the Articles of Organization was duly adopted at a meeting

held on _December 18_ , 20 _08_ , by a vote of: _____ ~~members~~,

_Thirteen (13)_ directors, or _____ ~~stockholders~~

☐ Being at least two-thirds of the members or directors legally qualified to vote in meetings of the corporation where there is no amendment to the Articles of Organization; OR

☐ Being at least two-thirds of its members legally qualified to vote in meetings of the corporation where there is an amendment to the Articles of Organization; OR

☑ Being at least two-thirds of its directors where there are no members pursuant to General Laws, Chapter 180, Section 3 and there is an amendment to the Articles of Organization; OR

☐ In the case of a corporation having capital stock, by the holders of at least two-thirds of the capital stock having the right to vote therein where there is an amendment to the Articles of Organization.

C   ☐
P   ☐
M   ☐
R.A. ☐

P.C.

*Delete the inapplicable words.
* *Check only one box that applies.
Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on one side only of separate 8 1/2 x 11 sheets of paper with a left margin of at least 1 inch. Additions to more than one article may be made on a single sheet as long as each article requiring each addition is clearly indicated.

1-19-53

IMMUNE DISEASE INSTITUTE, INC.

ATTACHMENT II

Purposes

The corporation is organized exclusively for charitable, educational, and scientific purposes, including:

(a)    to support and operate for the benefit of The Children's Medical Center Corporation and its affiliates, including the Children's Hospital Corporation;

(b)    to further scientific knowledge and public health through research in immunology and inflammation and other areas of biomedical science;

(c)    to advance biomedical education; and

(d)    to engage in any activity which may lawfully be conducted by a corporation organized under Massachusetts General Laws chapter 180 and exempt from tax under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended.

## ARTICLE I
The name of the corporation is:

Immune Disease Institute, Inc.

## ARTICLE II
The purpose of the corporation is to engage in the following activities:

See page 2A attached hereto and made a part hereof.

## ARTICLE III
A corporation may have one or more classes of members. If it does, the designation of such classes, the manner of election or appointments, the duration of membership and the qualification and rights, including voting rights, of the members of each class, may be set forth in the by-laws of the corporation or may be set forth below:

The designation, qualification and rights of members, if any, ~~shall~~ *may* be set forth in the bylaws.

## ARTICLE IV
**Other lawful provisions, if any, for the conduct and regulation of the business and affairs of the corporation, for its voluntary dissolution, or for limiting, defining, or regulating the powers of the corporation, or of its directors or members, or of any class of members, are as follows:

See pages 4A–4C attached hereto and made a part hereof.

*If there are no provisions, state "None".*
*Note: The preceding four (4) articles are considered to be permanent and may ONLY be changed by filing appropriate Articles of Amendment.*

IMMUNE DISEASE INSTITUTE, INC.

ATTACHMENT IV

Other lawful provisions for the conduct and regulation of the business and affairs of the corporation or for limiting, defining, or regulating the powers of the corporation, or of its trustees, are as follows:

(a)    Tax Exemption. No part of the assets or net earnings of the corporation shall inure to the benefit of any member, trustee, or officer of the corporation or any individual; no substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, except to the extent permitted by Section 501(h) of the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"); and the corporation shall not participate in, or intervene in (whether or not by the publication or distribution of statements), any political campaign on behalf of (or in opposition to) any candidate for public office. It is intended that the corporation shall be entitled to exemption from federal income tax under Section 501(a) of the Internal Revenue Code as an organization described in Section 501(c)(3) of the Internal Revenue Code and shall not be a private foundation under Section 509(a) of the Internal Revenue Code.

(b)    Amendment of the By-laws by the Member. The member of the corporation may make, amend or repeal the by-laws of the corporation in whole or in part in accordance with the by-laws.

(c)    Exculpation; No Personal Liability. No officer or trustee shall be personally liable to the corporation or its member for monetary damages for breach of fiduciary duty as an officer or trustee, except to the extent that the elimination of limitation of liability is not permitted under applicable law as in effect when such liability is determined. No amendment or repeal of this provision shall deprive an officer or trustee of the benefits hereof with respect to any act or omission occurring prior to such amendment or repeal.

(d)    Powers. The corporation shall have in furtherance of its corporate purposes all of the powers specified in Section 6 of Chapter 180 and in Sections 9 and 9A of Chapter 156B of the Massachusetts General Laws (except those provided in paragraph (m) of said Section 9) as now in force or as hereafter amended, and may carry on any operation or activity referred to in Article II to the same extent as might an individual, either alone or in a joint venture or other arrangement with others, or through a wholly or partly owned or controlled corporation; provided, however, that no such power shall be exercised in a manner inconsistent with said Chapter 180 or any other chapter of the Massachusetts General Laws or inconsistent with the exemption from federal income tax to which the corporation shall be entitled under Section 501(c)(3) of the Internal Revenue Code.

(e)    Interested Trustees, Officers, and Member. In the absence of fraud, no contract or transaction between the corporation and one or more of its trustees or officers, or member, or between the corporation and any other corporation, partnership, association, or other organization in which one or more of its trustees or officers, or member, are trustees, directors, officers, or a member, or have a financial or other interest, shall be void or voidable solely for

this reason, or solely because such trustee, officer, or member is present at or participates in the meeting of the Board of Trustees or a committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, nor shall any trustee or officer, or member, be under any liability to the corporation on account of any such contract or transaction if:

    (1)    the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Trustees or the committee, and the Board of Trustees or the committee authorized the contract or transaction by the affirmative votes of a majority of the disinterested trustees, even though the disinterested trustees are less than a quorum; or

    (2)    the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the Board of Trustees, the committee of the Board, or otherwise by the corporation; or

    (3)    the contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the member, at any meeting of the member the notice of which, or an accompanying statement, summarizes the nature of such transaction and such interest.

No interested trustee or member of this corporation may vote at any meeting at which such transaction shall be authorized, but may participate in discussion thereof, to the extent permitted by the non-conflicted trustees.

(f)    If and so long as the corporation is a private foundation (as that term is defined in Section 509 of the Internal Revenue Code), then notwithstanding any other provisions of the articles of organization or the by-laws of the corporation, the following provisions shall apply:

    (1)    the income of the corporation for each taxable year shall be distributed at such time and in such manner as not to subject the corporation to the tax on undistributed income imposed by Section 4942 of the Internal Revenue Code, and

    (2)    the corporation shall not engage in any act of self dealing (as defined in Section 4941(d) of the Internal Revenue Code), nor retain any excess business holdings (as defined in Section 4943(c) of the Internal Revenue Code), nor make any investments in such manner as to subject the corporation to tax under Section 4944 of the Internal Revenue Code, nor make any taxable expenditures (as defined in Section 4945(d) of the Internal Revenue Code).

(g)  Upon the liquidation or dissolution of the corporation, after payment of all of the liabilities of the corporation or due provision therefor, all of the assets of the corporation shall, subject to Section 11A of Chapter 180 of the Massachusetts General Laws, be disposed of to The Children's Hospital Corporation, a Massachusetts non-profit corporation, so long as it is then

exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, or if it is not then so exempt, to one or more organizations exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code.

      (h)    <u>Successor Provisions</u>.  All references herein to provisions of the Internal Revenue Code and the Massachusetts General Laws refer to such provisions as in effect from time to time, including any successor provisions thereto.

**ARTICLE V**

The effective date of the Restated Articles of Organization of the corporation shall be the date approved and filed by the Secretary of the Commonwealth. If a *later* effective date is desired, specify such date which shall not be more than thirty days after the date of filing.

**ARTICLE VI**

**The information contained in Article VI is not a permanent part of the Articles of Organization.**

a. The street address (post office boxes are not acceptable) of the principal office of the corporation *in Massachusetts* is:

800 Huntington Avenue, Boston, MA 02115

b. The name, residential address and post office address of each director and officer of the corporation is as follows:

|  | NAME | RESIDENTIAL ADDRESS | POST OFFICE ADDRESS |
|---|---|---|---|
| President: | See page 6(b) attached hereto | and made a part hereof. | |
| Treasurer: | | | |
| Clerk: | | | |
| Directors: (or officers having the powers of directors) | | | |

c. The fiscal year of the corporation shall end on the last day of the month of:   June

d. The name and business address of the resident agent, if any, of the corporation is:

N/A

**We further certify that the foregoing Restated Articles of Organization affect no amendments to the Articles of Organization of the corporation as heretofore amended, except amendments to the following articles. Briefly describe amendments below:**

Articles II, III, IV and VI are amended and restated in their entirety.

SIGNED UNDER THE PENALTIES OF PERJURY, this 20th day of February , 20 09 .

_____ , *President / *Vice President,

_____ , *Clerk / *Assistant Clerk.

*Delete the inapplicable words.        **If there are no such amendments, state "None".*

IMMUNE DISEASE INSTITUTE, INC.

