| | |
|---|---|
| LUIGI WARREN,<br><br>          Plaintiff<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL<br>CORPORATION,<br><br>          Defendant | Civ. A. No. 17-12472-DLC |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### FACTUAL BACKGROUND

**A. Dr. Warren Takes a Postdoc Job at the Immune Disease Institute**

Dr. Warren began his employment as a postdoctoral researcher ("postdoc") at the Immune

Disease Institute (IDI), a Harvard-affiliated non-profit research institution, in November 2007. He joined

the lab of Prof. Derrick Rossi, a junior "Principal Investigator" (PI) at the Institute, as the lab's first

postdoc. Dr. Warren had previously collaborated with Dr. Rossi at Stanford University, where they were

respectively graduate student and postdoc. The postdoc job was an "at will" position without a written

employment contract. However, the IDI did have in place a "Participation Agreement" (SUMF Ex. 3, pp.

15-17)[1] which made it a condition of continued employment that researchers support efforts to patent

inventions made at the Institute and assign ownership of such inventions to their employer while setting

the terms for the Institute's sharing of licensing revenue with them as employee-inventors. The rights and

obligations were spelled out in the IDI's "Research and Technology Policy," of October 28, 2004 (SUMF

Ex. 3) which incorporated the Participation Agreement, and which was shown to new hires during

---

[1] The abbreviation "SUMF" herein refers to the *Defendant's Statement of Undisputed Material Facts* filed with the Defendant's motion for summary judgment.

Orientation and posted on the IDI intranet for employees' perusal (Exhibit 7 at ¶ 12 and ¶ 14).

**B. Dr. Warren Conceives a New Way to Make Stem Cells with mRNA**

In June 2008 Dr. Warren conceived a novel method for using synthetic "messenger RNA" (mRNA) to reprogram ordinary skin cells into stem cells (Exhibit 2 at p. 3-74 of the notebook). He pitched the idea as a research project to Prof. Rossi the following month and received permission to explore further (*Id.* at p. 3-112). When his early trials showed the idea had promise, Prof. Rossi authorized him to pursue the project with full vigor. This represented a major gamble of Rossi Lab startup funds on an initiative in a field ("cellular reprogramming") in which neither Dr. Warren or Prof. Rossi had significant specialized expertise.

As it was clear that the mRNA technique could have commercial value if brought to fruition, Prof. Rossi briefed Ryan Dietz, the head of the IDI's Office of Technology Development, about Dr. Warren's project in August 2008 (Exhibit 3). By November 2008 Dr Warren had already shown that "innate immune" responses represented the main hurdle to achieving the sustained protein expression from mRNA needed to effect reprogramming, and he had identified and experimentally demonstrated a powerful strategy for overcoming this problem involving the use of "modified RNA"—a technology which would later gave its name to a company founded by Prof. Rossi, Moderna Therapeutics (Exhibit 2 at p. 6-29). Prof. Rossi and Dr. Warren met to discuss this progress with Mr. Dietz on January 12, 2009 (Exhibit 3) and brainstorming of approaches to commercialize the nascent technology began in earnest.

**C. The IDI Affiliates with Boston Children's Hospital in Contemplation of a Future Merger**

In February 2009 the IDI's employees were told in an email from management that the Institute would be affiliating with Boston Children's Hospital (BCH), a considerably larger and more diversified entity whose mission encompassed patient treatment as well as biomedical research. The Affiliation Agreement, which was not a public document, became effective on February 20, 2009 (SUMF Ex. 7). The affiliation was undertaken with an eye to the IDI's merging with the Hospital after a transition period lasting several years. The Institute would finally close its doors and merge into BCH on October 1, 2012.

As discussed in the Defendant's memorandum, the 2009 Affiliation Agreement included the

following language regarding Intellectual Property: "All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates…" (SUMF Ex. 7 at ¶ 6.5) The Defendant has never claimed to Dr. Warren or offered any evidence to show that the Institute altered the language of its internally-proffered employee-inventions policy or the Participation Agreement prior to the 2012 merger, and it is apparent from the events of Spring 2011 (discussed below) that even the senior administrators and legal staff of IDI and BCH believed the 2004 IDI Development Policy governed the Institute's relations with its own employee-inventors at that late time point, well after Dr. Warren's departure and the licensing of his inventions to Moderna.

**D. The IDI Files Patent Applications on the mRNA Invention**

Dr. Warren succeeded in reducing mRNA reprogramming to practice by late 2009 and the focus of practical work switched to validation experiments, which were mostly outsourced to laboratories at other institutions with relevant specialized tools and expertise. In early 2010 Dr. Warren started writing up his research in a scientific paper, and he and Prof. Rossi began working closely with the IDI's tech transfer office and its lawyers at Nixon Peabody LLP to put together a comprehensive patent filing before any public disclosure. Amongst other things, this included outlining potential therapeutic applications for synthetic mRNA that might broaden the appeal of the IP to prospective investors and licensees. The paper was submitted for review on March 30, 2010, and a first provisional patent application was filed on April 16, 2010 (Exhibit 7 at ¶ 25 of the draft lawsuit). A second application was filed by the IDI's lawyers just before the paper, titled "Highly efficient reprogramming to pluripotency and directed differentiation of human cells with synthetic modified mRNA," was published by the journal Cell Stem Cell on September 30, 2010. Prof. Rossi and Dr. Warren were listed as the joint and sole co-inventors on both applications.

