IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

    Plaintiff

vs.

THE CHILDREN'S HOSPITAL
CORPORATION,

    Defendant

Civ. A. No. 17-12472-DLC

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff disputes the following facts in the Statement of Undisputed Material Facts filed with Defendant's motion for summary judgment:[1]

1. Defendant's paragraph 20 is disputed. Dr. Warren did not state in his deposition that he had never seen the IDI Policy until after his employment with IDI ended, only that he had "no recollection" of having seen it at the IDI. It is quite possible he did see the Policy at the IDI given that it was posted on their intranet for employees to peruse and shown to new hires during Orientation as a matter of standard practice and given that all IDI employees executed the associated Participation Agreement according to the 2009 IDI-BCH Affiliation Agreement, which would entail seeing the IDI Policy. (SUMF Ex. 1 at 75:15-76:13, PMOS Ex. 1 at 65:7-20, PMOS Ex. 7 at ¶¶ 12-15 of the draft lawsuit, SUMF Ex. 7 at ¶ 2.9.2 and the employee list at p. 43 of the exhibit).

---

[1] The abbreviation "SUMF" herein refers to the *Defendant's Statement of Undisputed Material Facts* and "PMOS" refers to the *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment*.

1

2. Defendant's paragraph 26 is disputed inasmuch as there is no doubt that Prof. Rossi briefed the IDI's technology transfer office regarding Dr. Warren's invention in August 2008 as this discussion is documented in Ryan Dietz's case notes for the invention. (PMOS Ex. 3).

3. Defendant's paragraphs 30, 32, 51 and 53 are disputed in that there is no evidence to show that BCH's policy on sharing revenues with inventors was adopted at the Effective Time of the Affiliation Agreement in any sense relevant to the issues in this case, i.e., that the IDI adopted the revenue sharing terms for Hospital employees as the applicable terms for the Institute's own employees. The available evidence shows that, to the contrary, the IDI continued to follow the 2004 IDI Policy on revenue sharing terms with respect to its own employee-inventors well after the Affiliation Agreement became effective (into Spring 2011, at least) which is compatible with the provisions of the 1992 BCH Policy in that the latter explicitly states that it regulates payments only to the Hospital's own inventors. (PMOS Ex. 5, SUMF Ex. 5, PMOS Ex. 6, PMOS Ex. 7, SUMF Ex. 9 at page 3 of the BCH policy).

4. Defendant's paragraph 33 is disputed in that the IDI required its inventors to assign their inventions to the Institute and not to the Hospital (as indeed was done for all Dr. Warren's assignments concerning the IP licensed to Moderna). (SUMF Ex. 3 at ¶ 4 of the Participation Agreement on p. 15 of the exhibit, PMOS Ex. 4).

5. Defendant's paragraph 44 is disputed in that Dr. Warren's testimony indicates only that he had, at the time of his deposition in November 2018 (more than seven years after his communications with IDI of 2011 regarding their request for him to execute an assignment), a belief that research institutions generally require invention assignments from employees and establishes nothing about what Dr. Warren "understood" about his actual obligations under the law as an ex-employee of IDI at some unspecified juncture relevant to the current dispute. Indeed, the record of his interactions with IDI in 2011 shows that his ultimate conclusion that he was obligated to execute the assignment was reached only pursuant to his review of the draft lawsuit sent him by the IDI's lawyers which argued that he had a legal duty to assign flowing from the contractual

status of the IDI Development Policy. (SUMF Ex. 1 at 83:12-85:1 and 84:16-22, PMOS Ex. 5, SUMF Ex. 5, PMOS Ex. 6 and PMOS Ex. 7).

6. Defendant's paragraph 45 is disputed. Dr. Warren's first assignment is dated August 30, 2010, which is well after the first application for a patent of April 2010. (PMOS Ex. 4, PMOS Ex. 7 at ¶ 48 of the draft lawsuit).

7. Defendant's paragraph 48 is disputed inasmuch as Mr. Dietz did not respond to Dr. Warren with the "requested language," i.e., the IDI policy document(s), but only with an excerpt from the 2004 IDI Policy relating to the Institute's position regarding assignment, divorced from any context such as the promises on revenue sharing to employee-inventors. (PMOS Ex. 5—see Ryan Dietz email dated March 6, 2011).

