UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>        Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL CORPORATION,<br><br>        Defendant | Civ. A. No. 17-12472-DLC |

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

A.    <u>The IDI Policy Is Not A Contract.</u>

Just as the courts regularly hold in cases involving employee handbooks and other policies employers apply to employees-at-will, the IDI Policy was not an enforceable contract. In the main memorandum, we cited *Jackson v. Action for Boston Community Development, Inc.,* 403 Mass. 8 (1988), the seminal case on employee handbook enforceability, for the proposition that the power to amend unilaterally is fatal to a contract claim. We showed that the exception to that principle in *O'Brien v. New England Telephone & Telegraph Co.,* 422 Mass. 686 (1996), cannot apply here, since there is no evidence that Dr. Warren reasonably believed that IDI was making his continued employment contingent on his agreement with the IDI Policy. And we pointed out that the result would be the same using the multi-factor analysis of *Jackson* set forth *in Pearson v. John Hancock Mutual Life Insurance Co.,* 979 F.2d 254 (1st Cir. 1992).

In response, Dr. Warren cites *Wood v. Lucy, Lady Duff-Gordon,* 118 N.E. 214 (N.Y. App. Div. 1917), a classic law school case, for the proposition that courts "traditionally have been reluctant to deem promises illusory where there is the appearance of an obligation within an agreement." But *Wood,* a foreign case, deals with a supposed agreement that contained no

1

express promise rather than with a supposed agreement that contained a unilateral power of amendment. It simply is not on point.

Dr. Warren also cites *Ferguson v. Host International, Inc.,* 53 Mass. App. Ct. 96 (2001), a case that enforced an employee handbook as a contract despite language reserving to the employer the right to modify the handbook. *Ferguson*, though, focuses on the fact that Host, the employer, distributed the handbook to Ferguson, the employee, who signed for it, and led him to believe that its promises were binding. Indeed, the *Ferguson* handbook itself, unlike the IDI Policy, contained language that could justify such a belief: it defined a probationary period of employment in which the employee could be discharged at will and then a progressive discipline system that would apply to non-probationary employees. *Id.* at 99-100. Here, there is nothing similar, and more fundamentally, there is no evidence that Dr. Warren ever saw the policy, so he could not have had the kind of reasonable reliance on its contents that the employee in *Ferguson* was able to show, or that the court in *O'Brien* emphasized. [1]

Courts have applied the factors drawn from *Jackson,* both before and after the *O'Brien* decision, to hold employer policies unenforceable as contracts in similar circumstances. Under

---

[1] In his memorandum, Dr. Warren disputes the Hospital's assertion that he had never seen the IDI Policy until long after his employment with IDI ended. (Pl. SMF at 1, ¶1). Here is the relevant testimony:
    Q.    When do you think the first time is that you saw any portion of the IDI policy, Exhibit—
    A.    This is—
    Q.    Excuse me.
    A.    I don't know if I ever saw this. According to the draft lawsuit, this was on the IDI intranet. So maybe I looked at it there in the two or three years that I was at IDI. But I have no recollection of that.
    Q.    Okay.
    A.    So the first time that I recall seeing this was when—when Diane McCarthy sent me a copy.
    Q.    And you don't recall seeing it during your IDI onboarding process.
    A.    As I said, I don't really recall the onboarding process, so no.
    Q.    Right. So—and it's the kind of thing that you can't say one way or the other?
    A.    Yeah. I certainly can't say whether I ever saw it while I was at IDI.
(Warren Dep. 75:19-76:13). The most Dr. Warren can do is claim that he *ought* to have seen the Policy at the time he joined IDI or that he had the *opportunity* to see it, but this is not evidence that he saw it. And to the extent Dr. Warren wants to argue that the IDI Policy was a contract, and to the extent his knowledge of its contents is relevant to that question, it is his burden to show that he had seen it, not the Hospital's to show that he had not.

