1

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   LUIGI WARREN,                 :     CIVIL ACTION
                                         No. 17-12472-DLC
 4        Plaintiff,              :

 5             v.                 :

 6   THE CHILDREN'S HOSPITAL      :
     CORPORATION,
 7                                :
          Defendant.
 8   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 9             BEFORE THE HONORABLE DONALD L. CABELL,
                  UNITED STATES MAGISTRATE JUDGE
10                        MOTION HEARING

11   APPEARANCES:

12   For the Plaintiff:          LUIGI WARREN, PRO SE
                                  202 S. Raymond Ave, #205
13                                Pasadena, CA  91105

14   For the Defendant:          Pierce Bainbridge
                                  BY:  THEODORE J. FOLKMAN, ESQ.
15                                One Liberty Square, 13th Flr.
                                  Boston, MA  02109

16

17                                U. S. District Court
                                  1 Courthouse Way
18                                Boston, Massachusetts  02210
                                  Friday, May 3, 2019
19                                11:00 a.m.

20
     Proceedings recorded by electronic sound recording; transcript
21   produced by transcription service.
```

**JANICE RUSSELL TRANSCRIPTS**
**1418 Red Fox Circle**
**Severance, CO  80550**
**(757) 422-9089**
**trussell31@tdsmail.com**

1                          P R O C E E D I N G S

2          (Call to Order of the Court)

3                  THE COURTROOM DEPUTY:  The case of Warren versus The

4      Children's Hospital Corporation, Civil Action No. 17-12472,

5      will now be heard before this Court.

6                  Would the parties please identify themselves for the

7      record?

8                  MR. WARREN:  Yes.  Luigi Warren, plaintiff pro se.

9                  THE COURT:  Good morning, Mr. Warren.

10                  MR. WARREN:  Good morning.

11                  THE COURT:  Nice to finally meet you.  We were asking

12      ourselves have we ever had the occasion to actually be face to

13      face with you.  I, I had a image in my mind, but I think it was

14      manufactured solely by virtue of phone calls over the last year

15      and a half.

16                  So nice to finally meet you, yeah.

17                  MR. FOLKMAN:  Good morning, your Honor.  Ted Folkman,

18      Pierce Bainbridge, for the, the Hospital.

19                  THE COURT:  And good morning.  I think we actually

20      have met before.

21                  MR. FOLKMAN:  Yes, we have.

22                  THE COURT:  So nice to see you, again.

23                  MR. FOLKMAN:  You, too, your Honor.

24                  THE COURT:  All right.  So just a couple of ground

25      rules at the beginning, especially, Mr. Warren, somewhat for

1  your edification since you're pro se.  Here's the way I'm going

2  to go about doing things.  First, whomever is speaking should

3  stand when they are speaking.  I'm going to give each side an

4  opportunity to make their argument.  I'm going to start with

5  Mr. Folkman as the defendant because it's their motion and they

6  carry the burden.  And so we'll begin with them.

7          And then you'll get an opportunity to respond.

8          That being said, sometimes when an, a point is being

9  argued or suggested to the Court and it's, and there's an

10  assertion that is being made and it seems to me at that

11  juncture that it may be more beneficial for us to actually hear

12  a direct response to that particular assertion, I may -- don't

13  be surprised if I say to a party, "Okay.  Hold that thought for

14  a minute.  You just said something.  I want to hear what the

15  response is to that point," and then allow the party to resume.

16          So, you know, everybody should relax.  I will allot up

17  to an hour for this.  So be thinking in maximum terms of 30

18  minutes per side, although nobody is obligated to use that much

19  time.

20          I do have some questions and as it seems appropriate

21  to me during argument, I, I will ask those questions.

22          I want to begin with one that doesn't necessarily

23  involve the merits of this, but given that early June may be of

24  some significance in the context of this case and what can

25  happen with the, with the shares and all and given my, my sense

1    of the case from now having sort of delved into these papers

2    for the last few days, have the parties given any thought to

3    sitting down with a mediator to see whether some agreement can

4    be worked out now?  It just seems to me now there are more

5    ingredients there for possibly resolving this.

6            THE COURT:  Mr. Folkman?

7            MR. FOLKMAN:  Your Honor, the, the parties have

8    discussed that.  We have not been able to come to an agreement

9    as to whether mediation would be fruitful.  I know that you

10   have the power to refer us to, for example, court --

11           THE COURT:  Uh-huh (indicating an affirmative

12   response).

13           MR. FOLKMAN:  -- ordered mediation and you may want to

14   consider that.

15           THE COURT:  Well, I -- I -- in my near five years in

16   this position I've never ordered parties to go to mediation,

17   but I find that as time has gone by I've gotten closer to it

18   because sometimes it just seems to me as I'm looking at things

19   that I can't see why the case can't be resolved, given what,

20   what it seems the respective positions are and, and sometimes

21   given what seems to be, to be not a great distance between the

22   parties.

23           Let me just put it this way.  The benefit to trying at

24   least one session of mediation through the court is it's no

25   charge to the parties and the matter is presided over and

1   conducted by another judge, all of whom are, are seasoned

2   litigators and judges, who have no vested interest in the

3   outcome of the case, who will not discuss anything they do with

4   the parties outside of the confines of the mediation.  It would

5   remain confidential in that sense and they would not even talk

6   about it with me.

7           So there is nothing that could ever be brought out in

8   the course of that mediation that would ever have any

9   precedential or evidentiary value or could ever be used to

10  affect anything that might happen here.

11          So I, I would strongly urge the parties to consider

12  mediation.  If the parties were interested in doing it, it

13  could be arranged on fairly short notice.  We have a number of

14  judges here who do it as part of their responsibilities.  We

15  have a, a couple of senior judges who do really nothing but

16  mediation.

17          So, Mr. Warren, I, I do think it's something that you

18  may at least want to consider.

19          MR. WARREN:  Excuse me.  Your Honor, first, can I

20  clarify?  Are you speaking about any mediation a court would,

21  court appointing mediator?  Because that's not what we, you

22  know --

23          THE COURT:  Well, yeah.  I --

24          MR. WARREN:  -- the interactions.

25          THE COURT:  Yeah.  I mean, I, I was doing that only

1  because -- I mean, parties can do it through whomever they

2  want.  There are a number of organizations that are well known

3  that are made up of commercial lawyers and judges.  JAMS is one

4  of the best known one.  They have offices all over the country

5  and they charge.  And you'll get -- what you'll get to them,

6  depending on what the dynamic is, you may get something close

7  to an arbitration where the parties actually go into it

8  agreeing, "We're going to put this in the hands of somebody

9  else to answer some key factual questions that we dispute and

10 then to decide what the legal significance of those answers are

11 and we'll be bound by it."  Others may say, "Well, we won't be

12 bound by it, but we'll agree that it matters and that we should

13 both really listen to whatever this person has to say."  Here,

14 it's, it's not quite as formalized in the sense of it has no

15 legal binding effect, except that if you reach an agreement,

16 then the case is resolved and it goes away.

17         But when I speak of it, I'm speaking of it here, but

18 that's because I know the way it operates here.  But if there

19 was a mediator -- I know you're out on the West Coast.  You

20 might say, "I know of some places out here," and, I don't know,

21 maybe it can be conducted out there and make it more convenient

22 for you to participate in.

23         I -- so I'm not really so much speaking about the

24 mechanics, but about mediation as a way of resolving this.

25 Because the -- if, if the case doesn't resolve at summary

1    judgment, the stage we're at now, you know, it goes on now for,

2    it would be going on for another period of time and it just

3    seemed to me, just given what I know from looking at this

4    stuff, it's not clear to me why it needs to be going on for

5    months and months and months and months and months.

6          Now the essence of any mediation is compromise.  Both

7    parties are going to have to give up a little something to get

8    to a middle.  That's, that is the part, I think, parties have

9    to internalize before they agree to go to mediation.

10         But right now, I just want you to consider it and, and

11   my editorial is from everything I've seen, I think it would be

12   good for you guys to try it.  I don't know why you wouldn't try

13   it.  I don't see a downside to trying it, all right?  Okay.

14         All right.  So with that, Mr. Folkman, let me start

15   with you.  I've got questions jotted down all over the place,

16   but, and as your argument implicates them, I'll, I'll pose

17   them.

18         MR. FOLKMAN:  Thank you, your Honor.

19         I want to really address two points, the estoppel

20   reliance point, which I think is really at the heart of things,

21   and also, the point about the existence of the contract and

22   whether it was amended.  I would like to rest on my papers with

23   regard to the tax issues --

24         THE COURT:  That's, that's fine.

25         MR. FOLKMAN:  -- and the delivery-of-stock issues,

1   unless you have questions in which case, of course, I'll be

2   happy to answer them.

3           On reliance, what Dr. Warren has to prove is that he

4   did something different --

5           THE COURT:  Uh-huh (indicating an affirmative

6   response).

7           MR. FOLKMAN:  -- from what he otherwise would have

8   done.  That's just the black letter law.  And what is the

9   undisputed evidence about this?  Point No. 1, it's undisputed

10  that he never read the IDI policy while he was an employee of

11  IDI.  There's no evidence to the contrary.  There is evidence

12  that it was posted on the intranet and that  --

13          THE COURT:  Uh-huh (indicating an affirmative

14  response).

15          MR. FOLKMAN:  -- he may have had the opportunity to

16  read it.

17          THE COURT:  Uh-huh (indicating an affirmative

18  response).

19          MR. FOLKMAN:  There is evidence that IDI represented

20  to Children's Hospital that all employees, presumably including

21  Dr. Warren, had  --

22          THE COURT:  Uh-huh (indicating an affirmative

23  response).

24          MR. FOLKMAN:  -- signed a participation agreement,

25  which referenced policy.

