UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LUIGI WARREN,<br><br>   Plaintiff,<br><br>vs.<br><br>THE CHILDREN'S HOSPITAL CORP.,<br><br>   Defendant | Civ. A. No. 17-12472-DLC |

### DEFENDANT'S MEMORANDUM IN OPPOSITION TO
### PLAINTIFF'S MOTION FOR LEAVE TO FILE A FIRST AMENDED COMPLAINT

PRELIMINARY STATEMENT

  The plaintiff, Dr. Luigi Warren ("Warren"), brought this case in December 2017, more than two years ago. From the outset, he made it very clear that he was seeking only declaratory and injunctive relief. Many of the key decisions the defendant ("the Hospital") has made about how to litigate the case have followed from Warren's decision. The Hospital took no discovery about damages. The Hospital retained no expert on damages. The Hospital did not demand a trial by jury, because there were no issues about damages for the jury to decide.

  The case is now ready for trial. Summary judgment has come and gone. Now, Warren has decided he does not want to try the case the parties spent more than two years litigating. Instead he wants to try a different case, asserting an entitlement to damages on a new and fatally flawed theory. Until now, his theory was that the Hospital should have distributed shares of Moderna stock to him as soon as practicable after the Hospital received them, and that his monetary injury arose from an increased tax he claimed he owed because of the delay. His new theory is that the Hospital should instead have distributed the shares to him immediately after the expiration of the lock-up period that followed Moderna's IPO, and that the fact that it distributed the proceeds to

him some time later, when the price had fallen, gives rise to a claim for damages. The Court should reject Warren's procedurally improper, late, prejudicial, and futile effort to make the Hospital the insurer of his stock market returns. The motion should be denied.

## FACTS

A.   The Underlying Facts.

Warren was a post-doctoral researcher in the Rossi Lab from 2007 to 2010 (ECF 55, SUMF ¶ 3). The Rossi Lab was part of the Immune Disease Institute ("IDI"), at the time a freestanding research institution (Id. ¶¶ 3-4). While there, Warren and the head of the lab, Dr. Derrick Rossi, invented a new technique for programming cells in order to induce them to become pluripotent stem cells. (Id. ¶ 21). In April 2010, Warren assigned his rights in the invention to IDI. (Id. ¶ 45).

The Rossi/Warren research was not federally funded (Id. ¶ 12), and thus the law imposed no obligation on IDI to share revenues from the licensing of the invention with the inventors. *See* 35 U.S.C. § 202(c) (when research is federally funded, royalties must be shared with inventors). Nevertheless, IDI had a policy, adopted in 2004, under which it shared one-third of licensing revenues with inventors. (SUMF ¶ 16).

In 2008, IDI affiliated with the Hospital in contemplation of an eventual merger. (Id. ¶ 28). The Affiliation Agreement provided that as of February 2009, all IDI Intellectual Property Rights that had not by then been licensed would be subject to the Hospital's intellectual property policies. (Id. ¶ 29).

Warren left IDI in 2010 because of professional differences between him and Dr. Rossi. (Id. ¶ 5). Also in 2010, the Hospital exclusively licensed the Rossi/Warren invention to Moderna Therapeutics, Inc. (Id. ¶ 39), which then was a small, privately-held startup company but which

today has a market capitalization of more than $23 billion.[1] As a result of the license, IDI received Moderna common stock and the right to receive royalties based on sales later.

In 2011, after Warren's departure from IDI, IDI requested he execute a second assignment of his rights in the invention, which is customary in patent prosecution. Warren demurred and asked to see the language of the policy requiring the assignment, even though he had already assigned his rights. Ryan Dietz, a manager in IDI's technology transfer office, sent him the language of the IDI policy concerning Warren's obligation to assign. This was a mistake: under the Affiliation Agreement, the Hospital's IP policies had become effective as of February 2009, and Dietz should have sent Warren the corresponding language from the Hospital's policy. (SUMF ¶¶ 43-51).

The merger between the Hospital and IDI became effective in September 2012. (Id. ¶ 38).

