UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LUIGI WARREN,

      Plaintiff,

v.                                              No. 17-CV-12472-DLC

The CHILDREN'S HOSPITAL
CORPORATION,

      Defendant.

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(DKT NO. 51) AND PLAINTIFF'S MOTION TO AMEND (DKT NO. 72)**

Cabell, U.S.M.J.

    Plaintiff Dr. Luigi Warren sued defendant Children's Hospital
Corporation (Children's) for reportedly failing to honor the terms
of a revenue and equity policy regarding an invention of Dr.
Warren's that is included in a patent Children's owns.  Children's
demurred and moved for summary judgment.  (Dkt. No. 51).  Following
a hearing, the court denied Children's motion, and Dr. Warren
subsequently moved to amend the complaint, which Children's has
opposed.  (Dkt. Nos. 70, 72, 87).  For the reasons explained below,
the court vacates its prior order denying Children's motion for
summary judgment, and now allows the motion.  The court also denies
Dr. Warren's motion to amend.

## I.  <u>Factual Background</u>

The facts are taken from the Defendant's Statement of Undisputed Material Facts (Dkt. No. 55), the Defendant's Memorandum of Law in Support (Dkt. No. 52), the Plaintiff's Statement of Material Facts (Dkt. No. 58), the Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Dkt. No. 57), and the exhibits attached to these filings. The facts are undisputed unless otherwise noted. As always on a motion for summary judgment, the court views the facts in the light most favorable to Dr. Warren as the non-moving party and draws all reasonable inferences in his favor. *Carlson v. Univ. of New England*, 899 F.3d 36, 43 (1st Cir. 2018).

### A.  *Dr. Warren's Work at the IDI*

In November 2007, Dr. Warren began working at the Immune Disease Institute (IDI) in an at-will capacity as a postdoctoral researcher. (Dkt. No. 55, ¶ 3). While there, he co-invented, along with Principal Investigator Dr. Derrick Rossi, a breakthrough technique for "reprogramming" cells to induce them to become pluripotent stem cells (the Invention). (Dkt. No. 52, pp. 3-4). The parties quickly recognized the Invention's great medical and commercial potential.

Throughout the early part of 2010, Dr. Warren and Dr. Rossi worked with other IDI personnel to begin the process of securing

patents for the Invention.  (Dkt. No. 57, p. 3).  In April 2010, IDI filed for a provisional patent with the United States Patent and Trademark Office.  (*Id.*)  Dr. Warren left his position at IDI shortly thereafter, in June of 2010.  (Dkt. No. 55, ¶ 5).  On December 21, 2010, approximately six months after Dr. Warren left IDI, IDI exclusively licensed the Invention to Moderna Therapeutics, Inc.  (Dkt. No. 55, ¶ 39).[1]

**B.  *IDI's Affiliation with Boston Children's Hospital***

During the patent and licensing process, IDI itself was in a state of change.  In or around 2008, IDI and Children's began exploring the possibility of a merger, executing an Affiliation Agreement on December 24, 2008.  (*Id.* at ¶ 28).  Under that agreement, any IDI intellectual property not licensed before the affiliation was consummated (the "Effective Date") became subject to Children's policies as of the Effective Date, including Children's revenue and equity policies.  (*Id.* at ¶¶ 29, 31).  The parties agree that the Effective Date was February 20, 2009.  (*Id.* at ¶ 31; Dkt. No. 57, p. 2).  In September 2012, IDI dissolved and formally merged into Children's.  (Dkt. No. 55, ¶ 38).

---

[1] At the time, Moderna was a newly founded start-up.  Today, of course, Moderna is best known for its COVID-19 vaccine.  *See About Us*, MODERNA THERAPEUTICS, https://www.modernatx.com/about-us/our-story (last visited Jan. 11, 2023).