ATTACHMENT VI

6(b).  Officers

| Name | Title | Address |
|------|-------|---------|
| Theodore Cronin | President | 800 Huntington Avenue, Boston, MA 02115 |
| David Kirshner | Treasurer | 800 Huntington Avenue, Boston, MA 02115 |
| Stuart Novick | Clerk | 800 Huntington Avenue, Boston, MA 02115 |
| Rachelle Rosenbaum | Assistant Clerk | 800 Huntington Avenue, Boston, MA 02115 |

6(b).  Trustees

| Name | Address |
|------|---------|
| Frederick Alt | 800 Huntington Avenue, Boston, MA 02115 |
| Carleen Brunelli | 800 Huntington Avenue, Boston, MA 02115 |
| Robert Carpenter | 800 Huntington Avenue, Boston, MA 02115 |
| Gary Fleisher, M.D. | 800 Huntington Avenue, Boston, MA 02115 |
| David Kirshner | 800 Huntington Avenue, Boston, MA 02115 |
| Harvey Lodish, Ph.D. | 800 Huntington Avenue, Boston, MA 02115 |
| James Mandell, M.D. | 800 Huntington Avenue, Boston, MA 02115 |
| Walt Pressey | 800 Huntington Avenue, Boston, MA 02115 |
| Enid Starr | 800 Huntington Avenue, Boston, MA 02115 |

THE COMMONWEALTH OF MASSACHUSETTS

8 5/0205 l8 l

## RESTATED ARTICLES OF ORGANIZATION
### (General Laws, Chapter 180, Section 7)

I hereby approve the within Restated Articles of Organization and, the filing fee in the amount of $ _35_ having been paid, said articles are deemed to have been filed with me this _20_ day of _Feb_, 20 _09_.

Effective Date: _February 20 2009_

_William Francis Galvin_

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

1077511

## TO BE FILLED IN BY CORPORATION
### Contact information:

Stuart J. Novick, Esq.

Children's Hospital Boston, 300 Longwood Avenue

Boston, MA 02115

Telephone: 617-355-6000

Email: stuart.novick@childrens.harvard.edu

A copy this filing will be available on-line at www.state.ma.us/sec/cor once the document is filed.

3

AMENDED AND RESTATED BY-LAWS

OF

IMMUNE DISEASE INSTITUTE, INC.

Adopted November 16, 1989
Amended December 6, 1995
Amended June 14, 2001
Name Changed June 5, 2007
Amended February 20, 2009

Adopted:           November 16, 1989
Amended:        December 6, 1995
Amended:        June 14, 2001
Name Changed: June 5, 2007
Amended:        February 20, 2009

# AMENDED AND RESTATED BY-LAWS

## OF

## IMMUNE DISEASE INSTITUTE, INC.

In accordance with Section 10 of the By-laws of Immune Disease Institute, Inc. (the "Corporation") in effect as of June 5, 2007, the By-laws are hereby amended and restated in their entirety as follows:

### Section 1. MEMBERS

1.1. _Member_. The Children's Medical Center Corporation, acting through its board of trustees, shall serve as the sole member of the Corporation.

1.2. _Powers and Rights_. In addition to the rights provided to the member in Section 2.1 and Section 9, and such other powers and rights as are vested in the member by law, the Articles of Organization of the Corporation (the "Articles") or these By-laws, the member shall have such other powers and rights as the trustees may designate.

1.3. _Annual Meeting_. The annual meeting of the member shall be held within six (6) months after the end of the fiscal year of the Corporation on such date and at such hour and place as the trustees or an officer designated by the trustees shall determine. In the event that no date for the annual meeting is established or such meeting has not been held on the date so determined, a special meeting in lieu of the annual meeting may be held with all of the force and effect of an annual meeting.

1.4. _Regular Meetings_. Regular meetings of the member may be held at such times as the member may determine.

1.5. _Special Meetings_. Special meetings of the member may be held at any time when called by the president or by the trustees.

1.6. _Place of Meetings_. All meetings of the member shall be held at the principal office of the Corporation in Massachusetts or at such other place within the United States as shall be fixed by the trustees or the president.

1.7.    Notice of Meetings. A written notice of each meeting of the member, stating the place, date, and time and the purposes of the meeting, shall be given at least seven (7) days before the meeting to the clerk of the member. Whenever notice of a meeting is required, such notice need not be given to the clerk of the member if a written waiver of notice, executed by the member (or the member's attorney thereunto authorized) before or after the meeting, is filed with the records of the meeting.

1.8.    Quorum. At any meeting of the member, the existence of a quorum shall be as determined in the by-laws of the member, except when a larger quorum is required by law, the Articles or by these By-laws. Any meeting may be adjourned to such date or dates not more than ninety (90) days after the first session of the meeting by a majority of the votes cast upon the question, whether or not a quorum is present, and the meeting may be held as adjourned without further notice.

1.9.    Action by Vote. The member shall act as provided in its by-laws.

1.10.    Action by Writing. Any action required or permitted to be taken at any meeting of the member may be taken without a meeting if the member consents to the action in writing and the written consent is filed with the records of the meetings of the member. Such consents shall be treated for all purposes as a vote at a meeting.

1.11.    Proxies. The member may vote through its president or other duly authorized officer either in person or by written proxy dated not more than six (6) months before the meeting named therein, which proxies shall be filed before being voted with the clerk or other person responsible for recording the proceedings of the meeting. Unless otherwise specifically limited by their terms, such proxies shall entitle the holders thereof to vote at any adjournment of the meeting but the proxy shall terminate after the final adjournment of such meeting.

## Section 2. OFFICERS AND TRUSTEES

2.1.    Number and Election. The trustees shall be divided into two classes: (i) Class A trustees, of whom there shall be a maximum of three (3) trustees if GlaxoSmithKline Research & Development Limited ("GSK") elects not to appoint a trustee pursuant to a certain Research Collaboration Agreement by and between the Corporation and GSK, or a maximum of four (4) trustees if GSK elects to appoint a trustee; and (ii) Class B trustees, of whom there shall be not fewer than four (4) trustees if GSK elects not to appoint a trustee, or not fewer than five (5) trustees if GSK elects to appoint a trustee. As of the effective date of these Amended and Restated By-laws, the individuals set forth on Schedule A attached hereto shall become the trustees of the Corporation and shall serve for the terms designated on said Schedule A. Successor trustees shall be elected as follows:

Class A Trustees. At each annual meeting of the trustees, a majority of the Historical Trustees (as defined in Schedule A) then in office shall elect the appropriate number of successors to the Historical Trustees whose terms are then expiring and GSK shall select the GSK Trustee, if any, provided, however, that the member shall have the authority to object to any trustee elected by the Historical Trustees, in the member's reasonable discretion. Without limiting the foregoing, no individual shall serve as a Class A trustee unless and until the member shall have determined, in its sole discretion, that each such individual is independent. An individual shall be deemed to be independent for purposes of this Section 2.1 provided that such

11310827_20.DOC                    -2-

individual is not a director, trustee, officer, agent, or employee of the member or of Children's Hospital Corporation, and is not an officer, employee or agent of this Corporation. Each Class A trustee so elected shall hold office for a term of one (1) year and until his or her successor is elected and qualified, or until he sooner dies, resigns, is removed, or becomes disqualified.

Class B Trustees. At each annual meeting of the member of the Corporation, the member shall elect the appropriate number of successors to the Class B trustees whose terms are then expiring. Each Class B trustee so elected shall hold office for a term of one (1) year and until his or her successor is elected and qualified, or until he sooner dies, resigns, is removed, or becomes disqualified.

At any special or regular meeting, the member may increase or decrease the total number of trustees, provided, however, that at all times the number of Historical Trustees shall not be fewer than three (3) trustees and a majority of the trustees shall be Class B trustees, and provided that at least twenty percent (20%) of the trustees shall be Class A trustees.

The trustees at their annual meeting in each year shall elect a president, a scientific director, a treasurer, and a clerk, and may at any time appoint such other officers as they shall determine. Except as otherwise provided in these By-laws, the president, the treasurer, and the clerk shall hold office until the next annual meeting of the trustees and until their respective successors are elected and qualified. Other officers shall serve at the pleasure of the trustees.

2.2.    Resignations and Removal. Any trustee or officer may resign at any time by delivering his resignation in writing to the chairman of the board, if any, the president or the clerk, or to the Corporation at its principal office. Such resignation shall be effective upon receipt unless specified to be effective at some other time. A Class A trustee may be removed (i) for cause by the vote of two-thirds (2/3) of the total number of Class A and Class B trustees and (ii) without assignment of cause by the vote of two-thirds (2/3) of the total number of Class A and Class B trustees (provided that in the case of (ii), with respect to the removal of a Historical Trustee, such number shall include a majority of the Historical Trustees eligible to vote). A Class B trustee may be removed with or without assignment of cause by the vote of the member. An officer may be removed with or without assignment of cause by the vote of a majority of the trustees then in office. A trustee or officer may be removed for cause only after reasonable notice and opportunity to be heard before the body proposing to remove him or her.

2.3.    Vacancies. Any vacancy in the (i) Historical Trustees shall be filled by a vote of a majority of the Historical Trustees then in office and (ii) GSK Trustee shall be filled by GSK, provided, however, that the member shall have the authority to object to any trustee elected by the Historical Trustees, in the member's reasonable discretion. Any vacancy in Class B trustees shall be filled by a vote of the member. Any vacancy in Class A trustees resulting from the enlargement of the board may be filled by vote of a majority of the Class A trustees then in office, provided, however, that the member shall have the authority to object to any trustee elected by the Class A trustees, in the member's reasonable discretion. Any vacancy in Class B trustees resulting from the enlargement of the board may be filled by the member. The trustees shall elect a successor if the office of the president, treasurer, or clerk becomes vacant and may elect a successor if any other office becomes vacant. Each such successor shall hold office for the unexpired term and in the case of the president, treasurer, and clerk until his successor is chosen and qualified, or in each case until he or she sooner dies, resigns, is removed, or becomes

disqualified. The member and the trustees shall have and may exercise all their powers notwithstanding the existence of one or more vacancies in their number.