**E. Dr. Warren Quits the IDI and the Parties Argue and Reconcile**

Despite shared excitement over the outcome of the project and the interest it was drawing from those who had an early heads-up on the results, there was friction between Dr. Warren and his supervisor over multiple issues, and Dr. Warren voluntarily resigned his position at the IDI in June 2010. Dr. Warren

never became an employee of BCH. At the behest of the IDI's Office of Technology Development, he executed a form assigning ownership of the first provisional patent to the IDI on August 30, 2010 (Exhibit 4, Exhibit 7 at ¶ 26 of the draft lawsuit). The Plaintiff first learned that Prof. Rossi had founded a company on the strength of his work from reading the "Acknowledgments" section of the Cell Stem Cell paper after it went online in September 2010.

Although the IDI did not reach out to offer any specifics, Dr. Warren was generally aware by late 2010 that Moderna was a venture capital-backed "spinout" company founded upon his accomplishments and that, presumably, the Institute either had done or would be doing some kind of license deal with them from which he might eventually derive income. Indeed, an exclusive license agreement with Moderna for the IP filings co-authored by Dr. Warren and Prof. Rossi was executed in December 2010 (SUMF Ex. 6). The license agreement was between Moderna and the IDI, which remained a legally distinct entity from BCH, and the Institute retained ownership of the IP until the merger in 2012, at which point the Hospital assumed ownership of both the IP itself and of Moderna equity taken in partial consideration for the grant of the license as the Institute's legal successor in interest.

There was tumult as well as anticipation around the mRNA work in the months following Dr. Warren's departure from the Rossi Lab. In a highly unusual development, Cell Stem Cell first accepted and then "unaccepted" the paper describing the research, purportedly due to a communication from an unidentified "whistleblower." This disturbing situation was resolved in a matter of weeks, but an air of intrigue and distrust prevailed with diverse parties apparently maneuvering for advantage.

In February 2011 Ryan Dietz reached out to Dr. Warren to ask him to execute a second assignment, again in favor of the IDI, covering the patent application the IDI had filed in September 2010 (Exhibit 5). Dr. Warren took the occasion to query if there had been a Moderna licensing deal and, if so, whether it involved equity. In responding, Mr. Dietz made execution of the new assignment a precondition for sharing details of the Moderna deal. An increasingly wary Dr. Warren balked at this stipulation and initially declined to sign the assignment. A tug-of-war ensued in which Dr. Warren attempted to elicit basic information about the Moderna deal (notably, whether equity was involved) and

his financial stake as an employee-inventor, while IDI attempted to get him to execute the second assignment. During these exchanges (Exhibit 5) Mr. Dietz confirmed that Dr. Warren would share one third of Net Proceeds from the IP equally with Prof. Rossi in an email which excerpted the revenue-sharing distribution schedule directly from the IDI Policy. This comported with what Dr. Warren had been told by Prof. Rossi during his time at the Institute. However, Mr. Dietz refused Dr. Warren's requests to furnish the full text of the IDI Policy so that he could see (and have on record) exactly what it said about the parties' rights and responsibilities and (of particular concern) the handling of equity consideration, stating that "[t]he IDI policies are not public documents." In a series of exchanges, Mr. Dietz repeatedly underscored that the terms of the IDI Policy bound Dr. Warren.

The matter dragged on unresolved for a few weeks until in March 2011 Dianne McCarthy of the Hospital's Office of General Counsel, acting on behalf of the IDI, sent Dr. Warren a letter demanding his cooperation (SUMF Ex. 5) and providing a complete copy of the 2004 IDI "Research and Technology Policy," which Ms. McCarthy cited as the controlling authority regarding his obligations and his rights to receive a share of revenues. Dr. Warren emailed her asking for further clarification on the legal status of the policy document. Ms. McCarthy's reply was unenlightening and the impasse continued (Exhibit 6). In April, Dr. Warren got an email from IDI's outside counsel at Nixon Peabody, again stressing that he was obliged by the IDI's Research and Technology Development Policy to execute the assignment and with a draft lawsuit against Dr. Warren attached (Exhibit 7). The first count of the threatened suit was for "BREACH OF CONTRACT: Breach of Development Policy," thus asserting that the IDI Policy had the force of contract and was controlling with respect to Dr. Warren's obligations and rights in regards the licensing of his inventive work. (The Nixon Peabody email and the draft lawsuit are elided in the narrative presented in the Defendant' memorandum.) After reviewing the issues with his lawyer and satisfied to have in his hands at last the full text of the IDI Policy and affirmation of the contractual status of the bargain offered therein, Dr. Warren willingly executed follow-on assignments proffered him by Nixon Peabody in April 2011. He fully and promptly cooperated with all of the multiple subsequent requests for assistance in the prosecution of the IP which he received in the years following.