8. Defendant's paragraph 54 is disputed to the extent that "after" implies "in response to" with respect to the letter from BCH's general counsel. Dr. Warren replied to Ms. McCarthy's letter by asking for an explanation of the legal status of the IDI Policy and the impasse continued when Ms. McCarthy failed to elaborate in her reply of March 23, 2011. Plaintiff executed the assignment only after receiving an email on April 11, 2011 from the IDI's outside counsel with an attached draft lawsuit which spelled out the IDI's position that the 2004 Development Policy had the force of contract. (SUMF Ex. 1 at 72:2-73:14, PMOS Ex. 6, PMOS Ex. 7 at ¶¶ 38-46).

9. Defendant's paragraph 55 is disputed. To be more precise, Dr. Warren did not say in his deposition testimony that the invention was morally "his," but rather "I feel that the invention is primarily mine, although I certainly don't deny that [Prof. Rossi] had a role in it," nor did he agree that the default 50/50 split was "fair"—whatever that might mean—answering rather, "I don't really know," while also acknowledging that "rank has its privileges" (i.e., "fairness" is not necessarily of overriding concern in regards the split between co-inventors) and that he had never raised any issue with a 50/50 split. (SUMF Ex. 1 at 79:2-22).

10. Defendant's paragraph 56 is disputed. The Hospital has distributed a larger share of revenue to Prof. Rossi to date, as all but the most recent (November 2018) distribution have been done

according to the 1992 BCH Policy schedule, which apportions more revenue to inventors employed at the Hospital at the time of the distribution for cumulative licensing proceeds under $500K. In any case, the question of the co-inventor split is immaterial to this case (or tangential at best) as Dr. Warren's percentage is slightly higher than prescribed by the IDI Policy throughout the sub-$500K band in the 1992 BCH Policy schedule: half of 35% instead of half of 33⅓%. His complaint does not involve any issue of injury or prospective injury stemming from unequal apportionment of licensing revenues between Dr. Warren and Prof. Rossi. (PMOS Ex. 8, SUMF Ex. 3 at p. 9 of the IDI Policy, SUMF Ex. 9 at p. 3 of the BCH Policy, Compl., ECF 1 at 6).

11. Defendant's paragraph 67 is disputed inasmuch as the Plaintiff's request for relief includes "such other relief as the court deems just and appropriate," which could reasonably encompass a damages remedy under now foreseeable circumstances, e.g., if the Moderna equity becomes liquid due to the expiration of the post-IPO lockup or is actually liquidated as a result of its sale by the Hospital or a cash buyout of Moderna before the case is resolved (Compl., ECF 1 at 5).

12. Defendant's paragraph 70 is disputed to the extent it elides the time element in the IDI's promise to distribute stock "at the earliest opportunity following receipt," i.e., even if equity and cash proceeds from liquidated equity were absolutely equivalent from a tax treatment standpoint, a promise to distribute equity value at a time of the institution's choosing is materially different from one to deliver equity "at the earliest opportunity following receipt." (SUMF Ex. 3 at p. 10 of the IDI policy, SUMF Ex. 9 at p. 4 of the BCH Policy.)

PLAINTIFF'S OWN STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff states that the following facts are undisputed:

A. The IDI Policy

1. While BCH's mission encompasses patient treatment as well as scientific research, the IDI was purely a research-oriented institution. (PMOS Ex. 1, 25:14-27:5).

2. The 2004 IDI Research and Technology Development Policy (the "IDI Policy") was shown to the IDI's new hires as a matter of standard practice. (PMOS Ex. 1 at 65:7-20 and 148:4-12, PMOS Ex. 7 at ¶¶ 13-14 of the draft lawsuit).

3. The IDI Policy was posted on the IDI's intranet for employee perusal. (PMOS Ex. 1 at 148:4-15, PMOS Ex. 7 at ¶¶ 12 of the draft lawsuit).

4. The IDI obtained executed copies of the Participation Agreement attached to the IDI Policy from its employees as a matter of standard practice. (PMOS Ex. 1 at 65:7-20, SUMF Ex. 7 at ¶ 2.9.2.)

5. The IDI Participation Agreement specifically directs the employee's attention to the revenue sharing terms spelled out within the IDI Policy. (SUMF Ex. 3 at ¶ 11 of the Participation Agreement on p. 17 of the exhibit).