the six-factor test, the Court must consider: (1) whether the employer retained the right of unilateral modification; (2) whether there was a "firm commitment concerning the employer's course of conduct;" (3) whether the language was negotiated by the parties; (4) whether the employer called "special attention" to the manual; (5) whether there was evidence that the employee had manifested his assent to the manual's terms; and (6) whether there was a specified term of employment. *Pearson,* 979 F.2d at 256. In this case, all six factors favor unenforceability:

    1.    IDI retained the right to unilateral modification.

    2.    The Policy does not use the language of contractual commitment. Rather, it describes itself as "guide for members of the IDI community" (Warren Ex. 4 at 3), *See Pearson,* 979 F.2d at 256 ("the manual is not couched in language traditionally associated with firm commitments. Rather, it says that it "provides a description" of "personnel policies and procedures").[2]

    3.    The IDI Policy language was not negotiated.

    4.    IDI did not call "special attention" to the Policy.

    5.    There is no evidence that Dr. Warren assented to the Policy (or even knew about the Policy, beyond what he says he heard from Dr. Rossi).[3]

---

[2] Thus Dr. Warren's assertion that "Nowhere in the IDI Policies is it stated or suggested that they are only intended as a general guide or overview of the Institute's policies and/or benefits" (Pl. SMF at 5, ¶ 10) is incorrect.

[3] Dr. Warren asserts that "Prof. Rossi told Dr. Warren that IDI's employee inventors were promised one-third of the licensing proceeds." (Pl. SMF at 6, ¶12) Dr. Warren overstates his own testimony: he did not testify that Dr. Rossi told him about a "promise;" rather, he testified Dr. Rossi told him that the inventors were to share one-third of the proceeds. (Warren Dep. 68:23). More fundamentally, the fact that Dr. Rossi—a fellow employee—told him about the share inventors were to get cannot be attributed to IDI or be treated as a promise by IDI. In order for statements of an employee to be attributable to an employer, the declarant must have had actual or at least apparent authority to speak on behalf of the employer. *Rodowicz v. MA Mutual Life Ins.,* 192 F.3d 162 (1st Cir. 1999) (citations omitted). Finally, Dr. Rossi's statement to Dr. Warren is inadmissible hearsay, if offered for the truth of the matter asserted. And Dr. Rossi's statement is irrelevant if offered for any other purpose.

6. There was no specified term of employment.

In *Pearson*, where only four factors weighed against enforceability, the court found the plaintiff in a "much deeper hole." *Pearson,* 979 F.2d at 257. *See also McMillan v. Massachusetts Soc'y for Prevention of Cruelty To Animals,* 140 F.3d 288, 310 (1st Cir. 1998) (finding policy unenforceable because the terms were not negotiated, there was no evidence of employee signature, the manual was described as a guideline, and there was no evidence the employee reasonable expected the employer to be bound); *Bryant v. Kindred Hosps. E. LLC,* No. CV 07-12139-PBS, 2008 WL 11389202, at *3 (D. Mass. Aug. 6, 2008) (finding handbook unenforceable where first two factors favored unenforceability).

The aim of the *Pearson* factors is to allow a court to determine whether "an employee could reasonably have believed that the employment manuals he or she was given constituted the terms or conditions of employment, equally binding on employee and employer." *Hinchey v. NYNEX Corp.,* 144 F.3d 134, 141 (1st Cir. 1998), citing *O'Brien.* The "first issue," then, is to determine whether it was objectively reasonable for the employee to believe the terms of the manual comprised mutually binding contractual obligations. *Id.* Because Dr. Warren has no recollection of seeing the Policy, he could not have had *any* belief as to the binding effect of the policy, much less an objectively reasonable belief. Furthermore, even if Dr. Warren signed the Participation Agreement—and there is no evidence that he did—the Participation Agreement could not have given him a reasonable belief that the IDI Policy contained mutually binding contractual obligations. As explained below, the Participation Agreement specifically set forth the employee's obligations, which were conditions of continued employment, but it did not set forth reciprocal obligations for the employer, and it specifically included a disclaimer that the Participation Agreement was not an employment contract.