```
 1             THE COURT:  Right.
 2             MR. FOLKMAN:  So there's evidence that's adjacent to
 3   it, but there's no evidence that he actually saw it or read it.
 4             THE COURT:  But that's not the same as affirmative
 5   evidence that he did not.
 6             MR. FOLKMAN:  That's, that's correct.  Well --
 7             THE COURT:  Right?  I mean, you're -- so what you're
 8   saying is, "We don't know whether he relied on it because we
 9   don't have undisputed evidence that he did."  But isn't -- the
10   issue is whether at this juncture there would be undisputed
11   evidence that he did not --
12             MR. FOLKMAN:  He doesn't --
13             THE COURT:  -- rely.
14             MR. FOLKMAN:  He doesn't say he relied on it.  He says
15   he has the opportunity, he had the opportunity to read it.  And
16   really, what's at stake in order to show reliance is some
17   indication that in, in his mind was the --
18             THE COURT:  Uh-huh (indicating an affirmative
19   response).
20             MR. FOLKMAN:  -- policy.  The only thing that was in
21   his mind that's in the record --
22             THE COURT:  Uh-huh (indicating an affirmative
23   response).
24             MR. FOLKMAN:  -- is the statement of Dr. Rossi --
25             THE COURT:  Right.
```

1    MR. FOLKMAN:  -- to him saying, "You're going to get a

2  third" --

3    THE COURT:  Okay.

4    MR. FOLKMAN:  -- or, "We're going to get a third."

5    THE COURT:  Right.

6    MR. FOLKMAN:  Now Dr. Rossi was not management.

7  Dr. Rossi was in the same position as, as Dr. Warren.  They

8  were both beneficiaries of the policy, sort of acting at arm's-

9  length with respect to the Hospital.

10    THE COURT:  Right.

11    MR. FOLKMAN:  The way that you know that is because

12  Dr. Rossi later negotiated against the Hospital to get the *ad*

13  *hoc* policy --

14    THE COURT:  Right.

15    MR. FOLKMAN:  -- what we're calling, adopted.

16    THE COURT:  Right.

17    MR. FOLKMAN:  So I don't think that you could say, "A

18  fellow employee told me that I was going to get a third and,

19  therefore, I had a justified understanding that my employer

20  gave me that I can rely on."

21    THE COURT:  Well, now, now you're qualifying it by

22  putting in the word "justified."

23    MR. FOLKMAN:  Well, reliance has to be reasonable.

24  That's right.  I don't think there's any reliance in fact --

25    THE COURT:  Uh-huh (indicating an affirmative

1  response).

2       MR. FOLKMAN:  -- No. 1.  And that's when I'm talking

3  about the question of did he see the policy.  And I think --

4       THE COURT:  Right.

5       MR. FOLKMAN:  -- there's no evidence that he saw the

6  policy.

7       THE COURT:  Right.

8       MR. FOLKMAN:  Now if we're talking about the

9  undisputed fact that Dr. Rossi told him --

10      THE COURT:  Uh-huh (indicating an affirmative

11  response).

12      MR. FOLKMAN:  -- that "You might get a third," or that

13  "You will get a third" --

14      THE COURT:  Right.  Why would you, why would you say

15  that's patently unreasonable?

16      MR. FOLKMAN:  Well, because Dr. -- you know, the,

17  anybody at the Hospital could have said "you got a third," but

18  he had no --

19      THE COURT:  But it wasn't, it wasn't anybody.  It

20  wasn't the custodian and it wasn't somebody who works in the

21  cafeteria.  It was the closest thing to somebody in the same

22  situation as him as anybody in the world.  It was his

23  colleague.  It was the person who had the same interest,

24  somebody who's educated, and somebody, it seems to me, at least

25  as we sit here, it's not unreasonable to, to infer that he

1  would understood, he would understand that Dr. Rossi knew what

2  Dr. Rossi was talking about when Dr. Rossi said, "Hey, you'll

3  get a third."

4          MR. FOLKMAN:  Well, let me make two points about that,

5  your Honor.  I, I would agree with you if the statement were

6  coming from someone within what we call TIDO, the Tech Transfer

7  Office.

8          THE COURT:  Uh-huh (indicating an affirmative

9  response).

10          MR. FOLKMAN:  And, in fact, Dr. Warren deposed Ryan

11  Dietz, who was the, the responsible person at TIDO.

12          THE COURT:  Uh-huh (indicating an affirmative

13  response).

14          MR. FOLKMAN:  Dr. Rossi, we know, because he ended up

15  proposing the *ad hoc* policy, Dr. Rossi understood that at the

16  time of the merger the 33 percent no longer applied.  That's

17  why, that's why he came up with the compromise policy.

18          So I don't think that it's fair to say that someone

19  who is sort of similarly situated with respect to management --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. FOLKMAN:  Yes, he was a supervisor, has sort of

23  actual or apparent authority to make statements about what you

24  are or are not entitled to receive on behalf of the

25  institution.

1        THE COURT:  I'm not necessarily disagreeing with the

2   sentiment, but I just want to make sure --

3        MR. FOLKMAN:  I understand.

4        THE COURT:  -- we're not talk -- like you're using the

5   terms "apparent" and "actual authority."  This is not an

6   argument that legally, you know, he -- he was -- he was getting

7   guidance from somebody and the question is was that person --

8   were those -- were those words legally binding because this is

9   the person who told him, but, rather, was it reasonable or

10  unreasonable for him to rely on something that Dr. Rossi may

11  have told him about what the potential benefits were.

12        MR. FOLKMAN:  I think it's both, your Honor.  I do

13  think we cite a case in our papers that, that says, you know,

14  he wasn't, he didn't have either actual or apparent authority

15  to make those statements.

16        THE COURT:  Well, I, I agree with you.  He probably

17  didn't have --

18        MR. FOLKMAN:  Yeah.

19        THE COURT:  -- actual or apparent authority.

20        MR. FOLKMAN:  Yeah.

21        THE COURT:  Okay.

22        MR. FOLKMAN:  So, so I agree with you, then.  If, if

23  all we're talking --

24        THE COURT:  Okay.

25        MR. FOLKMAN:  -- about is, is did Dr. Rossi rely on it

1   or -- excuse me -- did Dr. Warren rely on it and was it

2   reasonable --

3           THE COURT:  Right.

4           MR. FOLKMAN:  -- that's an issue you're going to have

5   to decide.

6           THE COURT:  Okay.

7           MR. FOLKMAN:  Do you have any further questions on

8   that or can I --

9           THE COURT:  No, no.  No.

10          MR. FOLKMAN:  Okay.

11          THE COURT:  Thank you.

12          MR. FOLKMAN:  So Point No. 1, he never read the policy

13  when he was at IDI.

14          Point No. 2, he knew he had an obligation to assign

15  and he knew that --

16          THE COURT:  Uh-huh (indicating an affirmative

17  response).

18          MR. FOLKMAN:  -- in a lot of ways.  He knew that

19  because he knew it was the industry practice.  He knew it

20  because he testified that at all the other institutions where

21  he had worked --

22          THE COURT:  Uh-huh (indicating an affirmative

23  response).

24          MR. FOLKMAN:  -- and at IDI that was the policy.  He

25  signed the first assignment --

```
 1              THE COURT:  Uh-huh (indicating an affirmative
 2   response).
 3              MR. FOLKMAN:  -- which says -- and, you know, I would
 4   really refer you to the language of the first assignment --
 5              THE COURT:  Uh-huh (indicating an affirmative
 6   response).
 7              MR. FOLKMAN:  -- which is Tab 4 of Dr. Warren's
 8   exhibits -- you know, it goes into detail about his obligation
 9   to assign.
10              THE COURT:  So a question about that.
11              MR. FOLKMAN:  Uh-huh (indicating an affirmative
12   response).
13              THE COURT:  You, you say he knew he had an obligation
14   to assign.  Let me ask you, where did the obligation to assign
15   arise from?
16              MR. FOLKMAN:  There's --
17              THE COURT:  Or what did it arise from?
18              MR. FOLKMAN:  There's two, there's really two sources,
19   your Honor.  The first one -- and let me just stick with this
20   document for a minute.
21              THE COURT:  Uh-huh (indicating an affirmative
22   response).
23              MR. FOLKMAN:  So it's undisputed that he signs the
24   first assignment well before Mr. Dietz and the counsel made any
25   sort of misrepresentations --
```

16

1          THE COURT:  Uh-huh (indicating an affirmative

2     response).

3          MR. FOLKMAN:  -- to him, right?  And what that first

4     assignment says is that you've assigned to us this particular

5     patent and all continuations and all divisionals and --

6          THE COURT:  Uh-huh (indicating an affirmative

7     response).

8          MR. FOLKMAN:  -- all patents that might flow from this

9     and you agree that you'll execute any documents that we need

10    you to execute in order to sort of paper over your assignment

11    of all additional patent rights.

12         THE COURT:  Uh-huh (indicating an affirmative

13    response).

14         MR. FOLKMAN:  So, No. 1, he had an obligation that

15    stems from the first assignment, itself.  And there's no, no

16    real dispute about that and there's no, there's no argument

17    that the first assignment was the product of some sort of

18    misrepresentation.

19         THE COURT:  Okay.

20         MR. FOLKMAN:  So that's No. 1.

21         No. 2, it was just a condition of his employment.

22    That was the policy of the Hospital.  The Hospital required it.

23    If --

24         THE COURT:  Where -- where -- where does it say that?

25         MR. FOLKMAN:  Well, the, the IDI policy itself says

1   you, you have an obligation to assign.

2           THE COURT:  It says that?

3           MR. FOLKMAN:  Well, the, the participation agreement

4   says it and the partici -- so if you look at how the documents

5   work --

6           THE COURT:  Uh-huh (indicating an affirmative

7   response).

8           MR. FOLKMAN:  -- you will see, if you look, for

9   example, at Exhibit 3 of our exhibits, you'll see that there is

10  the policy and then attached to the policy is the participation

11  agreement, which does say, you know, you have an obligation to

12  assign.

13          Now the participation agreement -- let me skip ahead a

14  little bit --

15          THE COURT:  Uh-huh (indicating an affirmative

16  response).

17          MR. FOLKMAN:  -- we didn't address it in our main

18  brief.

19          THE COURT:  Right.

20          MR. FOLKMAN:  And the reason is because there's no

21  evidence that Dr. Warren ever signed it.  Dr. Warren has no

22  evidence that he signed it.

23          THE COURT:  Uh-huh (indicating an affirmative

24  response).

25          MR. FOLKMAN:  If he wants to say affirmatively, as

1    apparently he does, that he did sign it, well, then that's the,

2    the second source of, of the obligation if you, if you accept

3    without evidence, that, in fact, he did sign it.  Our position

4    is it's not a question that can be decided on summary judgment

5    whether he signed it or not.

6                THE COURT:  Okay.

7                MR. FOLKMAN:  So I think those are really the two, the

8    two sort of written places where you'll find it.

9                The third thing to note, of course, is that Dr. Warren

10   was an employee at will.  And so --

11               THE COURT:  Uh-huh (indicating an affirmative

12   response).

13               MR. FOLKMAN:  -- if he had said, if the Hospital had

14   said to him during his employment or IDI had said to him during

15   his employment, you know, "Assign us your rights" and he had

16   said, "No," they would have said, "You're fired."

17               THE COURT:  Uh-huh (indicating an affirmative

18   response).

19               MR. FOLKMAN:  So --

20               THE COURT:  Right.

21               MR. FOLKMAN:  -- those are really the, the, the

22   reasons why I say that he knew he had an obligation --

23               THE COURT:  Okay.

24               MR. FOLKMAN:  - to assign.

25               And the third undisputed fact -- and I've sort of

1  already addressed this -- is that Dr. Warren did assign.  And

2  again, I want to emphasize the fact that in light of the first

3  assignment the second assignment is really just ministerial and

4  a follow-on to what he had already done.  The first assignment

5  was an assignment of this one patent --

6          THE COURT:  Uh-huh (indicating an affirmative

7  response).

8          MR. FOLKMAN:  -- plus all the rights that may come out

9  of it when patent lawyers do their thing.

10          THE COURT:  Uh-huh (indicating an affirmative

11 response).

12          MR. FOLKMAN:  And then he agrees also to sign

13 additional documents that may be necessary to effect those.

14          THE COURT:  Okay.  And, and when you say "he agrees to

15 sign," is, is that coming from the same original source or is