In 2017, Rossi negotiated with the Hospital for a better deal for inventors than the Hospital's ordinary policy would have provided. (Id. ¶ 57). Under the usual policy, inventors who remain employed by the Hospital receive 70% of the first $100 in net revenues, 45% of the next $400,000, and 25% of the remaining net revenues. (Id. ¶ 58). Inventors who are no longer Hospital employees, such as Warren, receive 35% of the first $500,000 in net revenues and only 25% of the remainder. (Id. ¶ 59). But under the specially negotiated policy for the Warren/Rossi invention, inventors would receive 27.5% of *all* net revenues. (Id. ¶ 60). The Hospital is giving Warren the benefit of this specially negotiated policy, even though he was the one stakeholder who refused to approve it. (Id. ¶ 61).

---

[1] As of May 12, 2020. The Hospital asks the Court to take judicial notice of the financial data regarding Moderna that are presented here. The data come from Yahoo! Finance (https://finance.yahoo.com), a standard source of historical stock price data and other financial data. Stock prices and market capitalization for public companies "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), and the Court must therefore take judicial notice upon request, Fed. R. Evid. 201(c)(2). A table showing the stock prices from the IPO until May 8, 2020 is attached to this memorandum as Exhibit 1.

B.     Procedural Posture.

Warren filed his complaint on December 19, 2017 (ECF 1). As we explain below in more detail, the complaint seeks only declaratory and injunctive relief. The Hospital answered the complaint on February 14, 2018. (ECF 17). The Hospital answered the complaint that Warren had actually brought—a complaint for declaratory and equitable relief—and not a claim for damages. The Hospital did not demand a trial by jury.

On March 15, 2018, the Court entered a scheduling order under which written discovery was to be completed by September 28, 2018, fact witness depositions were to be completed by November 30, 2018, and expert discovery was to close on January 18, 2019. (ECF 23). The parties completed fact discovery, and neither party designated an expert witness.

The Hospital filed its motion for summary judgment on February 15, 2019. (ECF 51). A significant piece of its argument—the argument that Warren's claim for an injunction failed as a matter of law—rested in part on Warren's express disclaimer of a damages remedy. (ECF 52 at 15-16). Warren argued in his opposition (ECF 57 at 17-18) that he had not disclaimed a damages remedy. His argument was obviously false—in his initial disclosures, Warren had refused to provide any calculation of his damages, writing: "Not applicable as the plaintiff is seeking equitable relief." (Warren Initial Disclosures at 6),[2] and he had testified that his case was "not a damages case" and that he was merely "asking the judge to rule that the IDI percentage is controlling" (Warren Dep. 106:11-13).[3] In any event, even leaving aside the positions he had taken throughout the case, Warren was plainly on notice by February 2019 that in the Hospital's view there was no claim for damages in the case. Yet he did nothing to assert such a claim for

---

[2] A true copy of the Initial Disclosures is attaches to this memorandum as Exhibit 2.
[3] A true copy of an excerpt of Warren's deposition is attached to this memorandum as Exhibit 3.

more than a year, until March 2020 (ECF 72). That was approximately five months after the Court had ruled on the Hospital's motion for summary judgment (ECF 70).

## ARGUMENT

A.  Standard of Decision.

Leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). The court should, therefore, only deny a motion when the amendment is futile, when the movant is guilty of undue delay, when there would be undue prejudice to the nonmoving party, or when the defendant is guilty of bad faith or had a dilatory motive. *See Foman v. Davis,* 371 U.S. 178, 181 (1962). The matter is within the Court's discretion. *Id.*

B.  The Court Should Deny The Motion For Leave To Amend With Regard To Counts 3 and 4.

Counts 3 and 4 are entirely new. They seek damages, on contract and tort theories, arising out of the timing of the Hospital's sale after the post-IPO lockup period. Both are procedurally improper. Both counts would prejudice the Hospital severely. Both are futile in any case.