C.   *The Two Invention Revenue and Equity Policies*

The were some differences between IDI's and Children's respective revenue policies.  The IDI policy in effect when Dr. Warren was hired, known formally as the IDI Research and Technology Development Policy (IDI policy), provided among other things that all technology was "owned by IDI," (Dkt. No. 55-3, § E(1)(a)), and employee-inventors would "provide technical information, documentation, and all other assistance deemed necessary by IDI, including an assignment of the Inventor's rights in the Technology to IDI." (*Id.* at § F).  In exchange, IDI would give one-third of its technology-derived licensing revenue to the inventors. (Dkt. No. 55-3, § H(4)).[2]  Further, if IDI accepted equity from a company in exchange for licensing rights, the inventor's share of the equity would be deemed a "royalty" and "distributed to the Inventors at the earliest opportunity." (*Id.* at § I(3)).  The IDI policy also provided that IDI's trustees "retain the discretion to amend [the policy] from time to time." (*Id.* at § A).  The policy required each "Covered Person," including employees like Dr. Warren, to "sign a Participation Agreement in which the Covered

---

[2] Where, as here, an invention had multiple inventors, the policy provided that the one-third inventor share would be divided into equal shares for each inventor absent a contrary agreement among the inventors. (Dkt. No. 55-3, § H(5)).  Accordingly, under the IDI policy, Dr. Warren would be entitled to 16 2/3 percent of the net proceeds from the Moderna license.

Person agrees to comply with this Policy." (*Id.* at § C). The record is unclear as to whether Dr. Warren ever signed a Participation Agreement. (Dkt. No. 57, p. 16; Dkt. No. 59, p. 5).

In contrast, the Children's Hospital Policy on Inventions and Intellectual Property (Children's policy) contained materially different and slightly more complicated terms regarding revenue payments and equity sharing with employee-inventors. The Children's policy sets out different payment terms for inventors still employed by Children's and those who had left Children's. (Dkt. No. 55-9, p. 3). In the latter case, the inventor's share of license proceeds is 35 percent "up to" $500,000, then 25 percent "above" $500,000. (*Id.*). Like the IDI policy, the Children's policy equally divided this share among all co-inventors. (*Id.*). The parties do not dispute that Dr. Warren would receive a lesser share under the Children's policy than he would under the IDI policy. The Children's policy resembles the IDI policy regarding ultimate ownership of inventions and duties of employee-inventors:

> Every invention based on the Hospital's intellectual property . . . shall be the property of the Hospital . . . . When the Hospital determines to seek the patenting . . . of any invention . . . the inventor shall cooperate fully in such effort, including execution of all necessary or desirable agreements, applications, assignments, and other forms and instruments.

(*Id.* at p. 2).

5

D.  *The Invention Assignments*

In August 2010, after having left IDI, Dr. Warren voluntarily executed an assignment of his "entire right, title, and interest" in the Invention to IDI.  (Dkt. No. 57-4).  In February 2011, Ryan Dietz ("Dietz"), a manager at IDI's technology transfer office, sent Dr. Warren an email asking him to assign his rights a second time.  (Dkt. No. 55-4, pp. 10-11).  The subsequent assignment is variously described in the record as a "follow-up assignment[]," (Dkt. No. 55-1, 68:11-12), an "additional assignment of the same invention," (Dkt. No. 55, ¶ 46), and an "assignment pertain[ing] to a second provisional application."  (Dkt. No. 55-4, p. 10).

Reluctant to execute any further assignments, Dr. Warren requested a copy of the document purporting to require his execution of the assignment.  (Dkt. No. 55, ¶ 47).  In response, Dietz sent Dr. Warren the following excerpt from the IDI policy:

> Ownership of Inventions. Each Invention shall be the sole and exclusive property of IDI. I agree to execute an assignment to IDI or its nominee of my entire right, title, and interest in and to all Inventions (to which IDI has ownership rights pursuant to the "Research and Technology Development Policy") without additional compensation. I further agree, upon request of IDI and at its expense, to execute such documents as may be necessary or desirable in applying for and obtaining patents on the Inventions in the United States and any foreign country. I further agree, whether or not I am employed by IDI, to cooperate to the extent and in the manner reasonably requested by IDI in the prosecution or defense of any claim involving a patent covering any

6

> Invention or any litigation or other claim or proceeding
> involving any Invention . . . .

(Dkt. No. 55-4, p. 7).   Dr. Warren also asked for the relevant
policy regarding revenue sharing and licensing royalties.   (*Id.*).
Dietz again replied with the IDI policy's revenue-sharing
schedule.   (*Id.* at p. 6).