2.4.    Honorary Trustees.  The trustees may elect as honorary trustees former trustees who have served the Corporation with distinction. Honorary trustees shall be entitled to notice of and to participate in discussions at meetings of the trustees but shall not have the right to vote. Honorary trustees may be elected to serve at the pleasure of the trustees or for specified terms.

## Section 3. POWERS AND DUTIES OF TRUSTEES AND OFFICERS

3.1.    Trustees.  The affairs of the Corporation shall be managed by the trustees who shall have and may exercise all the powers of the Corporation, except those powers reserved to the member by law, the Articles, or these By-laws.

The following powers are reserved to the member:

(1)    the amendment of the Articles or these By-laws in accordance with Section 9;

(2)    the selection of the independent auditor and legal counsel of the Corporation;

(3)    hiring and firing of senior management of the Corporation excluding the officers;

(4)    any engagement in, or entry into, any transaction providing for the sale, mortgage or other disposition of all or substantially all of the Corporation's assets, or the approval and adoption of a plan of merger or consolidation of the Corporation with another corporation;

(5)    the creation or acquisition of any subsidiary or affiliate corporation of the Corporation;

(6)    the adoption of a plan of dissolution and/or distribution of the assets of Corporation;

(7)    the borrowing of any sum whose stated term is greater than one (1) year or which is secured by a mortgage of all or any portion of the Corporation's real property or by a security interest in the Corporation's assets or revenues;

(8)    any borrowing in excess of $50,000 whether long term or short term and whether secured or unsecured; and

(9)    the sale, lease, or disposition, not including a lease having less than a five (5) year term, of any real property owned by the Corporation.

3.2.    Chairman and President.  The trustees may appoint a chairman of the board who, unless otherwise determined by the trustees, shall when present preside at all meetings of the trustees and shall have such other powers and duties as customarily belong to the office of chairman of the board or as may be designated from time to time by the trustees. Unless otherwise determined by the trustees, the president shall be the chief executive officer of the Corporation and shall, subject to the direction of the trustees, have general supervision and control of the business of the corporation. The president shall perform such other duties and shall have such other powers as the trustees may designate from time to time.

3.3.    Scientific Director.  The scientific director shall be the chief scientific officer of the Corporation and shall have charge of the development and management of the scientific and educational program of the corporation.

3.4.  Vice Presidents.  The vice presidents, if any, shall have such powers and duties as may be designated from time to time by the trustees or by the president.

3.5.  Treasurer.  Except as the trustees shall otherwise determine, the treasurer shall be the chief financial and accounting officer of the Corporation and shall have such other powers and duties as customarily belong to the office of treasurer or as may be designated from time to time by the trustees or the president.

3.6.  Clerk.  The clerk shall record all proceedings of the trustees in a book or books to be kept therefor and shall have custody of the seal of the Corporation.

3.7.  Other Officers.  Other officers shall have such powers as may be designated from time to time by the trustees.

## Section 4. MEETINGS OF THE TRUSTEES

4.1.  Annual Meeting.  The annual meeting of trustees shall be held immediately following the annual meeting of the member, pursuant to Section 1.3.

4.2.  Regular and Special Meetings.  Regular meetings of the trustees may be held at such places and at such times as the trustees may determine.  Special meetings of the trustees may be held at any time and at any place when called by the chairman of the board of trustees, if any, the president, or a majority of the trustees.

4.3.  Notice.  No notice need be given for a regular meeting.  Forty-eight (48) hours' notice by mail or telephone shall be given for a special meeting unless shorter notice is adequate under the circumstances.  A notice or waiver of notice need not specify the purpose of any special meeting.  Notice of a meeting need not be given to any trustee if a written waiver of notice, executed before or after the meeting, is filed with the records of the meeting, or to any trustee who attends the meeting without protesting prior thereto or at its commencement the lack of notice to such trustee.

4.4.  Quorum.  A majority of the trustees then in office shall constitute a quorum, but a smaller number may adjourn finally or from time to time without further notice until a quorum is secured.  If a quorum is present, a majority of the trustees present may take any action on behalf of the board except to the extent that a larger number is required by law, the Articles, or these By-laws.

4.5.  Action by Vote.  When a quorum is present at any meeting, a majority of the trustees present and voting shall decide any question, including election of officers, unless otherwise provided by law, the Articles, or these By-laws.

4.6.  Action by Consent.  Any action required or permitted to be taken at any meeting of the trustees may be taken without a meeting if all the trustees consent to the action in writing and the written consents are filed with the records of the meetings of trustees.  Such consents shall be treated for all purposes as a vote at a meeting.

4.7.  Presence Through Communications Equipment.  Unless otherwise provided by law or the Articles, trustees may participate in a meeting of the board of trustees by means of a conference telephone or similar communications equipment by means of which all persons

participating in the meeting can hear each other at the same time, and participation by such means shall constitute presence in person at a meeting.

## Section 5. COMMITTEES

5.1.    Executive Committee.  The trustees may elect from their number an executive committee of no less than three (3) persons.  The executive committee shall have all of the powers of the board of trustees except those which by law, the Articles, or these By-laws may not be delegated.

5.2.    Other Committees.  The trustees may from time to time establish such other committees, the members of which need not be trustees, as they deem appropriate with such powers and duties as the trustees may determine.

5.3.    General.  The members of any committee shall hold office at the pleasure of the trustees.  All committees appointed by the trustees shall be subject to removal at the pleasure of the trustees.  All decisions of committees appointed by the trustees shall be subject to review and alteration by the trustees, provided that any such alteration by the trustees shall not affect any action taken prior thereto in reliance upon authorized committee action.  Except as the trustees may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by the trustees or such rule, its business shall be conducted as nearly as may be in the same manner as is provided by these By-laws for the conduct of business by the trustees.

## Section 6. SPONSORS, BENEFACTORS, CONTRIBUTORS, ADVISORS, FRIENDS OF THE CORPORATION

The trustees may designate persons or groups of persons as sponsors, benefactors, contributors, advisors, or friends of the Corporation or such other title as they deem appropriate.  Such persons shall serve in an honorary capacity and, except as the trustees shall otherwise designate, shall in such capacity have no right to notice of or to vote at any meeting, shall not be considered for purposes of establishing a quorum, and shall have no other rights or responsibilities.

## Section 7. INDEMNIFICATION

The Corporation shall, to the extent legally permissible, indemnify each person who may serve or who has served at any time as a member, trustee, director, officer, or committee member of the Corporation or of any of its subsidiaries, or who at the request of the Corporation may serve or at any time has served as a trustee, director, officer, or committee member of, or in a similar capacity with, another organization or an employee benefit plan (each such person being called in this Section 7 a "Person"), against all expenses and liabilities (including counsel fees, judgments, fines, excise taxes, penalties, and amounts payable in settlements) reasonably incurred by or imposed upon such Person in connection with any threatened, pending, or completed action, suit, or other proceeding, whether civil, criminal, administrative, or investigative, in which such Person may become involved by reason of serving or having served in such capacity (other than a proceeding voluntarily initiated by such Person unless he or she is successful on the merits, the proceeding was authorized by the Corporation, or the proceeding seeks a declaratory judgment regarding his or her own conduct); provided that no

indemnification shall be provided for any such Person with respect to any matter as to which he or she shall have been finally adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his or her action was in, or not opposed to, the best interests of the Corporation and in the case of any criminal proceeding, such Person had no reasonable cause to believe that the conduct was unlawful, or to the extent such matter relates to service with respect to any employee benefit plan, in the best interests of the participants or beneficiaries of such employee benefit plan. A Person whose duties include service or responsibilities as a fiduciary with respect to a subsidiary or other organization shall be deemed to have acted in good faith in the reasonable belief that his or her action was in the best interests of the Corporation if he or she acted in good faith in the reasonable belief that his or her action was in the best interests of such subsidiary or organization or of the participants or beneficiaries of, or other persons with interests in such subsidiary or organization to whom he or she had a fiduciary duty.

Such indemnification shall include payment by the Corporation of expenses incurred in defending a civil or criminal action or proceeding in advance of the final disposition of such action or proceeding, upon receipt of an undertaking by the Person to repay such payment if he or she shall be adjudicated to be not entitled to indemnification under this article, which undertaking may be accepted without regard to the financial ability of such Person to make repayment.

Notwithstanding the foregoing, as to any matter disposed of by compromise payment by any Person pursuant to a consent decree or otherwise, no indemnification either for said payment or for any other expenses shall be provided unless such compromise shall be approved as in the best interests of the Corporation, after notice that it involves such indemnification:

        (i)     by a disinterested majority of the trustees then in office; or

        (ii)    by a majority of the disinterested trustees then in office, provided that there has been obtained an opinion in writing of legal counsel to the effect that such Person appears to have acted in good faith in the reasonable belief that his or her action was in the best interests of the Corporation; or

        (iii)   by the member.