**F.  Dr. Warren Learns of a "Haircut" to His Share of Moderna Revenue**

Dr. Warren received his first payment stemming from the Moderna license deal from BCH in September 2015. The check was accompanied by a terse, spreadsheet-like statement showing some of the computations involved in figuring the amounts distributed (Exhibit 8). The rationale for these calculations was not explained and was unclear to Dr. Warren. It was apparent that another institution, the Harvard Stem Cell Institute (HSCI), received 10% of the licensing proceeds "off the top." Dr. Warren speculated this might relate to their having provided financial support for the mRNA reprogramming work. (The HSCI arrangement is not in controversy here.) Beyond that, it seemed Dr. Warren's share of the 90% of proceeds which flowed to BCH was actually slightly higher than the IDI had promised: half of 35% instead of half of 33⅓%. Looking at the spreadsheet, it was noteworthy that Dr. Warren's percentage share was lower than Prof. Rossi's. However, Dr. Warren's view was that, so long as BCH was paying him at least what IDI had promised—which he assumed they would consider themselves legally bound to do—there could hardly be any basis to complain or dispute their apportionment of the revenue.

In August 2017 Dr. Warren decided to reach out to Ryan Dietz, who now held the position of Senior Licensing Manager at BCH's Technology & Innovation Development Office, to ask once more about the Moderna agreement, sparking a series of exchanges that continued into November (Exhibit 9). This move was prompted in part by press reports suggesting a Moderna IPO might be in the offing. Dr. Warren was still in the dark about whether the license deal had involved equity. Also, Dr. Warren had run into former colleagues from the Rossi Lab while at a scientific meeting in Boston in June 2017 and was told that Prof. Rossi was winding down his lab at BCH. This was surprising news and raised concerns that something might be amiss in the relationship between Prof. Rossi and his new employer, giving Dr. Warren another reason to "check in" on his interest at BCH.

During an initial phone call with Mr. Dietz on August 4, 2017, Dr. Warren was informed for the first time that the Moderna deal had involved equity. Mr. Dietz said it could be anticipated that "tens of millions of dollars" would be distributed if Moderna underwent an IPO or buyout. Mr. Dietz sounded encouraging about the possibility of disclosing more specifics such as the size of the equity stake and the

product royalty terms but said he would have to inquire first.

Mr. Dietz shifted the discussion to what he called an "administrative matter." This turned out to be an *ad hoc* royalty distribution agreement which he had been working on, whereby parties owed percentages of the BCH licensing revenue from Moderna would mutually agree a revised formula for calculating the distributions. Mr. Dietz informed Dr. Warren that he (Mr. Dietz) had been operating under a misapprehension during the transition period between the 2009 IDI-BCH affiliation and the 2012 IDI-BCH merger. He explained that an analysis by BCH's lawyers had concluded that by dint of the 2009 agreement the IDI's management had promised BCH to adopt its 1992 "Children's Hospital Policy on Inventions and Intellectual Property" for any IP licensed after the affiliation came into effect.

Under the BCH policy of 1992 (SUMF Ex. 9) the Inventors' Share is higher than at the IDI for cash-based licensing revenue while the cumulative net revenue is under $500K, with inventors who stay at the institution getting better treatment in this bracket. Above the $500K threshold all listed co-inventors share equally, but the overall Inventor's Share falls to 25%—significantly less than the one third share called for in the IDI Policy. Also, while the IDI Policy prescribes that one third of revenues go to the lab of the PI on the licensed technology (if still active at the Institute), the 1992 BCH Policy has no "Lab Share" at all. For example, if $100M comes in from a license, the institutional share is about $33M under the IDI formula and $75M under the BCH formula, and the Hospital gets to keep an additional $42M under BCH rules ($33M that would have gone to the lab and $9M that would have gone to the inventors).

There are also important differences between the promises made regarding the Inventor's Share of equity-derived licensing consideration under the two policies. Page 10 of the IDI Development Policy straightforwardly directs that "the Inventor's share of equity taken as a royalty shall be distributed to Inventors at the earliest opportunity following receipt." The handling of equity in the BCH Policy is addressed in the 1993 amendment to the Policy, which states in part:

> Consistent with the Guidelines, the ownership, management and disposition of such equity shall be within the sole discretion of the Hospital. In the event the Hospital decides to sell such equity or to permit an inventor to own directly such equity, the cash proceeds or share of stock, as appropriate, will be distributed to the inventor as follows:

- 25% to the Inventor
- 25% to the Inventor's Department
- 40% to the Hospital
- 10% to the Office of Research Administration

In essence, the Policy says that if and when BCH decides to liquidate equity it should distribute 25% of the proceeds to inventors, but it also countenances the distribution of 25% of equity directly to inventors as an alternative way of paying them their share. The latter "Inventor's option" is discussed in more depth in the non-public "Guidelines" on equity management referred to in the 1993 Amendment to the Policy (Exhibit 11). However, there is no promise to inventors that the Hospital will either liquidate its equity or directly distribute equity according to any objectively defined circumstances or timeline.