6. The IDI Policy includes no disclaimer of contractual obligation, highlighted or otherwise, with respect to its provisions for revenue sharing with employee-inventors, though it does specifically disclaim that the Participation Agreement constitutes an employment contract. (SUMF Ex. 3 at p. 5 and p. 16 of the exhibit).

7. The language in the IDI Policy indicating that the Policy is subject to amendment appears in the section entitled "A. PURPOSE" at the beginning of the document and is not bolded or otherwise emphasized in any way within the document. (SUMF Ex. 3 at p. 4 of the Policy).

8. The language in the IDI Policy indicating that the Policy is subject to amendment does not assert that amendments can be made without notice or are unlimited in scope. (SUMF Ex. 3 at p. 4 of the Policy).

9. The IDI Policy includes terms that the IDI intended to be legally enforceable, including a requirement to make invention assignments. (SUMF Ex. 3 at ¶ 4 of the Participation Agreement on p. 15 of the exhibit).

10. Nowhere in the IDI Policies is it stated or suggested that they are only intended as a general guide or overview of the Institute's policies and/or benefits. (SUMF Ex. 3).

11. The draft lawsuit sent to Dr. Warren by the IDI's outside counsel in April 2011 in support of their demand for his execution of certain invention assignments explicitly characterizes the IDI Policy as a contract. (PMOS Ex. 7 at ¶ 38-46).

12. Prof. Rossi told Dr. Warren that IDI's employee inventors were promised one-third of licensing proceeds from their work during Dr. Warren's time as a postdoc at the Institute. (SUMF Ex. 1 at 76:18-77:8).

B. The Invention

13. Dr. Warren conceived of the mRNA reprogramming invention no later than June 2008. (PMOS Ex. 2 at lab notebook p. 3-74, PMOS Ex. 15 at p. 2 of the first declaration.)

14. Prof. Rossi briefed Ryan Dietz, the head of the IDI's tech transfer office, about Dr. Warren's conception of the mRNA invention and his research project in August 2008. (PMOS Ex. 3).

15. In the course of reducing his invention to practice, Dr. Warren had recognized the importance of innate immune responses as a barrier to achieving sustained protein expression from synthetic mRNA and had identified and demonstrated the utility of modified mRNA as a countermeasure to address this, including specifically the use of 5-methylcytidine and pseudouridine ($\psi$), by November 2008 (PMOS Ex 2 at lab notebook p. 6-29).

16. Dr. Warren voluntarily ended his employment at the IDI in June of 2010. (PMOS Ex. 7 at ¶ 33).

17. Dr. Warren's first assignment of IP rights relating to the mRNA reprogramming work was made on or about August 30, 2010. (PMOS Ex. 7 at ¶ 26, PMOS Ex. 4).

18. Dr. Warren cooperated with every request for assistance in prosecuting the licensed IP received subsequent to the resolution of his argument with the IDI over the follow-up assignment of 2011. (PMOS Ex. 4, PMOS Ex. 15).

C. Pattern of Non-Disclosure

19. The IDI Policy calls for the IDI to publicly disclose when it has accepted equity in a company in return for the grant of a license. (SUMF Ex. 3 at p. 10 of the Policy under Receipt of Equity).

20. The IDI never disclosed in any public forum that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 29:11-30:7).

21. The IDI never revealed to Dr. Warren that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 30:12-31:19).

22. The "Guidelines" on the management of equity referenced in the 1992 BCH Policy calls for BCH to publicly disclose when it has accepted an equity stake as a result of technology transfer arrangements. (SUMF Ex. 9 at p. 4 of the BCH Policy, PMOS Ex. 11 under Disclosure).

23. BCH never disclosed in any public forum that it had accepted equity from Moderna prior to Dr. Warren's outreach to Ryan Dietz in August 2017. (PMOS Ex. 1 at 31:20-32:19).

24. Moderna had three scientific co-founders, Prof. Rossi, Dr. Robert Langer and Dr. Kenneth Chien. (SUMF Ex. 10 at p. 11 of the exhibit).

25. Dr. Robert Langer is a member of the Hospital's senior management. (PMOS Ex. 12).

26. Dr. Langer has received a significant amount of Moderna equity, equivalent to 3.6% of the shares outstanding after the IPO. See Moderna's S-1/A SEC filing of December 4, 2018 at p. 326. https://www.sec.gov/Archives/edgar/data/1682852/000119312518341958/d611137ds1a.htm

D. The 1992 BCH Policy

27. The 1992 BCH Policy states that it provides only for payments to the Hospital's own inventors. (SUMF Ex. 9 at p. 3 of the BCH Policy).