4

B.  The Participation Agreement Does Not Help Dr. Warren's Claim, And There Is No Evidence He Signed One In Any Case.

Dr. Warren is correct to say that IDI generally entered into Participation Agreements with its scientists. He seems to claim that he signed a Participation Agreement, but without even offering an affidavit to support the claim. The Hospital did not reference the Participation Agreement in its opening memorandum because neither the Hospital nor Dr. Warren could even possibly assert as an undisputed fact that Dr. Warren signed one:

Q. Well, do you believe that you signed a Participation Agreement?

A. I have no belief about it. I just don't know.

(Warren Dep. 85:22-24).

But supposing that Dr. Warren *had* signed a Participation Agreement, the Hospital's motion would be unaffected. The Participation Agreement outlines the *employee's* obligations, but it does not provide that IDI had binding obligations to the employee—the requirements in the participation agreement were simply conditions of the employee's continued employment at will. The consideration for the agreement is simply the employee's "employment by … Immune Disease Institute (IDI) and/or being afforded an opportunity to work on projects being carried out by IDI, or substantive use of IDI resources." (Warren Ex. 4 at 14). Indeed, the participation agreement expressly states that it does not constitute an employment contract. (*Id.* at 15, ¶ 7).[4]

To be sure, the Participation Agreement includes a provision in which the employee represents that he has read and understood the IDI Policy and "agree[s] to comply with those policies, as amended by the appropriate authorized governing committee or board." (Warren Ex.

---

[4] Dr. Warren says that the *IDI Policy* includes no disclaimer of contractual obligations "with respect to its provisions for revenue sharing." (Pl. SMF at 5, ¶6) But it is unreasonable to construe the disclaimer in the Participation Agreement so narrowly that it excludes the IDI Policy, which the Participation Agreement references. The reasonable interpretation of the disclaimer is that the employee is an at-will employee, and that the guidelines and policies—including the revenue sharing policies—do not form an employment contract.

4 at 14). This language proves the Hospital's point: it refers to the IDI Policy *as amended.* Moreover, it refers only to the *employee's* obligation to comply with the policy, not any obligation of IDI. In contrast to the ten provisions that expressly impose obligations on the employee with words like "I shall," or "I agree" (Warren Ex. 4 at 14-17), the sole reference to the distribution schedule in the IDI Policy is merely an acknowledgment that the employee has read the schedule "mentioned" in the IDI Policy. (*Id.* at 16, ¶ 11).

But in any case, there is no evidence that Dr. Warren signed the participation agreement.[5] Dr. Warren suggests that IDI's representation to the Hospital, at the time of the Affiliation Agreement, that IDI's employees (presumably including Dr. Warren) had signed participation agreements is evidence that he had signed such an agreement. But that representation was not a statement made *by* the Hospital; it was a statement made *to* the Hospital, at a time when IDI and the Hospital were negotiating at arm's length. So it is hardly a statement of a party-opponent that could be admitted in evidence *against* the Hospital to show that Dr. Warren had in fact signed the agreement.

C. <u>IDI Amended Its Policy.</u>

Dr. Warren focuses most of his energy on arguing that the IDI Policy was a contract. But even if it were, IDI exercised its unilateral power of amendment at the time of the Affiliation Agreement. (Dietz Decl. ¶ 5). There is no evidence to the contrary. Dr. Warren says he disputes this fact (Pl. SMF at 2, ¶ 3), but the evidence—the provision of the Affiliation Agreement providing for the policy change (SUMF ¶ 29) and the declaration of Ryan Dietz stating that IDI made the change as the Agreement provided (Dietz Decl. ¶ 5)—is clear and unrebutted. Dr. Warren points to the communications from Mr. Dietz and the Hospital's counsel which

---

[5] To be clear, the Hospital is not affirmatively asserting that Dr. Warren did not sign a Participation Agreement. It is asserting that Dr. Warren has pointed to no evidence to support his assertion that he did.