16 that coming, coming from a different source?  'Cause I wanted

17 to talk to you about the second assignment.

18          MR. FOLKMAN:  So that's coming from --

19          THE COURT:  You, you say it was ministerial.

20          MR. FOLKMAN:  That's coming from the first assignment.

21          THE COURT:  All right.  So it's coming from the first

22 assignment.

23          MR. FOLKMAN:  Yes.

24          THE COURT:  All right.  And it's -- and I want to make

25 sure we're all talking about the same thing.  Now when he --

 1   'cause I understand he balked at signing the second --

 2            MR. FOLKMAN:  Correct.

 3            THE COURT:  -- initially.

 4            MR. FOLKMAN:  Yes.

 5            THE COURT:  And, and then it seemed the big guns came

 6   out.

 7            MR. FOLKMAN:  Yes.

 8            THE COURT:  And said, "You will be breaching a

 9   contract" --

10            MR. FOLKMAN:  Yes.

11            THE COURT:  -- "if you don't sign."

12            MR. FOLKMAN:  Yes.

13            THE COURT:  All right?  And that was the, the IDI

14   contract.  And that's the name we're using.  You may have, may

15   be referring to it differently.  But -- and, and I know you say

16   that, in and of itself, there's this asterisk.  Everybody was

17   relying on that, but, in fact, this was, what, post

18   affiliation/pre-merger.

19            So it was really the BCH language that everybody

20   should have been referring to.

21            But you say, though, or at the time the defendants

22   were saying, "Hey, there is a contract between us and you're

23   going to be breaching that contract."  And so forced with the,

24   the threat of a lawsuit, he then signs.

25            And I'm only bringing this up now, and I know you're

1    still talking about the estoppel, but this sort of then gets

2    into the second part of the contract, which is, you know,

3    curiously, you start out by saying, "Look, there never was a

4    contract.  I mean, there's no contract and at most, it's

5    illusory.  And so I'm not even sure why we're here," and you

6    even go so far as to suggest, if we buy that premise, really

7    everything else you say is just out of an abundance of

8    caution --

9              MR. FOLKMAN:  Correct.

10             THE COURT:  -- right?  And so I'm just trying to

11   reconcile those two.

12             MR. FOLKMAN:  So you make a really good point, your

13   Honor.  There is no question -- and we've said this from Day 1

14   -- that the Hospital screwed up, made a mistake.

15             THE COURT:  What was the screwup?

16             MR. FOLKMAN:  The screwup was to cite the IDI

17   policy --

18             THE COURT:  Uh-huh (indicating an affirmative

19   response).

20             MR. FOLKMAN:  -- and the 33 percent and to give those

21   figures rather than to say The Children's Hospital policy.

22   And, you know, if you ask --

23             THE COURT:  Okay.  But -- but --

24             MR. FOLKMAN:  If you were to, if you were to say --

25             THE COURT:  Well, let me just stop you there.  Because

1   this is --

2           MR. FOLKMAN:  Yeah.

3           THE COURT:  -- I think, where the semantics matter.

4           Now you're using the word "policy."  They were using

5   the word "contract," right?  And you argue there was no

6   contract.  And so I think we need to be precise with the, with

7   the noun.

8           MR. FOLKMAN:  Yeah.  No.  That's, that's a --

9           THE COURT:  Okay?

10          MR. FOLKMAN:  -- fair point.  And what I, what I would

11  say is that the, the real source of the obligation was the

12  first assignment.  Because that's the assignment that says,

13  "You are obligated to -- you already sort of presently assigned

14  us future rights in, in, in divisionals and continuations and

15  other patents that flow from this and you covenant that you're

16  going to, you're going to execute whatever documents we need to

17  effect that."  Now --

18          THE COURT:  And, and you're saying that obligation to

19  make that first assignment arose by virtue of Mr. Warren's

20  employment --

21          MR. FOLKMAN:  Correct.

22          THE COURT:  -- with IDI?

23          MR. FOLKMAN:  Correct.

24          THE COURT:  And, and that was based on language that,

25  among other things, said, "Here are kind of the conditions

1   under which you are working for us and, by the way, we can

2   modify this whenever we want."

3          MR. FOLKMAN:  Correct.

4          THE COURT:  All right.

5          MR. FOLKMAN:  That's right.

6          THE COURT:  And -- and -- I -- so I guess here's the

7   question.  When, when the defendants threatened a lawsuit for

8   breach of contract -- 'cause I, I always understood that was

9   based on a breach of the IDI contract and not the first

10  assignment, right?  Is that correct?  Like when they said,

11  "Hey, if you don't, if you don't do this, if you don't do this

12  second assignment, you're going to be in breach of contract."

13         MR. FOLKMAN:  I -- excuse me.  Are you asking

14  Dr. Warren or you're asking me?

15         THE COURT:  No, I'm asking you.  I'm asking you.

16         MR. FOLKMAN:  Well, it --

17         THE COURT:  I'm just try, I'm trying to understand.

18         So what -- what -- what is it they were saying he was

19  in danger of breaching if he did not effect that second

20  assignment?

21         MR. FOLKMAN:  Yeah.  So --

22         THE COURT:  What -- 'cause --

23         MR. FOLKMAN:  So I agree with you that the -- that the

24  -- that the express threat referred to the IDI policy.

25         THE COURT:  Okay.  Why is that not --

24

1           MR. FOLKMAN:  And that that was --

2           THE COURT:  Why is that not a problem for you here?

3  He took actions --

4           MR. FOLKMAN:  Yes.  They were --

5           THE COURT:  -- that he's not happy with.

6           MR. FOLKMAN:  They were actions that  --

7           THE COURT:  Because -- because they -- because they

8  said, "You are, you are contractually obligated to do this and

9  if you don't, we're going to sue you."

10           MR. FOLKMAN:  Well, they were actions that he admits

11  that he was obligated to take, anyway.

12           THE COURT:  Well -- well, that's -- all right.  That

13  is a response, but in the first instance he wasn't gonna do it.

14           MR. FOLKMAN:  So --

15           THE COURT:  And people came to him and said, "We're

16  gonna sue you," and not just anybody --

17           MR. FOLKMAN:  Yeah.

18           THE COURT:  -- right?  I mean, we had the General

19  Counsel --

20           MR. FOLKMAN:  Yeah.

21           THE COURT:  -- at Boston Children's Hospital.  We also

22  had Nixon Peabody --

23           MR. FOLKMAN:  Correct.

24           THE COURT:  -- right?

25           MR. FOLKMAN:  Right.

1          THE COURT:  So --

2          MR. FOLKMAN:  So I -- I think there's really -- I

3    mean, there's really two things.  One is you knew you had to do

4    it.  And so you had to do it, anyway, and there can't be any

5    reliance.

6          The second point I would just make, your Honor, is

7    that estoppel is equity, right?

8          THE COURT:  Right.

9          MR. FOLKMAN:  And, you know, Dr. Warren, I mean, look,

10   there's some equity in his case.  There's no --

11          THE COURT:  Yeah.

12          MR. FOLKMAN:  -- question.  From his perspective, he

13   says, "Yeah, I knew I had to do it, but I asked you what was I

14   gonna get and you told me and then I did it and then you didn't

15   give that to me."  So that's -- that has the ring of, of

16   fairness and that's the basis of, I think that's why we're

17   here.

18          But there's another side of the equitable coin, too,

19   which is --

20          THE COURT:  Yeah.

21          MR. FOLKMAN:  -- which is, you know, you are obligated

22   to do something.

23          THE COURT:  Right.

24          MR. FOLKMAN:  Someone says, "Okay.  You're obligated

25   to do it.  Please do it."  You say, "I'm not gonna do it unless

1  you tell me what's in it for me."

2          THE COURT:  Yeah.

3          MR. FOLKMAN:  And the implicit threat is, you know,

4  "Unless you tell me what I'd like to hear, I'm not gonna do

5  it."  That's not --

6          THE COURT:  Right.

7          MR. FOLKMAN:  -- equitable, either.

8          THE COURT:  Right.

9          MR. FOLKMAN:  So I would say to you that there's,

10 there's really two things going on.  One is I think we have,

11 we're a hundred percent right on the merits of the reasonable

12 reliance issue, which is an element of any claim of equitable

13 estoppel.

14         THE COURT:  Uh-huh (indicating an affirmative

15 response).

16         MR. FOLKMAN:  And, No. 2, I think while there is

17 equity behind his case -- and that's, frankly, why I think your

18 suggestion about the parties trying to resolve it makes

19 sense --

20         THE COURT:  Yeah.

21         MR. FOLKMAN:  -- there is equity on both sides.

22         THE COURT:  Right.

23         MR. FOLKMAN:  The equity on our side is you had to do

24 this.  Yu knew you had to do it.  You already did it and then

25 you wanted to gum up the works and, and, you know, what's in it

1 | for me beyond what everybody else at the Hospital has gotten.

2 |           THE COURT:  Well, but surely you can understand -- and

3 | I don't know what came first, the chicken or the egg -- but for

4 | somebody from the planet Mars who plops down in the middle of

5 | all of this you can, can't you see now in hindsight why

6 | somebody in Mr. Warren's position might be uncomfortable with

7 | the idea that he can be, he can be bound, he can be told, "You

8 | are bound to do all of these things and, by the way, we can

9 | unilaterally reduce your interest in this whenever we want.  We

10 | can make it zero, if we want."

11 |           MR. FOLKMAN:  Yep.  So let me, let me address that in

12 | two ways, your Honor.  The first way is if you look at any of

13 | the equitable estoppel cases where --

14 |           THE COURT:  Uh-huh (indicating an affirmative

15 | response).

16 |           MR. FOLKMAN:  -- some employee -- it's -- they're

17 | usually employee--employer cases.

18 |           THE COURT:  Yeah.

19 |           MR. FOLKMAN:  And, you know, someone says, you know,

20 | "I wanted to go out on FMLA leave" --

21 |           THE COURT:  Right.

22 |           MR. FOLKMAN:  -- "and I went to see the HR person and,

23 | and they told me," you know, "this is what you have to do

24 | and" --

25 |           THE COURT:  Right.

1          MR. FOLKMAN:  -- "and I did that and then it turns out

2    it wasn't the right thing."  All, all of those cases have that

3    equitable element in it, but the plaintiff doesn't always win

4    because without reasonable reliance, you know --

5          THE COURT:  Right.

6          MR. FOLKMAN:  -- that's just, that's just the nature

7    of, of the beast.

8          So I, I agree with you that a lot of these cases have

9    hard facts --

10          THE COURT:  Uh-huh (indicating an affirmative

11    response).

12          MR. FOLKMAN:  -- because there's always an element of

13    equity when someone tells you something and you rely on it or,

14    you know, and then you, you end up losing.  So I get that.

15          With regard to your other point about, you know, the

16    Hospital could reduce it to zero --

17          THE COURT:  Right.

18          MR. FOLKMAN:  -- the point of these policies -- so we

19    talk a little bit about where these policies come from and why

20    they exist.

21          THE COURT:  Right.

22          MR. FOLKMAN:  They come out of the, the Bayh-Dole Act.

23    There is no -- in, in a case like this where there was no

24    federal funding --

25          THE COURT:  Uh-huh (indicating an affirmative

 1   response).

 2           MR. FOLKMAN:  -- there is no obligation by an

 3   institution like the Hospital to share revenues with inventors.

 4   So why, why do hospitals do it?  Well, I, I mean, they do it

 5   for obvious reasons.  They, they want to attract --

 6           THE COURT:  Right.

 7           MR. FOLKMAN:  -- you know, key talent.

 8           THE COURT:  Right.

 9           MR. FOLKMAN:  And, and by the way, there's, there's no

10   question that this was not a, you know, a very significant

11   scientific advance.

12           THE COURT:  Right.

13           MR. FOLKMAN:  And Dr. Rossi and --

14           THE COURT:  Right.

15           MR. FOLKMAN:  -- Dr. Warren did, did a really amazing

16   thing, no, no question about that.

17           THE COURT:  Right.

18           MR. FOLKMAN:  So they want to attract that talent.

19   They want to line up everybody's incentives.

20           THE COURT:  Right.

21           MR. FOLKMAN:  So you can say, well, in the abstract,

22   you know -- and it's hypothetical --

23           THE COURT:  Right.

24           MR. FOLKMAN:  -- that the Hospital might say, "You get

25   zero" --