1.  Counts 3 and 4 are Procedurally Improper, Because They Refer To Events After The Commencement of the Action.

A motion for leave to amend is the proper vehicle to allege facts that occurred prior to the date of the original complaint. A supplemental pleading under Fed. R. Civ. P. 15(d) is the proper vehicle to allege "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." *See generally Cortés-Ramos v. Martin-Moralis,* 2020 U.S. App. LEXIS 11545, at *13 (1st Cir. Apr. 13, 2020) (discussing purpose of supplemental pleading); 3 *Moore's Federal Practice* § 15.30[1] (distinguishing amended and supplemental pleadings). This is not just a bit of procedure that lets a lawyer say "gotcha!" There is no reason to impose on the Hospital the burden of responding to a lengthy and entirely new complaint, either by way of answer or by way of motion, when the only asserted purpose of the proposed amendment is to

5

add facts that occurred after the commencement of the action. The Court should deny the motion, and Warren can, if he chooses, move for leave to file a supplemental pleading. The Hospital would oppose such a motion on the grounds that this case is ready for trial, and that the Court should not allow a further delay by introducing new claims arising out of occurrences that took place after the commencement of the action that would require reopening discovery and that lack legal merit in any case. But unlike on a motion for leave to file an amended complaint, a plaintiff who seeks leave to file a *supplemental* complaint is not out of luck if his motion is denied: he can simply file a new action to raise his new claims, and he can proceed to litigate that action without derailing the existing action.

      2.     The Amendment Is Futile.

Futility is measured by the standard that would apply to a motion to dismiss for failure to state a claim on which relief can be granted. *See Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir. 1996). In other words, the Court should deny the motion for leave to amend if the proposed amended complaint does not contain "sufficient factual matter … to state a claim for relief that is plausible on its face." *Squeri v. Mount Ida College,* 954 F.3d 56, 65 (1st Cir. 2020) (citation and internal quotation marks omitted).

      a.     Background to the Sale of Moderna Stock.

Throughout the case, Warren's position has been that he was entitled to receive the shares of stock immediately or at least soon after IDI or the Hospital received the shares of stock from Moderna. Now he says that he was entitled to receive the shares at the time the lock-up period expired or at least very soon thereafter. Why does the time matter to him? Because the price per share of Moderna stock has changed over time. Warren's view is that he should have received the shares, or at least that the Hospital should have sold the shares, when the price was relatively

higher. The measure of his damages, in his view, is the difference between the price at the time he should have received the shares and the effective price at which the Hospital sold the shares.

The overall stock price for Moderna, since its IPO, has fluctuated widely, as one would expect. The stock closed on its first day of trading at $18.6 per share. As of May 8, 2020, it was trading at $59.25 per share, its all-time high to date, and its all-time low to date was on August 5, 2019 ($12.26 per share).



Warren points to June 5, 2019, the expiration of the post-IPO lockup period, as the key date. On that date the price was $17.70 per share, though the day before it was exactly 10% higher ($19.47 per share on June 4), and about 1.3% higher the day after ($17.94 on June 6). The daily return over the entire period the stock has been trading ranges from -17.97% (March 8 to 9, 2020) to 27.81% (February 24 to 25, 2020). Even limiting the search to the period before February 1, 2020, to exclude the effects of COVID-19, the daily returns range from -10.56% (June 9 to 10, 2019) to 12.48% (April 4 to 5, 2019).

The Hospital began selling its stake in Moderna on July 8, 2019, approximately a month after the lock-up period ended. It made a series of 54 sales of equal numbers of shares on a daily

basis, ending on September 20, 2019, and a final sale of a much smaller number of shares on September 23.[4] Selling shares over time is not just acceptable but a best practice, in order to avoid the effects of day-to-day volatility, and in a case such as this, where a large number of shares are at issue, in order to avoid flooding the market with shares and potentially driving down the price. (Abrams Decl ¶¶ 4-5). In the early part of the sales period, the price trend was down, falling from $14.31 on the date of the first sale (July 8) to $12.73 on August 15. The trend then was generally up, reaching $15.25 on September 4, $16.97 on September 10, and $18.01 on September 20, the date of the sale of the last large lot of the shares.

    If the Hospital had sold its shares over a 54-day time period beginning on June 5, 2019, rather than over a 54-day time period beginning on July 8, assuming that the sales all took place at the adjusted closing price each day.[5] The fact is that the difference in timing would have made hardly any difference—the sales price had the sales begun on June 5 would have been approximately 98% of the sales price with the sales beginning on July 8. Notably, *Warren and the Hospital did better with sales beginning on July 8 than they would have had the sales begun on June 5*.

---

[4] Moderna trades on the NASDAQ. The NASDAQ was closed during the period of the sales for Labor Day on Sept. 2. There were, therefore, 54 business days between July 8, 2019 and September 20, 2019, or 55 business days including September 23.