After receiving this information, Dr. Warren declined to
execute the subsequent assignment.   (Dkt. No. 55, ¶ 52).
Subsequently, Dianne McCarthy, Children's General Counsel, sent
Dr. Warren an email with the full IDI policy attached, reiterating
that Dr. Warren was obligated to execute the assignment.   (*Id.*).
Dr. Warren also received an email from Children's outside counsel
threatening a lawsuit if Dr. Warren persisted in his refusal.
(Dkt. No. 55-7).   The email indicated that Dr. Warren's "refusal
to execute the assignment [was] in direct contravention of [his]
obligations under IDI's Research and Technology Development
Policy."   (*Id.* at p. 2).   Attached to the email was a draft
complaint against Dr. Warren, replete with references to the IDI
policy and asserting a breach of contract claim against Dr. Warren
for violating said policy.   (*Id.* at pp. 3, 5-6, 9).   Shortly after
receiving this email, Dr. Warren executed two additional
assignments.[3]   (Dkt. No. 57-4, pp. 4-7).

---

[3] The record is unclear why Dr. Warren executed two assignments instead of one.

Six years later, in August 2017, when rumors of an initial public offering for Moderna were circulating, Dr. Warren called Dietz (now officially working for Children's) to inquire about the Moderna licensing agreement. (Dkt. No. 57, p. 6). Dietz informed Dr. Warren that the references to the IDI policy back in 2011 were in error and that Dr. Warren's invention was subject to Children's policies on revenue and equity. (*Id.* at 7). Dietz offered Dr. Warren the opportunity to sign onto a superior "ad hoc" revenue policy that his co-inventor Dr. Rossi had negotiated with Children's, which Dr. Warren declined.[4] (Dkt. No. 55, ¶¶ 57-61; Dkt. No. 57, p. 7). Dr. Warren instead filed this suit, seeking *inter alia* a declaratory judgment that Children's is bound by the IDI policy, and injunctive relief ordering Children's to distribute payments to him according to the IDI policy. (Dkt. No. 1).

## II. <u>Discussion</u>

Broadly speaking, the parties appear to agree in their filings that Dr. Warren's complaint includes two claims: one for breach of contract and one for promissory estoppel.[5] The court also

---

[4] Under the ad hoc policy, the inventors' share of all net revenues would be 27.5 percent. (Dkt. No. 55, ¶ 60).

[5] While Dr. Warren asserts that he suffered multiple injuries due to Children's failure to abide by the IDI policy, and seeks multiple forms of relief, each of these assertions is predicated on the idea that Dr. Warren is entitled to payment as set out in the IDI policy, either because the IDI policy is a valid

considers, but ultimately rejects, a possible negligent misrepresentation claim.

### A. *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "assert[ing] the absence of a genuine issue of material fact and then support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Once the moving party meets that burden, the opposing party must "show that a factual dispute does exist." *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation omitted). "Such a showing 'requires more than the frenzied brandishing of a cardboard sword.'" *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014) (quoting *Calvi v. Knox Cty.*, 470 F.3d 422, 426 (1st Cir. 2006)). "The nonmovant must point to materials of evidentiary quality, . . . and such materials must frame an issue of fact that is more than merely colorable." *Irobe v. U.S. Dep't of Agriculture*, 890 F.3d 371, 377 (1st Cir. 2018) (internal quotations and omitted).

---

contract or because of Children's representations surrounding the second assignment.

When determining whether summary judgment is appropriate, "[t]he court must view the record in the light most favorable to the non-moving party and draw all reasonable inferences in [his] favor." *Carlson*, 899 F.3d at 43.  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (further internal quotation marks omitted).

B.  *Breach of Contract*

Dr. Warren claims that the IDI policy constitutes an implied contract which Children's breached by failing to honor the IDI terms on profits and equity sharing.  Children's contends that the IDI policy is not a contract because IDI could amend it at will, and that, in any event, under the Affiliation Agreement, the Children's policy replaced the IDI policy for intellectual property not licensed by February 20, 2009.  Since the Invention was not licensed until December 2010, the Children's policy applies to Dr. Warren, not the IDI policy.