Any indemnification or advance of expenses under this article shall be paid promptly, and in any event within thirty (30) days, after the receipt by the Corporation of a written request therefor from the Person, unless with respect to a claim for indemnification the Corporation shall have determined that the Person is not entitled to indemnification. If the Corporation denies the request or if payment is not made within such thirty-day period, the Person may at any time thereafter seek to enforce his or her rights hereunder in a court of competent jurisdiction and, if successful in whole or in part, he or she shall be entitled also to indemnification for the expenses of prosecuting such action. Unless otherwise provided by law, the burden of proving that the Person is not entitled to indemnification shall be on the Corporation.

The right of indemnification under this article shall be a contract right inuring to the benefit of the member, trustees, directors, officers and other persons entitled to be indemnified hereunder and no amendment or repeal of this article shall adversely affect any right of such Person existing at the time of such amendment or repeal.

The indemnification provided hereunder shall inure to the benefit of the heirs, executors, and administrators of the Persons entitled to indemnification hereunder. The indemnification provided hereunder may, to the extent authorized by the Corporation, apply to the member, trustees, directors, officers and other persons associated with constituent corporations that have been merged into or consolidated with the Corporation who would have been entitled to indemnification hereunder had they served in such capacity with or at the request of the Corporation.

The right of indemnification under this article shall be in addition to and not exclusive of all other rights to which such Persons may be entitled. Nothing contained in this article shall affect any rights to indemnification to which Corporation employees or agents other than the Persons entitled to indemnification hereunder may be entitled by contract or otherwise under law.

## Section 8.  SEAL AND FISCAL YEAR

The seal shall be circular in form with the name of the Corporation around the periphery and the year and state of incorporation within or in such other form as the trustees may determine. The fiscal year shall commence on July 1 of each year or such other date as the trustees may determine.

## Section 9.  AMENDMENT OF BY-LAWS

These By-laws may be altered, amended or repealed at any annual or special meeting of the member, notice of which shall specify the subject matter of the proposed alteration, amendment, or repeal or the sections to be affected thereby, by vote of the member; provided, however, that any amendment that adversely affects or diminishes the rights of the Historical Trustees under Sections 2.1, 2.2, 2.3 and 9 of these By-laws shall require consent of a majority of the Historical Trustees.

## Schedule A

Class A trustees

    (i) The "Historical Trustees":

        Robert Carpenter
        Walt Pressey
        Enid Starr

    (ii) The "GSK Trustee" (if applicable):

        [Not applicable]

Class B trustees

        Frederick Alt
        Gary Fleisher, M.D.
        David Kirshner
        Harvey Lodish, Ph.D.
        James Mandell, M.D.
        Vice President Research Administration of Children's Hospital Boston*

*Position currently filled by Carleen Brunelli

4

## OFFICER'S CERTIFICATE

The undersigned, on behalf of Immune Disease Institute, Inc. ("IDI"), hereby certifies the following in connection with the Affiliation Agreement (the "Affiliation Agreement") dated as of December 24, 2008, by and between IDI and The Children's Medical Center Corporation. All capitalized terms not otherwise defined in this Certificate shall have the meanings assigned to them in the Affiliation Agreement.

1.    The representations and warranties of IDI contained in Section 2 of the Affiliation Agreement are true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date.

2.    All covenants, obligations and agreements contained in the Affiliation Agreement required to be performed by IDI prior to or at the Closing have been performed in all material respects.

3.    The conditions contained in Section 5.1.3 of the Affiliation Agreement have been fulfilled as of the Closing Date.

February 20, 2009

*[The remainder of this page is intentionally left blank]*

Theodore M. Cronin
Acting President and Chief Financial Officer

5

*Execution Version*

## OFFICER'S CERTIFICATE

The undersigned, on behalf of The Children's Medical Center Corporation ("CMCC"), hereby certifies the following in connection with the Affiliation Agreement (the "Affiliation Agreement") dated as of December 24, 2008, by and between CMCC and Immune Disease Institute, Inc. All capitalized terms not otherwise defined in this Certificate shall have the meanings assigned to them in the Affiliation Agreement.

1.     The representations and warranties of CMCC contained in Section 3 of the Affiliation Agreement are true, complete and accurate in all material respects on and as of the Closing Date as though made on and as of the Closing Date.

2.     All covenants, obligations and agreements contained in the Affiliation Agreement required to be performed by CMCC prior to or at the Closing have been performed in all material respects.

3.     The conditions contained in Section 5.2.3 of the Affiliation Agreement have been fulfilled as of the Closing Date.

February 20, 2009

*[The remainder of this page is intentionally left blank]*

11528054_2.DOC

_____

James Mandell, M.D.
Chief Executive Officer

6

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue   Boston, MA  02199   617.239.0100   fax 617.227.4420   eapdlaw.com

February 20, 2009

The Children's Medical Center Corporation
300 Longwood Avenue
Boston, MA 02115

Ladies and Gentlemen:

We are furnishing this opinion to you pursuant to Section 5.1.5 of the Affiliation Agreement dated as of December 24, 2008 (the "Affiliation Agreement") between The Children's Medical Center Corporation ("CMCC") and Immune Disease Institute, Inc. ("IDI"), each a Massachusetts nonprofit corporation. Capitalized terms that are defined in the Affiliation Agreement and not otherwise defined in this opinion are used in this opinion as so defined.

We have acted as counsel to IDI in connection with the Affiliation Agreement. We have reviewed such documents and made such examination of law as we have deemed appropriate to give this opinion. We have relied, without independent verification, on certificates of public officials and, as to matters of fact material to this opinion, on representations made in the Affiliation Agreement and certificates and other inquiries of officers of IDI.

When used in this opinion, the phrase "to our knowledge" or an equivalent phrase limits the statements it qualifies to the actual knowledge of the lawyers in this firm responsible for preparing this opinion after such inquiry as they deemed appropriate.

This opinion is limited to Massachusetts law and the federal law of the United States.

Based upon the foregoing and subject to the additional qualifications set forth below, we are of the opinion that:

1.      IDI is validly existing as a nonprofit corporation under Massachusetts law and has the corporate power to execute and deliver the Affiliation Agreement and to perform its obligations thereunder.

2.      IDI has duly authorized, executed and delivered the Affiliation Agreement, and the Affiliation Agreement constitutes its valid and binding obligation enforceable against it in accordance with its terms.

3.      The execution and delivery by IDI of the Affiliation Agreement do not and the performance by it of its obligations thereunder will not (i) violate Massachusetts or federal law, (ii) result in a breach of, or constitute a default under, any agreement listed on Exhibit A hereto or (iii) violate its articles of organization or bylaws.

EDWARDS ANGELL PALMER & DODGE LLP

The Children's Medical Center Corporation
February 20, 2009
Page 2

     4.     To our knowledge, no consent or permit by any governmental authority is required to be obtained by IDI in connection with its execution and delivery of the Affiliation Agreement or the performance by it of its obligations thereunder, other than those that have been obtained, except for such consents and permits that, if not obtained, could not reasonably be expected to have a material adverse effect on IDI, taken as a whole.

     Our opinions above are subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity.

     This opinion does not address any future merger of IDI into an affiliate of CMCC pursuant to Section 6.1.2 of the Affiliation Agreement.

     This opinion shall be interpreted in accordance with the Legal Opinion Principles issued by the Committee on Legal Opinions of the American Bar Association's Section of Business Law as published in 53 Business Lawyer 831 (May 1998).

     This opinion is being furnished only to you for your use solely in connection with the closing under the Affiliation Agreement and may not be relied on without our prior written consent for any other purpose or by anyone else.

                    Very truly yours,

                    *Edwards Angell Palmer + Dodge LLP*

                    EDWARDS ANGELL PALMER & DODGE LLP

## Exhibit A

1. Loan from the Massachusetts Health and Educational Facilities Authority to The CBR Institute for Biomedical Research, Inc. to be funded from proceeds of the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-1A, Closing Date of 10/17/2003

2. Loan from the Massachusetts Health and Educational Facilities Authority to The CBR Institute for Biomedical Research, Inc. to be funded from proceeds of the Authority's Revenue Bonds, Capital Asset Program Issue, Series M-3A (2004) Pool 3, Closing Date of 11/2/2004

3. Master Lease and Sublease Agreement among Banc of America Public Capital Corp as Lessor and Servicer, HEFA as Lessee and Escrow Agent, and The CBR Institute for Biomedical Research, Inc. as Sub-Lessee, dated as of 1/11/2007 and Schedule No. 1 dated 2/6/2007 and Schedule No. 2 dated 4/29/2008

4. Master Lease and Sublease Agreement among Hewlett-Packard Financial Services Company, HEFA and The CBR Institute for Biomedical Research, Inc. dated 12/13/2005 and Schedule No. 1 dated 1/18/2006

5. Master Lease and Sublease Agreement among Banc of America Public Capital Corp as Lessor and Servicer, and HEFA as Lessee and Escrow Agent, and the Immune Disease Institute, Inc. as Sub-Lessee, dated as of April 29, 2008

6. Research Collaboration Agreement with GlaxoSmithKline Research & Development Limited, effective 5/14/2008

7. Reimbursement Agreement dated October 1, 2003, as amended relating to letter of credit for MHEFA Series M-1A Pool Loan

8. Reimbursement Agreement dated November 1, 2004, as amended relating to letter of credit for MHEFA Series M-3A Pool Loan

9. Application and Agreement for Standby Letter of Credit dated June 1, 2006 relating to letter of credit for the benefit of BMR-Blackfan Circle LLC required under CLSB lease

10. Revolving Credit Agreement dated October 31, 2001 as amended relating to $2,000,000 revolving credit facility

11. Lease dated May 10, 2006, between CBRI, as landlord, and 800 Huntington Avenue LLC, as tenant ("800 LLC")

12. Sublease dated May 10, 2006, between 800 LLC, as sublandlord, and CBRI, as subtenant

13. Lease dated May 23, 2006, between CLSB I LLC, as landlord, and CBRI, as tenant, as amended through a 3rd Amendment.

14. Sublease dated as of September 3, 1992, between Blood Research Institute, Inc., as sublandlord, and CBRI, as subtenant

15. President & Fellows of Harvard College (Landlord) to The CBR Institute for Biomedical Research, Inc. (Tenant); Space: 2,902 nasf on the 2nd floor of the Armenise Building. Dated June 21, 2006.  Term: June 21, 2006 through December 31, 2010.