The *ad hoc* split agreement letter proffered for Dr. Warren's signature in 2017 provides for a flat 27.5% Inventor's Share and a 7.5% Lab Share and, like the BCH Policy, makes no promises as to how or when "equity value" will be distributed.[2] After several exchanges, Dr. Warren told Mr. Dietz that he was unwilling to sign off on the *ad hoc* agreement because he believed he would be forfeiting his right to challenge what appeared to him a clear breach of contract. Mr. Dietz responded by offering to have a BCH lawyer reach out to explain why the changes were in fact justified. In the event, no such follow-up from BCH's legal department occurred. With some difficulty, Dr. Warren was able to coax Mr. Dietz into offering a slightly more detailed but still unconvincing rationale for the Hospital's repudiation of the IDI's promises to the Plaintiff. According to Mr. Dietz, BCH's in-house review concluded that, as the IDI-Moderna agreement post-dated the Affiliation Agreement and the IDI Policy included language giving management scope to amend the policy, the revenue-sharing terms in the BCH Policy represented true IDI policy at the time of the license agreement, not those in the 2004 IDI Policy document (Exhibit 9). Mr. Dietz now flatly refused to offer details of the Moderna licensing deal, citing "policy." Given this impasse and the stakes involved due to Moderna's multibillion-dollar valuation, Dr. Warren felt he had no choice but to bring the matter before a court of law and filed the instant suit in Massachusetts District

---

[2] The agreement letter proffered by Ryan Dietz in August 2017 was dated January 22, 2017. It was unsigned but the percentages were the same as in the partially-executed November 13, 2017 letter (SUMF Ex. 8.)

Court in December 2017. (Compl., ECF 1).

**G. Moderna Goes Public in December 2018**

At the time this suit was filed Moderna remained private and its stock was therefore illiquid for practical purposes. Moderna went public on NASDAQ, trading as $MRNA, on December 7, 2018. The shares held by the Hospital are subject to the 180-day post-IPO lockup period and will become liquid when the lockup expires in June. The $MRNA share price at liquidity remains to be seen, but the IDI's stake would have a value of at least ~$50M at the IPO Offering Price set by the underwriters[3].

<u>ARGUMENT</u>

**H. Contrary to the Defendant's memorandum, the Hospital has not treated Dr. Warren fairly in respect to the *ad hoc* policy, and the representations therein regarding the controversy over the *ad hoc* policy are tendentious and misleading.**

Reading the Defendant's memo, one might easily get the impression that the Hospital came up with the 2017 *ad hoc* distribution policy primarily to address perceived inequality and unfairness in the treatment of Dr. Warren relative to Prof. Rossi under the 1992 BCH Policy. The real story is quite different. Dr. Warren was not consulted on the creation of the *ad hoc* policy but was rather presented with it in 2017 as a fait accompli. As discussed above, Dr. Warren never raised concern over unequal treatment relative to Prof. Rossi in the early distributions, being content with the fact that, based on the limited information provided in the statements he received in the 2015-2017 period, BCH appeared not to be in violation of IDI's promises regarding his percentage. BCH, like the IDI before them, omitted to disclose to Dr. Warren that there was a high-value equity component before devising the *ad hoc* policy, preventing him from recognizing that a substantial, unilateral "haircut" to his share of the income was in the works before offering him a slightly less offensive haircut through the *ad hoc* policy. In keeping with the general

_____

[3] Exhibit 10 documents the equity received by the IDI. The estimate of $50M is based on the number of Common Units specified on the October 7, 2013 certificate, making the conservative assumption the Common Stock certificates shown in the exhibit correspond to the same underlying stake rather than additional equity. The 9.9935 common stock for common unit conversion pursuant to the company's 2016 Reorganization and 2.18 reverse stock split of November 27, 2018 described in Moderna's S-1/A filing with the SEC of December 4, 2018 are applied to get the number of shares at the IPO, and the Offering Price of $23 per share is taken from Moderna's 424B4 filing.

pattern of information hiding, the IDI flouted its own standards regarding the ethical handling of licensee equity (SUMF Ex. 3 at <u>Receipt of Equity</u> on p. 10 of the Policy) by failing to publicly disclose it had taken a stake in Moderna while BCH violated similarly strong provisions in the "Guidelines" referenced in the 1992 Policy (SUMF Ex. 9 at p. 4 of the Policy, Exhibit 11 at <u>Disclosure</u>). This seems all the more problematic given that Dr. Robert Langer, a member of BCH's senior management (Exhibit 12), received a significant equity stake in Moderna. (The company's S-1/A SEC filing of December 4, 2018 disclosed Dr. Langer's 3.6% post-IPO stake, worth over a quarter of a billion dollars at the IPO Offering Price.)

In fact, any equalization in the payments due Dr. Warren and Prof. Rossi under the *ad hoc* policy relative to the 1992 BCH Policy will affect only a miniscule fraction of the distributions to the inventors, owing to the fact that the anticipated equity revenue is (and has been for several years, given Moderna's well-known "unicorn" status) about two orders of magnitude higher than the $500K threshold built into the 1992 BCH Policy, above which all inventors would be treated equally anyway.

In reality, as Dr. Warren learned in 2017 from speaking to his former supervisor, the main driver for the institution of an *ad hoc* policy was pushback from Prof. Rossi over the fact that IDI's prescribed "Lab Share" (worth ~$15M at the IPO Offering Price) disappeared completely under the BCH Policy. It seems likely that Prof. Rossi received a substantial founders equity stake in Moderna as one of its three scientific co-founders, probably of similar magnitude to that of his co-founder Dr. Langer, and thus the issue of whether the Inventor's Share of license revenues is 25%, 27.5% or 33⅓% is to him marginal next to the question of the Lab Share. Indeed, that was Dr. Warren's takeaway from their exchanges in 2017. Also noteworthy is that the drawdown of Prof. Rossi's lab—which first raised alarms for Dr. Warren in 2017—was still effective last year (per an email exchange between Dr. Warren and Prof. Rossi in August 2018), that a press release from Convelo Therapeutics, a Cleveland-based startup of which Prof. Rossi is CEO, refers to his Boston appointments in the past tense (Exhibit 13) and that internal BCH communications produced in discovery show Prof. Rossi pointedly raising the issue of the Lab Share in the context of discussing his contemplated shutdown of his lab at the Hospital (Exhibit 14).