28. It was public knowledge that Moderna had attained a multibillion-dollar private valuation by January 2015, entailing that the Hospital's Moderna equity alone could reasonably be expected to yield licensing proceeds well into the millions of dollars. See Dan Primack, *The $3 billion startup that wants to help you to make medicines in your own body*, Fortune (January 8, 2015). http://fortune.com/2015/01/08/the-3-billion-startup-that-wants-to-help-you-to-make-medicines-in-your-own-cells/

29. The first payment stemming from the Moderna license received by Dr. Warren was issued by BCH in September 2015. (PMOS Ex. 8).

30. Prior to Dr. Warren's outreach to Ryan Dietz in August 2017, BCH never informed Dr. Warren that they were applying the 1992 BCH Policy to his distributions or that, owing to the tiered structure of the distribution schedule in that policy and the high value of the Moderna equity, this would likely entail a significant reduction in the share of the license income he would receive relative to that specified in the IDI Policy. (PMOS Ex. 1 at 147:9-19).

E. The Ad hoc Policy

31. The primary motivation for instituting the *ad hoc* distribution policy of 2017 was to address Prof. Rossi's dissatisfaction with the fact that the application of the 1992 BCH policy to Moderna distributions eliminated the Lab Share, which comprised 33⅓% of Net Proceeds under the IDI Policy. (PMOS Ex. 9—see Ryan Dietz email dated August 14, 2017, PMOS Ex. 14, SUMF Ex. 3 at p. 9 of the IDI Policy).

32. The secondary motivation for the creation of the *ad hoc* distribution policy was to partially meliorate the anticipated de facto reduction in the Inventor's Share under the 1992 BCH rules relative to the flat 33⅓% share specified in the IDI Policy, given the proceeds reasonably expected to flow from the Moderna equity stake would far exceed the $500,000 threshold at which the Inventor's Share falls to 25% under the 1992 BCH Policy. (PMOS Ex. 9—see Ryan Dietz email dated August 14, 2017, SUMF ¶ 66).

33. Barring a collapse in the value of the Hospital's Moderna stake, any unequal treatment of Dr. Warren relative to Prof. Rossi arising from provisions of the 1992 BCH Policy could never affect more than a few percentage points of the revenue that would ultimately be distributed to them had BCH continued to follow that Policy. (SUMF Ex. 9 at p. 3 of the BCH Policy, SUMF ¶ 66).

34. Under the terms of the 1992 BCH Policy, Dr. Warren's share of licensing proceeds is half of 35% throughout the sub-$500K cumulative revenue band where that policy specifies unequal treatment

of individual inventors based on whether or not they are currently employed at the Hospital, which is slightly higher than the half of 33⅓% provided for in the IDI policy. (SUMF Ex. 3 at p. 9 of the IDI Policy, SUMF Ex. 9 at p. 3 of the BCH Policy).

35. Dr. Warren has never complained to the IDI or BCH or any of their employees or agents about receiving a lower percentage of Moderna licensing proceeds than Dr. Rossi pursuant to the nuances of the 1992 BCH Policy or for any other reason. (SUMF Ex. 1 at 79:2-14).

F. Distribution of Equity Value

36. The 1992 BCH Policy and current *ad hoc* policy make no promises to employee-inventors, whether real or illusory, regarding the timeline or circumstances under which the Hospital will distribute the prescribed 25% Inventor's Share of equity directly to inventors or liquidate its equity holdings and distribute the Inventor's Share of the resulting proceeds. (SUMF Ex. 9 at p. 4 of the BCH Policy, SUMF Ex. 8).

Respectfully submitted,

/s/ Luigi Warren
Luigi Warren (Pro Se)
202 S. Raymond Ave, #205
Pasadena, CA 91105
Tel: (617) 275-1489
luigi.warren@outlook.com

Dated: March 8, 2019

**CERTIFICATE OF SERVICE**

      I, Luigi Warren, hereby certify that, in accordance with Local Rule 5.2(b), the foregoing document was filed through the ECF system on March 8, 2019 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                            /s/ Luigi Warren
                                          Luigi Warren (Pro Se)