6

erroneously pointed to the IDI Policy's revenue sharing schedule as evidence that IDI did not adopt the BCH schedule. Although the IDI Policy had been replaced by the BCH Policy, Mr. Dietz and the Hospital's counsel mistakenly referenced the IDI Policy's revenue sharing terms.[6] But a reference to the wrong policy is not evidence that the BCH Policy was never adopted.[7] Indeed, all distributions that the Hospital has made to Dr. Warren have followed the terms of the BCH Policy, not the IDI Policy. (PMOS Ex. 8; Pl. SMF at 3-4, ¶ 10) It is Dr. Warren's burden to come forward with evidence to rebut the evidence that IDI adopted the BCH Policy, and his failure to do so is dispositive. *See Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (nonmovant must demonstrate, "through submissions of evidentiary quality, that a trialworthy issue persists;" on issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion) (citations omitted).

Dr. Warren claims that IDI's unilateral power to modify the IDI Policy does not mean what it says because it is "vague boilerplate" and does not provide an objective metric to limit the power to amend. (Mem. at 12, 14). Dr. Warren cites no authority for the claim that a unilateral right of amendment must be limited. Instead, Dr. Warren asks the Court to construe the unambiguous unilateral right to amend as a right to amend, subject to negotiation with affected employees. Again, there is no authority for this proposition. Dr. Warren argues that ambiguity must be resolved *contra proferentem* in cases of disputed meaning. (Mem. at 12). But there can be no dispute about the plain meaning of the sentence: "The Trustees retain the discretion to amend this Policy from time to time to fulfill these purposes." (Warren Ex. 3 at 4). Furthermore,

---

[6] Dr. Warren takes issue with the Hospital's assertion (SUMF ¶ 7) that Mr. Dietz responded to his request with the "requested language." (Pl. SMF at 3, ¶ 7) But the e-mails reveal just that: Mr. Dietz requested execution of the assignment, and he reminded Dr. Warren that he remained obligated to comply "by the policies" of his employment with IDI. (PMOS Ex. 5 at 19). Dr. Warren then requested copies of the documents containing those "policies of employment" referenced in Mr. Dietz's email. (Id. at 18).
[7] Dr. Warren also states that prior to August 2017, BCH never reached out to inform him that it had begun to apply the BCH Policy. (Pl. SMF at 8, ¶ 30) This is irrelevant even if true.

7

the Participation Agreement specifically acknowledges that the employee agrees to comply with the Policy "as amended by the appropriate authorized governing committee or board." (Warren Ex. 4 at 14 ¶ 1) *Contra proferentem* is a doctrine of last resort, and it has no application here, where the language is unambiguous. *Sentinel Prod. Corp. v. Scriptoria, N.V.,* 124 F. Supp. 2d 115, 117 (D. Mass. 2000).

D.  The Hospital's Policy Could And Did Apply To Dr. Warren.

Dr. Warren argues that the BCH Policy could not apply to anyone other than the Hospital's own employees, citing the following provision in the BCH policy:

> This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

(Mem. at 15; SUMF Ex. 9)

But the Hospital's policy is just that: a policy. The Hospital has no obligation to apply it to anyone, and no one who enjoys the benefits of the policy has grounds to complain that the Hospital is applying the policy to him or her contrary to the policy's language. The Affiliation Agreement between IDI and BCH provided unambiguously that the BCH policy applied to all intellectual property rights not previously licensed at the Effective Time:

> All IDI Intellectual Property Rights not previously licensed as of the Effective Time shall at the Effective Time be subject to the policies and procedures established by CMCC with respect to intellectual property of CMCC and/or its affiliates, as the same may be amended from time to time; provided, however, that this section shall not apply to any IDI Intellectual Property Rights subject to the GSK Agreement.

(Warren Ex. 15 at 25).

Because the Affiliation Agreement provided that the Hospital policy governed, there was no need to explicitly state that the IDI Policy no longer governed.