```
 1              THE COURT:  Right.

 2              MR. FOLKMAN:  -- but in, in reality, that's not,

 3    that's not what happened.

 4              THE COURT:  Well, and that -- and, and obviously,

 5    that's a -- I'm exaggerating just to kind of make the point,

 6    but I think it's also fair to worry that they might do

 7    something that significantly increases their potential benefit

 8    when they're -- when -- when the -- when the product is

 9    ultimately monetized and at the expense of the inventor.

10    'Cause that's what happened here.

11              MR. FOLKMAN:  Well, you can imagine a case where, you

12    can imagine a case with bad facts along those lines where --

13              THE COURT:  Yeah.

14              MR. FOLKMAN:  -- where Moderna turns out to be a

15    billion-dollar company --

16              THE COURT:  Yeah.

17              MR. FOLKMAN:  -- and then people sit around inside the

18    hospital and figure out how to screw the inventors.

19              THE COURT:  Right.

20              MR. FOLKMAN:  And that's not what happened here.  What

21    happened here is there was a merger of institutions --

22              THE COURT:  Right.

23              MR. FOLKMAN:  -- and the policies were rationalized --

24              THE COURT:  Right.

25              MR. FOLKMAN:  -- because that's how you do a merger.
```

```
 1              THE COURT:  Right.
 2              MR. FOLKMAN:  So I think that, you know, yes, it's
 3   possible to imagine a case where there's real inequity where
 4   they, it's a bait and switch and they make the inventor do his
 5   thing --
 6              THE COURT:  Uh-huh (indicating an affirmative
 7   response).
 8              MR. FOLKMAN:  -- and he does his thing and then they
 9   pull the rug out from under him.
10              THE COURT:  Okay.  All right.
11              So with that, let's turn, if you wouldn't mind -- I
12   mean, I -- if you want to go back and argue this.  I'm, I'm
13   really as interested in the contract.
14              MR. FOLKMAN:  Sure.
15              THE COURT:  So let's, let's go to that.  Because by
16   the time of the second assignment it is apparent that
17   Mr. Warren has questions.  He's, he's now paying more attention
18   to this and there comes a point when the defendant says, "We
19   need you to do another assignment.  You must do this.  You are
20   bound to do this.  You have a contract," that is, the idea, IDI
21   contract and maybe they should have said BCH, but they say it's
22   -- but that is the contract.  "There is, there is a contract
23   between us."
24              How can you argue, then, that there is no contract to
25   have been breached?
```

1          MR. FOLKMAN:  Well, I -- so as I've said, I think that

2    the way that the -- you know, the Hospital made mistakes in how

3    it approached that negotiation.

4          THE COURT:  All right.  Let's, let's just look --

5          MR. FOLKMAN:  No, no question.

6          THE COURT:  -- pretend they called it the BCH.  Let's

7    pretend they --

8          MR. FOLKMAN:  And it's not --

9          THE COURT:  Let's pretend they were referring to what

10   they would have more correctly referred to and they said, "Here

11   is a draft lawsuit.  Here's an e-mail and here is a draft

12   complaint" --

13         MR. FOLKMAN:  Yeah.

14         THE COURT:  -- "in which we allege that you have

15   breached contract and we ask the court for injunctive relief

16   and a declaratory judgment."

17         MR. FOLKMAN:  Well, so, so I think the main answer to

18   that is one that I've already given, which is what they should

19   have said is, "You promised in the first assignment that you

20   were gonna do this and you're not doing it."  So that, that, I

21   think is, is Answer No. 1 if you're talking --

22         THE COURT:  Okay.

23         MR. FOLKMAN:  -- about, well, how can we say on the

24   one hand --

25         THE COURT:  Okay.

1      MR. FOLKMAN:  -- that these policies are just

2  policies.

3      THE COURT:  Right.

4      MR. FOLKMAN:  And on the other hand, "You had an

5  obligation."

6      THE COURT:  Right.  So -- all right.  I just want to

7  make sure I understand your argument.

8      So I get it part of it is they should have been

9  referring to something else.  And, and is it that they, they

10  should have been referring to the first assignment, which I'm

11  not sure I have in front of me --

12      MR. FOLKMAN:  It's --

13      THE COURT:  -- but the, the actual assignment --

14      MR. FOLKMAN:  Yes.

15      THE COURT:  -- that was signed.

16      MR. FOLKMAN:  Yes.

17      THE COURT:  That -- if, if there was a contract, that

18  is the contract, is that what --

19      MR. FOLKMAN:  I believe that is the best case for a

20  contract, absolutely.

21      THE COURT:  Okay.  You'd certainly have to at least, I

22  hope, acknowledge that from my perspective that creates kind of

23  a conundrum for us.  Because -- and maybe you can speak to this

24  -- Mr. Warren in a light most favorable to him did something

25  that he otherwise would not have done.  He thought he would be

1    in a better position if he didn't sign.  And maybe he's wrong

2    on that, but that's what he thought, or in a light most

3    favorable to him.  That's an inference.  And he was threatened

4    with a lawsuit if he did not sign something that, arguably,

5    reduced the value of, of what he thought he had and it was done

6    based on an assertion by the defendant that, "There is a

7    contract and you are obligated to sign it."

8              It kind of surprises me that you're, you don't at

9    least acknowledge that creates an issue here at, at the summary

10   judgment stage for your client.

11             MR. FOLKMAN:  Well, I think you have to compare sort

12   of what you're comparing against.  The question isn't --

13   suppose we say that the, the, the BCH policy --

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. FOLKMAN:  -- you know, had -- had a contract --

17   had imposed some obligations on him.

18             THE COURT:  Right.

19             MR. FOLKMAN:  The question isn't is it that or

20   nothing.  The question is is it that or the IDI policy.

21   Because the whole issue in the case is was the policy amended,

22   or one of the issues in the case --

23             THE COURT:  Right.

24             MR. FOLKMAN:  -- was the policy amended.

25             So we're really talking not about were you obligated

1    or were you not obligated --

2              THE COURT:  Uh-huh (indicating an affirmative

3    response).

4              MR. FOLKMAN:  -- but, rather, is it 33 percent or is

5    it 27-1/2 percent?

6              So I just want to put that idea on the table, too.

7              THE COURT:  Right.

8              MR. FOLKMAN:  In other words, I suppose that

9    Dr. Warren would say, although he doesn't, there's no

10   affidavit --

11             THE COURT:  Uh-huh (indicating an affirmative

12   response).

13             MR. FOLKMAN:  -- I, I suppose he would say, "If, if

14   you had told me that policy had changed" --

15             THE COURT:  Right.

16             MR. FOLKMAN:  -- "and now I'm getting 27-1/2

17   percent" --

18             THE COURT:  Uh-huh (indicating an affirmative

19   response).

20             MR. FOLKMAN:  -- by the way, just like every other

21   inventor --

22             THE COURT:  Right.

23             MR. FOLKMAN:  -- at the Hospital -- "then I wouldn't

24   have, then I wouldn't have signed it."  Now, you know --

25             THE COURT:  Yeah.

1          MR. FOLKMAN:  -- there's no evidentiary showing on

2    that, but let's assume that that's what he would say.

3          THE COURT:  All right.

4          MR. FOLKMAN:  I would say that that has nothing to do

5    with whether or not he's obligated.  They're just fighting

6    about the price.

7          THE COURT:  All right.  So let's, let's tweak this

8    just one tiny bit just so I can make sure I understand what

9    you're arguing.

10         Let's say there weren't two assignments.  There was

11   just one.

12         MR. FOLKMAN:  Yeah.

13         THE COURT:  And it was at the time of the first

14   assignment --

15         MR. FOLKMAN:  Yeah.

16         THE COURT:  -- that Mr. Warren raised the concerns he

17   had.

18         MR. FOLKMAN:  Uh-huh (indicating an affirmative

19   response).

20         THE COURT:  And that people did not mistakenly refer

21   to the IDI agreement.  They actually correctly referred to the

22   BCH agreement as governing whatever the, the respective rights

23   of people were to equity and proceeds and everything once the

24   product hit the market.

25         MR. FOLKMAN:  Uh-huh (indicating an affirmative

1  response).

2          THE COURT:  And he balked and the defendant went to

3  him and said -- are you saying now the defendant would not have

4  been able to go to him and say, "You are obliged to sign"?

5  'Cause as I understand your argument now you're saying the

6  obligation to sign arose from the first assignment, but if the

7  first assignment is actually the time when he raises the beef,

8  to begin with -- I understand you, you're not arguing that the

9  IDI or the BCH policy obligated him to do anything.

10          MR. FOLKMAN:  We're not claiming that the policies

11  themselves are contractual and the reason for that is, you

12  know, woven throughout our brief.  Now the --

13          THE COURT:  Okay.

14          MR. FOLKMAN:  -- the reason why this case has come

15  up --

16          THE COURT:  Uh-huh (indicating an affirmative

17  response).

18          MR. FOLKMAN:  -- is that, unlike others, Dr. Warren

19  did not make the move from IDI to the Hospital.  And so

20  everybody who --

21          THE COURT:  Right.

22          MR. FOLKMAN:  Everybody who made that move --

23          THE COURT:  Right.

24          MR. FOLKMAN:  -- understood, first because they were

25  told, but second, because they signed it, you know.  They --

1    they-- they -- they were told that this is the policy, that the

2    Children's policy was --

3              THE COURT:  Uh-huh (indicating an affirmative

4    response).

5              MR. FOLKMAN:  -- the policy and, "If you don't assign,

6    I suppose you're no longer employed."  And there would be

7    equitable claims, even for former employees, for, for failure

8    to assign.

9              So, for example, suppose I'm an inventor --

10             THE COURT:  Yep.

11             MR. FOLKMAN:  -- and I come up with a, a, a billion-

12   dollar idea and we have the same documents that we have in this

13   case.

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. FOLKMAN:  And I quit my job --

17             THE COURT:  Yes.

18             MR. FOLKMAN:  -- and, and then I, I make noises.  I --

19   I -- "I'm going to commercialize this product."  And the

20   employee, the employer comes to me and says, you know, "While

21   you were working here, you had an obligation to assign this to

22   us.  You created this while you were here" --

23             THE COURT:  Uh-huh (indicating an affirmative

24   response).

25             MR. FOLKMAN:  -- right?

1          THE COURT:  Uh-huh (indicating an affirmative

2     response).

3          MR. FOLKMAN:  The employee in that case can't just go

4     out and, and, and sell it.  There's going to be a claim by the

5     employer in equity saying, "This is really ours."  And so what

6     I would suggest to you is that it doesn't matter that his

7     employment had terminated.  He's really equitably --

8          THE COURT:  Uh-huh (indicating an affirmative

9     response).

10         MR. FOLKMAN:  -- in the same situation as if, like

11    everybody else, he had continued to be employed.

12         THE COURT:  And -- and -- and -- and -- and what is

13    that legal obligation to assign?  What does it -- what does,

14    does it arise from?  You're saying it's equitable.

15         MR. FOLKMAN:  Well, it arises because while he was an

16    employee, it was --

17         THE COURT:  Yeah.

18         MR. FOLKMAN:  -- it was a condition of his employment.

19         THE COURT:  Right.  And then he left.

20         MR. FOLKMAN:  Right.  And my point -- and, and so this

21    is exactly my point.  My point is if you leave --

22         THE COURT:  Yeah.

23         MR. FOLKMAN:  -- and then you -- you're gonna --

24    you're gonna try to make some money on work that you did while

25    you were at your employer, your employer is gonna say, "You,

40

1    you invented that while you were here.  You can't do that."

2              THE COURT:  Well, and -- all right.  So, and I guess

3    this is kind of what I'm trying to, to figure out.  While I'm

4    working there I understand I have obligations.

5              MR. FOLKMAN:  Yes.

6              THE COURT:  And I can be fired if I don't comply with

7    those obligations.

8              MR. FOLKMAN:  Yes.

9              THE COURT:  But then I leave.

10             MR. FOLKMAN:  Yes.

11             THE COURT:  I'm a co-inventor.  Everybody agrees that

12   I have, I have some equity in this, in this product.  The

13   company then starts to talk with other entities and to, to form

14   other new relationships that require people to assign interests

15   and to do things.  Obviously, you can compel anybody who -- you

16   can do more to compel somebody who is working there --

17             MR. FOLKMAN:  Yes.

18             THE COURT:  -- to play along than you can with

19   somebody who's no longer --

20             MR. FOLKMAN:  Yes.

21             THE COURT:  -- working there.  And what I guess that

22   I'm trying to figure out is what is the legal obligation?  What

23   -- from what springs the legal obligation of a nonemployee to

24   do something they may not want to do?  You can't threaten to

25   fire them because they're no longer fired.

 1          MR. FOLKMAN:  I think that the obligation arises from

 2   the fact that he had an obligation while he was working there

 3   to disclose the invention to his, to his employer, right?

 4          THE COURT:  And he did.

 5          MR. FOLKMAN:  Right.

 6          THE COURT:  And, and he did.  And then he left the

 7   company.

 8          MR. FOLKMAN:  Right.  Well, in practice, your Honor,

 9   what happens in, in that situation is when you disclose, that's

10   when TIDO and whatever it's called --

11          THE COURT:  Yeah.

12          MR. FOLKMAN:  -- at the particular institution sort of

13   gears up and starts doing assignments and so forth.

14          THE COURT:  And I, and I understand that.

15          MR. FOLKMAN:  Yeah.

16          THE COURT:  And I -- I'm -- and I -- and I'm -- and

17   I'm not suggesting that working with the company, even if

18   you're not, no longer an employee, wouldn't be the most

19   reasonable thing to do.  It probably would be.

20          MR. FOLKMAN:  Yeah.

21          THE COURT:  It would be in your best interest to do

22   that.  It'd probably be self-defeating to just go off and not

23   participate any longer.  I'm trying to figure out where the

24   legal obligation to act comes from.

25          MR. FOLKMAN:  I guess the only other thing I can say

42

1   about it, your Honor, is that if you take Dr. Warren's case --

2              THE COURT:  Uh-huh (indicating an affirmative

3   response).

4              MR. FOLKMAN:  -- that he did sign that participation

5   agreement --

6              THE COURT:  Yeah.

7              MR. FOLKMAN:  -- it's in there.  Now you may feel that

8   you can't decide that on summary judgment because, as we say --

9              THE COURT:  Uh-huh (indicating an affirmative

10  response).

11             MR. FOLKMAN:  -- there's no evidence about it, but

12  that's what Dr. Warren says.

13             THE COURT:  And when you say the "participation

14  agreement," I want to make sure we're talking about -- you're

15  talking about the IDI?

16             MR. FOLKMAN:  Correct.

17             THE COURT:  Okay.  All right.

18             MR. FOLKMAN:  And I'm not talking about --

19             THE COURT:  And --

20             MR. FOLKMAN:  -- the policy now.  I'm talking about

21  the participation agreement, which, if you look in the

22  exhibits, is attached to it.

23             THE COURT:  Okay.  Now you will agree with me before,

24  just so we don't end up on all this all, all day, when BCH went

25  to him and Nixon Peabody went to him and said, "If you don't

1  sign this, we're going to sue you for breach," they weren't,

2  they weren't relying on the participation agreement.

3            MR. FOLKMAN:  That's correct.  I, I agree with you --

4            THE COURT:  They -- they were --

5            MR. FOLKMAN:  -- a hundred percent that --

6            THE COURT:  They were relying on the IDI agreement.

7  Okay.

8            So here's my last question to you on this --

9            MR. FOLKMAN:  Yeah.

10           THE COURT:  -- and then you go back to whatever you

11  want to say to me.

12           MR. FOLKMAN:  Yep.

13           THE COURT:  What do we make of the fact that they were

14  -- they -- they -- they used a legally unsound argument and

15  invoked the wrong documents out there to induce a former

16  employee to do something the employee suggested he did not want

17  to do?  What should we make of that here?  Why is that not of

18  significance, especially where you start out by arguing he's

19  not entire, he, he's not entitled to make an equitably, an

20  equity-based argument or equitably-based argument here?  I

21  mean, how can you say that when the company basically strong

22  armed him into doing something based on something that you

23  concede was legally incorrect?

24           MR. FOLKMAN:  Well, I, I have two responses.  The

25  first is that I think, as I've tried to suggest, the equities

44

 1   are on both sides.  So we were trying to strong arm him --

 2            THE COURT:  Okay.

 3            MR. FOLKMAN:  -- and he was trying to strong arm us.

 4            THE COURT:  Sure.  Okay.

 5            MR. FOLKMAN:  So that's Point --

 6            THE COURT:  Uh-huh (indicating an affirmative

 7   response).

 8            MR. FOLKMAN:  -- No. 1.

 9            And, and Point No. 2 -- and I'll just return and I, I

10   won't say it again -- but --

11            THE COURT:  Uh-huh (indicating an affirmative

12   response).

13            MR. FOLKMAN:  -- the, the fact of the matter is no

14   matter how inequitable a situation looks --

15            THE COURT:  Right.

16            MR. FOLKMAN:  -- and I don't think it's, it looks that

17   inequitable when you weigh everything --

18            THE COURT:  Right.

19            MR. FOLKMAN:  -- no matter how inequitable it looks,

20   without the reasonable reliance you can't have estoppel and

21   there can't be reasonable reliance when you admit you were

22   obligated to do it, anyway.

23            So that --

24            THE COURT:  Okay.

25            MR. FOLKMAN:  -- that's the position.