[5] The actual sales prices are shown in the table attached as Exhibit 1 to the Abrams Declaration. These may differ from the public market adjusted closes because, for example, of the commissions the Hospital had to pay, or the fact that the price of a share fluctuates throughout the day.

b. Counts Three and Four Fail To State A Claim, Because Any Claim To Damages Would Be Hopelessly and Impermissibly Speculative.

Assuming that the Hospital had an obligation to give Warren a stock certificate rather than the proceeds of the sale, any claim for damages would fail because it would be necessarily speculative, for more than one reason.

*First,* assuming the Hospital wanted to transfer shares to Warren on June 5, it could not simply send him the shares. The stock was in certificated form, and the certificates stood in the name of the Hospital. The Hospital would have had to present its certificate to Moderna, the issuer, with a request to transfer the correct number of shares to Warren. *See* Del. Code tit. 6, § 8-401. The time it would take for this transfer to occur is both unknown and highly material given the day-to-day changes in the stock price.

*Second,* Warren's claim for damages depends necessarily on what he would have done with the stock once he had it. If he were particularly foresighted, he would have held it—the stock is up more than 200% since the end of the lock-up period as of May 8. If he were particularly shortsighted, he would have sold it right away, near its low. What would he have done *in fact?* Warren does not even attempt to make any allegations on this point, and even if he had alleged that he would have sold it at a time that would have resulted in more money for himself than the millions of dollars he has received, courts reject claims based on the kind of unknowable speculation involved. *See Vanderbeek v. Vernon Corp.,* 50 P.3d 866, 874 (Colo. 2002) (plaintiff's claim to lost profits for shares of stock he never purchased was impermissibly "speculative and conjectural," because "profits from a stock investment are not realized until the stock is sold at a higher price that that at which it was bought," and because the stock's price "has varied tremendously" from day to day); *LG Capital Funding, LLC v. 5barz Int'l,* 307 F. Supp. 3d 84, 103 n.14 (E.D.N.Y. 2018) (lost profits claim impermissibly speculative where it

depended on "the proposition that plaintiff would have been able to time its sale of shares to avail itself of the shares' high trading price at 'any time'" after the date he claimed he should have received them); *Kane v. Shearson Lehman Hutton, Inc,* 916 F.2d 643, 647 (11th Cir. 1990) (plaintiff's claim that he would have sold his shares had the defendant not made misrepresentations to him was impermissibly speculative, as it was a claim that "he would have sold the securities at the optimal time" absent the misrepresentations).

The same points about speculation apply even if Warren's claim is just a claim for damages rather than a claim that shares should have been delivered to him. *First,* if the Hospital was right to follow industry best practice and to sell its shares over time to avoid speculating on the price on any particular day or moving the market, everything argued above applies with full force.

*Second,* assuming Warren means to argue, contrary to industry practice, that the Hospital should have sold all the stock on a single day, identifying the "proper" date of the sale is impossibly speculative, but also highly material to Warren's claim. Nor is it possible to know (Warren makes no allegations on the point) what effect the Hospital's sale of its entire stake on one day would have had on the share price. Even professional stock brokers are not obligated to execute a trade within a set period of time; they weigh time against factors including price and liquidity when executing customer orders. *See, e.g., Kurz v. Fidelity Mgmt. & Research Co.,* 556 F.3d 639, 640 (7th Cir. 2009). No rule of law required the Hospital to sell the stock on the first possible day, and unlike the case of the broker and the customer, where the interests of the two parties may diverge, here the interests of Warren and the Hospital were completely aligned. The Hospital did no better and no worse for itself than it did for Warren.

   c. <u>Count Four Fails To State a Claim.</u>

Count Four asserts that the Hospital is liable for conversion on account of the passage of time between the end of the post-IPO lockup period and the sale of the stock. (Proposed First Am. Compl. ¶¶ 71-72). The claim fails as a matter of law.