To establish a breach of contract under Massachusetts law, "a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part

of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016) (citing *Singarella v. City of Boston*, 342 Mass. 385, 387 (1961)).  As the party seeking to enforce the alleged contract, the plaintiff bears the burden of proving a contract existed. *Kauders v. Uber Techs, Inc.*, 486 Mass. 557, 572 (2021); *see Canney v. New England Tel. & Tel. Co.*, 353 Mass. 158, 164 (1967) ("Where the existence of a contract is in issue, the burden is on the plaintiff to show it was made."). Massachusetts law provides that personnel manuals and other employer policies may form the basis of a contract between an employer and an employee. *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996) (citing *Jackson v. Action for Boston Cmty. Dev., Inc.*, 403 Mass. 8, 13 (1988)); *see Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 780 (2001) ("Where an employee signs a personnel policy, negotiates specific terms as a condition of beginning or continuing employment, or where an employer calls special attention to the policy, a finding that the terms of the policy form the basis of an implied contract may be justified.").

There is no "rigid list of prerequisites" for determining if an employment policy is an enforceable contract, but there are several factors that inform the analysis. *O'Brien*, 422 Mass. at 692.  Some factors, when present, suggest the existence of a

contract.  These include negotiation between the employee and the employer about the policy's terms, the employer calling "special attention" to the policy, and the employee manifesting assent to the policy.  *Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 256 (1st Cir. 1992) (citing *Jackson*, 403 Mass. at 14-15).  Factors pointing in the opposite direction include the employer reserving the right to unilaterally modify the policy and a characterization that the policy is meant to provide "guidance" rather than commit the employer to certain conduct.  *Id.*  The overarching questions are whether the employee believed that the policy "constituted the terms or conditions of employment, equally binding on employee and employer" and whether such belief was "reasonable under the circumstances."  *Derrig v. Wal-Mart Stores, Inc.*, 942 F. Supp. 49, 55 (D. Mass. 1996) (describing *O'Brien*, 422 Mass. at 694).

In this case, the parties do not dispute that Dr. Warren earnestly believed that the IDI policy was binding.  His pursuit of a breach of contract claim throughout this litigation makes that clear.  Whether his belief was reasonable is a more difficult question, with factors supporting both sides.  The IDI policy states explicitly that it "is intended to serve as a *guide* for members of the IDI community" and that IDI "retain[s] the discretion to amend [the] Policy from time to time," suggesting

that the policy was not binding.  (Dkt. No. 55-3, Preamble and §
A) (emphasis added).  At the same time, IDI both called special
attention to the policy's terms and induced its employees to
manifest assent insofar as it required all covered employees to
"sign a Participation Agreement in which the [employee] agrees to
comply with this Policy."  (*Id.* at § C).  Ultimately, the court
need not decide this issue, as Dr. Warren's breach of contract
claim suffers from a separate fatal flaw.

Even assuming *arguendo* the IDI policy was a contract, it was
not immutable.  Rather, IDI specifically reserved the right to
amend the policy at its discretion.  (*Id.* at § A).  It did just
that by entering into the Affiliation Agreement, which provided
that any IDI inventions not licensed by the Effective Date would
be subject to Children's revenue policy as of that date.  (Dkt.
No. 55, ¶¶ 29, 31).  The parties agree that the Effective Date was
February 20, 2009.  (*Id.* at ¶ 31; Dkt. No. 57, p. 2).  IDI did not
license the Invention until December 21, 2010.  (Dkt. No. 55, ¶
39).  As such, the Invention was unlicensed as of February 20,
2009, which meant that it became subject to the Children's policy
on that date.  By the time IDI licensed the Invention to Moderna,
it was the Children's policy that controlled the revenue-sharing
terms, not the IDI policy.  As a matter of law, then, Children's
did not breach the IDI policy by failing to distribute revenue

13

Case 1:17-cv-12472-DLC   Document 91   Filed 01/20/23   Page 14 of 24


according to its terms because the IDI policy was no longer the controlling agreement between the parties.