7



ROPES & GRAY LLP
ONE INTERNATIONAL PLACE
BOSTON, MA 02110-2624
WWW.ROPESGRAY.COM

February 20, 2009

Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115

Ladies and Gentlemen:

We have acted as counsel to The Children's Medical Center Corporation, a Massachusetts corporation ("CMCC"), in connection with the Affiliation Agreement, dated as of December 24, 2008 (the "Affiliation Agreement"), by and between CMCC and Immune Disease Institute, Inc. ("IDI"), each a Massachusetts nonprofit corporation.

This opinion is being rendered to you pursuant to Section 5.2.5 of the Affiliation Agreement. Unless otherwise specifically defined herein, each of the capitalized terms used herein shall have the meaning ascribed to it in the Affiliation Agreement.

In connection with this opinion, we have examined, among other documents, an executed copy of the Affiliation Agreement. We also have examined such records, certificates and other documents of CMCC and such other matters of law as we have considered necessary or appropriate for purposes of the opinions expressed below.

We have relied as to factual matters upon certificates of, and information received from, CMCC and/or representatives thereof. We have made no independent investigation of the facts stated in such certificates or as to any information received from CMCC or representatives thereof and do not opine as to the accuracy of any such factual matters. We also have relied upon certain certificates and other documents from public officials.

In rendering the following opinions, we have assumed, without investigation, that the representations and warranties of CMCC true and correct. In addition, we have assumed, without investigation, the authenticity of any document or other instrument submitted to us as an original, the conformity to the originals of any document or other instrument submitted to us as a copy or as the form of a document or other instrument, the legal capacity of natural persons, and the genuineness of all signatures on such original or copies (other than that of CMCC on the Affiliation Agreement). We also have assumed, but not independently verified, that all documents executed by a party other than CMCC were duly and validly executed and delivered by such party and are legal, valid and binding obligations of such party enforceable against such party in accordance with their respective terms, and that IDI has the requisite power and authority to enter into the Affiliation Agreement and to consummate the transaction contemplated thereby.

11410267_4.DOC

ROPES & GRAY LLP

With respect to the opinions set forth in the paragraph 1 below, we have relied solely on a certificate of good standing from the Secretary of State of The Commonwealth of Massachusetts, and our opinion with respect to such matters is rendered as of the date of such certificate and is limited accordingly.

This opinion does not address any future merger of IDI into CMCC or a controlled affiliate of CMCC pursuant to Section 6.1.2 of the Affiliation Agreement.

The opinions expressed herein are limited to matters governed by the laws of The Commonwealth of Massachusetts and the federal laws of the United States of America.

Based upon and subject to the foregoing, we are of the opinion that:

1. CMCC is a corporation validly existing and in good standing under the laws of The Commonwealth of Massachusetts, with all requisite corporate power and authority to execute, deliver and perform its obligations under the Affiliation Agreement.

2. The Affiliation Agreement has been duly authorized, executed and delivered by CMCC and, subject to the qualifications stated in the penultimate paragraph of this letter, constitutes the valid and binding obligation of CMCC enforceable against CMCC in accordance with its terms.

3. To our knowledge, no consent or permit by any federal or state governmental agency or body is required to be obtained by CMCC in connection with its execution and delivery of the Affiliation Agreement, or for the consummation by CMCC of the transaction contemplated thereby, except for such other consents or permits that, if not obtained, could not reasonably be expected to have a material adverse effect on CMCC, taken as a whole.

4. The execution and delivery by CMCC of the Affiliation Agreement and the consummation by CMCC of the transaction contemplated thereby does not and will not violate, or constitute a breach or default under, any provision of (i) applicable Massachusetts or federal law, or (ii) its articles of organization or by-laws.

Our opinion that the Affiliation Agreement is the legal, valid and binding obligation of CMCC, enforceable against CMCC in accordance with its terms, is subject to, and we express no opinion with respect to, (a) bankruptcy, insolvency, reorganization, receivership, liquidation, fraudulent conveyance, moratorium and other similar laws affecting the rights and remedies of creditors and secured parties, and (b) general principles of equity, regardless of whether applied in proceedings in equity or at law. We express no opinion herein as to any provisions of the Affiliation Agreement that provide for indemnification, contribution, waiver or release to the extent such provisions may be limited or rendered unenforceable, in whole or in part, as a matter of public policy.

ROPES & GRAY LLP

The foregoing opinion is furnished by us to you in connection with the transaction described above and is solely for your benefit.  Except as otherwise expressly consented to by us in writing, this opinion may not be relied upon for any other purpose or by any other person.

Very truly yours,

*Ropes & Gray LLP*

Ropes & Gray LLP

8

# ▶ Immune Disease Institute

800 Huntington Avenue
Boston, Massachusetts 02115
t: 617.278.3000
f: 617.278.3493
www.idi.harvard.edu

December 8, 2008

GlaxoSmithKline Research & Development Ltd.
Medicines Research Centre
Gunnels Wood Road
Stevenage SG1 2NY
UK

Attn: Russell Brooks, Attorney

**Re:    Request for Consent**

Dear Mr. Brooks:

With respect to the Research Collaboration Agreement by and between GlaxoSmithKline Research & Development Limited ("GSK") and Immune Disease Institute, Inc. ("IDI"), dated May 14, 2008 (the "GSK Agreement"), IDI hereby (i) provides notice and requests the consent of GSK to the proposed change of control of IDI, (ii) requests that GSK forego its right to appoint trustees to the IDI board of trustees ( the "IDI Board"), and (iii) seeks to clarify certain intellectual property rights established under the GSK Agreement. By way of signature below, GSK agrees to and acknowledges the requests contained in this consent and waiver letter. Capitalized terms not otherwise defined herein shall have the meanings set forth in the GSK Agreement.

1.    GSK consents to the change of control of IDI and the affiliation between IDI and The Children's Medical Center Corporation ("CMCC"), whereby CMCC will become the sole corporate member of IDI with the right to control a majority of the IDI Board (the "Affiliation").

2.    In recognition of the Affiliation, GSK agrees to waive and forego its right under Section 16.3 of the GSK Agreement to terminate the GSK Agreement in whole or in part on the basis of the Affiliation or the potential subsequent merger of IDI into CMCC or an affiliate of CMCC.

3.    GSK agrees that its right to appoint up to two trustees to the IDI Board pursuant to Section 11 of the GSK Agreement shall (i) be reduced to the appointment of one trustee upon the effective date of the Affiliation and (ii) terminate in the event at any time after the consummation of the Affiliation IDI is merged into CMCC or an affiliate of CMCC and ceases to be a separate entity.

4.    GSK agrees and acknowledges that upon the effective date of the Affiliation and for as long as the GSK Agreement remains in effect, all rights and licenses to the



intellectual property or technology of IDI granted to GSK under the GSK Agreement, including without limitation the right of first negotiation under Section 4, shall continue to be limited solely to IDI's intellectual property and technology, and in no way shall apply to or include any intellectual property or technology of CMCC or its Affiliates other than IDI. Nothing in the GSK Agreement shall be construed or interpreted in a manner that would provide GSK or its successors or permitted assigns with an interest in, or a right, option or license with respect to, any intellectual property or technology licensed to or owned by CMCC or any of its Affiliates other than IDI.

5.   In the event at any time after the consummation of the Affiliation IDI is merged into CMCC, or an affiliate of CMCC, and ceases to be a separate entity, CMCC agrees to continue to operate IDI as a separate department, division or program of CMCC or its Affiliate ("CMCC Program"). GSK agrees and acknowledges that upon such merger all rights and licenses to the intellectual property or technology of IDI granted to GSK under the GSK Agreement, including without limitation the right of first negotiation under Section 4 of the GSK Agreement, shall continue to be limited solely to the intellectual property and technology of such CMCC Program as successor to IDI, and in no way shall apply to or include any other intellectual property or technology of CMCC or its Affiliates. Nothing in the GSK Agreement shall be construed or interpreted in a manner that would provide GSK or its successors or permitted assigns with an interest in, or a right, option or license with respect to, any intellectual property or technology licensed to or owned by CMCC or any of its Affiliates other than such CMCC Program as successor to IDI.

6.   Nothing herein shall be construed to have any effect on rights or licenses to the intellectual property or technology granted by GSK to IDI under the GSK Agreement which rights and licenses shall continue in full force and effect.