Thus, the impression created by the Defendant's memorandum that the Plaintiff is a lone

malcontent here is more than slightly deceptive. And, in contrast to Prof. Rossi, who at least became a Hospital employee, Dr. Warren has no other leverage to pursue his complaint than to bring it for adjudication before a court of law.

**I.  Contrary to the Defendant's memorandum, it is not obvious that the timing of the invention's conception, reporting and reduction to practice is irrelevant to the resolution of the case.**

If the court finds that that the IDI policies were the basis of a bilateral contract which Dr. Warren accepted as a result of signing the Participation Agreement—as the IDI represented to BCH he and all other current employees did within the Affiliation Agreement (SUMF Ex. 7 at ¶ 2.9.2)—or simply by showing up for work, then the timeline of his inventive work may indeed be irrelevant as his acceptance of the terms offered in the Policy occurred before he even conceived the invention. If, alternatively, the court finds that the IDI inventions policy was a unilateral contract pertaining specifically to actual employee-inventors with acceptance by performance, the timing of the invention could be relevant as the prevailing view is that in such cases the acceptor obtains an option contract locking in the terms either by beginning performance—*Restatement (Second) of Contracts § 45 (1981)*—or through some "substantial performance." *Cook v. Coldwell Banker/ Frank Laiben Realty Co.*, 967 S.W.2d 654 (Mo. Ct. App. 1998).

With respect to the timing of the invention, the Director of IDI's Office of Technology Development, Ryan Dietz, was briefed on Dr. Warren's invention by Prof. Rossi in August 2008 (Exhibit 3). In filings to the USPTO, BCH asserted its conception occurred no later than June 2008, referencing Dr. Warren's lab notebooks (Exhibit 15 and Exhibit 2 at notebook p. 3-74). In addition, although a full reduction to practice was not attained until late 2009, Dr. Warren had already identified innate immune responses as the key roadblock to that reduction to practice and conceived, tested and demonstrated the utility of modified RNA as a way around this problem several months before the IDI-BCH Affiliation Agreement became effective in February 2009 (Exhibit 2 at p. 6-29 of the lab notebook).

**J.  Contrary to the Defendant's memorandum, boilerplate language regarding the mutability of the IDI Policy does not render it an illusory contract, while a deeper consideration of the aims of the Policy argues against affording BCH any benefit of the doubt in regard to such a claim.**

An "illusory contract" is an agreement that looks at first sight like a real, legally-binding contract, but on closer examination fails to satisfy the basic requirement that a contract must incorporate a bargain involving a mutual exchange of consideration or forbearances because at least one of the parties does not really promise anything at all. For example, if A promises B that he <u>might</u> give B $1000 in return for the title to B's car, that is an illusory contract. The Defendant's memorandum claims it is obvious and beyond contention that the 2004 IDI Research and Technology Policy is only an illusory contract because of the following sentence which appears in the preamble to the document ("A. PURPOSE"):

The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes.

On the Defendant's theory, then, the IDI Policy offers not a bargain but rather a descriptive snapshot of management sentiment on a particular day in 2004 as to what kind of language might induce employee effort, cooperation, retention (and so on), e.g., the throwing out of a suggestion that a 1/3rd share of licensing proceeds will be distributed to cooperating employee inventors. Given the notion of "illusory contract" invites abuses that would be corrosive to civil society based on the creative use of equivocation or actual or functional "fine print" disclaimers, and that a general principle of contract law is that courts should err on the side of enforcing contracts, courts have traditionally been reluctant to deem promises illusory where there is the appearance of an obligation within an agreement. *See Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214. Looking at the language cited above, which is not even highlighted within the Policy document, it seems doubtful that, properly construed, it renders the very specific promises of consideration in the body of the document illusory. The letter of the statement is in fact perfectly compatible with the idea that any amendment to terms materially affecting the rights of an existing party would only be done in a manner which exempts that party or fairly bargains for their assent (which is in fact possible with any contract). Inasmuch as the sentence is vague boilerplate, it is also subject to the doctrine that ambiguous language in a contract should be interpreted *contra proferentum* in the case of any dispute as to its meaning.

The memorandum's discussion of the general nature of academic revenue sharing policies notes that "better retention" is one of the motivations behind such policies. It is worth bringing out here that a

key element of this "retention" is the retention of staff who have <u>already</u> conceived and started work on commercially promising innovations. Given the potential for higher pay and consulting work in industry, and even the prospect of allying with other parties to start a company and receive founder equity, there would be a strong incentive for postdocs who have promising ideas and findings to "jump ship" and quit low-paying at-will employment positions absent the revenue-sharing arrangements generally offered by their academic employers. Over time, this would entail a substantial loss of licensing income to those academic employers. These effects would be felt more acutely at pure research institutions such as the IDI, as compared to diversified enterprises such as Children's Hospital.