8

Dr. Warren also argues that even if IDI adopted the Hospital policy as of the Effective Date, the retired IDI policy should apply to his intellectual property rights because he "substantially performed" by engaging in inventive activity prior to the Effective Date. (Mem. at 11) Dr. Warren's theory fails for several reasons. First, under the Affiliation Agreement the Hospital Policy was to apply to "All IDI Intellectual Property Rights not previously **licensed as of the Effective Time**." (Warren Ex. 15 at 25) (emphasis supplied). It is undisputed that the intellectual property rights resulting from Dr. Warren's and Dr. Rossi's work were not previously licensed as of the Effective Time. (SUMF ¶31, 39)

Dr. Warren argues that his work on the invention constituted "substantial performance," creating a unilateral contract which bound IDI to the distribution schedule in force at the time of this work. However, under Massachusetts law,

> That an offer for a unilateral contract is accepted by the act or acts of the offeree in accordance with the offer is not questioned.... [A]n acceptance of an offer must be in accordance with its terms, that is, by full performance by the offeree, in order that a contract may come into existence.

*Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interests in Int'l & Foreign Courts*, 727 F.3d 10, 18 (1st Cir. 2013), citing *Northampton Inst. for Sav. v. Putnam*, 313 Mass. 1, 7 (1943).

Thus, under Massachusetts law, nothing short of full performance could create an enforceable unilateral contract. It is undisputed that neither the written invention disclosure required by the IDI Policy nor the assignment of intellectual property rights required by the IDI Policy occurred prior to the Effective Time. Conception of the invention alone, and even oral disclosure of the inventive concept, does not even approach *partial* performance of the obligations on inventors set forth in the IDI Policy, much less the *full* performance required by Massachusetts law.

E.     There Is No Estoppel Here.

Dr. Warren argues (Mem. at 17) that he relied on representations by the Hospital about the applicability and governing force of the IDI Policy when he finally agreed to assign his rights in the second patent application to IDI in April 2011.[8]

We argued in the main brief that Dr. Warren cannot possibly show either promissory or equitable estoppel. He bears a "heavy burden" to prove that he was induced to do something that he otherwise would not have done. *Boston & Albany R.R. v. Reardon,* 226 Mass. 286, 291 (1917). And one who has a legal obligation to do something cannot show reliance on some other representation that induced him to do what he already was obliged to do. *Nagle v. Acton-Boxborough Reg'l Sch. Dist.,* 576 F.3d 1, 7 (1st Cir. 2009).

Dr. Warren knew that he was obligated to assign his invention to IDI as a condition of his employment. (SUMF ¶ 44).[9] He did what he was obliged to do when he signed the first assignment of rights to the invention. In the first assignment, Dr. Warren also obligated himself to:

---

[8] Dr. Warren points out, correctly, that he only executed the second assignment after the email from the Hospital's outside counsel, Nixon Peabody, with a draft complaint attached. (Pl. SMF at 3, ¶ 8). But the communication from the Hospital's outside counsel was simply more of the same. Like the earlier communications from Ms. McCarthy and Mr. Dietz, it set forth the source of Dr. Warren's obligation to assign and erroneously referenced the IDI Policy, just as the previous communications had done. It adds nothing to the case that the Hospital has not already addressed.

[9] In his testimony, Dr. Warren states that he understood that it is standard industry practice to require scientists to assign their inventions to their employer institutions as a condition of employment. He testified that he understood this to be the policy at all of the research institutions where he had worked, including MIT, Caltech and IDI. (Warren Dep. 83:12-85:1). Yet, in his Statement of Material Facts ("Pl. SMF"), Dr. Warren disputes the fact that he knew this was the policy at those institutions. (Pl. SMF 2, ¶ 5) He characterizes his testimony as his state of knowledge in 2018, claiming that his understanding in 2018 does not imply that he understood this to be standard industry practice during the years he was employed as a scientist at these institutions. There is simply no way to read the testimony as saying that he was unaware of the practice when he was actually employed but has now become aware of it. Aside from the tortured reading of the testimony required to reach this conclusion, this characterization necessarily fails because Dr. Warren cannot simultaneously claim (1) that he was aware of the Policy or that he signed the Participation Agreement—both of which detail the employee's obligation to assign inventions—and (2) that he was unaware of the policy requiring assignment. (Pl. SMF at 1, ¶ 1)

> sell, transfer and set over, unto the said Immune Disease Institute, Inc., its successors, legal representatives and assigns, the entire right, title and interest, throughout the world in, to and under the said improvements, and the said application and all divisions, renewals and continuations thereof, and all Letters Patent of the United States which may be granted thereon….