```
 1            THE COURT:  Okay.

 2            MR. FOLKMAN:  Let me, let me just turn to the, the

 3   question of the existence and the amendment of the contract --

 4            THE COURT:  Uh-huh (indicating an affirmative

 5   response).

 6            MR. FOLKMAN:  -- if there were a contract.  And, and I

 7   don't want to belabor it because from, from your questions --

 8            THE COURT:  Uh-huh (indicating an affirmative

 9   response).

10            MR. FOLKMAN:  -- I, I have the sense that the Court's

11   tentative view, at least, is that you're willing to say that it

12   wasn't a contract and, and that you think that the, the

13   consequences of that may be bad for us, which, which I

14   understand why --

15            THE COURT:  Uh-huh (indicating an affirmative

16   response).

17            MR. FOLKMAN:  -- where that view comes from.

18            But I just want to say that the, the factors that

19   courts use to look at this, if you tick them off --

20            THE COURT:  Uh-huh (indicating an affirmative

21   response).

22            MR. FOLKMAN:  -- and I'm, I'm not going to tick them

23   off one by one --

24            THE COURT:  Right.

25            MR. FOLKMAN:  -- we tick off each and every box.  All
```

1    of the pierce factors and those factors are derived from the

2    Jackson case.  All of those factors are satisfied here.  And,

3    and so I think under Massachusetts law it's quite, it's

4    quite --

5              THE COURT:  Uh-huh (indicating an affirmative

6    response).

7              MR. FOLKMAN:  -- clear that this is sort of the, the,

8    the example of, of the kind of manual or handbook or policy --

9              THE COURT:  Uh-huh (indicating an affirmative

10   response).

11             MR. FOLKMAN:  -- that employers have that just are not

12   deemed to be contractual.  If you thought it, if you thought it

13   was a contract --

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. FOLKMAN:  -- I would just point you to the

17   undisputed declaration of Ryan Dietz, the TIDO --

18             THE COURT:  Uh-huh (indicating an affirmative

19   response).

20             MR. FOLKMAN:  -- fellow, who says, "At the time of the

21   affiliation we amended that."  And there's no, there's no real

22   dispute about that.

23             THE COURT:  Uh-huh (indicating an affirmative

24   response).

25             MR. FOLKMAN:  Dr. Warren's view, I think, is that,

1  "Well, where, where are the voluminous documents that show

2  this?"

3       THE COURT:  Uh-huh (indicating an affirmative

4  response).

5       MR. FOLKMAN:  There aren't voluminous documents that

6  show it, but that's the, that's what the Hospital did.

7       THE COURT:  Why didn't, why didn't the company tell

8  people it was reducing their interest?

9       MR. FOLKMAN:  So --

10      THE COURT:  That seems --

11      MR. FOLKMAN:  -- I have to go outside the --

12      THE COURT:  At best, that was really tone deaf.

13      MR. FOLKMAN:  Yeah.  So let me, let me just go outside

14  the record, if I may, to sort of tell you what I understand

15  about that.

16      THE COURT:  Okay.

17      MR. FOLKMAN:  And I, you know, I don't want to say

18  it's in any kind of evidentiary sense, but I think it's a fair

19  question and --

20      THE COURT:  Yeah.

21      MR. FOLKMAN:  -- I think the real answer is that they

22  did tell everybody but since Dr. Warren didn't make the move,

23  he didn't get the message.  I think that's the real answer.

24  Now I, you know, that's not part of this motion.

25      THE COURT:  Uh-huh (indicating an affirmative

1    response).

2            MR. FOLKMAN:  And I understand why you want to know

3    it, but that's the, I think that's the fact of the matter.

4            The last point I want to make -- well, I have a couple

5    last points.  I do want to acknowledge a, a mistaken citation

6    in our briefs --

7            THE COURT:  Okay.

8            MR. FOLKMAN:  -- which was the Nagel (phonetic) case.

9    The citation is fine --

10           THE COURT:  Uh-huh (indicating an affirmative

11   response).

12           MR. FOLKMAN:  -- and the proposition for which we

13   cited it is fine.  We are actually citing Judge Liposis'

14   (phonetic) dissent and we ought to have said that in the, in a

15   parenthetical.

16           THE COURT:  Okay.

17           MR. FOLKMAN:  So I don't think it, it, it makes a

18   difference, but I just want to let you know that we're aware of

19   that.  And I apologize to the Court that we didn't indicate

20   that in the, in the parenthetical to the citation.

21           THE COURT:  Okay.

22           MR. FOLKMAN:  The, the point of that citation is

23   essentially the same point that we, that we cite the, the, the

24   Railway case for and some of the other estoppel cases, which is

25   to say if you're obligated to do it --

```
 1              THE COURT:  Uh-huh (indicating an affirmative
 2   response).  -
 3              MR. FOLKMAN:  -- you can't claim reasonable reliance
 4   when someone makes a misrepresentation to you.
 5              THE COURT:  Uh-huh (indicating an affirmative
 6   response).
 7              MR. FOLKMAN:  And, and the last point I want to
 8   make -- and, and this is, again, something that is, is outside
 9   the record, but it addresses a point that is sort of
10   throughout --
11              THE COURT:  Uh-huh (indicating an affirmative
12   response).
13              MR. FOLKMAN:  -- Dr. Warren's papers -- the Hospital's
14   intent has always been that when the lock-up period ends --
15              THE COURT:  Uh-huh (indicating an affirmative
16   response).
17              MR. FOLKMAN:  -- it's going to sell the stock and it's
18   going to distribute the proceeds.  So I think --
19              THE COURT:  Okay.
20              MR. FOLKMAN:  -- there's some suggestion that maybe it
21   would never happen.
22              THE COURT:  Right.
23              MR. FOLKMAN:  The fact of the matter is the Hospital
24   is not in the business of speculating on stock.
25              THE COURT:  Uh-huh (indicating an affirmative
```

1    response).

2           MR. FOLKMAN:  There's a lot of people inside the

3    Hospital that would like to use this money for, you know,

4    important research.  So --

5           THE COURT:  Are, are you able to make a representation

6    that, you know, within "X" period of time after the stock is

7    able to be sold the Hospital intends to sell it on the market

8    for market price?

9           MR. FOLKMAN:  I cannot make a representation as to a

10   particular time, but what I can make a representation is that

11   promptly after the expiration of the lock-up date, that's their

12   intention.

13          THE COURT:  Okay.

14          MR. FOLKMAN:  And I -- I -- you know, you asked about

15   market price and so forth.

16          THE COURT:  Uh-huh (indicating an affirmative

17   response).

18          MR. FOLKMAN:  I didn't actually ask that question

19   before the hearing.

20          THE COURT:  Uh-huh (indicating an affirmative

21   response).

22          MR. FOLKMAN:  My assumption is they're not selling it

23   for less than it's worth, but I, you know, I --

24          THE COURT:  I mean, these are -- is it listed on a

25   market?

```
 1                MR. FOLKMAN:  Yes.  And so --

 2                THE COURT:  All right.

 3                MR. FOLKMAN:  Yeah.

 4                THE COURT:  So it's going to be --

 5                MR. FOLKMAN:  That's right.

 6                THE COURT:  -- in a market --

 7                MR. FOLKMAN:  That's right.

 8                THE COURT:  -- transaction.

 9                MR. FOLKMAN:  Correct.

10                THE COURT:  It's not a private deal with a --

11                MR. FOLKMAN:  Correct.

12                THE COURT:  Okay.

13                MR. FOLKMAN:  Correct.

14                THE COURT:  Do you mind?  I just had a couple --

15                MR. FOLKMAN:  Yes.

16                THE COURT:  -- of questions.  And actually, that was

17   one of the questions I wanted to ask.  So thank you.  And for

18   the record I was told, "Don't ask that.  He's not going to

19   answer that question."  And, and you offered that.  So thank

20   you.

21                The other is -- and this is going back to -- and trust

22   me.  I'm not reopening.  I just want to make sure I understand

23   everything.  What is it -- just string it out for me -- if we

24   go back to the first assignment.  I know you say obligations

25   arose from signing the first assignment.
```

 1          MR. FOLKMAN:  Yes.

 2          THE COURT:  But if we're at the time of the first

 3  assignment and Mr. Warren is not an employee and Mr. Warren

 4  balks, what would have been the consequences of his not

 5  signing?  I suppose on one level what could have happened to

 6  him?  What, what could the defendant have done to impel him to

 7  sign?  But in terms of the, the ability to do anything with the

 8  product, how would it have been hampered by his failure to sign

 9  the assignment?

10          MR. FOLKMAN:  Well, so the -- you raise a really

11  important point.  It would have, it would have been very, very

12  significant not to have an assignment from all of the inventors

13  because Moderna wants to be the exclusive licensee.

14          THE COURT:  Uh-huh (indicating an affirmative

15  response).

16          MR. FOLKMAN:  And I, you know, I can't speak to

17  exactly what would have happened, but it would have been a very

18  significant problem for the deal --

19          THE COURT:  Okay.

20          MR. FOLKMAN:  -- if the, the owner of the patents had

21  not been able to say that they had written assignments from all

22  of the inventors.

23          Now I think that there would have been legal arguments

24  that the first assignment --

25          THE COURT:  Uh-huh (indicating an affirmative

1   response).

2         MR. FOLKMAN:  -- effectively assigned all rights and

3   so that the second assignment, in a sense, is just --

4         THE COURT:  Right --

5         MR. FOLKMAN:  -- going to serial --

6         THE COURT:  --  but -- and I was just tweaking to say

7   if we, if we're at the time of the first assignment --

8         MR. FOLKMAN:  Yeah.  Yeah.  Yeah.

9         THE COURT:  -- and somebody was balking then, what

10  could the -- and, and then that -- and let's, like taking out

11  the mistaken reliance on the IDI --

12        MR. FOLKMAN:  Yeah.

13        THE COURT:  -- you could go back in time and you were

14  advising them, "Here legally is what you can do to get the

15  person to, to sign this first assignment," what would that have

16  been?

17        MR. FOLKMAN:  I think the Hospital would have sued

18  Dr. Warren and said, "It was a condition of your employment

19  that you" --

20        THE COURT:  Right, but he's no longer employed.

21        MR. FOLKMAN:  "It was a condition of your employment

22  that you do this."

23        THE COURT:  Right.

24        MR. FOLKMAN:  And so in equity, equity regards as

25  being done that which ought to have been done.

54

1          THE COURT:  So you would have been suing for a

2     specific performance, I suppose, in a way --

3          MR. FOLKMAN:  Correct.  Correct.

4          THE COURT:  -- to -- to -- to perform something you

5     would have been obligated to do had you been an employee?

6          MR. FOLKMAN:  Right.  And no one wants to be in that

7     position --

8          THE COURT:  Right.

9          MR. FOLKMAN:  -- but I, I think that that's the, the

10    likely answer.  And I would say, also, that depending on how

11    you feel about Dr. Warren's assertion --

12         THE COURT:  Uh-huh (indicating an affirmative

13    response).

14         MR. FOLKMAN:  -- that he signed the participation

15    agreement --

16         THE COURT:  Uh-huh (indicating an affirmative

17    response).

18         MR. FOLKMAN:  -- if, if you think that he did sign it

19    for purposes of this motion, we would also have had a

20    contractual, a contractual cause of action.

21         THE COURT:  Okay.  Thank you.

22         MR. FOLKMAN:  Thank you.

23         THE COURT:  All right.

24         All right, Mr. Warren.  Finally, sir.

25         MR. WARREN:  Thank you, your Honor.

1              THE COURT:  I, I went over the -- I was trying to do a

2    30-30 split, but I've done 45 so far.  But let's -- let's --

3              MR. WARREN:  Okay.

4              THE COURT:  -- let's see where we go with you.

5              MR. WARREN:  Yes.  First of all, I don't just see this

6    as primarily an, an equitable or estoppel based.  I, I say

7    "primarily."  It's a contract claim.

8              THE COURT:  Uh-huh (indicating an affirmative

9    response).

10             MR. WARREN:  I do believe that I would have valid

11   arguments in estoppel if they're in the contract or in, if

12   there's a contract and it was -- the Court finds that

13   (indiscernible) ultimately bear it.

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. WARREN:  I would, would like to note that there's

17   a recent case in this court, Terrace v. Harvard (phonetic),

18   which had a, involved a similar participation agreement and a

19   royalties policy and in deciding a, on a motion to dismiss the

20   court affirmed that there was a contract.  And that case, I

21   infer that they could prove that he signed a participation

22   agreement, which I concede I can't prove that.  I asked for my

23   participation agreement and Derrick Rossi's --

24             THE COURT:  Right.

25             MR. WARREN:  -- and they told me they looked high and

 1   low and they can't find it.  I -- so I don't know what to make

 2   of that.

 3            THE COURT:  Well, you say you signed it.

 4            MR. WARREN:  I'm not -- I don't really assert that.  I

 5   don't know.

 6            THE COURT:  Okay.

 7            MR. WARREN:  I do assert that they have asserted that

 8   was their standard policy and that that did happen at

 9   orientation.

10            THE COURT:  Right.

11            MR. WARREN:  And they asserted during the, in the

12   affiliation agreement --

13            THE COURT:  Uh-huh (indicating an affirmative

14   response).

15            MR. WARREN:  -- in their Reps and Warranties that

16   everybody -- and my name and Rossi's name was listed there --

17            THE COURT:  Uh-huh (indicating an affirmative

18   response).

19            MR. WARREN:  -- had signed.

20            THE COURT:  Okay.

21            MR. WARREN:  But I don't know.  I -- my -- I would

22   argue that there's a contract and if we didn't sign it, they

23   dropped the ball, whatever.

24            THE COURT:  Okay.

25            MR. WARREN:  I also think that a great, everything

1  becomes much simpler --

2         THE COURT:  Uh-huh (indicating an affirmative

3  response).

4         MR. WARREN:  -- if we just assume that there was a

5  contract and that the representations that were made to me by

6  Ryan Dietz, by the BCH counsel --

7         THE COURT:  Uh-huh (indicating an affirmative

8  response).

9         MR. WARREN:  -- and by Nixon Peabody back in 2011 were

10  correct, both as to the fact that I was obliged, that the

11  policy was a contract.

12         THE COURT:  Uh-huh (indicating an affirmative

13  response).

14         MR. WARREN:  I was obliged under.  The policy did

15  provide for deferred compensation and I was obligated to --

16         THE COURT:  Okay.

17         MR. WARREN: -- obligated to assign and the IDI

18  percentages ruled.  If we just assume that, our problems go

19  away.

20         THE COURT:  I'm, I'm just curious.  How, if at all,

21  does any of your sense of, of, of what you think your rights

22  are and what you think they did wrong, how, how does any of

23  that change if we endorse this idea that there was a good faith

24  mistaken reference to the IDI agreement that you kind of

25  entered into and, in fact, everybody really should have been

58