The Hospital was rightfully in possession of the stock certificates. *See Abington Nat'l Bank v. Ashwood Homes, Inc.,* 19 Mass. App. Ct. 503, 507 (1985) (conversion plaintiff must prove that defendant "has no right of possession at the time" that he exercises control over the personal property in question). The stock certificates were in the Hospital's hands because the Hospital (and its predecessor in interest, IDI) had received them from Moderna under the license agreement. Warren's claim is not that the Hospital failed to deliver *his* stock certificates to him, it's that the Hospital breached its promise to transfer *the Hospital's* stock certificates to him as promptly as he says the contract required. Of course, there are cases where a retention or exercise of control over stock certificates belonging to someone else is deemed a conversion. But in those cases the plaintiff is already a shareholder, or had purchased the stock. *See, e.g., Handy v. Miner,* 258 Mass. 53 (1926) (a refusal to issue certificates to existing shareholder would be a conversion); *Lacks v. R. Rowland & Co.,* 718 S.W.2d 513 (Mo. Ct. App. 1986) (broker failed to return stock certificates to customer after demand). Here, Warren was never a legal or equitable shareholder of Moderna, and the IDI Policy, like the Hospital Policy, applies to licensing agreements whether or not they have a stock component. Even if Warren were right about the existence of a contract between himself and IDI, that contract was not a contract *for the purchase or delivery of stock.* To put the distinction another way: if A. promises to pay B. $100 in return for something of value and A. fails to pay, B.'s claim is for breach of contract, not conversion. But if B. gives A. $100 for safekeeping and A. doesn't give it back when demanded, then A. may be liable for conversion. Warren's claim is like the first case, not the second.

11

### 3. The Amendment Would Prejudice The Hospital.

This case has been litigated from start to finish on the understanding, which Warren confirmed at every opportunity, that the only remedy he sought was equitable. His complaint very specifically seeks a declaratory judgment, an injunction, and "costs, attorneys' fees, and such other relief as the court deems just and appropriate." (ECF 1).[6] The failure to mention damages (or prejudgment interest) is striking given Warren's demonstrated ability to understand and comply with the Federal Rules of Civil Procedure and given the simplicity of pleading damages—all that is required is a demand for "damages in an amount to be determined at trial."

Warren confirmed at the first opportunity that he was not seeking damages. In his initial disclosures, which required him to disclose his calculation of damages, *see* Fed. R. Civ. P. 26(a)(1)(A)(iii), he wrote: "Not applicable as the plaintiff is seeking equitable relief." (Ex. 1). When he testified, Warren went out of his way to make sure counsel understood that this was not a damages case:

> Q. I'd like to talk about the damages and remedies that you're claiming in this lawsuit.
> A. Uh-huh.
> Q. One element of what you're claiming, as I understand it, is that the percentage of the licensing revenue, the net licensing revenue, that you were entitled to under the IDI policy is higher than the percentage that you were entitled to under the policies that the hospital has actually applied and you're entitled to the difference between those two percentages.
> Are you with me?
> A. That's a somewhat strange way of putting it, since it's not a damages case, but I'm asking the judge to rule that the IDI percentage is controlling.
> Q. That's a very fair point.
> I mean, you're not claiming damages, you're claiming—you're seeking a declaratory judgment. But that's the essence of your point about the percentages, right?
> A. Yes.

---

[6] Of course, the formulaic catch-all demand for "such other relief" as may be appropriate is not sufficient to overcome Warren's failure to demand an entire type or category of relief. *See RSE, Inc. v. Pennsy Supply, Inc.,* 77 F.R.D. 702, 703 (M.D. Pa. 1977).

(Ex. 2; Warren Dep. 105:24-106:19).

In reliance on these unambiguous statements, the Hospital retained no experts on damages and conducted no discovery on damages. If the Court allows the amendment, it would be necessary to reopen discovery in order to allow the Hospital to pin down Warren's new theories (precisely when should the stock have been delivered or sold? Should a sale have happened all at once, or over time?) and to obtain the evidence relevant to determining what Warren's profit would have been had the Hospital delivered the shares to him (what is his investment history? What is the evidence about what Warren would have done with the shares if he had had them?) Questions of speculative lost profits almost certainly will require expert testimony, and an expert would likely also be required to address the tax issues Warren has brought up throughout the litigation. The parties will have to litigate the question whether the Hospital could have transferred the stock to Warren at or near the time it received the stock—which was, after all, Warren's original claim—and they will need discovery and likely expert testimony in order to value the stock as of that time, as Moderna had not yet gone public. Particularly in light of the need for experts, a delay of six to nine months would not be unreasonable.