Dr. Warren tries mightily to escape this conclusion. First, he points to the fact that, in February 2011, two senior IDI officials and IDI's outside counsel all pointed him to (and threatened him with) the IDI policy, not the Children's policy. Second, Dr. Warren denies, without any supporting authority, that IDI had the right to unilaterally alter its policy "to abrogate specific promises made to employees." (Dkt. No. 57, p. 15). Finally, Dr. Warren argues that the Children's policy, by its express terms, only applied to Children's employees, not IDI employees. Each of these contentions misses the mark.

Regarding IDI's mistaken reference to the IDI policy in seeking to obtain the plaintiff's signature, lawyers, despite all jokes to the contrary, are human, and sometimes make mistakes. Here, two senior lawyers and an IDI manager all mistakenly informed Dr. Warren that the IDI policy controlled his revenue share in 2011. That mistake was regrettable but it does not in any way alter or abrogate the fact that the Children's policy superseded the IDI policy in February 2009. Regardless of whether their misrepresentations are otherwise legally significant (as discussed below), they do not control when or whether the IDI policy remained effective.

14

As to Dr. Warren's second point, he offers no authority to suggest that IDI did not have the right to unilaterally amend the IDI policy despite its explicit reservation of such right, and the court is aware of no such authority.

Finally, Dr. Warren cites to this provision from the Children's policy for the proposition that the policy does not apply to him:

> This policy provides that Children's Hospital pays royalties only to its own inventors. However, when a Children's Hospital inventor makes an invention with a co-inventor in another academic or non-profit institution, and the institutions agree to market the invention jointly, the Director of Research Administration may authorize an agreement whereby each institution pays all inventors according to the terms of its own intellectual property policy.

(Dkt. No. 55-9, p. 3). Dr. Warren reads this provision to say that because he was never an employee of Children's, the Children's policy commands that he be paid in accordance with his own institution's policy, namely IDI's. But Dr. Warren fails to explain how this provision, which explicitly applies to situations "when a Children's Hospital inventor makes an invention with a co-inventor in another . . . institution," applies here. More significantly, Dr. Warren's contention flies in the face of basic principles of contract interpretation. It is a "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with

15

each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995); *see also* Restatement (Second) of Contracts § 202(5) (Am. Law Inst. 1981) ("Wherever reasonable, the manifestations of intention of the parties to a promise of agreement are interpreted as consistent with each other."). Likewise, "if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1).

The Affiliation Agreement provided that, as of the Effective Date, all unlicensed IDI inventions would become subject to the Children's policy. Under Dr. Warren's reading, applying the Children's policy to IDI inventions (and inventors) would just point right back to the IDI policy, making the entire provision completely frivolous. This clearly was not the parties' intention. Further, maintaining a separate IDI revenue-sharing policy would be contrary to the entire purpose of the Affiliation Agreement, which was to bring IDI and Children's closer together in preparation for a later merger. In short, IDI and Children's can have only intended exactly what they said in the Affiliation Agreement: the Children's policy would apply to IDI inventions and inventors. The court thus rejects Dr. Warren's contrary interpretation.

For the foregoing reasons, the court finds that, as a matter of law, the former unlicensed intellectual property of IDI, including the Invention, became subject to the Children's policy on February 20, 2009 by the terms of the Affiliation Agreement. As such, there can be no breach based on the IDI policy.

### C. *Promissory Estoppel*

Although the IDI policy no longer applied to the Invention as of February 2009, that does not necessarily end this dispute. When Dr. Warren asked IDI about equity in February 2011, three different individuals referred Dr. Warren to the IDI policy rather than the applicable Children's policy. These misrepresentations, which the defendant acknowledges, justify an inquiry into whether Dr. Warren is entitled to compensation in line with the IDI policy under a theory of promissory estoppel.

Through promissory estoppel, alternatively called a reliance-based theory in Massachusetts law, a noncontractual promise can be enforceable in whole or in part by virtue of an offeree's reasonable reliance on it. *Loranger Constr. Corp. v. E.F. Hauserman, Co.*, 376 Mass. 757, 760-61 (1978). The promise is then in every way a "contract" and enforceable pursuant to "traditional contract theory." *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F. Supp. 278, 286 (D. Mass. 1987) (citing *Loranger Constr. Corp.*, 376 Mass. at 761). In other words, "[i]n the absence of a

17

contract in fact, promissory estoppel implies a contract in law where there is proof of an unambiguous promise coupled with detrimental reliance by the promisee." *Malden Police Patrolman's Ass'n v. City of Malden*, 92 Mass. App. Ct. 53, 60 (2017) (citing *R.I. Hosp. Tr. Nat'l Bank v. Varadian*, 419 Mass. 841, 848 (1995)). A promissory estoppel claim can only succeed in the absence of an enforceable contract. *Id.* at 61.