7.   GSK and IDI hereby agree this consent and waiver letter shall be for the benefit of IDI and CMCC.

8.   Except for the changes and clarifications expressly stated above, the terms of the GSK Agreement remain in full force and effect and all of GSK's rights as stated under the original GSK Agreement shall remain in full force and effect, without any change, and shall not be restricted or otherwise limited in any way as a result of this change of control.

[The remainder of this page is intentionally left blank.]

If you have any questions, please feel free to contact me at (617) 278-3420.  Thank you.

Very truly yours,

IMMUNE DISEASE INSTITUTE, INC.

By:  _____

Theodore M. Cronin
Acting President and Chief Financial Officer

Acknowledged and Agreed:

GLAXOSMITHKLINE RESEARCH
AND DEVELOPMENT LIMITED

By:  _____
Name:
Title:       Paul Williamson
             For and on behalf of
             Edinburgh Pharmaceutical Industries Limited
             Corporate Director
Date:

BOS111 12335655.2

9

CONSENT TO SUBLEASE ASSIGNMENT

THIS CONSENT TO SUBLEASE ASSIGNMENT ("Consent") dated as of Febuaury 12, 2009 is made with reference to that certain sublease (the "Sublease") dated September 3, 1992 by and between Blood Research Institute, Inc. with an address at 800 Huntington Avenue, Boston, MA ("Tenant") and Center for Blood Research, Inc., with an address at 800 Huntington Avenue, Boston, MA ("Subtenant"), and is entered into by and among President and Fellows of Harvard College, with an address at 180A Longwood Avenue, Boston, Massachusetts ("Landlord"), Tenant, Subtenant, and The Children's Medical Center Corporation ("CMCC") with reference to the following facts:

(A)   Landlord and Tenant are the parties to that certain lease dated as of September 3, 1992 ("Master Lease");

(B)   Tenant and Subtenant (now known as Immune Disease Institute, Inc.) are parties to the Sublease; and

(C)   Tenant has requested Landlord's approval of a transaction (the "Transaction") pursuant to which CMCC will become the sole corporate member of Subtenant.

(D)   Tenant has also requested that Landlord approve the potential merger, at a fuure date, of Subtenant into (x) CMCC, (y) The Children's Hospital Corporation or (z) any nonprofit corporation of which either of them is the sole member (the "Merger").

NOW, THEREFORE, for good and valuable consideration, the parties agree as follows:

1.   Landlord hereby consents to the Transaction and Merger upon the terms and conditions set forth below. Landlord expressly waives, to the extent arising out of the Transaction and/or the Merger, any rights of first refusal and first offer pursuant to Sections 21.3 and 21.4, respecti vely, of each of the Master Lease and the Sublease.

2.   This Consent shall not release Tenant from any existing or future duty, obligation or liability to Lan dlord pursuant to the Master Lease, nor shall this Consent change, modify or amend the Master Lease in any manner, except insofar as it constitutes Landlord's consent to the Transaction and the Merger. This Consent shall not relieve Tenant from any requirement set forth in the Master Lease that Tenant obtain Landlord's prior written approval of any additional subleases, assignrnents or other dispositions of its interest in the Master Lease, the Sublease or the Premises (as defined in the Master Lease).

3.   Landlord shall not (i) be liable to CMCC for any act, omission or breach of the Assignment by Subtenant or Tenant, or (ii) be subject to any offsets of defenses which CMCC might have against Subtenant or Tenant.

4.      CMCC hereby acknowledges that it has read and has knowledge of all of the terms and provisions of the Sublease and the Master Lease

5.      This Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors in interest and assigns, subject at all times, nevertheless, to all agreements and restrictions contained in the Lease, the Sublease, and this Consent, with respect to subleasing, assignment, or other transfer.  The agreements contained herein constitute the entire understanding between the parties with respect to the subject matter hereof, and supersede all prior agreements, written or oral, inconsistent herewith.

6.      Tenant and Subtenant agree to indemnify and hold Landlord harmless from and against any loss, cost, expense, damage or liability, including reasonable attorneys' fees, incurred as a result of a claim by any person or entity (i) that it is entitled to a commission, finder's fee or like payment in connection with the Transaction or (ii) arising out of the Transaction or the Merger.

7.      Landlord shall not be considered to have consented to the Transaction or the Merger until this Consent is executed and delivered by Landlord, Tenant, Subtenant and CMCC. Any liability of Landlord to Tenant, Subtenant and/or CMCC under or in connection with this Consent, shall be limited to the same extent as Landlord's liability to Tenant is limited under the Master Lease.

EXECUTED under seal.

LANDLORD:                                          TENANT:

President and Fellows of Harvard College          Blood Research Institute, Inc.


By: _____                    By: _____
Name: Daniel G. Ennis                             Name: THEODORE M. CRONIN
Duly Authorized                                   Duly Authorized


SUBTENANT:

Immune Disease Institute, Inc.                    The Children's Medical Center Corporation


By: _____                    By: _____
Name: THEODORE M. CRONIN                          Name: STUART T. NOVICK
Duly Authorized                                   Duly Authorized


2

10

 **Immune Disease Institute**

800 Huntington Avenue
Boston, Massachusetts 02115
t: 617.278.3000
f: 617.278.3493
www.idi.harvard.edu

November 21, 2008

Blood Research Institute, Inc.
c/o David R. Pokross, Jr., Clerk
Edwards Angell Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02109

RE:   Consent to Proposed Affiliation

Dear Mr. Pokross:

Pursuant to Section 21.1 of the Sublease dated September 3, 1992 (the "Sublease"), by Blood Research Institute, Inc. ("BRI"), as Sublandlord, to Center for Blood Research, Inc. (now known as Immune Disease Institute, Inc. ("IDI"), as Subtenant, IDI hereby requests BRI's consent to the transfer of a majority of the controlling interest in IDI as described below.

IDI contemplates entering a transaction (the "Affiliation") with The Children's Medical Center Corporation ("CMCC") whereby CMCC will become the sole corporate member of IDI with the right to control a majority of the board of trustees of IDI (the "IDI Board"). In connection with the Affiliation, CMCC shall acquire the right to merge IDI into CMCC or a controlled affiliate of CMCC on or after October 1, 2012 (or earlier with the agreement of the minority trustees on the IDI Board).

By signature below, BRI acknowledges and consents to IDI's change of control under the Affiliation and any future merger of IDI into CMCC or a controlled affiliate of CMCC that may occur in connection with the Affiliation. BRI also hereby expressly waives and forgoes, with respect to such change of control and any such future merger, the requirement under Section 21.4 of the Sublease that the surviving entity in any such future merger must enter into a separate written agreement with BRI agreeing to be bound by all of the obligations of Subtenant. Furthermore, BRI hereby acknowledges, confirms and agrees that the Affiliation and any future merger of IDI into CMCC or a controlled affiliate of CMCC shall not constitute defaults under the Sublease.

BRI and IDI hereby agree this consent and waiver letter shall be for the benefit of IDI and CMCC and shall survive any merger of IDI into CMCC or a controlled affiliate of CMCC. Except as provided in this consent and waiver letter, the terms of the Sublease remain in full force and effect.

If you have any questions, please feel free to contact me at (617) 278-3000. Thank you.

Harvard Medical School Affiliate

Very truly yours,

IMMUNE DISEASE INSTITUTE, INC.

By: _____

Theodore M. Cronin
Acting President and Chief Financial Officer

Acknowledged, agreed and consented to:

BLOOD RESEARCH INSTITUTE, Inc.

By: _____
Name: EDWARD J. BENZ, JR., M.D
Title: PRESIDENT
Date: 11/24/08

11

 **Immune Disease Institute**

800 Huntington Avenue
Boston, Massachusetts 02115
t: 617.278.3000
f: 617.278.3493
www.idi.harvard.edu

January 5, 2009

Mr. Joseph Ellis, Director

NIH Office of Policy for Extramural Research Administration (OPERA)

Suite 350, MSC 7974

6705 Rockledge Drive

Bethesda, MD 20817

Re: Affiliation between the Immune Disease Institute and Children's Hospital Boston

Dear Mr. Ellis:

As we discussed over the phone, Immune Disease Institute, Inc. (IDI) and The Children's Medical Center Corporation (CMCC), the parent of Children's Hospital Boston (collectively, Children's) signed an affiliation agreement on December 24, 2008. The summary below outlines the key terms of the affiliation agreement that are relevant to IDI's conduct of research under NIH grants or funding for such research. We want to confirm with your office that this affiliation will have no impact on the current grant awards or the eligibility of IDI for future grant awards and that no further action by IDI is required at this time.

Under the terms of the affiliation agreement, there will be no change in IDI's legal status as a separate corporation. IDI will continue to operate as a separate legal entity under the IDI name and tax ID number. IDI will become an affiliate of CMCC when CMCC becomes the sole corporate member of IDI, with the authority to appoint the majority of the IDI board of trustees, while the present IDI board will have a minority representation on the IDI board of trustees (the IDI minority trustees). The affiliation does not involve a corporate merger. At a later time, Children's may elect to merge IDI into one of its corporate affiliates, but not before October 1, 2012, unless a majority of the IDI minority trustees agree to a merger prior to that date.