Losses from lower licensing revenue are not the end of the story here. An ecosystem turning out academic "spinout" companies has arisen in the biotech arena which affords professors ample scope to translate the ideas of junior researchers and funding from non-profit and public entities into substantial private fortunes through the receipt of founder equity in venture capital-backed startups. The burgeoning opportunities to cash in on academic appointments enhance the abilities of the institutions to attract talent in a virtuous cycle. This entire ecosystem would be undermined if low-paid innovators at the base of the system were not induced to finish commercially-promising work in the same labs in which they started.

The foregoing context is pertinent to the question of whether specific, detailed revenue-sharing terms laid out in academic invention "policies" should properly be construed as non-binding, illusory promises or whether they represent binding offers of consideration to employee-inventors who reduce their ideas to practice in-house and cooperate in the securing of institutional IP rights for the same.

**K.  Contrary to the Defendant's memorandum, promises in employee handbooks have been ruled to have contractual effect in the absence of clear, unambiguous language disclaiming this intent.**

The IDI's invention policy sets out in specific terms the cooperation the institution demands of its employees to enable it to generate licensing revenues from the Institute's core scientific research and innovation activities while spelling out in equally concrete terms the consideration offered to incentivize this cooperation. The trend in Massachusetts case law for some years has been to accord contractual status to apparent promises found in employee handbooks, even made in regard to what might reasonably be

considered purely administrative questions such as disciplinary procedures, unless the employer goes out of its way to disclaim binding intent and specifically draws the employees' attention to such disclaimers.[4] *See Ferguson v. Host International, Inc*., 53 Mass App. Ct., 96 (2001).The aim is to prevent employers from abusively "having their cake and eating it" by dangling rewards for efforts and forbearances on the part of employees which they can back away from after having reaped the benefits of the induced behavior. *See O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 692-93 (1996).

**L. Contrary to the Defendant's memorandum, if the IDI policy is a contract, the boilerplate language therein regarding the possibility the policy might be changed did not give the IDI the right to unilaterally alter consideration it had already promised to employee-inventors.**

As a general principle of contract law, if a contract allows for one party to unilaterally change the consideration offered in the bargain after the other party has accepted, the rules governing such variation must be specified in reference to some objective, external factor or metric outside the parties' control, for example the Prime Rate or the price of a barrel of oil. The language in the IDI Policy regarding the Board's right to amend is vague boilerplate which does not provide a basis for the institution to vary the Inventor's Share of revenue without notice after the inventor has accepted the contract. Moreover, the IDI Participation Agreement specifically calls prospective inventors' attention to the distribution schedule in Section H of the Policy, underscoring the definite and specific character of the consideration on offer:

> Distribution Policy. I have read and understood the Distribution of Net Proceeds mentioned in the IDI's "Research and Technology Development Policy."

**M. Contrary to the Defendant's memorandum, even if the Court finds that the IDI-BCH Affiliation Agreement altered the IDI's policies and they had the right to unilaterally make such a change, the promises regarding IDI employee consideration would be unaffected.**

With respect to the effective policy at IDI at the time the Moderna License was executed in 2010, the Defendant claims that by language in a clause within the 2009 Affiliation Agreement, the IDI

---

[4] Reviewed in *Employee Handbooks in Massachusetts: Benefits, Pitfalls and Preserving At-Will Employment* by Tamsin R. Kaplan (presenter and author), Massachusetts Continuing Legal Education, 2010, available at http://www.davismalm.com/1BE153/assets/files/News/KaplanEmployeeHandbooksinMass.pdf.

committed itself to making inventions licensed after the Affiliation subject to the Hospital's policies regarding IP, which they equate with the Amended 1992 BCH Policy. It is the Defendant's position that the head of the IDI's tech transfer office, the IDI's counsel at Nixon Peabody and BCH's Office of General Counsel were all simply mistaken when more than two years after the affiliation they advised the Plaintiff, in response to his pointed queries regarding his rights and obligations with respect to the technology licensed to Moderna, that these were set out in the 2004 IDI Policy document, while making no mention at all of the 1992 BCH Policy. Even if we accept that this was all disinterested human error arising from poor communication or a cavalier, "anything goes" approach to such matters by the institutions' management, administrators and counsel that would not, of course, prove the IDI Board had any right to abrogate specific promises made to employees by adopting a policy with different promises. Parties makes mutually contradictory promises to different counterparties in contracts all the time and, when they do, their liabilities multiply accordingly and they may end up in court, as in the instant case.

Even if one were to accept that the management had the right to override their earlier promises to employee-inventors, there is still no evidence that they did so. What matters here is the specific offers made to inventors in return for their effort and cooperation—the law has little to say about "policies" as such. The 1992 BCH Policy is explicit that it specifies only the consideration to be paid to Children's own employee-inventors. Dr. Warren was never an employee of Children's having left long before the 2012 merger. Insofar as the BCH Policy says anything about the payments to be made to employee-inventors at collaborating institutions it only suggests—reasonably enough—that they be paid according to the respective institution's inventions policy (SUMF Ex. 9):

> This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

There is nothing in the language of the Affiliation Agreement about retiring the IDI Policy. Thus, even on the most Defendant-friendly interpretation of the facts and law, the operative promises regarding revenue sharing applicable to Dr. Warren are those found within the 2004 IDI Development Policy—a

conclusion which also has the virtue of living in perfect harmony with basic principles of contract law.