(PMOS Ex. 4 at 1)

Dr. Warren further agreed to:

> Sign all lawful papers, execute all divisional, continuing and reissue applications, make all rightful oaths and generally do everything possible to aid the said Immune Disease Institute, Inc., its successors, legal representatives and assigns, to obtain and enforce proper patent protection for said improvements in all countries.

(Id.)

Thus, Dr. Warren was legally obligated to assign the invention, and knew he was obligated, for several reasons: his knowledge of the requirement to assign inventions as standard industry practice; his signature on the Participation Agreement (assuming, without evidence, that he signed it), which expressly required the assignment of inventions as a condition of employment; and his undisputed signature on the first assignment, obligating him to assign and execute all future documents to secure patent protection for the invention.

Indeed, the draft complaint from the Hospital's outside counsel, asserts the IDI Policy *and the first assignment* as separate bases for Dr. Warren's obligation. Dr. Warren testified that after consultation with his attorney, he understood that the Hospital had a good case against him. (Warren Dep. at 73:3-6). In other words, Dr. Warren understood that he was legally obligated to assign. Because he understood that he had an obligation to assign independent of the IDI Policy, and because in fact he had an obligation to assign independent of the IDI Policy, Dr. Warren cannot meet the "heavy burden" of proving that the Hospital's mistake induced him to do something he otherwise would not have done.

F.  This Is Not A Damages Case.

Dr. Warren did not seek damages in his complaint. He did not indicate that he was seeking damages in his initial disclosures, nor has he ever amended those disclosures. And in his testimony, he went out of his way to say that this was not a damages case. (Warren Dep. 105:24-106:19). It is much too late, and it would be much too prejudicial now, to allow Dr. Warren to seek damages. First, even now Dr. Warren has not done anything—presented any evidence, offered any expert opinion—to quantify his damages or even to show that he suffered an injury compensable by damages. But equally importantly, the Hospital has litigated the entire case on the basis of Dr. Warren's clear statements that he is not seeking damages. For example:

- The Hospital did not demand a trial by jury, as Dr. Warren's claims sought only equitable relief.

- The Hospital agreed not to withdraw its request for production of Dr. Warren's tax returns in return for a stipulation that Dr. Warren was not an "accredited investor" for securities law purposes, and it did not even seek discovery into other aspects of his finances, because in the absence of a claim for damages, it was unnecessary to explore the ways in which his financial situation at the times he claims he should have received shares of stock, relative to his financial situation now, might or might not affect the measure of damages.

- The Hospital took no discovery and engaged no experts to help it determine the value of Moderna shares at the times Dr. Warren says they should have been distributed to him.

- The Hospital took no discovery from Dr. Warren's accountant and made the tactical decision not to challenge Dr. Warren's facially absurd claims that even the name of his accountant was privileged, since the issue had limited importance given the nature of the case.

In short, Dr. Warren cannot be allowed to turn the case on its head now that discovery is closed and the Court is considering a motion for summary judgment:

> Plaintiffs may not raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment []. Allowing a plaintiff to proceed on new, unpled theories after the close of discovery would prejudice defendants, who would have focused their discovery efforts on theories actually pled.

*Miranda-Rivera v. Toledo-Davila,* 813 F.3d 64, 76 (1st Cir. 2016) (citations omitted); *see also Formulatrix, Inc. v. Rigaku Automation, Inc.,* 344 F. Supp. 3d 410, 425 (D. Mass. 2018) (refusing to consider new damages theory on summary judgment). Nor is Dr. Warren's demand for "such other relief as the Court deems just and appropriate" enough to allow him to change course so dramatically now. *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 90 (2d Cir. 2005); *Fox v. Bd. Of Trs. Of SUNY,* 42 F.3d 135, 141-42 (2d Cir. 1994). Such "implicit" references to a claim, or the "hint of a possible additional claim," are insufficient. *See Torres-Rios v. LPS Labs., Inc.,* 152 F.3d 11, 16 (1st Cir 1998).