```
 1    referring to the agreement that, as it was modified after BCH
 2    took over after the affiliation?  And would you still be
 3    arguing, "Oh, that wouldn't have made a difference," you know?
 4    "I -- I" -- or would you be arguing that that makes a
 5    difference?
 6              MR. WARREN:  If they had cited -- and not just in that
 7    2011 interaction -- but a new policy, they could have cited the
 8    new policy.
 9              THE COURT:  Uh-huh (indicating an affirmative
10    response).
11              MR. WARREN:  They could have expressed that to their
12    employees.
13              THE COURT:  Right.
14              MR. WARREN:  And they can change a policy.
15              THE COURT:  Right.
16              MR. WARREN:  That's --
17              THE COURT:  Okay.
18              MR. WARREN:  That's allowed.  I've read through a
19    bunch of these --
20              THE COURT:  Right.
21              MR. WARREN:  -- cases.  They could change the policy.
22    It will become effective when they retired the old policy --
23              THE COURT:  Uh-huh (indicating an affirmative
24    response).
25              MR. WARREN:  -- and expressedly -- and they expressed
```

1    it to their employees not simply by --

2              THE COURT:  Okay.

3              MR. WARREN:  -- whatever happened in that contract,

4    but it would actually have to be expressed to employees to come

5    into effect.  It still would not have, be effective

6    retroactively.  I think Lematra (phonetic) is the obvious case

7    to look at there.

8              THE COURT:  What, what do you say to this notion that

9    there was language when you were an employee that said the

10   terms, the conditions under which you operated could be

11   modified?

12             MR. WARREN:  Yes.  I think Lematra and many other

13   cases, but Lematra is a very good one here -- first of all,

14   most of these cases, including all the ones that --

15             THE COURT:  Uh-huh (indicating an affirmative

16   response).

17             MR. WARREN:  -- Mr. Folkman cited --

18             THE COURT:  Uh-huh (indicating an affirmative

19   response).

20             MR. WARREN:  -- in support of his position, involve a

21   default, at will, and presumptively, at-will employment

22   situation --

23             THE COURT:  Right.

24             MR. WARREN:  -- and they're about progressive

25   discipline policies.

1                    THE COURT:  Right.

2                    MR. WARREN:  And as a number of courts have noted,

3     there's a conundrum there and that weighs against giving

4     contractual weight to those progressive discipline policies.

5                    THE COURT:  Uh-huh (indicating an affirmative

6     response).

7                    MR. WARREN:  That doesn't apply here.  Even, even when

8     it does apply, many courts, and increasingly, courts have found

9     that they do have, have contractual weight.

10                   THE COURT:  Uh-huh (indicating an affirmative

11    response).

12                   MR. WARREN:  That doesn't, doesn't apply here.

13                   So, sorry.

14                   THE COURT:  That, that's okay.

15                   MR. WARREN:  Can you repeat the question --

16                   THE COURT:  Well, no, no. --

17                   MR. WARREN:  -- or refresh my memory?

18                   THE COURT:  It -- it -- it's just that -- right.

19    'Cause one of the things they are trying to suggest on us,

20    well, there's a few things that are being suggested.  So this

21    actually does get a little muddled and we would have to stop

22    ourselves and go back and, and try to start with one thought

23    and then go in a linear fashion.

24                   But one of the, one of the things they say is, "Well,

25    there was no contract, to begin with."

 1          MR. WARREN:  Uh-huh (indicating an affirmative

 2   response).

 3          THE COURT:  All right.  It was illusory, at best, and

 4   it was illusory, in part, because there was language that every

 5   employee on, was, was made aware of and understood, which was

 6   that, "What we're really describing here are the, the, the

 7   things that we are making available to you as an employee," you

 8   know.  "We're going to give you a desk and a chair and we

 9   might, we might change the desk at any time.  We might change

10   the chair.  We, we can do these things at our discretion

11   whenever we want."

12          So that you kind of knew that changes could be made

13   and there's no contract, really, to have been breached.  They

14   were just exercising a right that they always have.

15          MR. WARREN:  Yes.  And I think a number of courts have

16   found that that's not a valid argument.

17          THE COURT:  Uh-huh (indicating an affirmative

18   response).

19          MR. WARREN:  First, one, one reason being that the

20   policy's clearly intended to incentivize, makes promises --

21          THE COURT:  Uh-huh (indicating an affirmative

22   response).

23          MR. WARREN:  -- to incentivize economically

24   beneficial --

25          THE COURT:  Right.

```
 1              MR. WARREN:  -- behavior.  That's -- many courts have

 2    in deciding these cases --

 3              THE COURT:  Right.

 4              MR. WARREN:  -- these handbook cases, have cited that

 5    as an important factor.

 6              THE COURT:  Uh-huh (indicating an affirmative

 7    response).

 8              MR. WARREN:  It's detailed.  It's not, despite

 9    Mr. Folkman's quote about, half a sentence fragment, about

10    guidelines, this is a very detailed explication --

11              THE COURT:  Uh-huh (indicating an affirmative

12    response).

13              MR. WARREN:  -- of what I'm going to get as an

14    employee inventor written in legalistic language with

15    definitions such as "covered persons," etc., etc.

16              MR. WARREN:  So that --

17              THE COURT:  Uh-huh (indicating an affirmative

18    response).

19              MR. WARREN:  -- supports reasonable reliance that is,

20    that is a binding offer.

21              THE COURT:  Right, but then you left the company --

22              MR. WARREN:  Uh-huh (indicating an affirmative

23    response).