A need to reopen discovery and the accompanying delay are the archetypical forms of prejudice that courts note when denying motions to amend. In *Acosta-Mestre v. Hilton International of Puerto Rico, Inc.,* 156 F.3d 49, 51-53 (1st Cir. 1998), for example, the motion to amend came "near the close of discovery"—not, as here, long after discovery ended. By the time the plaintiff filed its motion, "nearly all of the case's pre-trial work was complete" (here, *all* of the pretrial work except for the pretrial conference and motions *in limine* is complete). Moreover, the proposed amendment in *Acosta-Mestre* would have led the defendant to a "likely major

13


alteration in trial strategy and tactics." The same is true here: without the amendment, the Hospital would want to emphasize the difficulties in transferring pre-IPO shares to Warren at or near the time the shares were received. Indeed, the Hospital took no steps to explain the details of how restricted shares could have been transferred pre-IPO, and instead emphasized that Warren had developed no evidence to show that they could have been transferred. (SUMF ¶ 68). But *with* the amendment, the Hospital might (depending on the opinions of expert as to valuation) want to emphasize the possibility of making the transfer, so as to minimize the possible measure of damages. In *Acosta-Mestre,* these factors justified denial of a motion for leave to amend, and the same conclusion applies here *a fortiori.*

Warren's undue delay strengthens the point. Mere delay, without a valid reason, is sufficient to justify denying a motion for leave to amend. *Id.* at 52. Here, there is no possible justification for the delay with respect to Counts 1 and 2. Warren could have made those claims at the time of the original complaint, and he could have made them at any time in the fifteen months since the Hospital made a point of the absence of a claim for damages in its motion for summary judgment (ECF 52 at 15-16). And although Warren is right to observe that the *amount* of the damages his theory suggests he suffered could not be known until the Hospital sold its shares, Warren could have brought the claim earlier and demanded damages in an amount to be determined at trial. And if he wanted to know about the Hospital's sale of shares earlier, he could have sought documents on that point in discovery, and the Hospital would have had an obligation to supplement its document production, *see* Fed. R. Civ. P. 26(e)(1).

C.   The Amendment Is Needless With Respect to Counts 1 and 2, and the Hospital Should Not Have To Bear the Burden of Answering an Amended Complaint.

The original Complaint's claim was, in summary, that the Court should declare that the Hospital should have applied the percentages in the IDI Policy to determine how much of the

revenue of the Moderna transaction to share with Warren, rather than the percentages in the Hospital Policy or the Hybrid Policy that the Hospital later adopted for the Moderna case. Count 1 of the proposed Amended Complaint restates that theory. Count 2 simply seeks damages to which Warren would be entitled if he is entitled to the declaration he sought in the original Complaint and which he now seeks in Count 1. The Hospital's position has always been that if, following the exhaustion of all appeals, Warren is found to be entitled to the percentage of revenues specified in the IDI Policy, then the Hospital will pay him the difference between what it has already paid him and the amount to which he is found to be entitled.[7]

Because the proposed amendments to Counts 1 and 2 add nothing to the case, the Court should not allow the motion with respect to them, even though those counts, unlike Counts 3 and 4, and not futile. The amendment is not one that "justice … requires," Fed. R. Civ. P. 15(a)(2).

---

[7] If the Court allows the amendment with respect to Counts 1 and 2, the Hospital reserves the right to assert, by motion, that the Court should not award prejudgment interest in the circumstances of the case, given that Warren could have demanded prejudgment interest even when he only sought declaratory relief but conspicuously failed to do so. *See Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, L.P.*, 171 F.3d 52, 56 (1st Cir. 1999).

## CONCLUSION

For these reasons, the Court should deny the motion.

## REQUEST FOR ORAL ARGUMENT

Pursuant to L.R. 7.1(d), the Hospital requests a hearing on this motion.

Respectfully submitted,

THE CHILDREN'S HOSPITAL CORPORATION

By its attorney:

*/s/ Theodore J. Folkman*

Theodore J. Folkman (BBO No. 647642)
FOLKMAN LLC
53 State Street, Suite 500
Boston, MA 02109
(617) 219-9664
ted@folkman.law

Dated: May 18, 2020