A party seeking to assert promissory estoppel must demonstrate that "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 6 Mass. App. Ct. 152, 154 (1978), *aff'd*, 376 Mass. 757 (1978). Additionally, the promisee's reliance on the promise must be reasonable. *See R.I. Hosp. Tr. Nat'l Bank*, 419 Mass. at 850.

In considering Dr. Warren's breach of contract claim, the court assumed without deciding that the IDI policy (later displaced by the Children's policy) was an enforceable contract. The court will now give Dr. Warren the benefit of the opposite assumption in considering promissory estoppel. Even so, any promissory estoppel

claim fails because Dr. Warren cannot prove that IDI's misrepresentations induced him to act.

A well-settled rule in the field of contracts is that "performance of a pre-existing legal duty that is neither doubtful nor subject to honest and reasonable dispute is not valid consideration where the duty is owed to the promisor." *In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980); *accord* Restatement (Second) of Contracts § 73; *see also Johnny's Oil Co. v. Eldayha*, 82 Mass. App. Ct. 705, 714 (2012) ("Detrimental reliance on an offer or a promise . . . is a substitute for consideration."). "The policy underlying this rule is to discourage parties under such a duty from using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *In re Lloyd, Carr & Co.*, 617 F.2d at 890. It stands to reason that a promise cannot induce a promisee to act if the promisee already has a clear legal duty to act.

In this case, Dr. Warren had a preexisting legal duty to assign his rights in the Invention to IDI. The "general rule [is] that rights in an invention belong to the inventor." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 785 (2011) (citations omitted). When, however, an individual is "employed to make an invention, . . . [he] is bound

19

to assign to his employer any patent obtained."  *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 (1933); *accord Standard Parts Co. v. Peck*, 264 U.S. 52, 59-60 (1924); *Nat'l Dev. Co. v. Gray*, 316 Mass. 240, 247 (1944); *see Banks v. Unisys Corp.*, 228 F.3d 1357 (Fed. Cir. 2000) ("[W]here an employee is hired to invent something or solve a particular problem, the property of the invention related to this effort may belong to the employer."). IDI hired Dr. Warren to work as a postdoctoral research fellow in the Rossi Lab.  Dr. Warren developed the Invention in an IDI lab, while being paid by IDI, doing exactly the type of work for which IDI hired him.  Per the precedent cited above, these circumstances strongly suggest that Dr. Warren had a common-law duty to assign the Invention to IDI.

And there is more.  Not content to rely on the common law, IDI adopted its own policy on the subject.  No one disputes that this policy was in force when Dr. Warren joined IDI in 2007.  This policy explicitly required Dr. Warren, as an "Inventor," to among other things assign his rights in the Invention to IDI.[6]  (Dkt. No. 55-3, § F).  Under Massachusetts law, such policies are generally valid and binding upon employees, even if the employees

---

[6] Drs. Warren and Rossi did not formally disclose their invention to IDI until May 2010, by which time the Children's policy had supplanted the IDI policy. Because the Children's policy imposes substantially identical obligations on inventors, *see* (Dkt. No. 55-9, p. 2), the result is the same regardless of which policy applies.

are not specifically aware of them.  *See Greene v. Ablon*, Civil Action No. 09-10937-DJC, 2012 WL 4104792, at \*14-\*15 (D. Mass. Sept. 17, 2012); *Grocela v. Gen. Hosp. Corp.*, Civil Action No. 11-991-BLS1, 2012 WL 3205616, at \*4-\*5 (Mass. Super. Ct. July 18, 2012).  As such, separate and apart from the common law, Dr. Warren had a legal duty to assign the Invention to IDI pursuant to the IDI policy.[7]  This remained true even after he left IDI.  *See E.I. Du Pont de Nemours & Co.* v. *Okuley*, 344 F.3d 578, 585 (6th Cir. 2003) (obligation to assign invention to employer survives "until fulfilled," even after employee's resignation).