As a result of the affiliation, IDI will do business as a multi-disciplinary research program associated with Children's as the "Program in Cellular and Molecular Medicine." Children's will provide financial support to IDI. IDI faculty members will receive faculty appointments at Children's, but there is no present intention that Children's provide them with direct salary support or that the responsibility for IDI research grants be shared with Children's. IDI will stay in its present space. Ted Cronin will remain CEO for at least one year and his successor will be approved by the IDI minority trustees. Children's and IDI will explore opportunities for efficiency in IDI operations, but any consolidations are not expected to be undertaken for a year and IDI would continue to be responsible for the cost of any services provided through Children's.

Harvard Medical School Affiliate

We plan to speak with the HHS Division of Cost Allocation about the F&A rate.

We request that you contact us at your earliest convenience if our summary of our conversation is not completely accurate or if our understanding concerning the impact of the affiliation on IDI grant awards is incorrect. A confirmation of the summary would be appreciated.

Sincerely,

Theodore M. Cronin, CPA
Acting President & CFO
Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 01225
617-278-3420 (v)
cronin@idi.harvard.edu

- Page break  -

- Next document -



**DEPARTMENT OF HEALTH & HUMAN SERVICES**   Public Health Service

National Institutes of Health
Bethesda, Maryland 20892

January 29, 2009

Mr. Theodore M. Cronin, CPA
Acting President & CEO
Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 01225

Dear Mr. Cronin:

This is in response to your letter of January 5, 2009, in which you summarized our phone conversation regarding Immune Disease Institute, Inc. (IDI) affiliation with Children's Medical Center Corporation (CMCC). We have noted that the affiliation agreement was signed on December 24, 2008, and under the terms of the affiliation agreement there will be no change in the legal status of IDI as a separate corporation. With respect to IDI NIH grant applications and awards, it is also noted that IDI will continue to operate as a separate legal entity under the IDI name and tax ID number.

With this letter, NIH confirms that the affiliation between IDI and CMCC will have no impact on the current grant awards or the eligibility of IDI for future grant awards. Accordingly, no further action is required by the NIH or IDI at this time.

Copies of this conformation will be distributed to Grants Management Officers of NIH Institutes and Centers with active awards with Immune Disease Institute, Inc. Please call myself or George Gardner at (301)435-0949 if you have a question.

Sincerely,

Joseph J. Ellis
Director
Office of Policy for Extramural Research Administration
Office of Extramural Research, OD
National Institutes of Health, DHHS

cc:
Grants Management Advisory Committee (GMAC)

Rockledge I, 6705 Rockledge Drive, Suite 350, MSC 7974, Bethesda, MD 20892-7974
Phone: 301-435-0938, FAX: 301-435-3059, Email: ellisj1@mail.nih.gov

- Page break  -

- Next document -

# Immune Disease Institute

800 Huntington Avenue
Boston, Massachusetts 02115
t: 617.278.3000
f: 617.278.3493
www.idi.harvard.edu

January 12, 2009

Mr. Robert Aaronson, Director
Department of Health and Human Services
Regional Administrative Support Center
Division of Cost Allocation
26 Federal Plaza
Room 41-122
New York, NY 10278

Re: Affiliation between the Immune Disease Institute and Children's Hospital Boston

Dear Mr. Aaronson:

This letter confirms our telephone conversation concerning the affiliation agreement recently signed between Immune Disease Institute, Inc. (IDI) and The Children's Medical Center Corporation (CMCC), the parent of Children's Hospital Boston (collectively, Children's) and summarizes key terms of the affiliation agreement relevant to IDI's conduct of federally-funded research and the costs associated with that research. Based on our discussion, we understand that the affiliation will involve no change in IDI's F&A and fringe benefit rates at this time.

IDI and CMCC signed an affiliation agreement on December 24, 2008. Under the terms of the affiliation agreement, there will be no change in IDI's legal status as a separate corporation. IDI will continue to operate as a separate legal entity under the IDI name and tax ID number. IDI will become an affiliate of CMCC when CMCC becomes the sole corporate member of IDI, with the authority to appoint the majority of the IDI board of trustees, while the present IDI board will have a minority representation on the IDI board of trustees (the IDI minority trustees). The affiliation does not involve a corporate merger. At a later time, Children's may elect to merge IDI into one of its corporate affiliates, but not before October 1, 2012, unless a majority of the IDI minority trustees agree to a merger prior to that date.

As a result of the affiliation, IDI will do business as a multi-disciplinary research program associated with Children's as the "Program in Cellular and Molecular Medicine." Children's will provide financial support to IDI. IDI faculty members will receive faculty appointments at Children's, but there is no present intention that Children's provide them with direct salary support or that the responsibility for IDI research grants be shared with Children's. IDI will stay in its present space and will continue to conduct its research activities in the same facilities. (Children's may, but is

Harvard Medical School Affiliate

not required to, lease some space from IDI and provide other services, at cost). Ted Cronin will remain CEO for at least one year and his successor will be approved by the IDI minority trustees. Children's and IDI will explore opportunities for efficiency in IDI operations, but any consolidations are not expected to be undertaken for a year and IDI will continue to be responsible for the cost of any services provided through Children's. If there is a further change in our legal status or research operations that may be relevant to our costs or F&A and fringe benefit rates, we will discuss its implications with you.

As you know, IDI is operating under a provisional F&A rate for the years ended June 30, 2009 and 2010. We expect to submit an accounting of incurred costs for fiscal 2009 by December 31, 2009, and at that time we plan to negotiate with the Division of Cost Allocation to finalize the 2009 rate, fix the 2010 rate, and establish a rate for 2011. We will also submit a fringe benefit proposal at that time.

We have spoken with NIH OPERA about the continued award of grants to IDI, and are waiting for their confirmation of our discussion that the affiliation will have no impact on the current IDI grant awards or the eligibility of IDI for future grant awards and that no further action by IDI is required at this time.

We request that you contact us at your earliest convenience if this summary of our conversation is not completely accurate or if our understanding of the impact of the Children's affiliation on our F&A and fringe rates is incorrect. A confirmation of receipt of the summary would be appreciated.

Sincerely,

Theo M. Cu

Theodore M. Cronin, CPA
Acting President & CFO
Immune Disease Institute, Inc.
800 Huntington Avenue
Boston, MA 02115
617-278-3420 (v)
cronin@idi.harvard.edu


cc: Mr. Louis Martillotti

12

# EDWARDS ANGELL PALMER & DODGE LLP

111 Huntington Avenue  Boston, MA 02199  617.239.0100  *fax* 617.227.4420  eapdlaw.com

David R. Pokross, Jr.
617.239.0287
dpokross@eapdlaw.com

January 8, 2009

## VIA FIRST CLASS MAIL

David Spackman, Esq.
Division of Public Charities
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

>      *Re:    Affiliation of Immune Disease Institute, Inc. and The Children's Medical*
>             *Center Corporation*

Dear Mr. Spackman:

   While we do not believe that notice to your office of the transaction described below is
required, nonetheless we would like to provide the following information as a courtesy.

   Our client, the Immune Disease Institute, Inc. ("IDI"), a tax-exempt Massachusetts
nonprofit corporation, is affiliating with The Children's Medical Center Corporation ("CMCC"),
a tax-exempt Massachusetts charitable corporation (the "Affiliation"). Pursuant to the
Affiliation, CMCC will become the sole member of IDI and elect a majority of its trustees. IDI
will continue its operations as a separate Massachusetts nonprofit corporation with its own board
of trustees.

   Over the last year, the IDI Board of Trustees (the "IDI Board") and management have
engaged in examination and evaluation of various options to determine how best to meet IDI's
needs. After discussions with several organizations, the IDI Board concluded that the goals of
improved efficiency, cost effectiveness and program quality and scope were best served by
seeking affiliation with a similarly aligned but larger and more financially stable organization.
CMCC's mission, purpose and programs are compatible with those of IDI. IDI's charitable
mission and purpose will remain unchanged and its operations will continue without interruption.

   We believe that no notice to, or action on the part of, your office is required to effectuate
the Affiliation, and that the provisions of Section 8A(c) of Chapter 180 of the Massachusetts
General Laws do not apply because (i) there is no sale, lease, exchange or other disposition of all

EDWARDS ANGELL PALMER & DODGE LLP

David Spackman, Esq.
January 8, 2009
Page 2

or substantially all of IDI's property and assets and (ii) there will not be a material change in the nature of the activities of IDI as a result of the Affiliation. In the interest of ensuring that your office is aware of the Affiliation, however, we are providing you with this letter as a courtesy.

Very truly yours,

David R. Pokross, Jr.

Enclosures
cc:     Theodore M. Cronin
          *Immune Disease Institute, Inc.*
        Stuart J. Novick
          *The Children's Medical Center Corporation*
        Michele M. Garvin
          *Ropes & Gray, LLP*

BOS111 12341305.2

13

*Execution Version*

## ENDOWMENT INVESTMENT AGREEMENT

This Endowment Investment Agreement (the "Agreement") is made as of February 20, 2009 (the "Effective Date") by and among The Children's Medical Center Corporation ("CMCC") and Immune Disease Institute, Inc. ("IDI") (each a "Party" and collectively the "Parties"). All terms used herein, unless otherwise defined herein, have the meanings ascribed to them in the Affiliation Agreement, dated December 24, 2008 (the "Affiliation Agreement").