**N.  Contrary to the Defendant's memorandum, it is not necessary to prove that contract terms have been read by a counterparty or relied upon to establish breach of contract.**

The memorandum states as fact that Dr. Warren has testified that he never read the IDI Policy while at the Institute. In fact, as he stated in the deposition, he recalls being told of the specified 1/3rd Inventor's Share verbally by his supervisor but simply has no recollection of whether he ever perused the IDI Policy document during the years he worked at the Institute (SUMF Ex. 1 at 75:15-76:13). The IDI itself claimed the Policy was shown to new hires at Orientation as a matter of standard practice and was posted on the IDI employee intranet (Exhibit 7 at ¶ 12 and ¶ 14 of the draft lawsuit), and they represented to BCH in the 2009 Affiliation Agreement that all current employees had signed the Participation Agreement (SUMF Ex. 7 at ¶ 2.9.2). In any case, this question is not relevant to whether a breach of contract has occurred. In most contractual interactions which occur in our society where there is a written contract, one of the parties does not read the full text of the contract. For example, one might buy a car without examining the warranty terms at the time of sale. If the car's engine blows up after 4 years, the parties' legal rights and duties are different according to whether the sales contract specifies a 3-year warranty or 5-year warranty, whether or not the buyer was aware of those terms before the purchase.

**O.  Contrary to the Defendant's memorandum, it is by no means clear that arguments based on estoppel or reliance are moot and inapplicable in this dispute or that Dr. Warren's alleged knowledge of his duty to assign must inevitably relieve the Defendant from liability arising from the IDI's later-disavowed assertions of 2011 regarding their obligations to the Plaintiff.**

The memorandum strives to make the case that the positions taken regarding the binding character of the IDI Policy in 2011 by diverse representatives of BCH and its predecessor in interest and later repudiated by the Hospital cannot now be adduced to establish liability through any claim based on estoppel or reliance should the Court find the Policy was an illusory contract or that it was a contract whose terms with respect to consideration promised Dr. Warren were rightfully varied after acceptance. In other words, even if it seems at first sight that the inconsistency in the Defendant's position has allowed it to take unjust advantage of the Plaintiff by hoodwinking him into giving the Defendant what it

wanted and needed and then double-crossing him on his promised recompense, in law he can have no plausible claim apart from alleging breach of contract.

One rationale here is that there is no reason to believe that Dr. Warren would have withheld the invention assignments had he been told of the "haircut" to his percentage, the backtracking on any firm promise to share equity in a timely fashion and the assertion that any promises made to inventors were illusory and legally unenforceable. In fact, it is reasonable to infer based on the probing character of Dr. Warren's communications back in 2011 that if the IDI had taken BCH's current position then, he would have continued to withhold cooperation on the assignment. It is far from clear what the outcome of such an impasse would have been, and certainly not obvious that his reliance on the representations made to him at the time was without detrimental effect on his prospective income from the Moderna license.

A second line of argument is that, by his own admission, Dr. Warren knew he was required to assign his inventions over to the IDI regardless of any promises regarding revenue-sharing. With respect to the claim that Dr. Warren "knew" he had to execute the assignments because this is "standard practice" at research institutions, and therefore he could not be relying on the Defendant's representations when he chose to execute them, let us recall that *(a)* Dr. Warren was no longer employed at the IDI when the 2011 exchanges occurred, and *(b)* it is clear from his deposition testimony that Dr. Warren understood that such requirements might arise pursuant to an institutional policy and the legal status of any rights and obligations so defined was exactly what his questioning was designed to elicit, clarify and confirm.

**P. Contrary to the Defendant's memorandum, Dr. Warren has never disclaimed a damages remedy in this case and has the right in law to amend his relief request to conform to the evidence should the evidence in the case support such a remedy.**

The memorandum falsely states that Dr. Warren has "disclaimed" a damages remedy in this dispute. The prayer for relief in his complaint did not specify a damages component because there was no way to place a dollar value on the detriments flowing from the reduced Inventor's Share and the failure to deliver equity in kind at "the earliest opportunity" given that, at the time of filing: *(a)* the amount of equity involved was undisclosed; *(b)* the equity was illiquid and without a public market; and *(c)* the

prospective tax treatment-related injury was unquantifiable without detailed information on the timing and character of the Moderna equity transaction. The quoted remarks from Dr. Warren's deposition are not a disclaiming of any damages remedy but rather a description of the state of affairs at the time the deposition was taken. The law recognizes that a change in underlying conditions or available information as a case unfolds can support an amended request for relief "when justice so requires." Fed. R. Civ. P. 15(a). Furthermore, the Plaintiff's original request included asking for "such other relief as the Court deems just and appropriate" and, where it does not prejudice the rights of the defendant, the Court can on its own initiative tailor relief in light of its findings regarding the actual and current circumstances as they relate to injuries alleged by a plaintiff.