G.  <u>Dr. Warren Can Only Speculate About A Possible Injury Arising From the Hospital's Refusal To Give Him Shares Of Stock.</u>

Dr. Warren concedes that he may have been entitled to capital gains treatment on payments he receives, including payments reflecting the proceeds of the Hospital's share of Moderna stock. He asserts that while the tax experts he has belatedly consulted have told him that "there appears to be a strong *prima facie* case for capital gains treatment" (Mem. at 19), the matter is uncertain. There may or may not be some uncertainty, but Dr. Warren has neither cited any cases to support a claim of uncertainty nor offered any expert opinion on the matter. And to the extent there might be uncertainty, the burden is on Dr. Warren, even on summary judgment, to come forward with *some* argument or evidence to show that what the Hospital has argued is incorrect. *Fontanez-Nunez v. Janssen Ortho LLC,* 447 F.3d 50, 54-55 (1st Cir. 2006) (party opposing summary judgment motion must "show that a factual dispute does exist," but it must do

13

so without relying on "improbable inferences, conclusory allegations, or rank speculation.") (citation omitted); *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) (party opposing summary judgment motion must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.") (citation omitted).

Because Dr. Warren has not even attempted to argue or prove that he would not be entitled to capital gains treatment, the Court must conclude that in fact Dr. Warren *will be* entitled to capital gains treatment, as the Hospital has shown. And as Dr. Warren concedes that he could not have sold the Moderna stock if he had received it (SUMF ¶68), the issue of capital gains treatment is the *only* reason Dr. Warren has offered to suggest that the Hospital's refusal to give him shares of Moderna stock was an injury to him — aside from the fact that the Hospital might have mistakenly paid him one-half of 33.33% of the proceeds instead of one-half of 27.5% of the proceeds, in which case, he asserted, he rather than the Hospital, would have had better leverage when the Hospital asserted that the IDI Policy did not apply:

> Q. And so, as I understand it, the basis of your claim that you would have been better off receiving the stock earlier rather than receiving the cash later is that you believe you would not be entitled to capital gains treatment on cash that you received later, but you would have been entitled to capital gains treatment if you had received the stock earlier. Is that a fair statement of your view?
> A. In terms of that direct economic injury resulting from not receiving the stock early, that's correct, yes.
> Q. And is there any other reason that you think you would have been better off receiving the stock earlier rather than receiving the cash later?
> A. I do think that receiving the stock earlier would have made it harder for the—for the hospital to, as it were, change the rules on me. …

(Warren Dep. 110:2-22).

On this record, Dr. Warren has failed to show *any* injury,[10] let alone the kind of irreparable injury that could entitle him to equitable relief.

## CONCLUSION

For these reasons, the Court should enter summary judgment in favor of BCH on all claims.

Respectfully submitted,

THE CHILDREN'S HOSPITAL CORP.

By its attorneys:

_____

Theodore J. Folkman (BBO No. 647642)
PIERCE BAINBRIDGE BECK PRICE & HECHT, LLP
One Liberty Square
Boston, MA 02109
(617)
tfolkman@piercebainbridge.com

*Attorneys for The Children Hospital Corporation*

---

[10] Dr. Warren argues that there is an injury in failure to transfer the stock at the "earliest opportunity." However, Dr. Warren acknowledges that he could not have sold the Moderna stock if he had received it. (SUMF ¶68) There is no claim that Moderna paid dividends that he did not receive, or that he lost an opportunity to vote his shares. Thus, Dr. Warren was not harmed by the failure to deliver shares at the "earliest opportunity," nor has he done anything to explain just when that moment in time was. Perhaps he means to suggest that the value and the cost basis of the shares would have been lower had they been transferred to him earlier, which might have been disadvantageous to him from the perspective of tax on the eventual sale of the shares and might have been advantageous to him to the extent the receipt of the shares might be considered ordinary income to him. But again, Dr. Warren has done nothing to quantify his damages, provided no expert analysis of the tax situation, and cited no authority. He has simply failed to meet his burden in opposing this motion.