24              THE COURT:  -- right?  So you -- you're -- there were

25    things that -- yeah.  You -- you -- you say, "There was
```

1   reliance.  I signed this.  I was an employee and I, as an

2   employee, I was entitled to all these things," and then you

3   leave the company --

4              MR. WARREN:  Yes.

5              THE COURT:  -- right?

6              So at the time you leave the company and then there's

7   communication with the defendant and they're asking you to, to

8   assign, the argument is is that you concede that you knew you

9   had an obligation to, to sign the assignment, is that -- do --

10  do you agree with that or you disagree with that?

11             MR. WARREN:  So there, so there was a first

12  assignment, which I signed, which I executed in August after I

13  left.

14             THE COURT:  Uh-huh (indicating an affirmative

15  response).

16             MR. WARREN:  The consideration that's laid out in that

17  assignment is for, basically, for salary and employee benefits.

18             THE COURT:  Okay.

19             MR. WARREN:  I've left the company.

20             THE COURT:  Uh-huh (indicating an affirmative

21  response).

22             MR. WARREN:  If it's just for salary, I don't even

23  know if that would be supportable.

24             THE COURT:  Uh-huh (indicating an affirmative

25  response).

1          MR. WARREN:  But even if, even if that were

2    supportable -- and they do try and suggest that --

3          THE COURT:  Right.

4          MR. WARREN:  -- really, it's only binding on me --

5          THE COURT:  Right.

6          MR. WARREN:  -- and they're not promising anything --

7    but even if that's supportable, that's past consideration.  So

8    it's not consideration.

9          So it's not a binding --

10         THE COURT:  Well -- all right.  You're giving me --

11         MR. WARREN:  -- contract.

12         THE COURT:  -- a nice legal answer.

13         MR. WARREN:  Yeah.

14         THE COURT:  I guess the question I'm asking you is,

15   did you have an understanding you were obligated to sign that?

16         MR. WARREN:  I understood that there was an

17   arrangement by which I would get a percentage.  I probably

18   didn't even understand what an assignment was at the time I was

19   at the company.

20         THE COURT:  Uh-huh (indicating an affirmative

21   response).

22         MR. WARREN:  I think the first time, probably, I ever

23   saw an assignment or ever kind of considered it --

24         THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. WARREN:  -- was looking at that assignment that I

2     signed in August and I thought, okay.  This is part of our

3     arrangement.  So I'm going to get something.  That's the

4     employee benefits that are mentioned.  And I'm, even though I'm

5     a layman, I know enough about law that past consideration is

6     not consideration.

7          THE COURT:  Uh-huh (indicating an affirmative

8     response).

9          MR. WARREN:  But I've heard about, I've been told.

10    That's been my operating assumption all this time that I've

11    been promised a certain percentage of, of anything that they

12    get.

13         THE COURT:  Uh-huh (indicating an affirmative

14    response).

15         MR. WARREN:  So I signed it.  But, you know, I could

16    have been wrong about either of those things.  I could have

17    been wrong, when we actually come and look at it, that they're

18    not legally bound to, to give me, to give me a percentage and

19    they're not legally bound to assign.  I just -- that's it.

20    That was my understanding.  That was the level of reliance that

21    I had.  I didn't go over it with a legal fine --

22         THE COURT:  Okay.  But -- but --

23         MR. WARREN:  -- tooth --

24         THE COURT:  But you signed it.  I mean, you're, you're

25    a professional and under law --

1          MR. WARREN:  Yeah.

2          THE COURT:  -- you're deemed to have read --

3          MR. WARREN:  And I did.

4          THE COURT:  -- and accepted the terms of anything you

5    signed.  And I'm asking this, in part, because Mr. Folkman says

6    that first assignment, in and of itself, contractually binds

7    you or binds you --

8          MR. WARREN:  Yes.

9          THE COURT:  -- to sign any second or successor

10   assignments.  Maybe not successor, that's not the right word,

11   but any subsequent assignments.

12          So by the time of the second where you are balking

13   they say, "Well, you were bound to sign that, too."  Now do you

14   agree or disagree with that?

15          MR. WARREN:  That was the second cause of action

16   giving them --

17          THE COURT:  Yes.

18          MR. WARREN:  -- the lawsuit.

19          THE COURT:  That, that was the one where they

20   threatened you with a lawsuit if you didn't.

21          MR. WARREN:  Well, the first cause of action is breach

22   of contract, which is I'm happy at that point because they've

23   admitted that it's a contract.  That's --

24          THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. WARREN:  If you look at the communications --

2          THE COURT:  Right.

3          MR. WARREN:  -- in 2011 --

4          THE COURT:  Right.

5          MR. WARREN:  -- that's what I'm trying to elicit.

6          THE COURT:  Right.

7          MR. WARREN:  Am I -- is there a contract here where I

8   help you by giving you the assignment and supporting patent

9   prosecution and you pledge to give me a certain percentage.  So

10  that, that's clear.

11         Then the second cause of action is that I'm obliged by

12  the first assignment.

13         THE COURT:  Right.

14         MR. WARREN:  Now I can't remember.  I remember having

15  discussions with my lawyer.  I don't know if I was -- I think I

16  probably did recognize that there was a failure of

17  consideration in the first assignment so, that that was at

18  least a weak claim.

19         And then there was a third claim that I'm obliged and

20  not -- it's not that I didn't want to give them the assignment.

21         THE COURT:  Right.

22         MR. WARREN:  I wanted to give them an assignment, but

23  know --

24         THE COURT:  Right.  You wanted to --

25         MR. WARREN:  -- and have in writing --

68

1          THE COURT:  -- know what you were getting for it.

2          MR. WARREN:  -- what the terms were --

3          THE COURT:  You wanted to know what you --

4          MR. WARREN:  -- what's my deal.

5          THE COURT:  Right.

6          MR. WARREN:  What -- what --

7          THE COURT:  You wanted to know what you were gonna

8  get.

9          MR. WARREN:  And this is, you know, you can see

10 reading --

11         THE COURT:  Right.

12         MR. WARREN:  -- Dietz's response, responses and,

13 and -- that he was evasive --

14         THE COURT:  Right.

15         MR. WARREN:  -- and he didn't want to initially give

16 me the, the, the, the participation agreement --

17         THE COURT:  Okay.  Now --

18         MR. WARREN:  -- somewhat.

19         THE COURT:  -- stop right there.

20         MR. WARREN:  Sorry.

21         THE COURT:  Remember -- no, no.

22         MR. WARREN:  Yeah.

23         THE COURT:  Remember what I said somebody might say

24 something and then I want to hear from the other side.

25         MR. WARREN:  Sure.

1      THE COURT:  So you stay right there.

2      So, Mr. Folkman, why, if you know, did it seem as

3  though Mr. Dietz was not, ostensibly, more forthcoming about

4  sharing with Mr. Warren what the results of signing that second

5  assignment would be?  It seems like nobody wanted to kind of

6  tell him, "Look, here's, here's how it's going to affect your

7  position."

8      MR. FOLKMAN:  Yeah.  So I don't believe there's

9  testimony on that, your Honor.  I will say that the e-mails

10  themselves say that the, the policy is not public and I -- I --

11  you could speculate that because Dr. Warren was no longer an

12  employee --

13      THE COURT:  Uh-huh (indicating an affirmative

14  response).

15      MR. FOLKMAN:  -- he has a institutional or

16  bureaucratic reason not to share the policy outside of the

17  institution.  I -- I --

18      THE COURT:  Well, but I don't -- but, but I think what

19  he was -- I mean -- and that's a fair response -- but I think

20  his concern was, "I need to know what's in it for me.  I need

21  to know how this affects me," which is not the same as sharing

22  the policy with the outside world, right?

23      MR. FOLKMAN:  Understood.  Understood.  All I can --

24  all I can --

25      THE COURT:  You know?  It might even be, "This is,"

 1  you know, "I hate to say it.  This is actually not so good for

 2  you," or, "This is neutral for you," or, "This is actually

 3  better for you.  There's risks, but if things go a certain

 4  way," I mean, right?  That -- that --

 5          MR. FOLKMAN:  Yeah.  No, no.  You --

 6          THE COURT:  It seems -- seems -- seems fair to, to

 7  assume somebody who's being threatened with a lawsuit to sign

 8  this would be entitled to have that sort of information, right?

 9          MR. FOLKMAN:  Yeah.  So I, I'm not disagreeing that,

10  that he should have, as he, in fact, ultimately did --

11          THE COURT:  Uh-huh (indicating an affirmative

12  response).

13          MR. FOLKMAN:  -- give the figures to Dr. Warren.

14          THE COURT:  Okay.

15          MR. FOLKMAN:  I -- your question, I, I understood to

16  be, why didn't he do it in the first place.

17          THE COURT:  Yeah.

18          MR. FOLKMAN:  And I, you know.

19          THE COURT:  Yeah.  And it just seemed from what I

20  could see in the record that it seemed like there was, "Well,

21  why don't you sign it and then" --

22          MR. FOLKMAN:  Yeah.

23          THE COURT:  Okay.  All right.  Thank you.

24          Sorry, Mr. Warren.  Go ahead.

25          MR. WARREN:  Yes.  I wanted to address something else,

1  which was suggested that it was all very benign that they --

2  that -- this change in policy.

3          THE COURT:  Uh-huh (indicating an affirmative

4  response).

5          MR. WARREN:  In fact, there was a bitter fight when

6  they announced that the BCH policy was going to apply to Rossi

7  not because of his --

8          THE COURT:  Uh-huh (indicating an affirmative

9  response).

10          MR. WARREN:  -- personal (indiscernible) for this 33-

11  1/3 as an inventor --

12          THE COURT:  Right.

13          MR. WARREN:  -- I think, because he's going to get

14  many times that through his, his, his founder's equity, but his

15  33-1/3, which looks to be about $20 million --

16          THE COURT:  Uh-huh (indicating an affirmative

17  response).

18          MR. WARREN:  -- disappeared.  Now I'm not making a

19  case.  They may have, have a, a much better legal case --

20          THE COURT:  Uh-huh (indicating an affirmative

21  response).

22          MR. WARREN:  -- that they have the right to impose

23  that.  But essentially, by saying that this language in the

24  affiliation agreement, even though it was never expressed to

25  employees --

1          THE COURT:  Uh-huh (indicating an affirmative

2    response).

3          MR. WARREN:  -- made this the effective policy, they

4    established a tough bargaining position, a --

5          THE COURT:  Right.

6          MR. WARREN:  -- zero-based bargaining position --

7          THE COURT:  Right.

8          MR. WARREN:  -- and eventually Rossi, looks like, by

9    threatening to quit --

10          THE COURT:  Uh-huh (indicating an affirmative

11    response).

12          MR. WARREN:  -- eventually negotiated an up to 2-1/2

13    percent and then looked like he settled at 7-1/2 percent.  But

14    in the process, I get squeezed.  Rossi doesn't --

15          THE COURT:  Right.

16          MR. WARREN:  -- care, probably, about his personal

17    percentage getting --

18          THE COURT:  Uh-huh (indicating an affirmative

19    response).

20          MR. WARREN:  -- squeezed a few points, but, for me,

21    that's about 20 percent --

22          THE COURT:  Right.

23          MR. WARREN:  -- plus I lose another, potentially, more

24    on the tax issues --

25          THE COURT:  Uh-huh (indicating an affirmative

1   response).

2         MR. WARREN:  -- plus I've lost all the leverage and

3   they can abuse me.

4         THE COURT:  So, so why did you execute the second

5   assignment?

6         MR. WARREN:  Sorry.  Why?

7         THE COURT:  Why, why did you?

8         MR. WARREN:  I was satisfied, I thought.

9         THE COURT:  Okay.  You were satisfied with it.

10        MR. WARREN:  I -- I --

11        THE COURT:  Okay.

12        MR. WARREN:  I also kind of inferred that there wasn't

13  -- I fig, I figured there probably hadn't been an equity deal

14  because it looked like I should have been distributed shares.

15        THE COURT:  Right.

16        MR. WARREN:  So I thought there probably wasn't an

17  equity deal, anyway.  So --

18        THE COURT:  Okay.

19        MR. WARREN:  -- no big deal.  But also, I'd got what I

20  wanted, which was the IDI participation agreement and their

21  statement that that was a contract.

22        Now they still, I guess, managed --

23        THE COURT:  Right.

24        MR. WARREN:  -- to leave themselves a little bit--

25        THE COURT:  Right.

```
 1              MR. WARREN:  -- of wiggle room there.

 2              THE COURT:  Right.  Well, you got it in a

 3   roundabout --

 4              MR. WARREN:  But, you know.

 5              THE COURT:  You got it in a roundabout way.  You got

 6   it in the form of a threatened lawsuit that says there is this

 7   contract and you're --

 8              MR. WARREN:  Yes.  I mean --

 9              THE COURT:  -- you're going to be in breach of it if

10   you don't sign it.

11              MR. WARREN:  -- it would have been nice --

12              THE COURT:  Okay.

13              MR. WARREN:  -- if they'd just responded to me with

14   the participation agreement, which I was supposed to have been

15   given --

16              THE COURT:  Right.

17              MR. WARREN:  -- and signed --

18              THE COURT:  Right.

19              MR. WARREN:  -- at my orientation.  And at the time

20   all this was happening, you know, I was going from a state of

21   naivete or --

22              THE COURT:  Right.

23              MR. WARREN:  -- thinking, oh, you know --

24              THE COURT:  Okay.

25              MR. WARREN:  -- I can trust these people to, well, and
```

1   hearing from other people and seeing things happen that, hey,

2   you gotta watch your back in this situation.  And so that's,

3   that's where that whole interaction came from.

4            And everything appeared to be okay and, you know, for

5   the next six years and I did research, you know.  Obviously, it

6   came to the fore and it was announced, you know, that, that

7   Moderna's raising all these funds --

8            THE COURT:  Right.

9            MR. WARREN:  --  and is likely to exit --

10           THE COURT:  Uh-huh (indicating an affirmative

11  response).

12           MR. WARREN:  -- sometime soon.  Well, what is my

13  position?  So it's only then in 2017 -- and I -- in that period

14  I have --

15           THE COURT:  Right.

16           MR. WARREN:  -- by the way, been cooperating with

17  helping them with --

18           THE COURT:  Right.

19           MR. WARREN:  -- patent prosecution --

20           THE COURT:  Uh-huh (indicating an affirmative

21  response).

22           MR. WARREN:  -- and I think it was some kind of

23  interference proceeding and so on and providing documents

24  there.

25           THE COURT:  Uh-huh (indicating an affirmative

1   response).

2           MR. WARREN:  But then I discover, hey, they've,

3   they've basically squeezed me probably, primarily, to allow

4   them to, to give them a good bargaining position with Rossi and

5   sort of, "Well, that's just a policy.  So" --

6           THE COURT:  Right.

7           MR. WARREN:  -- "you get nothing."  Okay.  "Well, if

8   you threaten to leave, we'll give you a bit."  Meanwhile, I'm

9   getting squeezed.  They -- after they threaten me with a

10  lawsuit --

11          THE COURT:  Right.

12          MR. WARREN:  -- for not cooperating with them on the

13  basis of this very policy that they are now abrogating.

14          THE COURT:  So do I understand that, that the net

15  effect of all of this is is that your interest has gone from 33

16  percent to 27-1/2 percent, is that --

17          MR. WARREN:  Well, it's half of that.

18          THE COURT:  Well -- okay.  Those are the --

19          MR. WARREN:  'Cause I share equally with Rossi.

20          THE COURT:  To share -- all right.  Okay.

21          MR. WARREN:  And it went down to, effectively, 25

22  percent.  It's been more complicated than that.

23          THE COURT:  Okay.

24          MR. WARREN:  But for the amount of money that's

25  involved here, it's effectively 25 percent.

1          THE COURT:  Okay.

2          MR. WARREN:  And they've put 20, 27-1/2 in a, a *ad hoc*

3  agreement, which I have not yet signed, but the last two checks

4  were under the 27-1/2.

5          THE COURT:  Okay.

6          MR. WARREN:  So I'm still down almost 20 percent, plus

7  I have, potentially, still been injured by the failure to

8  distribute stock --

9          THE COURT:  Well --

10          MR. WARREN:  -- earlier, but --

11          THE COURT:  Well, when you say -- let me just make

12  sure I understand.  When you say you're "down 20 percent,"

13  what's the 20 percent you're down?

14          MR. WARREN:  Well, if you go from 33-1/3 down to 27-

15  1/2 --

16          THE COURT:  Oh, okay.

17          MR. WARREN:  -- it's about --

18          THE COURT:  And I'm doing it on a --

19          MR. WARREN:  -- 18.

20          THE COURT:  -- basis of a, zero to a hundred, but you

21  say --

22          MR. WARREN:  Yeah.  That's the --

23          THE COURT:  -- the, the difference between --

24          MR. WARREN:  -- fraction.

25          THE COURT:  -- 33-1/3 --

```
 1              MR. WARREN:  Yeah.  So --

 2              THE COURT:  -- and 27-1/2.

 3              MR. WARREN:  -- I think it's --

 4              THE COURT:  Okay.

 5              MR. WARREN:  -- like --

 6              THE COURT:  But I understand --

 7              MR. WARREN:  -- takes me down --

 8              THE COURT:  Right.

 9              MR. WARREN:  -- from nine million to seven million --

10              THE COURT:  Okay.

11              MR. WARREN:  -- of the current stock price.

12              THE COURT:  Okay.  All right.

13              MR. WARREN:  So it's not a trivial amount of money.

14              THE COURT:  No, it's not a trivial amount, but I -- I

15    -- again, I, I guess I'm going to kind of circle back at the

16    end of this now to where I started at the beginning.