In light of the foregoing, the court finds that Dr. Warren had a preexisting legal duty to assign the Invention to IDI when Dietz and others mistakenly referred him to the IDI policy.  As such, Dr. Warren was not thereby legally induced to execute the subsequent assignments, and there can accordingly be no promissory estoppel.

D.  *Negligent Misrepresentation*

In its previous order denying the motion for summary judgment (Dkt. No. 70), the court contemplated (without so specifying) that this case could survive summary judgment to the extent that the

---

[7] Children's separately argues that Dr. Warren incurred a legal duty to execute the subsequent assignments by executing the first assignment.  The court acknowledges but does not reach this argument.

complaint sets forth a claim for negligent misrepresentation based on the misrepresentations IDI officials made to Dr. Warren in 2011. On further reflection, though, the court now finds that any such claim fails for substantially the same reasons discussed above.

In order to recover for negligent misrepresentation, the plaintiff must prove that the defendant: (1) in the course of his or her business, (2) supplied false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and that the defendant (6) failed to exercise reasonable care or competence in obtaining or communicating the information. *DeLuca* v. *Jordan*, 57 Mass. App. Ct. 126, 136-37 (2003) (quoting Restatement (Second) of Torts § 552(1) (Am. Law Inst. 1977)).

Here, Dr. Warren cannot prove that he suffered any pecuniary loss or that he justifiably relied on the misrepresentations. Dr. Warren's theories of loss in this case are based on Children's compensating him less generously than the IDI policy provides, but the IDI policy no longer applies. In fact, Children's has heretofore provided Dr. Warren *more* generous compensation than what is set out in the controlling Children's policy. Similarly, Dr. Warren cannot have relied on the misrepresentations as a matter of law since he already had a legal duty to assign the Invention

to IDI.   These deficiencies are fatal to any negligent misrepresentation claim.

### E.  *Motion to Amend*

Where, as here, a defendant has filed a responsive pleading or a motion for summary judgment, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires." *Id.*  The decision to grant or deny such a motion is within the discretion of the district court. *See Steir v. Girl Scouts of the USA*, 383 F.3d 7, 14 (1st Cir. 2004).  The court will deny a motion to amend a complaint where the proposed amendment would be futile, "mean[ing] that the complaint, as amended, would fail to state a claim upon which relief could be granted." *Rife v. One West Bank, F.S.B.*, 873 F.3d 17, 21 (1st Cir. 2017) (internal quotation omitted); *but see Resolution Tr. Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (where motion to amend is not filed until after defendant moves for summary judgment, plaintiff is "required to demonstrate . . . that the proposed amendments [are] supported by substantial and convincing evidence") (internal quotation omitted).

Dr. Warren seeks to amend his complaint to add a conversion claim "based on [his] right to ownership of his share of the Moderna equity at lock-up expiry under the IDI Policy, the

23

defendant's willful interference with [Dr. Warren's] taking possession of stock over [Dr. Warren's] objection and the economic harm he suffered as a result." (Dkt. No. 73, ¶ 14). As set out in the proposed amended complaint, the new count is specifically based on Children's acting contrary to the terms of the IDI policy. (Dkt. No. 72-1, ¶ 70). As discussed above in detail, however, the terms of the IDI policy do not govern any revenue or equity distributions between Children's and Dr. Warren. As such, the proposed conversion claim, based as it is on the IDI policy, fails to state a claim for which relief can be granted, s*ee Rife*, 873 F.3d at 21, and it is certainly not "supported by substantial and convincing evidence." *See Gold*, 30 F.3d at 253. The proposed amendment is therefore futile.

## III.  <u>Conclusion</u>

For the foregoing reasons, the court VACATES its previous order denying summary judgment (Dkt. No. 70), ALLOWS Children's motion for summary judgment (Dkt. No. 51), and DENIES Dr. Warren's motion to amend (Dkt. No. 72).


<u>So Ordered</u>.                          /s/ Donald L. Cabell
                                   DONALD L. CABELL, U.S.M.J.

DATED:  January 20, 2023

24