WHEREAS, pursuant to Section 6.4.1 of the Affiliation Agreement, the Parties have agreed to enter an agreement to transfer management of IDI's endowment fund balances (the "IDI Endowment") in order to allow CMCC to invest and manage the IDI Endowment consistent with the terms of this Agreement;

WHEREAS, CMCC desires to allocate $20 million in additional funds (the "CMCC Support") to be invested along side the IDI Endowment (together the "Combined IDI Account"), with all net investment earnings to be used for the benefit of IDI.

WHEREAS, CMCC desires to manage, and IDI consents to the management of, the Combined IDI Account consistent with the terms of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements set forth in this Agreement, the Parties agree as follows:

1.     Creation of the Combined IDI Account.  As soon as practicable after the Effective Date, IDI shall transfer the IDI Endowment (consisting of approximately $19.2 million at September 30, 2008) to an account controlled by CMCC.  Upon completion of such transfer, CMCC shall allocate the CMCC Support to be invested along side the IDI Endowment.  CMCC's obligation to provide the CMCC Support shall continue for at least five (5) years from the Effective Time, after which, CMCC will continue to provide the CMCC Support at CMCC's discretion.

2.     Investment and Management of the Combined IDI Account.  CMCC agrees to invest and manage the Combined IDI Account consistent with CMCC's investment of other CMCC endowed funds.  CMCC agrees to track the investment return/loss on the Combined IDI Account separately from the balance of CMCC's other endowment funds.  CMCC agrees to provide to IDI quarterly reports indicating the financial performance of the Combined IDI Account to the extent such information is available.

3.     Use of Combined IDI Account.  Subject to Section 6 of this Agreement, all net investment earnings on the Combined IDI Account shall be used exclusively for the benefit of IDI until at least the fifth (5th) anniversary of the Effective Time.

4.      Use of IDI Endowment.  Subject to Section 6 of this Agreement, the IDI
Endowment, together with all net investment earnings on the IDI Endowment, shall be used
exclusively for the benefit of IDI until the earlier of (i) the merger of IDI into CMCC or a
controlled affiliate of CMCC; or (ii) termination of the Affiliation under Section 6 of this
Agreement (the "Management Period").  Upon request by IDI to satisfy any outstanding liability
or obligation of IDI during the Management Period, CMCC shall make any amounts in the IDI
Endowment, together with all net investment earnings on the IDI Endowment, available as soon
as commercially practicable to IDI to satisfy any such liability or obligation to the extent, in the
aggregate, of the IDI Endowment together with all net investment earnings on the IDI
Endowment.

5.      Line of Credit.  CMCC shall extend to IDI a $3 million line of credit, such line of
credit to be used by IDI to satisfy its ongoing operational expenses consistent with IDI's agreed
upon budget.  The amount of the line of credit may be increased or decreased from time to time
by written agreement of the Parties.

6.      Event of Termination of Affiliation.  In the event CMCC and IDI terminate their
affiliation prior to any merger of IDI into CMCC or a controlled affiliate of CMCC as
contemplated by the Affiliation Agreement, (i) the IDI Endowment, including all gains and
subtracting any losses, shall be returned to IDI, (ii) CMCC shall have exclusive right and title to
the CMCC Support, including all gains on said funds, and (iii) IDI shall repay to CMCC all
outstanding amounts under its line of credit with CMCC as soon as commercially reasonable, but
no later than 30 days after the termination of the affiliation.

7.      Limitation on Liability.  Notwithstanding anything in this Agreement to the
contrary, CMCC shall not be liable to IDI or any other party for any action taken or omitted or
for any loss or injury resulting from its actions or its performance or lack of performance of its
duties hereunder in the absence of gross negligence or willful misconduct on its part.  Without
limiting the generality of the foregoing, CMCC shall not be held responsible, financially or
otherwise, for any losses the Combined IDI Account may sustain by virtue of the investments
selected CMCC or its investment custodian(s).

8.      Expenses.  Each Party shall be responsible for its own costs and expenses incurred
in connection with this Agreement.

9.      Affiliation Agreement.  This Agreement is subject to the terms and conditions set
forth in the Affiliation Agreement, including without limitation, Sections 6.4.1, 6.4.2 and 6.4.3.

10.     Benefit of the Parties.  The Parties hereby agree this Agreement is for the
exclusive benefit of the Parties hereto (including any affiliates of CMCC) and their respective
successors hereunder, and shall not be deemed to give, either express or implied, any legal or
equitable right, remedy, or claim to any other entity or person whatsoever.

-2-

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed on their behalf, in the day and year first hereinabove set forth, as an instrument under seal.

THE CHILDREN'S MEDICAL CENTER CORPORATION

By:    _James Mandell_____

James Mandell, M.D.
Chief Executive Officer


IMMUNE DISEASE INSTITUTE, INC.


By:    _____

Theodore M. Cronin
Acting President and Chief Financial Officer

-3-

11402775_7.DOC

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed on their behalf, in the day and year first hereinabove set forth, as an instrument under seal.

THE CHILDREN'S MEDICAL CENTER
CORPORATION

By: _____
      James Mandell, M.D.
      Chief Executive Officer


IMMUNE DISEASE INSTITUTE, INC.

By: _____
      Theodore M. Cronin
      Acting President and Chief Financial Officer

11402775_7.DOC

14

*Execution Version*

## THE CHILDREN'S MEDICAL CENTER CORPORATION

Appointment of Class B Trustees to the Immune Disease Institute, Inc. Board of Trustees

The Children's Medical Center Corporation ("CMCC"), as sole member of the Immune Disease Institute, Inc. ("IDI"), hereby appoints the following individuals as Class B Trustees pursuant to Section 2.1 of the Amended and Restated By-Laws of IDI, as amended February **20**, 2009:

> Frederick Alt
> Carleen Brunelli
> Gary Fleisher, M.D.
> David Kirshner
> Harvey Lodish, Ph.D.
> James Mandell, M.D.

Such appointments shall become effective as of the closing date of the affiliation between CMCC and IDI, as effected by the Affiliation Agreement by and between CMCC and IDI, dated December 24, 2008.

IN WITNESS WHEREOF, I have hereunto set my hand as of this **20ᵗ** day of February, 2009.

James Mandell, M.D.
Chief Executive Officer

11551305_2.DOC

15



*The Commonwealth of Massachusetts*
*Secretary of the Commonwealth*
*State House, Boston, Massachusetts 02133*

**William Francis Galvin**
Secretary of the
Commonwealth

**February 17, 2009**

TO WHOM IT MAY CONCERN:

I hereby certify that according to the records of this office

### IMMUNE DISEASE INSTITUTE, INC.

is a domestic corporation organized on **January 19, 1953 (Chapter 180)**.

I further certify that there are no proceedings presently pending under the Massachusetts General Laws Chapter 180 section 26 A, for revocation of the charter of said corporation; that the State Secretary has not received notice of dissolution of the corporation pursuant to Massachusetts General Laws, Chapter 180, Section 11, 11A, or 11B; that said corporation has filed all annual reports, and paid all fees with respect to such reports, and so far as appears of record said corporation has legal existence and is in good standing with this office.



In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

Processed By crm

* This is not a tax clearance. Certificates certifying that all taxes due and payable by the corporation have been paid or provided for are issued by the Department of Revenue.

- Page break  -

- Next document -



*The Commonwealth of Massachusetts*

*Secretary of the Commonwealth*

*State House, Boston, Massachusetts 02133*

William Francis Galvin
Secretary of the
Commonwealth

**February 17, 2009**

TO WHOM IT MAY CONCERN:

 I hereby certify that according to the records in this office, **PROTEIN FOUNDATION, INCORPORATED** was incorporated under the General Laws of this Commonwealth on **January 19, 1953 (Chapter 180)**.

 I further certify that in Articles of Amendment filed here **May 19, 1967**, the name of said corporation was changed to **BLOOD RESEARCH INSTITUTE, INC.**

 I also certify that in Articles of Amendment filed here **August 2, 1972**, the name of said corporation was changed to **CENTER FOR BLOOD RESEARCH, INC.**

 I further certify that in Articles of Amendment filed here **August 12, 2003**, the name of said corporation was changed to **THE CBR INSTITUTE FOR BIOMEDICAL RESEARCH, INC.**

 I also certify that in Articles of Amendment filed here **June 5, 2007**, the name of said corporation was changed to **IMMUNE DISEASE INSTITUTE, INC.**

 I further certify that so far as appears of record here, said corporation still has legal existence.



In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

16



*The Commonwealth of Massachusetts*
*Secretary of the Commonwealth*
*State House, Boston, Massachusetts 02133*

**William Francis Galvin**
Secretary of the
Commonwealth

**February 17, 2009**

TO WHOM IT MAY CONCERN:

I hereby certify that according to the records of this office

**THE CHILDREN'S MEDICAL CENTER CORPORATION**

is a domestic corporation organized on **December 31, 1959 (Chapter 180)**.

I further certify that there are no proceedings presently pending under the Massachusetts General Laws Chapter 180 section 26 A, for revocation of the charter of said corporation; that the State Secretary has not received notice of dissolution of the corporation pursuant to Massachusetts General Laws, Chapter 180, Section 11, 11A, or 11B; that said corporation has filed all annual reports, and paid all fees with respect to such reports, and so far as appears of record said corporation has legal existence and is in good standing with this office.



In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

Processed By sam

\* This is not a tax clearance. Certificates certifying that all taxes due and payable by the corporation have been paid or provided for are issued by the Department of Revenue.