If the court finds for the Plaintiff, declaratory relief remains an applicable remedy for addressing the ongoing aspects of the royalty obligation, and some combination of a declaratory judgment and an injunction may still provide the best solution for addressing the injuries arising from the Defendant's failure to distribute stock in kind "at the earliest opportunity" as the IDI Policy promised.

**Q. Contrary to the Defendant's memorandum, the possibility that provisions of IRS Section 1235 might afford capital gains tax treatment for Dr. Warren's distributions does not obviate his claim that the failure to distribute stock as prescribed by the IDI Policy is detrimental.**

After his deposition last November, Dr. Warren independently learned that provisions within IRS Code Section 1235 might allow him to get the benefit of capital gains tax treatment on his Moderna license distributions, regardless of their form (cash or stock) or underlying source (equity vs. product royalties or cash fees, etc.) In order to obtain such treatment, which would greatly reduce the Federal tax burden on his distributions, it would be necessary to take a position with the IRS that the distributions, which the Hospital reports as non-employee compensation on 1099-MISC forms, are properly classified as capital gains distributions stemming from the transfer of intellectual property,[5] and the IRS would have

---

[5] Discussed in *Equity and Tax Matters for Faculty* published online by Johns Hopkins Technology Ventures at https://ventures.jhu.edu/wp-content/uploads/2014/11/equity_and_tax_matters_for_faculty.pdf and *The Taxation and Reporting of Distributions Derived from Licensing Intellectual Property* by Edward J. Jennings in the March/April 2004 issue of *Taxation of Exempts*.

to accept that position. Dr. Warren has recently consulted with two different tax experts to get their views, and in both cases their advice was broadly consistent with the analysis offered in the Defendant's memorandum: there appears to be a strong *prima facie* case for capital gains treatment (especially given the relevant assignments were made before the 2018 tax reform that placed new limits on claiming capital asset treatment on intellectual property), but uncertainty attaches to the outcome due the complexity of the issues involved in the IRS's determination of the application of the law to the facts and circumstances.

By contrast, had the IDI distributed to Dr. Warren his share of Moderna stock back when it was initially received (when the stock still had a very low basis), there is no reason to doubt that he would end up paying capital gains tax rates on the stock's greatly-appreciated value at liquidity, even were that original distribution to be treated as non-employee compensation. The Defendant has not offered any evidence with its motion to show that the stock could not have been distributed on receipt and, again, the IDI Policy promises distribution "at the earliest opportunity." Therefore, given the uncertainty over "Section 1235" treatment (conceded by the Defendant in its own memorandum) the Hospital has failed to show that there can be no case for injury to the Plaintiff arising from the failure to distribute the stock. At minimum, even a simple declaratory judgment ruling that the IDI promises apply could improve the Plaintiff's position in later seeking damages if a "Section 1235"-based tax position were to be rejected.

An important point easily elided here (perhaps usefully, from the Defendant's point of view) is that the IDI Policy promises to distribute equity to its employee-inventors "at the earliest opportunity" while the 1992 BCH Policy makes no such promise regarding equity-based distributions, regardless of their form. Therefore, even if we set aside issues related to taxation and treat stock and its cash equivalent as interchangeable, there is still the matter of the promised timing of the equity-based payout. Clearly, time is of the essence in this as in most contracts. If A agrees to pay B $1000 for a car on the assignment of title and after receiving the car and the title announces he has changed his mind and will pay B only at an indeterminate time of his own choosing, then B surely has a justiciable claim against A.

**R. Contrary to the Defendant's memorandum, the IDI policy does indeed unambiguously promise the distribution of equity taken in consideration for a license to inventors, and (equally**

**relevant) it directs that such distributions be undertaken "at the earliest opportunity."**

The language of the IDI Policy speaks for itself. (SUMF Ex. 3 at p. 10 of the Policy, Exhibit 1 at 28:20-29:10). There is no basis other than casuistry and verbal chicanery for asserting that it carves out a special sub-category of equity received "in lieu of a Licensing Fee" apart from equity not received for a License Fee with only the former being "equity taken as a royalty" and therefore subject to being "distributed to inventors at the earliest opportunity following receipt," nor is there any definition or other verbiage to show that an upfront payment of equity (the only equity arrangement countenanced by the Policy without special dispensation) should be considered distinct from payment of equity "in lieu of a Licensing Fee," nor would the mere existence of cash license fee terms in a license agreement somehow entail that an upfront payment of equity is not itself the payment of equity "in lieu of a Licensing Fee," for the obvious reason that the existence of one licensing fee does not preclude the existence of another.

<u>CONCLUSION</u>

Regarding the Standard of Decision for a motion for summary judgment, as the Defendant notes, the Court "must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (citation omitted). With the record so viewed, the moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). As detailed in this memorandum and in the Reply to the Defendant's Statement of Undisputed Material Facts filed along with it, the Defendant has not come close to meeting this requirement. The Plaintiff therefore respectfully moves the Court to deny the Defendant's motion.

Respectfully submitted,


_____/s/ Luigi Warren_____
Luigi Warren (Pro Se)
202 S. Raymond Ave, #205
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Date: March 8, 2019

## <u>CERTIFICATE OF SERVICE</u>

I, Luigi Warren, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on March 8, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

   /s/ Luigi Warren   
Luigi Warren (Pro Se)