17              This is a business dispute and you are a very

18    intelligent person whose sophistication on the business side

19    has evolved and I think you now have a pretty good

20    understanding of, of the landscape and I think this case is

21    ripe for you folks to sit down with a neutral, put somebody in

22    the middle.  Because there may be elements of mistrust.  There

23    still may be some not, you may not all be working on the same,

24    sharing the same facts.  You, you, you still may be, be looking

25    at some things differently than they are.
```

1          Because, I mean, we're now on the cusp of this stuff

2   being able to be sold on the market and it sounds like they

3   plan to sell it as soon as they can.  It sounds like you're not

4   adverse to that.  What we're really talking about is what

5   should happen with the proceeds.  It's kind of an intense

6   window, but it's like a month or so where it seems to me you

7   guys have a chance to sit down and see if you can work

8   something out.

9          Now I, I don't want to say anything that, that

10  suggests -- nothing I say should suggest any thoughts about the

11  legal issues here in this case, all right?  It's not, it's not

12  meant to, but if you, it seems to me that if are willing to

13  internalize that, you might not get back up to the 33, but --

14  and they were willing to internalize they're going to have to

15  kind of go up from 27-1/2 -- that you guys might be able to

16  come up with something in there, in that range that is mutually

17  agreeable measured against continuing this litigation for

18  another year.

19         In that regard, what's gonna happen if the, if the

20  stock is sold?  Are you gonna just all of a sudden start

21  distributing pursuant to what you understand the present

22  formula to be, is that -- would that be the plan?

23         MR. FOLKMAN:  I'm not sure I can answer that question,

24  your Honor.  I think that because the dispute is pending, it

25  would -- I'm not sure exactly what would happen.  Up till now

1    in terms of royalties received, we have been paying Dr. Warren

2    27 and, his one-half of 27-1/2 percent.

3            And if I may just say a very quick word about that.

4    That is even though, as, as he's just said, he has not agreed

5    to that.  In other words, we're giving him the benefit of it,

6    anyway.

7            THE COURT:  Right.

8            MR. FOLKMAN:  So I, I don't know whether the Hospital

9    would treat the proceeds of the sale in precisely the same, or

10   the net proceeds of the sale in precisely the same way that it

11   has treated royalties.  I -- I -- I just can't say.

12           THE COURT:  Okay.

13           MR. FOLKMAN:  I assume it would, but I'm not sure.

14           THE COURT:  And, and if that, if that is how they're

15   going to do it, then I guess we could find ourselves within the

16   span of a couple of months in a potential scenario where you

17   have actually now received proceeds from the disposition of

18   equity, right?  That's -- that's what -- that's what I imagine

19   would happen.  They're going to sell the stuff and you're going

20   to get what they say you get.  You still may say you deserve

21   more.  And then this really does just become a, a lawsuit about

22   the, the money difference between the 33 and the 27-1/2 or the

23   25, or whatever, right?  Okay.

24           That -- that -- that just underscores, I think, if you

25   guys can figure out ahead of time.  'Cause otherwise, it

 1  becomes spending money for a declaratory judgment for one or

 2  the other, either the high range or the low range, right?  And,

 3  and, you know, we'll do our best to do it expeditiously, but

 4  that's really what this becomes.  Because there would be

 5  nothing else left for us to do, just to declare you were right

 6  or you were wrong.  And if we say you're right, then I guess

 7  you get a little bit more.

 8          So while we go back and start to consider all of this,

 9  how do you feel about at least attempting mediation in the

10  short term between now and early to mid-June?  Is that

11  something you'd be willing to do?

12          MR. WARREN:  I mean, in principle, I'd be willing to

13  do it.  My concerns are it's going to add to my costs and that

14  the other side can go, pile higher and deeper in that mediation

15  and they have no exposure --

16          THE COURT:  Well -- well, wait.

17          MR. WARREN:  -- of --

18          THE COURT:  Well, hang on 'cause I, I just want to

19  make sure you understand.  I -- the whole purpose is designed

20  not to disadvantage one side.

21          Now you're-- you're -- you're on the West Coast.  I

22  will tell you as a practical matter mediations work best when

23  the parties are there in person, right, for every reason you

24  can think of.  It's easier to deal with people face to face,

25  but it wouldn't be the first time that a mediation occurred

1    where a party was attending remotely.  So it --

2            MR. FOLKMAN:  Your Honor, if I may interrupt.  We've,

3    we've said, already, that we would be willing to go to LA to,

4    to mediate.

5            THE COURT:  Okay.  So they would be willing to go out

6    there.

7            Now then it becomes, okay, what mediation service do

8    you use.  There are a lot of excellent folks out there who do

9    this for money.  That costs.  So sometimes the parties will

10   agree to split the costs.  Sometimes one party will actually

11   say, "We'll bear the cost."  I can't speak to that.  All I can

12   tell you is if you were willing to do it out here in this

13   courthouse under our program, there's no charge to anybody.

14   It's just their time.

15           So you don't necessarily lose anything.  You -- you --

16   you spend a few hours and if it doesn't work, it doesn't work.

17   But if it works, the case is over.

18           MR. WARREN:  That option sounds okay to me.

19           THE COURT:  Right.  And then it --

20           MR. WARREN:  The option where I --

21           THE COURT:  And then it's a matter, though, of getting

22   a judge here to agree to allow you to participate remotely.

23   There are logistics issues.  Because what happens is you may

24   start out with a judge talking to everybody at the same time,

25   but shortly thereafter the judge will talk to one side, then

1    talk to the other side.  So they'd kind of have to hang up the

2    phone and say, "Okay.  I'll call you back."  It can be done.

3    It can be done.  It can also be done out in LA.  I think

4    Mr. Folkman is looking for a reason to travel out to the West

5    Coast.

6              But I really think you should consider giving it a

7    shot, all right?  I'm not going to tell you what to do.  And

8    sometimes people say, "I'd rather litigate this to the end and

9    be told the court disagrees with me than compromise."  And if

10   that's how you feel, fine.  But if you're thinking, "Hey," you

11   know, "it's going to be some pretty substantial proceeds here.

12   I don't think you should get everything you're, you're getting.

13   I think I should get more" -- and they're willing to give you

14   more -- it can't hurt at least to have that conversation.

15             MR. WARREN:  Can I ask?

16             THE COURT:  Ask whatever you want.

17             MR. WARREN:  To do it, to do it here, what would be

18   the, the step in making that happen?  And we're talking about a

19   limited, several hours --

20             THE COURT:  Yeah.  Here's what -- here's -- here's how

21   it would happen.  If you guys said you wanted to do it, we

22   would, we would refer it to mediation right away.  It goes

23   right down to the clerk's office.  We have a coordinator who

24   will then immediately reach out to the judges and say, "We have

25   a case.  There's some time sensitivity.  Events are gonna

1   happen in early to mid-June.  The parties would like to,

2   therefore, have a session during the month of May."  If it was

3   important that you attend remotely to, to save costs, we could

4   even note in there, "In this case the plaintiff is pro se," but

5   we would make sure they understood, you know, it just means you

6   don't have a lawyer -- it doesn't mean you don't know your way

7   around a courtroom -- "and, and would like to be able to

8   participate remotely to save costs," you know.

9        And, and then it just gets referred.  They would reach

10  out to you guys and they could probably get you a session

11  within two to three weeks.  And usually, what they require from

12  the parties is a memorandum that is not draconian.  Usually,

13  it's like five pages, tops, double spaced.  They just need to

14  know what's this case about, really what's, what's the sticking

15  point, what's been the history, if any, of any settlement

16  talks.  And, and these are confidential memos, only for the

17  judge's consumption.  And so the judge will, you know, he may

18  ask you, "Tell me what you think is reasonable here so I kind

19  of have a sense of what," you know.  "And I'll look at theirs

20  and I get, I'll get their sense of what they think is

21  reasonable and what they're willing to do.  I'll get you in and

22  we go up from there."

23        MR. WARREN:  I would -- if, if it's not gonna drain me

24  financially and it's going to be --

25        THE COURT:  It's -- there's, there's no --

```
 1              MR. WARREN:  -- the limited --

 2              THE COURT:  -- charge.

 3              MR. WARREN:  -- time

 4              THE COURT:  You will not get a bill from us.  You --

 5   and if you -- and if the judge is amenable to you doing it

 6   remotely -- and you can make -- we can make that a condition.

 7   Listen, I, I started by telling you I've never ordered anybody

 8   to do this, but I am strongly encouraging you to do this 'cause

 9   I don't see a downside and I see a huge upside.  The case might

10   go away.

11              You won't get a bill from us.  The judge won't charge

12   you.  The only cost is going to be what it takes for you to

13   participate and if, and if you're appearing remotely, it's,

14   it's the charge from the telephone call.

15              MR. WARREN:  And it's ultimately nonbinding?

16              THE COURT:  It is nonbinding.  If you -- of course, if

17   you resolve the case --

18              MR. WARREN:  Yeah.

19              THE COURT:  -- and it results in a settlement

20   agreement, then the case is over.  But otherwise, yeah, I mean,

21   we, we, you know, I think we probably have somewhere between a

22   60 and 70 percent success rate and if the case doesn't succeed,

23   the parties just go back to litigating the case.  And what I

24   would do in this case is we wouldn't even take it off the trial

25   list.  That's a phrase that normally means sometimes we will
```

1   press the pause button on the litigation while the parties try

2   to work the case out through mediation, but not always.  And

3   here, we would, we would actually start to look at this, start

4   to evaluate the summary judgment motion.  So nobody's losing

5   anything in terms of time, all right?  It's going to take us a

6   little while to wade through this, but we'll start that process

7   now.

8           And in the interim, you guys are just sitting down to

9   see if you can work things out so that by the time the stock is

10  sold there's actually already an express understanding of

11  what's going to happen with the equity and then the proceeds,

12  all right?  And if not, then I imagine -- I don't know for

13  sure.  Mr. Folkman doesn't know for sure -- but looks like

14  you'll get something and then it's, this is just going to be a

15  fight over how much more you should get based on all of the

16  legal arguments that are being raised.

17          MR. FOLKMAN:  So my understanding, your Honor, after

18  this is that we -- we -- we are agreeing to use the court-

19  sponsored mediation in Boston if, if Dr. Warren --

20          THE COURT:  Well, he's nodding.  I don't, I don't

21  think he has said yet.  I think he's still --

22          MR. WARREN:  I -- I --

23          THE COURT:  -- processing there.

24          MR. WARREN:  I -- I --

25          THE COURT:  So we're, we're gonna --

1          MR. WARREN:  I do need to process it and maybe get

2     some advice, too.

3          THE COURT:  Okay.

4          MR. WARREN:  It sounds good.

5          THE COURT:  Here's the thing.  Whoever you talk to

6     about getting advice, tell them the Judge looked right at you

7     and said, "I strongly encourage you to, to come to a mediation

8     session, to try for mediation whether it's through the

9     courthouse or whether it's through somebody else," right?

10    Okay.

11         MR. WARREN:  All right.  And assuming that I decide to

12    go for it --

13         THE COURT:  You just let us know.

14         MR. WARREN:  So remind me again what would be the --

15         THE COURT:  Here's -- it's, it's very informal.

16         MR. WARREN:  We both agree to that?

17         THE COURT:  It's very -- yeah.  If you guys -- all it

18    takes is one of you, right?  You just send an e-mail to

19    Ms. Russo saying, "Okay, we'll give it a shot," and we take it

20    over from there.  We'll put something out that let's everybody

21    know, "Look, these, these folks need to get in here soon," and

22    then the matter will be referred out and there'll be something

23    on the court docket from the judge who's going to be doing the

24    mediation saying, "Okay.  I need you guys to submit some stuff

25    to me.  Give me some dates."  And you guys actually could even

1   already start the ball rolling by saying, "Here are dates on

2   which we are both available," so that the judge who gets the

3   case already knows and can maybe even already schedule

4   something.

5          And again, if you, if there's a condition that you be

6   allowed to participate remotely, I think we would want to make

7   that very clear just in case a judge has an issue with that.

8   But I think if they understand you reside in California and

9   that due to the costs that you would like to be able to

10  participate remotely and that you are pro se, you know, we'll

11  just put that out there so they know that ahead of time.

12         Here's what we don't like and I, I don't mean that

13  like, "Oh, we hate it," but, but here's what makes things

14  difficult, is when a party is participating and at key juncture

15  says, "Okay.  I need to now go consult with somebody."  We like

16  to structure these so that if momentum is generated and

17  progress is being made, there's gonna, there's not going to be

18  anything to stop the parties from actually reaching an

19  agreement in principle such that they can notify the Court,

20  "Okay.  We've worked this thing out and within a few weeks

21  we'll submit the papers that show we, the case has been

22  settled," all right?  I mean, it, it truly is a session that is

23  designed to help the parties negotiate a mutually agreeable

24  resolution to the case in that session, okay?

25         So let us know sooner rather than later one way or the

1   other and we'll go from there, okay?

2          MR. WARREN:  Thank you very much, your Honor.

3          THE COURT:  All right.  Anything else any party want

4   to say before we call it a day?

5          MR. FOLKMAN:  No, your Honor.

6          THE COURT:  Okay.

7          Mr. Warren?

8          MR. WARREN:  I'm done.

9          THE COURT:  All right.

10          Thank you, both.

11          MR. FOLKMAN:  Thank you, your Honor.

12          THE COURT:  Have a nice weekend.

13          THE COURTROOM DEPUTY:  All rise.

14      (Proceedings concluded at 12:19 p.m.)

15

16

17                          CERTIFICATE

18          I, court approved transcriber, certify that the

19   foregoing is a correct transcript from the official electronic

20   sound recording of the proceedings in the above-entitled

21   matter.

22   */s/ Janice Russell*                    May 10, 2019

23   Janice Russell, Transcriber                  Date

24

25